19-1135

# U.S. Court of Appeals for the Federal Circuit

SYNERON MEDICAL LTD.,

Plaintiff-Appellant,

v.

INVASIX, INC. and INMODE MD LTD.,

Defendants-Appellees,

*Appeal from the U.S. District Court for the Central District of California in case no. 8:16-cv-00143-DOC-KES, Judge David O. Carter*

## CORRECTED OPENING BRIEF OF PLAINTIFF-APPELLANT

January 28, 2019

*/s/ John J. Edmonds*
John J. Edmonds
COLLINS, EDMONDS, &
SCHLATHER, PLLC
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (213) 973-7846
Facsimile: (213) 835-6996

*Counsel for Plaintiff-Appellant,*
*SYNERON MEDICAL LTD.*

## CERTIFICATE OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rule 47.4, the undersigned counsel for Plaintiff-Appellant hereby certifies that:

1. The full names of every party or amicus represented by me is:

   Syneron Medical Ltd.

2. The names of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:

   None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Syneron Medical Ltd. is wholly owned and privately held by Apax IX GP Co. Ltd.

4. The names of all law firms and the partners or associates that appeared for any of the parties represented by me in the District Court or are expected to appear in this court are:

   COLLINS, EDMONDS & SCHLATHER, PLLC
   John J. Edmonds
   Stephen F. Schlather
   Shea N. Palavan
   Eric R. Carr

   Previously of COLLINS, EDMONDS & SCHLATHER, PLLC
   Brandon G. Moore

5. The title and number of any cases know to counsel to be pending in this or

any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

None.

Dated: January 28, 2019

*<u>/s/ John J. Edmonds</u>*
John J. Edmonds

# TABLE OF CONTENTS

**CERTIFICATE OF INTEREST** .......... ii

**TABLE OF CONTENTS** .......... iv

**TABLE OF AUTHORITIES** .......... vi

**Cases** .......... vi

**Rules** .......... x

**Statutes** .......... x

**Other Authorities** .......... x

**STATEMENT OF RELATED CASES** .......... xi

**I. STATEMENT OF JURISDICTION** .......... 1

**II. STATEMENT OF THE ISSUES** .......... 2

**III. STATEMENT OF THE CASE AND FACTS** .......... 4

**A. Preliminary Statement** .......... 4

**B. Patents-In-Suit** .......... 4

1. TransPharma Patents .......... 4

2. Syneron Patents .......... 5

**C. Proceedings Below** .......... 5

1. Special Master Appointment .......... 5

2. Special Master's R&Rs .......... 5

3. Dist.Ct. Summary Adoption of R&Rs .......... 7

**IV. SUMMARY OF THE ARGUMENT** .......... 8

**V. ARGUMENT** .......... 10

**A. Standards of Review; Legal Principles ..... 10**

1. Review of R&Rs adopted by District Court ..... 10
2. Claim Construction ..... 11
3. Summary Judgment of Invalidity ..... 12
4. Daubert and Strike Motions ..... 13

**B. The Dist.Ct. Erred In Construing "applicator tip," Including Erroneously Construing The Erroneously Imposed Sub-Term "attachment." ..... 14**

**C. The Dist.Ct. Erred In Granting Summary Judgment Of Invalidity, ..... 18**

1. Invasix's Insufficient Invalidity Record Evidence ..... 19
2. Erroneous Anticipation Findings/Conclusions ..... 28
3. Erroneous Obviousness Findings/Conclusions ..... 52

**D. The Dist.Ct. Erred In Granting Invasix's Daubert Motion On Syneron's Damages Expert ..... 55**

1. Erroneous exclusion of Syneron's damages expert's report and testimony ..... 55
2. Report conducts a proper, reliable royalty analysis ..... 58
3. Erroneous findings/conclusions of Dist.Ct. ..... 59

**VI. CONCLUSION AND PRAYER FOR RELIEF ..... 72**

**ADDENDUM ..... 74**

**CERTIFICATE OF SERVICE ..... A**

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME, TYPEFACE, AND TYPE STYLE REQUIREMENTS/LIMITATIONS ..... B**

# TABLE OF AUTHORITIES

## CASES

*Akamai Techs, Inc. v. Cable & Wireless Internet Servs., Inc.*,
344 F.3d 1186 (Fed. Cir. 2003) ........................................................................13

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
811 F.3d 1334 (Fed. Cir. 2016) ........................................................................11

*Allergan, Inc. v. Athena Cosmetics, Inc.*,
738 F.3d 1350 (Fed. Cir. 2013) ........................................................................14

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ................................ 12, 43

*Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Human Servs.*,
569 F.3d 1367 (Fed. Cir. 2009) .................................................................. 56, 57

*Artrip v. Ball Corp.*,
735 F. App'x 708 (Fed. Cir. 2018) ...................................................................10

*AstraZeneca v. Apotex*,
782 F.3d 1324, 1338 (Fed. Cir. 2015) ........................................................ 61, 64

*Besig v. United States*,
208 F.2d 142 (9th Cir. 1953) ............................................................................45

*B-K Lighting, Inc. v. Fresno Valves & Castings, Inc.*,
375 F.Appx. 28 (Fed. Cir. 2010) ......................................................................40

*Cave Consulting Grp., LLC v. OptumInsight, Inc.*,
No. 5:11-CV-00469-EJD, 2015 WL 13413389 (N.D. Cal. Feb. 20, 2015) .........56

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .........................................................................................12

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) ..........................................................................56

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) ........................................................................65

*Connell v. Sears, Roebuck & Co.*,
722 F.2d 1542 (Fed. Cir. 1983) .................................................................. 28, 29

*Cook Biotech Inc. v. Acell, Inc.*,
460 F.3d 1365 (Fed. Cir. 2006) ........................................................................12

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .................................. 4, 7, 13, 55, 56, 57, 59, 60, 65, 66, 68

*Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*,
909 F.3d 398 (Fed. Cir. 2018) ..........................................................................12

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018) ........................................................................65

*F.T.C. v. BurnLounge, Inc.*,
753 F.3d 878 (9th Cir. 2014) ..................................................................... 14, 56

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) ............................................................60
*Fresenius USA, Inc. v. Baxter Int'l Inc.*,
582 F.3d 1288 (Fed. Cir. 2009) ............................................................50
*Garretson v. Clark*,
111 U.S. 120, 4 S.Ct. 291, 28 L.Ed. 371 (1884) ....................................60
*Georgia–Pacific v. U.S. Plywood*,
318 F.Supp. 1116 (S.D.N.Y. 1970) ............................ 57, 58, 63, 66, 67
*Gottlieb v. Barry*,
43 F.3d 474 (10th Cir.1994) ..................................................................10
*Greater Yellowstone Coal. v. Lewis*,
628 F.3d 1143 (9th Cir. 2010) ...............................................................12
*Honeywell Intern., Inc. v. Hamilton Sundstrand Corp.*,
378 F.Supp.2d 459 (D. Del. 2005) .........................................................71
*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
87 F. Supp. 3d 928 (N.D. Cal. 2015)......................................................56
*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ............................................................13
*In re Gabapentin Patent Litig.*,
503 F.3d 1254 (Fed. Cir. 2007) ............................................................40
*Kumho Tire Company Ltd. v. Carmichael*,
526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ........................56
*Labyrinth Optical Techs. LLC v. Alcatel-Lucent USA, Inc.*,
No. SA12-CV-0759-AGMLGX, 2015 WL 12720323 (C.D. Cal. Mar. 10, 2015)
............................................................................................ 56, 72
*Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*,
322 F.3d 1335 (Fed. Cir. 2003) ............................................................12
*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ............................... 57, 58, 62, 63, 69
*Lupo v. Colvin*, No. 8:14-CV-1791, 2015 WL 12844409 (M.D. Fla. Sept. 23, 2015)
..................................................................................................46
*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996) ................................................................................6
*Martek Biosciences Corp. v. Nutri-nova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009) ............................................................16
*Mass Engineered Design, Inc. v. Planar Sys., Inc.*,
No. 3:16-CV-1510-SI, 2017 WL 2642277 (D. Or. June 19, 2017) ..................56
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..............................................................................12
*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
248 F.App'x 199 (Fed. Cir. 2007)...........................................................14

*Mentor Graphics v. EVE-USA*,
870 F.3d 1298 (Fed. Cir. 2017) .......... 60
*Metso Minerals, Inc. v. Powerscreen Int'l Distribution, Ltd.*,
526 F.App’x 988 (Fed. Cir. 2013) .......... 13
*Microsoft Corp. v. Biscotti, Inc.*,
878 F.3d 1052 (Fed. Cir. 2017) .......... 28, 29
*Net MoneylN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed.Cir.2008) .......... 28, 29
*Nickson Indus., Inc. v. Rol Mfg. Co., Ltd.*,
847 F.2d 795 (Fed. Cir. 1988) .......... 57
*NLRB v. Monfort, Inc.*,
29 F.3d 525 (10th Cir.1994) .......... 10
*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) .......... 11
*Oracle Am., Inc. v. Google Inc.*,
798 F.Supp. 2d 1111 (N.D. Cal. 2011) .......... 71
*Oracle Am., Inc. v. Google LLC*,
886 F.3d 1179 (Fed. Cir. 2018) .......... 10
*OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*,
701 F.3d 698 (Fed. Cir. 2012) .......... 13
*Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*,
575 F.2d 1152, 196 USPQ 726 (6th Cir. 1978) .......... 68
*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .......... 11
*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
894 F.3d 1015 (9th Cir. 2018) .......... 14
*Polara Eng'g Inc v. Campbell Co.*,
894 F.3d 1339 (Fed. Cir. 2018) .......... 13
*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008) .......... 13
*Reoforce, Inc. v. U.S.*,
138 S. Ct. 517, 199 L. Ed. 2d 388 (2017) .......... 11
*Reoforce, Inc. v. U.S.*,
853 F.3d 1249, 1265 (Fed. Cir. 2017), *cert. denied,* 138 S. Ct. 517, 199 L. Ed. 2d 388 (2017) .......... 11
*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) .......... 57
*Sealant Sys. Int’l, Inc. v. TEK Glob. S.R.L.*,
616 F.App’x 987 (Fed. Cir. 2015) .......... 58

*Sealant Sys. Int'l, Inc. v. TEK Glob. S.R.L.*,
No. 5:11-CV-00774-PSG, 2014 WL 1008183 (N.D. Cal. Mar. 7, 2014), *rev'd on o.g.*, 616 F.App'x 987 (Fed. Cir. 2015)....................58
*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
289 U.S. 689 (1933)....................58
*Soule v. City of Edmonds*,
736 F.App'x 182 (9th Cir. 2018)....................43
*Soverain Software LLC v. Newegg Inc.*,
705 F.3d 1333 (Fed. Cir. 2013), *amended on reh'g*, 728 F.3d 1332 (Fed. Cir. 2013)....................45
*Soverain Software v. Newegg*,
728 F.3d 1332 (Fed. Cir. 2013)....................45
*StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc.*,
No. 8:13-CV-2240-T-33MAP, 2015 WL 3824170 (M.D. Fla. June 19, 2015)...58
*Sweat v. Berryhill*,
No. 5:17-CV-52, 2018 WL 4043192 (S.D. Ga. Aug. 24, 2018)....................46
*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015)....................11
*TF3 Ltd. v. Tre Milano, LLC*,
894 F.3d 1366 (Fed. Cir. 2018).................... 28, 29
*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)....................11
*Tokai Corp. v. Easton Enterprises, Inc.*,
632 F.3d 1358 (Fed. Cir. 2011)....................13
*U.S. Energy Corp. v. Nukem, Inc.*,
400 F.3d 822 (10th Cir. 2005)....................10
*U.S. Ethernet Innovations, LLC v. Acer, Inc.*,
646 F.App'x 929 (Fed. Cir. 2016)....................13
*U.S. v. Silverman,*
861 F.2d 571 (9th Cir.1988)....................10
*VirnetX, Inc. v. Cisco Sys.*, Inc.,
767 F.3d 1308 (Fed. Cir. 2014)....................60
*Whitserve, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012)....................58
*Wi-LAN USA, Inc. v. Ericsson, Inc.*,
675 F.App'x 984 (Fed. Cir. 2017)....................43
*Wordtech Sys. v. Integrated Networks*,
609 F.3d 1308 (Fed. Cir. 2010)....................57
*Wyeth & Cordis Corp. v. Abbott Labs*,
720 F.3d 1380 (Fed. Cir. 2013).................... 13, 49

**RULES**

Fed. Cir. R. 4 ........ 1
Fed. R. App. P. 4 ........ 1
Fed. R. Civ. P. 52 ........ 10
Fed. R. Civ. P. 53 ........ 10
Fed. R. Civ. P. 56 ........ 12
Fed. R. Evid. 702 ........ 14, 55, 56, 57, 59, 60, 65, 66

**STATUTES**

28 U.S.C. § 1295 ........ 1
28 U.S.C. § 1331 ........ 1
28 U.S.C. § 1338 ........ 1
28 U.S.C. § 1400 ........ 1
28 U.S.C. § 2107 ........ 1
35 U.S.C. § 102 ........ 28
35 U.S.C. § 282 ........ 13

**OTHER AUTHORITIES**

Dictionary.com,
definition of "attached," located at https://www.dictionary.com/browse/attached ........ 17
Dictionary.com,
definition of "attachment," located at https://www.dictionary.com/browse/attachment ........ 17
Dictionary.com,
definition of "tip,": located at https://www.dictionary.com/browse/tip ........ 15, 16
Merriam-Webster,
definition of "attached," located at https://www.merriam-webster.com/dictionary/attached ........ 17
Merriam-Webster,
definition of "attachment," located at https://www.merriam-webster.com/dictionary/attachment ........ 17
Oxford English Dictionary,
definition of "tip," located at https://en.oxforddictionaries.com/definition/tip ........ 15, 16

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Plaintiff-Appellant, Syneron Medical Ltd. ("Syneron"), by and through its counsel, hereby states it is unaware of, and knows of, no other case pending in this Court or in any other court, including the Federal District Court for the Central District of California below (the "Dist.Ct."), that may directly affect, or be directly affected by, the Court's decision in this appeal.

## I. Statement of Jurisdiction

Syneron brings this Appeal in accordance with this Court's Rules, the Federal Rules of Appellate Procedure, and the Federal Statutes, including 28 U.S.C. §1295(a)(1). *See* Fed.R.App.P. 4(a)(4)(B)(i). This action arose under the U.S. Patent Laws, including pursuant to, 28 U.S.C. §§1331, 1338(a), and 1400(b).

Syneron takes this appeal from the final judgment[1] entered in the case below based upon the Dist.Ct.'s clearly erroneous Order[2] adopting the Special Master's Reports and Recommendations ("R&Rs")[3] construing the term "applicator tip," granting summary judgment of invalidity, and excluding Syneron's damages expert's opinions, amounting to clear error and an abuse of discretion.

This Order is final because an appealable Order was entered (*see* fn.2) followed by entry of final judgment based on the Order dismissing Syneron's claims (*see* fn.1). Syneron timely filed its Appeal[4] within thirty (30) days of entry of the final judgment in accordance with 28 U.S.C. §2107, Fed.R.App.P. 4(a), and Fed.Cir.R. 4.

---

[1] *See* Judgment of invalidity and dismissal of claims. Appx00001-00004.
[2] Appx00005-00008.
[3] *See* Special Master R&R on Claim Construction (Appx00009-00045); R&R on motions to strike/exclude damages experts (Appx00046-00081); R&R on Syneron's Objections to the Tentative Summary judgment R&R (Appx00082-00085); and Summary judgment R&R (Appx00086-00122).
[4] Appx38413-38417.

## II. STATEMENT OF THE ISSUES

1. Whether the Dist.Ct. erred, including via clear error and an abuse of discretion,[5] in Order accepting and/or adopting the Special Master's R&Rs (*see* fn.3).

2. Whether the Special Master's R&Rs, as adopted by the Dist.Ct.,[6] erred in construing "applicator tip" in the '654 and '036 patents, including whether the Dist.Ct. erred in further construing its "attachment" requirement.

3. Whether the Dist.Ct. erred in granting summary judgment of invalidity based upon anticipation and obviousness, including, without limitation, (1) whether the Dist.Ct. erred in finding Invasix met a threshold burden or any other burden on summary judgment; (2) whether the Dist.Ct. erred in relying upon Invasix's conclusory expert opinions, including unsupported, conclusory opinions contrary to the actual patent disclosures; (3) whether the Dist.Ct. erred in failing to accept or consider Syneron's factual summary judgment evidence and weigh inferences in Syneron's favor; and/or (4) whether, at a minimum, genuine issues of material fact should have precluded summary judgment.

---

[5] All error alleged herein, individually and/or collectively, amounts to clear errors of judgment in weighing relevant factors, errors of law and/or clearly erroneous factual findings, which, individually and/or collectively, amounts to an abuse of discretion. For ease of reading, "erred" and "error" refers to the foregoing.

[6] For ease of reference, references to the Dist.Ct. or its holdings, findings, and/or conclusions refer to the Special Master and its corresponding holdings, findings, and/or conclusions and the Dist.Ct.'s acceptance and adoption thereof, which shall collectively be referred to herein as the "Dist.Ct."

4. Whether the Dist.Ct. erred in excluding the report and opinions of Syneron's damages expert, including whether the Dist.Ct. erred in finding an improper royalty base; erred in finding a violation of the entire market value rule ("EMVR"); erred in finding there to be a "de facto" lost profits analysis; erred in failing to allow proper application of the book of wisdom; and/or erred in finding improprieties in the hypothetical royalty negotiation, including relative to the date of, patents in, and/or parties at, the hypothetical royalty negotiation, and further whether the Dist.Ct. erred in excluding the entirety of Syneron's damages expert's opinions.

5. Whether the Judgment (*see* fn.1) based upon the above-noted Order should be reversed upon reversal of said Order.

## III. Statement of the Case and Facts

### A. Preliminary Statement

Syneron is a world leader in aesthetic dermal treatments, including radiofrequency ("RF") treatments. Syneron claimed Invasix's infringement of U.S. Patent No. ("USP") 6,148,232 (Appx00173-00191; "'232 patent")–claims 29- 30; U.S. Patent No. 6,615,079 (Appx00192-00210; "'079 patent" –claims 10,11,18, and 25; USP 8,496,654 (Appx00211-00223; the "'654 patent")–claims 1-4,7-14,16-17,19-21,23-25, and 27-30; and USP 9,108,036 (Appx00224-00237; the "'036 patent")–claims 1-7,10-18,20-22, and 24-28 (collectively, "Asserted Claims" of the "Patents-in-Suit"). This appeal stems from the Dist.Ct.'s erroneous acceptance and adoption of the Special Master's R&Rs on the parties' pretrial motions concerning claim construction, summary judgment on validity, and *Daubert* and strike motions regarding damages experts. *See* fn.3. The Special Master, whose R&Rs were summarily rubber-stamped. (Appx00005-00008), erroneously construed "applicator tip," erroneously concluded the Asserted Claims were invalid, and erroneously excluded the opinions of Syneron's damages expert. The same errors in the R&Rs are imputed to the Dist.Ct.

### B. Patents-In-Suit

#### 1. *TransPharma Patents*

Syneron obtained the '232 and '079 patents (collectively, the "TransPharma Patents") from TransPharma. The '079 patent is a divisional of the '232 patent, and

they share a common specification and effective filing date of November 9, 1998.

*2. Syneron Patents*

The '654 and '036 patents (collectively, the "Syneron Patents") are both continuations in a line from USP 8,357,150 and share a common specification and effective filing date of date of June 17, 2009.

**C. Proceedings Below**

Syneron alleged Invasix infringed the Asserted Claims (Appx00238-00274), and Invasix Answered (Appx00275-00292), asserting defenses of, *inter alia*, invalidity against each of the Asserted Claims.

*1. Special Master Appointment*

Following the close of discovery, the parties filed various pretrial motions.[7] The Dist.Ct. entered a Minute Order recommending the parties meet and confer on appointment of a Special Master. Appx00159 at Doc. 201, and Dist.Ct. entered an Order appointing a Special Master to hear pretrial motions, as well as setting a briefing schedule for claim construction for six disputed terms. *See id*. at Docs. 204 & 215;Appx36244-36254;Appx31296-31302;Appx00327-00340.

*2. Special Master's R&Rs*

*i. Claim Construction*

Following briefing and hearings, the Special Master issued a final R&R on

[7] Because no claim construction briefing process was set in the District Court, Syneron briefed pertinent claim construction arguments in its MSJ.

claim construction, construing the six terms. *See* Appx00009-00045. Neither party has appealed these constructions, however, as noted below, one error by the Dist.Ct. was concluding USP 6,708,060 to Avrahami ("Avrahami or "'060");Appx01985-02012) anticipates '654 claim 24 and '036 claim 21 despite there being no evidence, or even judicial discussion, findings, or conclusions, for the "processor…" MPF limitations as construed being met by Avrahami. Further, as noted below, although neither party requested construction of the term "applicator tip," the Special Master *sua sponte* erroneously construed that term in its MSJ R&R which was erroneously adopted.

*ii. Summary Judgment*

The Special Master held its hearing on the parties' motions for summary judgment ("MSJs"). Appx36882-37143;Appx37018-37021. Thereafter, the Special Master issued its MSJ R&R. Appx00086-00122. This R&R, which the Dist.Ct. erroneously adopted, erroneously *sua sponte*[8] construed "applicator tip" (Appx00094-00095), as noted above; erroneously found Avrahami '060 (Appx01985-02012) anticipates '654 claims 1-4,7-10,13-14,16-17,19-21,23-25,27, and 30 and '036 claims 1-7,10-13,16-18,20-22, and 24-28; erroneously found Avrahami, in view of the knowledge of a person of ordinary skill in the art ("POSITA"), render obvious '654 claims 11,12,28, and 29 and '036 claims 14-15;

[8] *See* Appx00086-00122;Appx36907 at 18:23-25; *see also* Appx07656-07659 (noting all disputed terms and the parties' proposed constructions);Appx32897-32903 (noting the six terms disputed during *Markman* proceedings).

erroneously found USP 6,022,316 to Eppstein ("Eppstein" or "'316";Appx01907-01922) anticipates '232 claim 29 and '079 claims 10-11, and 18; and erroneously found Eppstein, in view of the knowledge of a POSITA, renders obvious '232 claim 30 and '079 claim 25. *See* Appx00092-00116;Appx00005-00006.

*iii. Damages Experts*

The Special Master held its hearing[9] on the *Daubert* motions and motions to strike. *See* Appx00047. Thereafter, the Special Master issued an R&R erroneously recommending Syneron's damages expert's opinions be excluded (Appx00046-00081), which the Dist.Ct. erroneously adopted (Appx00005-00006).

*3. Dist.Ct. Summary Adoption of R&Rs*

The parties timely filed their objections (and responses t) to the R&Rs (Appx37224-37234;Appx37660-37690;Appx37251-37263;Appx37264-37270;Appx37235-37250), and the Dist.Ct. held a hearing on same. *See* Appx38038-38403. Shortly after the hearing, the Dist.Ct. entered its Order accepting and adopting the R&Rs wholesale. Appx00005-00006.

Thereafter, the parties' filed a joint stipulation for entry of final judgment of invalidity and non-infringement, which preserved Syneron's right to appeal. Appx38404-38412. Consistent with its Order, and parties' stipulation, the Dist.Ct. entered final judgment. Appx00001-00004. Syneron timely appealed. Appx38413-38417.

[9] No hearing transcript, but Syneron's hearing slides are at Appx36822-36881.

## IV. SUMMARY OF THE ARGUMENT

The Dist.Ct. (in adopting the R&Rs), erroneously construed "applicator tip. On summary judgment, the Dist.Ct. erroneously held the Asserted Claims of the Transpharma Patents to be anticipated or obvious over Eppstein '316. This was erroneous, including because Eppstein does not disclose "a power source, which is adapted to apply, between two or more of the plurality of electrodes, an alternating electric current so as to cause ablation of the stratum corneum" as required by all asserted '232 claims, nor does it disclose "applying electrical energy to the plurality of the electrodes so as to induce an electrical current to flow through the stratum corneum, causing ablation of narrow channels through the stratum corneum" as required by all asserted '079 claims. Rather, the only ablation disclosed by Eppstein is thermal ablation, which is very different.

Regarding Eppstein, the R&R and Order erred in holding Eppstein discloses, in a single embodiment, each and every element of each and every Asserted Claim of the TransPharma Patents. Rather, the R&R and Order erroneously misapprehend and conflated the teachings of Eppstein(Appx1902-1922) and USP application 08/776,863(Appx00627-00739), now USP 5,885,211(Appx00740-00801; "Eppstein," "'863 or "'211") incorporated therein. Among other errors, the R&R and Order erroneously improperly conflate and combine multiple disclosed embodiments within Avrahami, none of which, individually or collectively, disclose each and every limitation.

Further, Dist.Ct. erroneously struck and excluded the opinions and testimony of Syneron's damages expert, including due to fundamental errors by the Dist.Ct. in mis-construing Syneron's damages model and the proper formulation of royalty damages.

The Special Master, and, thus, Dist.Ct. further erred in granting summary judgment of invalidity including, without limitation, in (1) finding Invasix met a threshold burden, or any other burden, on summary judgment; (2) relying upon conclusory alleged evidence from Invasix, including evidence at odds with the actual disclosures of the alleged prior art references; (3) failing to failing to accept or consider Syneron's factual summary judgment evidence and weigh all factual inferences in Syneron's favor; and (4) granting summary judgment where, at a minimum, genuine issues of material fact preclude summary judgment.

The damages expert R&R (*see* fn.3), which the Dist.Ct. erroneously accepted and adopted in its Order (*see* fn.2), erred in finding an improper royalty base; erred in finding Syneron's damages expert violated the entire market value ("EMV") rule; erred in finding there to be a "de facto" lost profits analysis; erred in finding improprieties in the HRN, including relative to the date of, patents in, and/or parties at, the hypothetical royalty negotiation ("HRN"); and erred in failing to allow proper application of the "Book of Wisdom". *See* Appx00046-00081;Appx00005-00008.

Thus, the Dist.Ct.'s Order (fn.2) and Judgment (fn.1), based on the underlying erroneous Special Master R&Rs (fn.3), should be reversed and remanded for further

proceedings on the merits in view of the proper legal principles and non-erroneous view of the facts.

# V. ARGUMENT

## A. Standards of Review; Legal Principles

### *1. Review of R&Rs adopted by District Court*

A Dist.Ct. reviews findings of fact and legal conclusions within a master's report *de novo*. Fed.R.Civ.P. 53(f)(1) & 53(f)(3)-(4); *see Gottlieb v. Barry,* 43 F.3d 474, 486 (10thCir.1994); *U.S. Energy v. Nukem*, 400 F.3d 822, 830 (10thCir.2005).

Where the Dist.Ct. accepts and adopts the master's R&Rs, they become those of the district court,[10] and the standard of review applicable to the district court applies. *See* Fed.R.Civ.P. 52(a)(4); *Nukem*, 400 F.3d at 830 (*citing NLRB v. Monfort,* 29 F.3d 525, 528 (10thCir.1994)). Thus, conclusions of law are reviewed *de novo* and findings are reviewed under the clearly erroneous standard, unless a different standard has been found to apply, such as those noted below. Fed.R.Civ.P. 52(a)(6); *see Oracle v. Google*, 886 F.3d 1179, 1192 (Fed.Cir.2018).[11] Under the *de novo* standard, no deference is given to the underlying ruling, with the matter considered anew. *See Artrip v. Ball*, 735 F.App'x 708, 711 (Fed.Cir.2018); *U.S. v. Silverman,* 861 F.2d 571, 576 (9thCir.1988). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with

[10] *See* fn.7.
[11] *See* fn.5.

the definite and firm conviction that a mistake has been committed." *Reoforce v. U.S.*, 853 F.3d 1249, 1265 (Fed.Cir.2017), *cert. denied,* 138 S.Ct. 517 (2017).

*2. Claim Construction*

The proper construction" of a patent, and its terms, is a question of law, which this Court reviews *de novo*, with any underlying findings about extra-patent understandings or other facts outside the patent documents calling for clear-error review. *Teva Pharm. v. Sandoz*, 789 F.3d 1335, 1339 (Fed.Cir.2015); *Akzo Nobel Coatings v. Dow Chem.,* 811 F.3d 1334, 1339 (Fed.Cir.2016). However, when, as here, "the district court reviews only evidence intrinsic to the patent…the judge's determination will amount solely to a determination of law." *Id.*

This Court's *Phillips* opinion provides the basic legal framework for construing claims in view of a POSITA at the time of invention considering intrinsic and relevant extrinsic evidence. *Phillips v. AWH*, 415 F.3d 1303 (Fed.Cir.2005) (*en banc*). There is a "heavy presumption…terms carry…ordinary and custom meaning[s] unless the patentee" expressly gave different meanings. *See id.*; *Omega Eng'g v. Raytek*, 334 F.3d 1314 (Fed.Cir.2003). Indeed, the intrinsic evidence could compel departure from plain meaning in only two narrow instances of lexicography and disavowal. *Thorner v. Sony Computer Entm't Am.*, 669 F.3d 1362 (Fed.Cir.2012). Other pertinent legal principles are noted below.

### 3. *Summary Judgment of Invalidity*

#### i. *Summary Judgment*

This Court generally reviews grants of MSJs under regional circuit law, here, the Ninth. *Enplas Display Device v. Seoul Semiconductor*, 909 F.3d 398, 405 (Fed.Cir.2018). Thus, this Court reviews grants of MSJs of invalidity *de novo*, even when stemming from the district court's adopting a special master's report. *Id.*; *see Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1148 (9thCir.2010); *Lacks Indus. v. McKechnie Vehicle Components*, 322 F.3d 1335, 1341 (Fed.Cir.2003). Further, although a grant of MSJ may include underlying factual determinations, such material determinations are reviewed *de novo*. *See Cook Biotech v. Acell*, 460 F.3d 1365, 1373 (Fed.Cir.2006).

Summary judgment is only proper where "…there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (*citing* Fed.R.Civ.P. 56). In reviewing this MSJ, this Court views the facts, and makes all reasonable factual inferences, in the light most favorable to the losing party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

"An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case" (*id.* at 248), and "genuine" if "the record taken as a whole could...lead a rational trier of fact to find for the nonmoving party" (*Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Broad, conclusory statements offered by experts are not evidence

and are not sufficient to carry one's summary judgment burden. *See, e.g., Wyeth & Cordis v. Abbott Labs*, 720 F.3d 1380 (Fed.Cir.2013).

*ii. Invalidity*

"The first step in any invalidity analysis is claim construction, an issue of law this [C]ourt reviews *de novo*." *Akamai Techs. v. Cable & Wireless Internet Servs.*, 344 F.3d 1186, 1192 (Fed.Cir.2003). A party challenging validity must prove it by clear and convincing evidence. *Polara Eng'g v. Campbell*, 894 F.3d 1339, 1348 (Fed.Cir.2018) (*citing* 35 U.S.C. §282). Moreover, this burden is even higher or "enhanced," where, as here, alleged prior art was already considered by the PTO. *See PowerOasis v. T-Mobile*, 522 F.3d 1299, 1304 (Fed.Cir.2008); *Tokai Corp. v. Easton Enterprises*, 632 F.3d 1358, 1367 (Fed.Cir.2011). *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule*, 676 F.3d 1063, 1069 (Fed.Cir.2012). Thus, issues of anticipation and obviousness, while involving issues of fact, are reviewed *de novo* when decided on summary judgment. *See OSRAM Sylvania v. Am. Induction Techs.,* 701 F.3d 698, 704 (Fed.Cir.2012); *Metso Minerals v. Powerscreen Int'l Distribution*, 526 F.App'x 988, 995 (Fed.Cir.2013). Further, when there are no factual disputes, the invalidity issue may collapse into claim construction issues. *See U.S. Ethernet Innovations v. Acer*, 646 F.App'x 929, 932-33 (Fed.Cir.2016).

*4.* Daubert *and Strike Motions*

For issues not unique to patent law, such as evidentiary matters in motions to strike or exclude expert testimony, this Court applies the law of the regional circuit,

here, the Ninth, which reviews them under an abuse of discretion standard. *See Allergan v. Athena Cosmetics*, 738 F.3d 1350, 1354 (Fed.Cir.2013); *F.T.C. v. BurnLounge*, 753 F.3d 878, 883 (9thCir.2014); *MEMC Elec. Materials v. Mitsubishi Materials Silicon*, 248 F.App'x 199, 203 (Fed.Cir.2007); Fed.R.Evid. 702. "An abuse of discretion occurs if the district court bases its decision on an erroneous legal standard or on clearly erroneous findings of facts." *Pinkette Clothing v. Cosmetic Warriors*, 894 F.3d 1015, 1025 (9thCir.2018).

**B. The Dist.Ct. Erred In Construing "applicator tip," Including Erroneously Construing The Erroneously Imposed Sub-Term "attachment."**

During MSJ proceedings, neither party requested construction of the term "applicator tip," rather, both parties deemed it to have plain meaning. *See* Appx36907;Appx30623. However, in support of its erroneous invalidity finding (discussed below),[12] the Dist.Ct. ***sua sponte*** found (a) a claim construction dispute existed; (b) lexicography; and (c) "applicator tip" to mean "substrate having an array of voltage to skin application elements wherein the voltage to skin delivering elements is [sic] configured to allow quick attachment to an applicator." Appx00095. Because its erroneous construction requires the substrate be "configured to allow quick attachment…," the Dist.Ct. also construed the sub-term "attachment" to have a "plain and ordinary meaning" of "to be joined" or "to be connected." *Id*.

---

[12] As discussed further below, this erroneous construction resulted in the District Court erroneously finding Avrahami '060 discloses an applicator tip, resulting in its further erroneous invalidity finding and summary judgment grant against TransPharma Patents' Asserted Claims.

The correct construction of the term "applicator tip" is simply plain meaning, namely the tip of an applicator. As noted below, a tip is the distal end of an elongate object,[13] *e.g.*, a pencil, a spear, or, here, an applicator. One glaring error in the Dist.Ct.'s construction is its failure to require an "applicator *tip*" be *on the tip*, *i.e.*, distal end, of an applicator. Appx00095. Thus, aside from erroneously finding lexicography (*id.*), the Dist.Ct.'s unsupported, erroneous construction otherwise fails to provide justification for departure from plain meaning, including failing to distinguish (a) the ***tip*** of an applicator from a ***portion*** or ***side*** of an applicator not constituting its tip and (b) applicator tip 212 from either carrier 100 or the applicator carrier 100 attaches to.

Moreover, as noted below, the Dist.Ct. erroneously held a roller rolling over a patch is somehow "attached" to the patch, so Avrahami Figs.17A/B patch[14] qualify as an "applicator tip." However, a roller transitorily contacting, while rolling over, a patch is not attached to, joined with, or connected to that patch – meaning the Dist.Ct. erred finding this element met even under its own erroneous construction. Further, although the proper construction of "applicator tip," noted above, does not require "attachment," to the extent this "attachment" requirement is affirmed, the proper construction of "attachment" is a ***physical*** connection to the applicator, such as via

[13] *See, e.g.*, "tip" definition, Oxford English Dictionary ("pointed or rounded end or extremity of something slender or tapering."); Dictionary.com ("slender or pointed end or extremity, especially of anything long or tapered").

[14] Figs.17A/B show the top and bottom sides of a single patch embodiment. Appx02011 at 26:37-45.

an attachment mechanism, not mere transitory touching.

Contrary to the Dist.Ct.'s findings(Appx00095), none of its alleged lexicography is *clear* or *explicit*[15] and no special definition for "applicator tip" is set forth, much less *clearly* set forth – the term is not explicitly defined as anything other than an applicator tip (*i.e.*, the *tip* of an *applicator*), namely applicator tip 212 and tip 800, as disclosed in the preferred embodiment as the tip portion of carrier 100. *See, e.g.*, Appx00220 at 3:30-33. The language from the specification erroneously relied upon by the Dist.Ct. (Appx00095) merely identifies carrier 100, which comprises a substrate, as an applicator tip, which is because it mates, via mechanisms, *e.g.*, mechanism 820, with the distal end, *i.e.*, tip, of an applicator, not shown. Appx00220 at 3:30-33;Appx00222 at 7:28-31. Nothing in this language, or elsewhere in the specification, states, or implies, *any* "carrier," or "substrate," including one that attaches anywhere to an applicator, or does not attach to an applicator, qualifies as an applicator tip simply as a substrate with electrodes.

A "tip" is simply the distal end of a slender or elongate object,[16] which distinguishes the ***tip*** of, for example, a spear, arrow, or applicator, from, for example, the ***bottom*** of a car, box, or cup, as well as applicators shaped with a tip from applicators, *e.g.*, Avrahami '060 Figs. 1A and 17A/B embodiments (*see* Appx01988

[15] While a patentee is free to be his own lexicographer, any special term definition must be set forth in the specification "clear[ly] and explicit[ly]." *See Martek Biosciences v. Nutri-nova*, 579 F.3d 1363, 1380 (Fed.Cir.2009); *Thorner*, 669 F.3d at 1365-1366.
[16] *See* fn.14.

& Appx01998),[17] with a bottom, but no tip. The Dist.Ct. provides no support or reason from the specification to construe "tip" otherwise. In context, the applicator tip is merely the distal end of an elongate applicator, namely, a fractional RF applicator. Thus, no issue of lexicography exists which supports construing "applicator tip" as anything else.

Moreover, to the extent this term is erroneously affirmed to further include the Dist.Ct.'s erroneous "configured to allow quick attachment to an applicator" limitation, such "attachment" is more than mere touching or transitory or fleeting event. *See* Appx00212-00217 & Appx00220 at 3:43-55; Figs. 2-5 & 7, showing the applicator tip as part of an entire apparatus including source 200, harness 220, shield 224, applicator case 208, and applicator tip 212. Thus, to the extent this erroneous "attachment" limitation is affirmed, such attachment must be a ***physical*** connection to the applicator.[18] In all instances, attachment/attached is more than transitory contact, including in context.

The Syneron Patents disclose attachment of the applicator tip, including a

---

[17] Notably, while the District Court relies on Avrahami '060 disclosures, it provides no reasoning or justification for why a wholly unrelated patent, with different inventors, informs the understanding/interpretation and disclosures of the Syneron Patents.

[18] *See, e.g.*, "attachment" definition, Merriam-Webster ("physical connection by which one thing is attached to another; the process of physically attaching"); Dictionary.com ("act of attaching or the state of being attached"); "attached" definition, Merriam-Webster ("connected or joined to something…the attached document; a house with an attached garage"); Dictionary.com ("joined; connected; bound; to fasten or affix; join; connect").

removable applicator tip, as attached via some *attaching mechanism*, not merely by virtue of transitory, or happenstance, contact – similar to how a tire is not considered attached to a road or a rolling pin is not attached to a counter. *See* Appx00222 at 7:28-31 & Claim 14. Even Avrahami '060, which the Dist.Ct. erroneously found disclosed an applicator tip under its erroneous construction, uses the term "attach" to mean more than a transitory touching. *See* Appx02002 at 8:16-18. In other words, a patch, separate from any handheld device is attached to the skin (*i.e.*, ablation surface) in the same manner as a nicotine or seasickness patch. A device that simply ***presses against*** or ***passes over*** a patch is not ***attached*** to it. Nor is there any support for the Dist.Ct.'s erroneous conclusion merely having electrical contact or connection is an attachment, including for these same reasons, including because electrical contact does not require attachment.

Thus, and the term "applicator tip" should have been construed under its plain and ordinary meaning, the distal end, *i.e.*, tip, of an elongate structure, *i.e.,* the applicator. Further, to consider an applicator tip as "attached" (if that sub-limitation is erroneously affirmed) it must be fixed or joined to the applicator for more than some mere transitory or passing moment (Appx00222 at 7:28-31),

**C. The Dist.Ct. Erred In Granting Summary Judgment Of Invalidity,.**

In this case, both parties filed MSJs on Invasix's invalidity claims, based, *inter alia*, on Eppstein and Avrahami, and the Dist.Ct. erroneously granted summary judgment in favor of Invasix and erroneously found Avrahami anticipates the '654

and '036 claims noted babove; Avrahami '060, in view of the knowledge of a POSITA, renders obvious the '654 and and '036 claims noted above; Eppstein '316 anticipates '232 claim 29 and '079 claims 10, 11, and 18; and Eppstein '316, in view of the knowledge of a POSITA, renders obvious '232 claim 30 and '079 claim 25. *See* Appx00092-00116;Appx00005-00006. In addition to including, and basing its findings, at least in part, upon, its erroneous "applicator tip", the Dist.Ct. erred in relying upon Invasix's expert's unsupported, conclusory opinions, including about elements a POSITA would allegedly deem disclosed by Avrahami and Eppstein, when neither reference actually discloses such elements; disregarding Syneron's summary judgment evidence from its expert as conclusory (including when his rebuttal was, at a minimum, no less conclusory than Invasix's expert being rebutted); concluding Syneron's expert "admitted" Avrahami '060 Figure 1A patch was an applicator tip when, clearly, he explained/clarified and retracted the alleged "admission"; and failing to weigh all factual inferences in Syneron's favor, including relative to said retraction of the alleged "admission."

1. *Invasix's Insufficient Invalidity Record Evidence*

Invasix's MSJ regarding Eppstein '316's anticipation TransPharma Patent claims (Appx10398-10402) sorely lacks specifics, and conflates electroporation, microporation, and ablation in order to obscure the lack of an electrically ablative process involving alternating current ("A/C")[19] flowing through the skin. The totality

[19] *See* Appx06060, fn.2.

of evidence offered by Invasix for these conclusions was Eppstein ‘316, Eppstein ‘211, an alleged “admission” by Syneron’s expert (not relied upon by the Dist.Ct.),[20] and the Pearce Report, pp. 85-88(Appx03671-03679) and Ex. E(Appx11956-11967), for the ‘232 patent, and pp. 111-114(Appx03695-03700) and Ex. K(Appx11968-11991), for the ‘079 patent. Appx10398-10402.

On the contested ‘232 “power source…” limitation, Invasix moved solely based upon a vague notion of “electric current for microporation.” Appx10398-10399. For convenience, the entirety of Dr. Pearce’s contentions regarding Eppstein ‘316 disclosing this limitation is set forth verbatim in Syneron’s expert’s report and Charts E and K, along with part of his rebuttal to same. Appx08653-08669; *see also* Appx05581;Appx05914;Appx05931-05932;Appx5959. Pearce’s invalidity charts at Exs. E and K further make conclusory statements that Eppstein discloses the preamble, and this ablative limitation, and then quotes pages of text from ‘316 and ‘211 with no analysis or reasoning provided. Appx08660-08666;Appx11957;Appx11960-11967. Pearce’s conclusory opinions regarding Eppstein disclosing the ‘079 “induce an electrical current to flow through the stratum corneum, causing ablation…” limitation are further quoted verbatim in Syneron’s expert’s report and Charts E and K, along with part of his rebuttal to same.

[20] The alleged “admission” Eppstein ‘316 discloses ablation was simply Syneron’s expert noting Eppstein ‘316’s *thermal ablation*, which was not alleged by Invasix, nor held by the District Court, to meet the claim elements, was a process for ablating micropores.

Appx11968-11991; *see also* Appx5597-5600.

The Pearce Report's body is no less conclusory, and no more informative, simply referring to a subset of the quotes from these exhibits. With respect to the above-noted '232 limitation, the cited quotes simply stand for the propositions electroporation electrodes may microporate; electroporation current may be A/C; electroporation, which involves short bursts of electricity, can form micropores; and a POSITA "would understand the electrodes to be *capable* of causing ablation." Appx03671-03679;Appx08653-08657;Appx08660-08666;Appx10398-10402. However, there is no cite to support or reasoning for Eppstein using A/C to form micropores via ablation.

The MSJ vaguely alleges "Dr. Pearce testified that by itself, this microporation step discloses all elements" and, as support, cites generally to "…Pearce Report[], Charts E and K." Appx10399;Appx11956-11991. The only specification support for these allegations is citation to '316 referring to '211 as disclosing "microporation of tissue, wherein the tissue surface, such as the skin or mucosal layer, is physically breached by the formation of micropores, approximately 1-1000 μm in diameter." Appx10399; Appx01916 at 1:21–25). Here again, Invasix cites generally to "…Pearce Report[] at 85–88, Exhibit E." Appx10399.

Invasix cites "Dr. Pearce's testimony that 'Eppstein '316 discloses that the current flowing between the electrodes may be "a balanced AC signal," 8:42-45,'" alleging a POSITA "'would have understood [this] as including an [A/C].'"

Appx10401 (*citing* Appx03674). However, this section of Eppstein '316 only refers to electroporation and electrically heated probes. Appx01919 at 8:5:45.

Invasix, citing Pearce, contends "[t]here is no material dispute that Eppstein '316, together with the [Eppstein '211], discloses using electric energy to ablate the micropores in the stratum corneum." Appx10400 (*citing* Appx03673-03674). However, where cited, Pearce opines an electric current forms micropores; the electroporation electrodes may participate in microporation; current flowing between electrodes may be A/C; using short pulses of electricity to form micropores; and a POSITA would understand Eppstein '316's electrodes "*capable* of microporation and ablation" without "undue experimentation." Appx03673-03674.

Invasix's MSJ regarding Avrahami '060 anticipating Syneron Patents' claims was further sorely lacking in specifics and conflated the two patches relied upon to obscure the fact neither, even if erroneously deemed an applicator tip, had other required structural claim limitations. Appx10392-10396. The totality of the MSJ's evidence offered for concluding an applicator tip (present in all Syneron Patent Asserted Claims), was Avrahami, alleged "admissions" by Syneron's expert regarding Fig.1A patch (which were retracted during the same deposition), and Dr. Pearce's Report, pp. 253-269 (Appx03839-03855) and Ex. O (Appx11992-Appx12060), for the '654 patent, and 313-327 (Appx03899-03913) and Ex. R (Appx12061-12141), for the '036 patent.[21] Appx10392-10396.

[21] Invasix's MSJ also purports to rely upon Pearce Report, pp. 328-344, but these

The entirety of Pearce's contentions regarding Avrahami disclosing an "applicator tip" are set forth as noted, and Syneron's expert's report and Charts O and R, along with part of his rebuttal to same. Appx08953-09031;Appx09216-09296; *see also* Appx05410-05418;Appx05664-05665. Dr. Pearce's Exs. O and R make conclusory statements Avrahami '060 discloses an applicator tip, supporting them only with block quotes from Avrahami, with no expert analysis or reasoning provided. *See* Appx8955-8957;Appx9217-9219;Appx11994-11997;Appx12063-12064. The Pearce Report's body is likewise wholly general and conclusory, and does not identify any patch or other apparatus of Avrahami '060 as the applicator tip. Appx08955-08957;Appx03849-03840. The report has no deeper analysis than the vacuous statement "devices disclosed in Avrahami '060 are handheld devices that have a tip touching the skin and that this tip, with the electrodes on it, would be an applicator tip." Appx03839-03840;Appx3850. Such vague and conclusory statements are insufficient to carry any summary judgment burden, much less prove, with clear and convincing evidence, this limitation is met. Further, the Pearce Report quotes text from Avrahami, referencing Figs. 16 and 17A/B, but does not reference or rely upon any Fig. 1A/B patches. Appx08955-08957;Appx11994-12003.

The totality of the MSJ's evidence offered for Avrahami 'disclosing the "…combined application element surface area substantially smaller than the ground

---

pages pertain to unrelated prior art not pertinent to this appeal. Appx10396 (*citing* Appx03914-03930).

electrode surface area" limitation (present in '654 independent claims 1 and 24, and their dependent claims), is a general reference to "…Pearce Report[] at 255-56." Appx10394. For the similar "plurality of electrodes…arranged at a periphery…" limitation (present in '036 independent claims 1 and 21, and their dependent claims) the MSJ offers a similar general reference to "…Pearce Report[] at 315-16, Exhibit R at 19-24." Appx10395. The entirety of Pearce's contentions regarding Avrahami disclosing these limitation are set forth as noted, and also in Syneron's expert's report and Charts O and R, along with part of his rebuttal to same. Appx08242;Appx08963-08969;Appx09011-09014;Appx09230-09232;Appx09283-09288. Pearce Report Exs. O and R make conclusory statements Avrahami '060 discloses these element, supporting them only with block quotes from Avrahami '060, with no expert analysis or reasoning provided. *Ids*.;Appx12003-12010;Appx12079-12083. The Pearce Report's body only refers to the return electrode strip on the Figs.17A/B patch as substantially larger than the active electrodes thereon or arranged at the periphery. Appx03841-03842;Appx03901-03902. However, as noted above, neither Invasix's MSJ, nor Pearce Report upon which it relies, provides any evidence, analysis, or even argument for how the Fig.1A(or 1B) patch, which only has same-sized electrodes, including arranged in a line or grid, could possibly meet this element.

The totality of the MSJ evidence offered for Avrahami disclosing the "free of any [ground/portion of the larger sized] electrode therebetween" limitations (present

in ‘654 independent claims 1,19 and 24, and their dependent claims and ‘036 independent claims 1 and 21, and their dependent claims), was a general reference to "…Pearce Report[] at 255–56," for the ‘654 claims, and "…Pearce Report[] at 315-16, Exhibit R at 19-24", for the ‘036 claims. Appx10394-10395. The entirety of the Pearce Report's contentions regarding Avrahami ‘060 disclosing these limitations are set forth as noted, and also in Syneron's expert's report and Charts O and R, along with part of his rebuttal to same. Appx08242;Appx08963-08969;Appx09007-09011;Appx09021-09025;Appx09230-09233;Appx09284-09288. Pearce Report Exs. O and R make conclusory statements about Avrahami ‘060 disclosing these element, supported only by block quotes from Avrahami ‘060, with no expert analysis or reasoning provided. *Ids*.;Appx12003-12010;Appx12038-12044;Appx12054-12057;Appx12079-12084;Appx12131-12136. The Pearce Report's body only refers to the return electrode strip on the Figs.17A/B patch as being free of ground electrodes between the active electrodes on that patch. Appx03841-03842;Appx03851-03854;Appx03983-03984;Appx03992-03995. However, as noted above, neither Invasix's MSJ, nor the expert report upon which it relies, provides any evidence, analysis, or even argument for how the Fig.1A(or 1B) patch, which has an interspersed matrix of electrodes, including arranged in a line or grid, could possibly meet this element.

The totality of the MSJ's evidence offered for Avrahami ‘060 disclosing the "plurality of [ground/substantially larger] electrodes…" limitations (present in ‘654

independent claim 19, and its dependent claims, and '036 claims 1 and 21, and their dependent claims), was a general reference to "…Pearce Report[] at 254–55, 257–58, 264–65, Exhibit O at 42–53," for the '654 claims, and "…Pearce Report[] at 315-16, Exhibit R at 19-24," for the '036 claims. Appx10394-10395. The entirety of the Pearce Report's contentions regarding Avrahami '060 disclosing these limitations are set forth as noted above, and also in Syneron's expert's report and Charts O and R, along with part of his rebuttal to same. Appx08242;Appx08247-08248;Appx08963-08969;Appx09004-09007;Appx09011-09014;Appx09230-09232;Appx09283-09288. Pearce Report Exs. O and R makes a conclusory statement Avrahami '060 discloses this element, supporting it only with block quotes from Avrahami '060, with no expert analysis or reasoning provided. *Ids.*;Appx12003-12010;Appx12035-12038;Appx12079-12083. The Pearce Report's body only refers to the return electrode strip on the Figs.17A/B patch as being free of ground electrodes between the active electrodes on that patch. Appx3841-3842. Further, for the '654 claims, the Pearce Report's body relies solely upon a statement at 26:20-29 of Avrahami that any of the devices "described *hereinabove*" may comprise "one or more return electrodes." Appx03849-03850. Here, the Pearce Report makes no reference to the Figs.17A/B patch, which is perhaps not surprising, as it is *first described **below*** this text. *See* Appx02011-02012, 26:19-27:13. Indeed, the Pearce Report does not even allege the Figs.17A/B patch, or, for that matter, any specific patch has a plurality of electrodes. Further, as noted

above, neither Invasix's MSJ, nor the expert report upon which it relies, provides any evidence, analysis, or even argument for how the Figs.17A/B patch, which has a single ground electrode, or Figs. 1A(or 1B) patch, which has an interspersed matrix of electrodes, including arranged in a line or grid, could possibly meet this element.

As for the the "processor…" terms, the Dist.Ct. construed these terms as means-plus-function ("MPF") terms (Appx00040). The totality of the MSJ's evidence offered for Avrahami '060 disclosing these limitations (present in independent '654 claim 24 and '036 claim 21), was a general reference to "…Pearce Report[] at 267–68, Exhibit O at 63–66," for the '654 claims, and "…Pearce Report[] at 323-26," for the '036 claims. Appx10395-10396. The entirety of the Pearce Report's contentions regarding Avrahami disclosing these limitations are set forth as noted, and also in Syneron's expert's report and Charts O and R, along with part of his rebuttal to same. Appx08249;Appx09021-09025;Appx09276-09283. Pearce Report Exs. O and R make conclusory statements Avrahami '060 discloses these limitations, supporting them only with block quotes from Avrahami '060, with no expert analysis or reasoning provided. *Ids*.;Appx12054-12057;Appx12121-12124. The Pearce Report's body contends there was no algorithm linked to this MPF term, and, thus, it was indefinite (Appx03421), yet, perhaps unsurprisingly, does not treat this element as MPF, and, like Exs. O and R, made no effort to compare Avrahami '060 to any algorithm. Appx03853-03854;Appx03910-03912.

As further noted herein, although the Dist.Ct.'s summary judgment ruling

found Avrahami discloses a processor, it made no attempt to inquire into, or find, Avrahami '060 disclosed a processor that performed the algorithm the Dist.Ct. separately found part of a proper MPF construction. *See* Appx00040;Appx00103-00104.

2. *Erroneous Anticipation Findings/Conclusions*

Anticipation requires the identical invention be shown in a single embodiment such that each and every claim limitation is disclosed, and arranged or combined as recited in the claims. *TF3 v. Tre Milano*, 894 F.3d 1366, 1374 (Fed.Cir.2018); *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed.Cir.1983); *Microsoft v. Biscotti*, 878 F.3d 1052, 1068 (Fed.Cir.2017); *Net MoneylN v. VeriSign*, 545 F.3d 1359, 1371 (Fed.Cir.2008); *see* 35 U.S.C. §102.

i. *Erroneous findings Eppstein '316 anticipates TransPharma Patents' Asserted Claims*

The Dist.Ct. erred in finding Eppstein anticipates the above-noted claims of the Syneron Patents, including because Eppstein fails to disclose at least claim limitation [C], as referenced by the Dist.Ct., for the '232 and '079 patents. Appx00110-00111; *see* Appx00191 at Claim 29;Appx00209-00210 at Claims 10, 11, & 18. The relevant terminology referred to herein of electroporation, microporation, ablation, puncture, and heated probe, is defined in the references. *See* Appx01916-01917 at 2:65-3:62 (defining "microporation," electroporation," "micropore," and "heated probe");Appx00779 at 9:10-36 (defines "microporation,"

"ablation," and "puncture."). The Dist.Ct. relied solely on an improper misapprehension and conflation of the disclosures in Eppstein '316 and Eppstein '211. Appx00109-00115. Specifically, '211 discloses a thermally, optically, and mechanically ablative microporation process and '316 discloses, subsequent to a thermal or optical microporation process, a separate, non-ablative electroporation process, which the Dist.Ct. erroneously found can be performed using the same instrument, but this is uninformative of whether either, singular process meets each and every claim element on its own. Appx00113; *see* Appx01907-01922;Appx00740-00801. While '316 incorporates the microporation techniques of '211, as separate, distinct processes, disclosures for one apply solely to that specific process and should not be combined with those of another. *See Biscotti*, *Connell*, *Verisign*, and *TF3* cases, *supra*. However, the Dist.Ct. erroneously dismisses this fundamental legal principle, erroneously finding '316 anticipates based "solely on the explicit teachings in the microporation step," yet no such "explicit teachings" exist to support this erroneous conclusion. Appx00112. Notably, Invasix's argument regarding the Eppstein patents evolved, but, as of the MSJ hearing, Invasix conceded '316 does not anticipate and focused solely on '211. *See* Appx00112.

a. <u>Eppstein '211</u>

With respect to '211, which discloses microporation, while this step is thermally, optically, or mechanically ablative, the Dist.Ct. erred in finding ablation by modified-electroporation because there is no such disclosure, including because

there is no equating of micropore creation by electroporation with *electrical* ablation, much less A/C applied between electrodes causing ablation ('232) or electrical current flowing through the stratum corneum to cause ablation ('079). Appx00111 (*quoting* Appx29185-29246 at 20:28-36 & 44:12-14). Eppstein '211, focusing on thermal microporation, generally discloses the microporation process as, in relevant part, "porating the stratum corneum…by means that form a micro-pore…," creating and using "an appropriate thermal energy source, or heat probe, which is held in contact with the [skin]," where specific methods are disclosed thereafter. Appx00777 at 5:6-17;Appx00780-00781 at 12:48-13:48.

Despite the Dist.Ct.'s erroneous finding of "at least seven microporation techniques" (Appx00112-00113), the disclosed techniques comprise the use of a singular element for (a) *thermal microporation* via "thermal energy source or heat probe," such as (a.1) optical/laser/thermal via water vaporization by pulsed light/laser and a dye[22]; (a.2) thermal via heated metal/wire by ohmic heating, current loop, magnetic field, or electric pulsing[23]; (b) *microporation by puncture* (b.1) hydraulically via high pressure fluid jet[24] or (b.2) mechanically via micro-lancets[25];

[22] Appx00741 at [57];Appx00776 at 3:3-8;Appx00776 at 3:13-4:16 & 4:26-42;Appx00777 at 5:29-6:6;Appx00781-00783 at 13:49-17:50; *see also* Appx00784-00788, Expls. 2-10 & Appx00798 at Expl. 38.

[23] Appx00741 at [57];Appx00776 at 3:3-8;Appx00777 at 6:26-60;Appx00783-00784 at 18:20-19:58; *see also* Appx00788-00789, Expls. 11-13 & 38.

[24] Appx00741 at [57];Appx00776 at 3:3-8;Appx00777 at 5:29-45; *see also* Appx00796, Expl. 37.

[25] Appx00741 at [57];Appx00776 at 3:3-8;Appx00777 at 5:29-45;Appx00784 at 19:59-20:10; *see also* Appx00796, Expl. 35.

or (c) sonic microporation via focused sonic beam in pulses or bursts[26].

Eppstein '211 discloses the modification of electroporation devices for use in microporation,[27] but the processes are still different. Here, the dispute revolve around those thermal microporation techniques involving pulses or bursts, or, what the Dist.Ct. erroneously refers to as "(6) electric ablation," wherein the stratum corneum is punctured "with short pulses of electricity to form a micropore of up to about 1000 µm in diameter," and modified-electroporation microporation. Appx00113 (*citing* Appx00741 at [57]). However, none of the disclosed techniques are *electrically* ablative, including because the only disclosures of electrical energy in Eppstein '211 either powers a light source for optical ablation or causes the probe to be heated for thermal ablation, not for causing ablation directly via passing current through the skin.[28] Other than in relation to modified-electroporation microporation, the only disclosures of specific use of short pulses/bursts of electricity relate to the pulsing of electricity for ***thermal*** microporation via hot wire (Appx00787 at 26:6-50 & Appx00751-00752 at Figs. 9-10) or ***sonic*** microporation (Appx00791 at 33:20-31), not for ablation via A/C. *See also* fns.22-28. This is bolstered by the fact that, Eppstein '211 provides differing disclosures for modified-electroporation microporation, wherein electric pulses/bursts are applied ***to*** the stratum corneum

---

[26] Appx00741 at [57];Appx00775-00776 at 1:61-3:8;Appx00777 at 5:29-45;Appx00784 at 20:11-27; *see also* Appx00789-00798, Expls. 14-27 & 39.

[27] Appx00784 at 20:28-36.

[28] Appx05581-05583;Appx05597-05599;Appx05697-05699;Appx05718-05720;Appx05911-05914;Appx05931-05938; *see gen.* Appx05950-05966.

(Appx00784 at 20:28-36), and the other, erroneously relied on, techniques, wherein the stratum coreneum is punctured ***with*** electric pulses/bursts, *i.e.*, the probe is heated with electric pulses/bursts (*see* Appx00741 at [57]).

In addition to its disclosure conflation, the Dist.Ct.'s overarching error is the numerous leaps, *i.e.*, erroneous factual inferences which, at a minimum, should have been viewed in Syneron's favor, made without any support from the intrinsic, *e.g.*, Eppstein '211, or extrinsic, *e.g.*, expert opinions, evidence. For example, the Dist.Ct. erred in finding the Eppstein '211 disclosures related to technique (e) in the Abstract (Appx00741 at [57]; *see also* Appx00777 at 5:29-45;Appx00798 at Expl. 38) relate to the separate disclosure related to modified-electroporation (Appx00784 at 20:28-36), including because such a finding ignores the clear disclosures noted above. Appx00112-00113. It was further error to equate the separate disclosures for use of short pulses/bursts in thermal microporation and description of electroporation as short pulses/bursts simply because they use similar words, while ignoring the specific disclosures related thereto.

The Dist.Ct. attempts to support its erroneous conclusions solely on a single paragraph in Eppstein '211, erroneously finding any commercially available electroporation instrument can be used for microporation when "sufficient" electrical energy is provided. Appx00113 (*quoting* Appx00784 at 20:28-36). However, as noted above, electroporation is non-ablative and involves low voltages and non-RF currents, such as direct current ("D/C"). Further, Eppstein '211, and the

Dist.Ct.'s findings, lack any support for the use of more than a single electroporation electrode for microporation. Indeed, only a singular probe/element is disclosed, and the only disclosure of the use of electrodes in Eppstein '211 is with respect to the hot wire. Appx00783-00784 at 18:56-19:28. Thus, with only a single probe/element, there is no return path for current to flow through the skin and back to the device, and, thus, it would be unsafe. *See* Appx32916-32917 (*citing* Appx35372-35409).

Solely based on this flawed misapprehension of Eppstein '211, the Dist.Ct. then erroneously found that modified-electroporation microporation does anything more than microporate. Appx00113-00114; *see* Appx00784 at 20:38-36. Improperly importing the discussion of puncturing the skin related to thermal microporation into the modified-electroporation microporation, the Dist.Ct. erroneously found modified-electroporation microporation to be ablative. Appx00113-00114. However, this was flawed for three reasons. First, including as noted, modified-electroporation microporation does not puncture the skin, nor is there any disclosure of such; rather, the only disclosures of puncturing relate to mechanical microporation and a sub-set of thermal microporation. *See* fns.23-27. Second, even if modified-electroporation microporation was erroneously found to puncture (which it does not), the Dist.Ct. has no support, because there is none, for its erroneous equation of puncture and ablation. While Eppstein '211 states puncture and ablation can be used interchangeably, it limits it solely to where they accomplish poration "without significant damage to the underlying tissues." Appx0079 at 9:33-36. Rather than

make any findings as to whether modified-electroporation microporation porates without significant damage to the underlying tissues, the Dist.Ct. simply ignores the limited interchangeability and equates puncture and ablation *carte blanche*. Appx00113-00114. Third, there is no "explicit[] equat[ing of] the term 'microporation' with 'ablation' and 'puncture'" (Appx00113-00114) including because all that is required for microporation is a "lessen[ing of] the barrier properties of…the skin" (Appx00779 at 9:10-22).

While the Dist.Ct. erroneously found only "'***sufficient energy***" is needed to convert electroporation into microporation, there is no analysis or finding as to what a "sufficient" amount would be or whether change in voltage or current is needed, nor any disclosure of the use of A/C. Nor is there any disclosure in Eppstein '211, or Dr. Pearce's opinions, as to these issues. To the contrary, while Eppstein '211 mentions the use of A/C with the hot wire (for the magnetic field) and sonic technique (for vibration of material in prior art), it does not disclose the use of A/C with electroporation, which may be performed using direct current ("D/C"). *See* Appx00775 at 1:61-2:4;Appx00777 at 6:52-60;Appx00784 at 19:5-21. Moreover, the disclosure of only a singular probe/element further supports A/C is not used, as, there is no proper circuit for current flow. Further, to the extent Eppstein '211 is even found to disclose such conversion from electroporation into microporation, electroporation may be performed with D/C or low frequency A/C, to the extent A/C is erroneously found disclosed, and, thus, any increase in "energy" would be to

voltage or current ***amplitude***, not modifying current ***frequency***.

Further, the Dist.Ct. erred in failing to show any disclosure the "short pulses/bursts" of electricity flow through the skin or between any electrodes. To the contrary, as noted above, the short pulses/bursts are for electrically heating a singular hot wire element or sonic microporation, not passing any electricity through the skin.

The Dist.Ct. further erred in dismissing Syneron's expert's opinions regarding microporation, erroneously agreeing with Invasix that he focused solely on the electroporation step. Appx00111. However, this erroneous finding was based on the Dist.Ct. erroneously conflating the references' disclosures (discussed below), and failure to view the evidence in Syneron's favor. The Dist.Ct. appears to fault Syneron's expert for failing to address the microporation of Eppstein '211 anticipating the claims, yet, as noted above, Dr. Pearce's analysis does not even discuss how Eppstein '211 does so. Moreover, as cited hereinabove, Syneron's expert provided opinions regarding the lack of disclosures in Eppstein '211.

The Dist.Ct. merely makes the above erroneous conclusions and then erroneously finds simply because electroporation is converted to microporation, and microporation is, as it erroneously found, equated with ablation and puncture, ***in some instances*** which are not found, that, somehow, Eppstein '211 anticipates. However, there is no dispute Eppstein '211 equates these terms in some instances, but, rather, these disclosures, as properly understood, are insufficient to anticipate the specific claim limitations of the TransPharma Patents. Further, at a minimum,

the above issues regarding the interpretation of "short pulses," "sufficient energy," and whether electroporation is disclosed as a means for electrical ablation rather than thermal ablation represent disagreements between experts and disputed facts which are improper for resolution at summary judgment. The Dist.Ct. erred in finding otherwise, including in failing to view such factual disputes in the light most favorable to Syneron.

Eppstein '211 fails to disclose at least limitations [B] and [C] of '232 claim 29, including because there is no disclosure of [B] a plurality of electrodes nor [C] a power source which applies alternating current between said lacking plurality of electrodes to cause ablation. Further, Eppstein '211 fails to disclose at least limitations [B] and [C] of '079 claim 10, including because there is no disclosure of [B] a plurality of electrodes nor [C] the application of electrical energy to said lacking plurality of electrodes with electrical energy flowing into and through the skin. The Dist.Ct. erred in holding otherwise.

b. <u>Eppstein '316</u>

Even ignoring Invasix's abandonment of Eppstein '316 and reading the disclosures of Eppstein '211 into Eppstein '316, the Dist.Ct. erred in concluding Eppstein '316 anticipates. As noted above, Eppstein '211 fails to disclose A/C ablation, including of skin between electrodes, in the microporation step, and disclosure of electrodes is only in reference to thermal hot wire ablation. Appx00109-00114; *see also* Appx08660-08662;Appx08803-08807. Nor does

Eppstein '316 disclose all elements of the above-noted claims of the TransPharma Patents. As noted, Eppstein '316 discloses two distinct, separate steps: microporation followed by electroporation. There is no dispute the electroporation step does not anticipate, including because electroporation is non-ablative and reversible. Appx01917 at 3:17-20;Appx05851-05852;Appx05951-05952. Nor is there any meaningful dispute the microporation expressly disclosed in Eppstein '316 cannot anticipate, including because all such disclosures in Eppstein '316 of microporation are by thermal (*e.g.*, probe heated optically or electrically, such as with electric pulses) or optical (*e.g.*, light/laser and a dye) techniques, not any current flowing through the skin. *See, e.g.*, Appx01918-01919 at 6:24-7:2;Appx07890-07895;Appx08007-08010.

Here, the sole dispute relates to whether the modification of the electroporation device of Eppstein '316 for use in the modified-electroporation microporation technique of Eppstein '211, comprise all elements of the above-noted claims of the TransPharma Patents. In the first instance, the Dist.Ct. erred in finding they do, including because, as noted above, Eppstein '211 fails to disclose ablation by any means other than thermal, optical, mechanical, and sonic ablation, the same as Eppstein '316, except mechanical and sonic ablation. Further, the Eppstein '316 electrodes do not perform any high frequency ablation, nor is alternating current even required for electroporation. Appx05914. Thus, rather than any electric current being applied between the electrodes of Eppstein '316 to cause ablation, Eppstein

‘316, even incorporating the disclosures of Eppstein ‘211, discloses microporation solely via thermal or optical ablation.

The Dist.Ct. attempts to support its erroneous findings by stating Eppstein ‘316 discloses the electroporation step as applying a voltage between the electrodes, and, thus, through an unsupported modification of the electroporation step, not disclosed in either Eppstein ‘316 or Eppstein ‘211, the microporation step would do the same. However, including as noted above, the only disclosures in either reference of microporation do not include microporation by any means other than optical or thermal. Thus, the Dist.Ct.’s conclusions are fundamentally flawed in that they make the unsupported leap, including based on its erroneous findings on Eppstein ‘211. Such compounded errors amount to, at a minimum, clear error, including, as noted above, where the Dist.Ct. failed to view numerous factual disputes in favor of Syneron.

Further, during the ‘079 prosecution, Eppstein ‘316 was ultimately overcome with the Sohn Declaration, which Webster affirmed, and which distinguished, successfully, the microporation and electroporation steps disclosures in Eppstein ‘316 from the ‘079 patent. *See* Appx07892-07896;Appx08656-08657;Appx08662;Appx08796;Appx08800;Appx08806-08807;Appx08810-08811;Appx08814. In view of this, the Dist.Ct. erred in finding Invasix met its enhanced burden to show Eppstein ‘316 anticipates.

Thus, at a minimum, Eppstein ‘316 fails to disclose at least limitation [C] of

‘232 claim 29, including because there is no disclosure of [C] a power source which applies alternating current between a plurality of electrodes to cause ablation. Further, Eppstein ‘316 fails to disclose at least limitation [C] of ‘079 claim 10, including because there is no disclosure of [C] the application of electrical energy to a plurality of electrodes with electrical energy flowing into and through the skin. The Dist.Ct. erred in holding otherwise. Further, the Dist.Ct. fails to show Invasix sufficiently met its high burden on summary judgment to support its findings, including its enhanced burden.

c. ‘079 claims 11 and 18

The Dist.Ct.’s conclusions the additional limitations of ‘079 claims 11 and 18 are met are also erroneous, including because they are based upon the same false premises noted above. The Dist.Ct. further errs in its wholesale dismissal of Syneron’s expert’s opinions as “conclusory statements of disagreement without supporting analysis,” including because Syneron’s expert provides ample analysis, including as noted above. Appx05851-05852,¶¶909-911;Appx05914,¶1077;Appx05950-05952, ¶¶1133-1135; *see also* fn.23.

*ii. Erroneous findings Avrahami ‘060 anticipates*

The Dist.Ct. erred in finding Avrahami ‘060 anticipates the above-noted Syneron Patents’s claims, including because (1) it erroneously, improperly construed “applicator tip”; (2) none of the Avrahami ‘060 Figs. 1A, 17A, or 17B patches (the “Avrahami patches”) are “applicator tips,” including under any

construction; and (3) these patches, even if erroneously found "applicator tips," lack other required claim limitations. While Avrahami '060 is directed to various, separate embodiments for skin ablation devices,[29] the Dist.Ct. relied solely on two patch embodiments (Figs. 1A and 17A/B) in support of its erroneous findings. Appx00095-00098.

In view of the Dist.Ct.'s wholesale lack of analysis on any limitation other than "applicator tip," which is entirely based on its erroneous construction thereof, the Dist.Ct.'s analysis is simply an issue of claim construction this Court reviews *de novo*. Here, the Dist.Ct. committed clear error in failing to properly view the facts, including by improperly overly-relying on extrinsic evidence contrary to the intrinsic evidence. Simply put, when properly viewed, including viewing all facts and reasonable inferences in Syneron's favor, Avrahami '060 does not disclose each and every element of the Asserted Claims. Further, at a minimum, there are multiple genuine issues of material fact which preclude summary judgment, including competing views between the parties' experts as to whether the patches comprise an applicator tip under any construction. *See In re Gabapentin*, 503 F.3d 1254, 1259 (Fed.Cir.2007); *B-K Lighting v. Fresno Valves*, 375 F.Appx. 28, 32 (Fed.Cir.2010).

a. <u>Avrahami '060 lacks "applicator tip"</u>

The Dist.Ct. errs in concluding Avrahami '060's disclosure of an "applicator tip" is "well supported by the record." Appx00095. Put simply, neither Avrahami

[29] *See* Appx37291 at 5:4-11 (noting 4 embodiments).

patch, or any other disclosed patch or apparatus disclosed in, is an "applicator tip," *i.e.*, neither is the distal end (*i.e.*, tip) of an elongate applicator. Nor did the Dist.Ct. provide any pertinent factual justification for its erroneous, contrary findings.

The entirety of its support is (a) each of the Avrahami patches are disclosed as electrodes on a patch which pass current through them which "is consistent" with its erroneous "applicator tip" and "attachment" constructions and, (b) solely for Figs. 1A-1B patches,[30] Syneron's expert allegedly "admitted" or "confirmed" they were applicator tips. Appx00095-00098. However, such findings are clearly erroneous and lack factual support – the cited Avrahami patch disclosures point to *patches*, not *applicator tips*; Syneron's expert clearly retracted/clarified his alleged "admission" regarding Figs. 1A-1B; he never stated Figs.17A/B patch was an applicator tip; and any alleged (but nonetheless clearly retracted/clarified) "admission" related to Figs. 1A-1B patches are irrelevant to Figs.17A/B patch.

As an initial matter, as noted above, the Dist.Ct.'s findings are erroneous at least because they are based on its erroneous, unsupported constructions of "applicator tip" and "attachment." *See* §V.D. Under proper constructions, noted above, the Avrahami patches are not "applicator tips," including because (1) Fig.1A patch 40 is not the tip (*i.e.*, distal end) of any elongate applicator, but, rather, a patch non-elongate control unit 30 is *pressed against* (Appx01988 at Fig.1A;Appx02005

[30] The District Court did not rely upon Fig. 1B patch, but, in any event, it lacks the same elements, for at least the same reasons, as Fig.1A patch.

at 14:51-63); (2) to the extent this Court affirms the Dist.Ct.'s erroneous construction of "applicator tip," including sub-term "attached," Fig.1A patch 40 is not attached to control unit 30, but, rather, a patch non-elongate control unit 30 is *pressed against* (*id*.); (3) Figs.17A/B patch 602 is not the tip (*i.e.*, distal end) of any elongate applicator, but, rather, a patch placed or laid upon/against the skin and rolled over by roller apparatus 600 (Appx01998 at Figs.17A/B;Appx02011 at 26:29-50); (4) to the extent this Court affirms the Dist.Ct.'s erroneous construction of "applicator tip," including sub-term "attached," Figs.17A/B patch 602 is not attached to anything, but, rather a patch placed or laid upon/against the skin and rolled across by roller apparatus 600 (*id*.). Moreover, there is no attachment of either patch to any applicator via any mechanism under any construction. Each of the Avrahami patches is placed on the skin, then pressed on, or rolled over, by another device, *e.g.*, Fig.1A control unit 30 or Figs.17A/B apparatus 600, in a transitory manner wherein electrodes on the patch are electrically "coupled" with those of the device:

Preferably, the device includes a patch, fixed to the receiving electrodes, which patch is adapted to be applied to the skin.

Electrodes **610** and return strip **614** preferably pass through patch **620** from the top surface thereof (FIG. **17A**) to the bottom surface thereof (FIG. **17B**), so as to contact skin **22** when the patch is placed on the skin.

Preferably, a handheld unit including at least one high-voltage driving electrode **650**, a return electrode **652**, and a power source (not shown) is passed by the user over a patch **602**

In this manner, as the handheld unit is passed over the patch, driving electrode **650** preferably comes into contact with each of receiving electrodes **610**, and drives current through these electrodes into skin **22**.

Simultaneously, return electrode **652** makes contact with return strip **614** on patch **602**, allowing current injected into skin **22** to return to the handheld unit.

Appx2004-2012 at 12:52-54,14:51-15:29, & 26:36-27:5. A device that simply ***presses against*** or ***passes over*** a patch is not ***attached*** to it, *i.e.*, the electric coupling of electrodes is not a "joining" or "connecting." Nor has the Dist.Ct. shown such – it merely imposed a limitation but failed to enforce it.

Further, similar to the court in *Wi-LAN*, which this Court found erred, the Dist.Ct., here, further erred in weighing the evidence and opinions presented by each parties' expert against the disclosures of the alleged prior art, improperly drawing inferences from these facts,[31] and improperly relying on Invasix's attorney arguments, which are not evidence.[32] *Wi-LAN v. Ericsson*, 675 F.App'x 984, 990 (Fed.Cir.2017).

Further, the Dist.Ct. erroneously held Syneron's expert "admitted" or "confirmed," during his deposition, Figs. 1A-1B patches of the TransPharma Patents (and, thus, related Avrahami '060 – *see* Appx00096, fn.9) are "applicator tips"

[31] "[W]hen ruling on a motion for summary judgment, '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…'" *Wi-LAN*, 675 F.App'x at 990. (*quoting Anderson*, 477 U.S. at 255); *Soule v. City of Edmonds*, 736 F.App'x 182 (9thCir.2018) (*quoting* same).

[32] Court's reliance on attorney arguments, which are not record evidence, including bare assertions and conclusions, improper at summary judgment. *See Wi-LAN*, 675 F.App'x at 990-991.

within the context of, and as disclosed and claimed in, the Syneron Patents, including improperly relying on Invasix's characterization thereof. Appx00096-00097 (*citing* Appx10513-10514 at 598:13-600:5;Appx12143-12162); *see* Appx37305-37306.

In the first instance, the Dist.Ct. erred in finding there to be an "admission" at all, or, at a minimum, erred in failing to construe the alleged "admission," including whether it was sufficiently retracted/clarified, favorable to Syneron and making improper sufficiency and credibility determinations regarding the retraction/clarification. Syneron's expert only marked the exhibit in that manner because *he was asked* to mark it that way, not because his opinion such a marking represented Fig.1A patch was an applicator tip; moreover, he further retracted, or, at a minimum, corrected/clarified, this alleged "admission" testimony. *See* Appx30617 at 793:21-25;Appx30619 at 795:7-9; *see gen.* Appx30616-30619. Regardless of whether his retraction/clarification is accepted as credible – a determination for the factfinder, not Dist.Ct. on summary judgment (*see* fn.21),[33] there simply is no evidence Syneron's expert was testifying that the specific devices in Avrahami '060, Figs. 1A-1B, were applicator tips in the context of, and as disclosed and claimed in, the Syneron Patents. Rather, as Syneron's expert clarified (before retrating), his testimony was limited solely to the specific figures and context/disclosures of the he was asked about, and no evidence shows he intended otherwise. Appx30619 at

[33] Sufficiency of which being a factual which the Special Master and Distr.Ct. noted during each respective hearing. Appx36917 at 28:13-16;Appx38363-38364 at 32:4-33:14.

795:7-9.

Further, before concluding his testimony, Syneron's expert confirmed everything in his report was correct (Appx30661 at 837:14-16), including that TransPharm Patents' Figs. 1A-1B patches are not applicator tips as claimed in the Syneron Patents.[34] Further, Syneron's expert submitted a sworn declaration, comprising the opinions in his reports, filed with Syneron's MSJ response, which clearly states the Avrahami patches are not applicator tips.[35] The only fair, reasonable reading of Syneron's expert's deposition testimony, including when viewed in Syneron's favor, is his alleged "admission" was ambiguous, at best, he, in any event, retracted/clarified it, and he further submitted an expert declaration stating these patches are not applicator tips. In any event, this alleged "admission" by Syneron's expert was not binding upon Syneron. *See Soverain v. Newegg*, 705 F.3d 1333, 1341 (Fed.Cir.2013), *amended on reh'g*, 728 F.3d 1332 (Fed.Cir.2013); *Besig v. U.S.*, 208 F.2d 142, 147 (9thCir.1953).

In erroneously dismissing Syneron's expert's opinions, the Dist.Ct. states the "entirety" of Syneron's expert's response to Invasix's expert's alleged analysis is conclusory. Appx00099. This was erroneous. Syneron's expert's opinions comprise specific, reasoned statements that the patches are not applicator tips. *See* fns.35-36. Firstly, the Dist.Ct. fails to even address, or acknowledge, Syneron's expert's

[34] *See, e.g.*, Appx08067-0873;Appx08241-08251;Appx08285-08294;Appx08952-09031;Appx09215-09296.
[35] Appx05629-05643;Appx05674-05686;Appx05757-05772;Appx05823-05835.

opinions related to Fig.1A patch, aside from the improper, erroneous findings related to the alleged "admission," noted above, and, instead, as noted, relies solely on its erroneous findings on the "admission" and erroneous conclusion "Invasix's contention…is well supported by the record," further based solely on its erroneous constructions. Appx00095-00096. As noted above, Dr. Pearce lacks analysis of Fig.1A patch. *See* §V.C.1 For Figs.17A/B patch, the Dist.Ct. erroneously concludes Syneron's expert had nothing more than "conclusory statements," improperly cherry-picking from his reports, ignoring further analysis therein. Appx00099; *See Lupo v. Colvin*, 2015 WL 12844409, *4 (M.D.Fla. Sept. 23, 2015); *Sweat v. Berryhill*, 2018 WL 4043192, *6 (S.D.Ga. Aug. 24, 2018).

For example, despite Dr. Pearce's lacking Fig.1A patch analysis, Syneron's expert states, with respect to *both* Avrahami patches, a patch is not an applicator tip. *See* Appx08957 & Appx09004 (".. the electrodes are ***not*** *on the applicator tip*.");Appx05630 & Appx05675 ("... patch…does not comprise an applicator tip").

The Dist.Ct. erred in relying upon Dr. Pearce's allegedly "detailed and thorough analysis" on Avrahami '060 anticipation, repeatedly citing his conclusory statements and simply regurgitating his unsupported conclusions, often in their entirety, as support for its erroneous findings. For example, the Dist.Ct. correctly quotes the report at ¶763(Appx00098-00099), but, rather than being an "example" of Dr. Pearce's "applicator tip" analysis, this paragraph is the entirety of it – there is no explanation for the Avrahami patches, including none for Fig.1A, being

applicator tips. *See* Appx03839-03840;Appx11994-11997;Appx12034-12035;Appx12063-12064; §V.C.1. Rather, ¶763, relied upon by the Dist.Ct., simply cites Avrahami '060 disclosures related to Figs.17A/B patch, then provides conclusory statements not tied thereto, *e.g.*, concluding the "material with electrodes…is an applicator tip…because it applies the electric energy to the skin," lacking explanation why simply providing electric energy is all required to be an applicator tip, including where there is no suggestion the "material with electrodes" is the patch, which is not even an applicator tip. Appx03839-03840 (*citing* Appx2002 at 7:7:45-48;Appx2011 at 26:14-59). Moreover, the skin patch in the first ¶763 citation is "a skin patch containing a drug," not electrodes. Appx02002 at 7:45-50.

Moreover, such dismissal is based, at least in part, on the Dist.Ct.'s legal error Invasix met its burden, including based on a reliance on Invasix's expert's opinions, and, thus, Syneron was required to rebut Invasix's insufficient[36] showing. *See* Appx00099;Appx00102;Appx00106. At a minimum, there is a genuine issue of material fact regarding whether a patch is an "applicator tip" and/or Syneron's expert's retraction/clarification was sufficient. Thus, in view of the above, it was error for the Dist.Ct. to find the Avrahami patches are applicator tips.

b. Avrahami '060 lacks other limitations

The Dist.Ct. further erred in finding anticipation relative to the Avrahami

[36] *See* §V.C.1.

patches because, even if erroneously deemed applicator tips, they lack other required claim limitations, namely that (1) Fig.1A patch (Appx01988) lacks a plurality of RF application elements having a combined application element surface area substantially smaller than the ground electrode surface area ('654 claims 1, 19, and 24); lacks a plurality of RF application/voltage to skin elements free of any ground/ larger sized electrode therebetween ('654 claims 1, 19, and 24; '036 claims 1 and 21); and lacks a cluster of voltage to skin elements free of any portion of the therebetween; and (2) Figs. 1A (*id.*) and 17A/B (Appx01998) patches both lack a plurality of ground electrodes/electrodes sized substantially larger ('654 claims 1 and 19; '036 claims 1 and 21). *See* illustrations at Appx36683-36688 & Appx36690-36692; §V.C.1. The Dist.Ct.'s erroneous findings on these limitations are entirely conclusory, lacking any analysis or citation to Avrahami '060, and any purported analysis thereof is simply wholesale accepting Invasix's conclusory, unsupported, and jumbled (jumbled because they conflate and confuse different embodiments) expert's opinions (*see* §V.C.1) and erroneous disregard of Syneron's expert's opinions (*see id.*), including as noted above. Appx00100-00104. For example, while the Dist.Ct. purports to rely upon the Pearce Report for the erroneous conclusion Fig.1A patch has ground electrodes with a surface area larger than the combined surface area of the RF application electrodes, when there is no factual support in Avrahami '060. Indeed, the electrodes in Fig.1A are all active electrodes of the same size. Appx01988;Appx02005 at 14:34-65. Further, while there is a generic statement

in Avrahami '060 some of the active electrodes may be used as ground (Appx02003 at 9:18-23), there is no tie to any specific embodiment or disclosure as to the arrangement or sizing thereof, nor has the Dist.Ct., or Dr. Pearce, cited to such. As for Figs.17A/B, the disclosure is clear, there is a single ground surrounding the active electrodes, but no disclosure of the relative sizes thereof. Appx01998.

The Dist.Ct. also erred in relying upon, and, further, in giving greater weight to, Dr. Pearce's conclusory opinions a POSITA would understand elements to be disclosed, which are ***not***, *in fact*, disclosed, and which should carry no weight on summary judgment. *See Abbott Labs*, 720 F.3d 1380. Thus, even if the Dist.Ct. did not erroneously dismiss Syneron's evidence as conclusory, it is no less conclusory than Invasix's purported evidence. *See* §V.C.1. Invasix never established any patches are an "applicator tip," including because, as a matter of fact and law, they are not. Even if the Pearce Report was erroneously read as asserting the patches are an "applicator tip," there is still no support for Fig.1A patch being an "applicator tip," and, this is, at most, conclusory, and still would not make them an applicator tip.

These erroneous reliances upon Invasix's expert's conclusory statements, which are contradictory to Avrahami '060, was erroneous, as was the disregard of Syneron's expert's opinions, as well as the actual disclosures of Avrahami '060. As noted, much of the Dist.Ct.'s findings are based on the erroneous opinions of Invasix's expert, who, as the party with the burden on summary judgment, had the

burden of showing there is no genuine issue of material fact on invalidity by clear and convincing evidence. The Dist.Ct. fails to show Invasix sufficiently met its high burden on summary judgment to support its findings.

c. Insufficient ‘036 limitations analysis

Rather than provide any meaningful analysis, the Dist.Ct. conclusorily states ‘036 claim 1 tracks ‘654 claim 1 with "some differences in claim language," and subsequently conclusorily matches ‘036 claim 1 limitations with ‘654 claim 1 limitations, without any justification as to why they "track" or are "similar." Appx00105.

d. Insufficient "processor…" limitations analysis

The Dist.Ct. further erred in finding the "processor…" limitations (Appx00223 at Claim 24;Appx00237 at Claim 21) met under its construction (Appx00040) of these limitations as MPF terms, wherein the corresponding structure is a stated algorithm. Appx00104. However, in view of this construction, the Dist.Ct.'s erroneous findings, and Invasix's expert's opinions upon which the findings are based, wholly lack any application of its construction, including lacking any valid, proper MPF analysis, which would justify such findings. Where a term is deemed a MPF term, invalidity analysis requires a showing a relevant structure, or, here, algorithm, in the prior art device performs the identical function recited in the claim and be identical, or equivalent to, the corresponding structure in the specification. *See Fresenius v. Baxter*, 582 F.3d 1288, 1299 (Fed.Cir.2009). Rather

than performing the required, let alone *any*, "function-way-result" analysis showing Avrahami '060 discloses the "processor…" limitations, the Dist.Ct.'s entire analysis, as with much of its other analysis, is simply regurgitation of Dr. Pearce's Report (which have no proper "function-way-result" analysis; *see* Appx03853-03854;Appx03910;Appx12054-12057;Appx12121-12124; §V.C.1) and a sweeping dismissal of Syneron's expert's opinions. Appx00104. Notably lacking is any findings as to the function, algorithm, the way the algorithm is performed, or the result of the algorithm, for either the Syneron Patents or Avrahami '060 or comparison thereof.

Despite noting Dr. Pearce's lack of MPF analysis (Appx38298-38299 at 16:12-18:21), the Dist.Ct. clearly erred in its reliance on Dr. Pearce's opinions, including because, Dr. Pearce's conclusory opinions (*see* §V.C.1) on '654 claim 24, which are limited to solely the understanding of a POSITA "under Syneron's proposed construction and apparent position as to claim scope" (Appx03853), which the Dist.Ct. did not adopt. *C.f.* Appx00032 (showing Syneron's proposed construction);Appx00040 (showing the Dist.Ct.'s construction). Similarly, with respect to '036 claim 1, while Dr. Pearce's conclusory opinions supposedly consider "both parties' proposed constructions" (Appx03910), his analysis is equally lacking any proper MPF analysis under *any* construction, let alone the Dist.Ct.'s. To the extent Invasix argues the constructions are the same, and, thus, the was no further analysis necessary, such an argument is erroneous, including because there is still

insufficient MPF "function-way-result" analysis.

Thus, there is no basis to conclude Avrahami '060 discloses these terms, and it was error for the Dist.Ct. to do so.

3. *Erroneous Obviousness Findings/Conclusions*

i. *Erroneous findings Eppstein '316 renders TransPharma Patents' Asserted Claims obvious*

In the first instance, the Dist.Ct's obvious conclusions on all dependent Asserted Claims are erroneous because the dependent claims are not anticipated. Further, the Dist.Ct. erred in concluding Eppstein '316 renders obvious '232 claim 30 and '079 claim 25, each adds the limitation "the power source is adapted to apply the alternating current at a frequency above about 100Hz." As initial matter, the Dist.Ct.'s erroneous conclusion relies on same flawed anticipation analysis and findings discussed above. Moreover, the Dist.Ct. entirely lacks findings and conclusions supporting a motivation to combine and addressing the claims, as a whole. Rather, the Dist.Ct. simply found that, because it erroneously concluded Syneron had no real rebuttal, it could simply regurgitate Dr. Pearce's conclusory opinions.

Here, the only support relied on is Dr. Pearce's vague, unsupported opinions (*see* §V.C.1) it would have been obvious to a POSITA to use high frequency currents Eppstein '316 electrodes, because of the "benefit of reducing shock to patients when HF AC current is used," which the Dist.Ct. erroneously found a "detailed showing."

Yet the Pearce Report is neither clear nor convincing – it is conclusory. As above, Dr. Pearce's "analysis" primarily quotes language and makes unsupported conclusions.

Moreover, Syneron's expert does not merely recite conclusory language, but, rather, contains a lengthy paragraph-by-paragraph rebuttal to Dr. Pearce's "analysis." *See* §V.C.1. The Dist.Ct. improperly discounts Syneron's expert's contrary analysis as conclusory, which it is not, and because of Syneron's expert's alleged "admission" a POSITA "knew that currents at above 100Hz could be applied to electrodes and that these frequencies could be used for microporation." Appx00116. However, all Syneron's expert "admitted" was using 100Hz is *one way* to provide A/C, not the only way, or way a POSITA would modify Eppstein '316. *See* Appx30516-30519 at 692:3-695:20. Moreover, Syneron's expert has opined that D/C or A/C will suffice, including at frequencies under 100Hz. See Appx05950-05956;Appx08667-08669;Appx08819-08821. At a minimum, this merely established a fact issue between experts as to whether a POSITA would so modify Eppstein '316. This is insufficient on summary judgment, including that mere knowledge does not establish obviousness or establish any motivation to combine.

*ii. Erroneous findings Avrahami '060 renders Syneron Patents's Asserted Claims obvious*

The Dist.Ct. erred in finding Avrahami '060 renders the Syneron Patents obvious (Appx00107-00108), including because, at a minimum, the underlying

independent claims are not anticipated. Further, in support of its findings, the Dist.Ct., again, improperly relies upon conclusory statements in the Pearce Report alleging the obviousness of using isolated transformers and serial capacitors, yet improperly dismisses the Webster Report's corollary discord with them as deficient. Such conclusory statements are insufficient for summary judgment, where Invasix's expert simply quotes the claims and draws unsupported conclusions. *Id*. In any event, Syneron's expert properly disputes those assertions, including in terms no less conclusory, making summary judgment improper with all inferences in Syneron's favor. *See, e.g.*, Appx08053-08055;Appx08067-08071;Appx08241-08251;Appx08285-08294;Appx08361-08373;Appx08415-08426;Appx08952-09093;Appx09215-09296. With regard to the Dist.Ct.'s footnote 10, Syneron explained at the hearing this was simply a mistake, and, further, pointed to numerous of Syneron's expert opinions, including those noted hereinabove (*see* §V.C.1) with specific rebuttal to Dr. Pearce's conclusory opinions. *See* Appx38369-38370 at 38:18-42:9.

Further, the Dist.Ct.'s reliance on the vague questions asked of Syneron's expert whether certain limitations were known, ***in the abstract***, with no relation to the patent disclosures, is insufficient to support a finding of obviousness. *See* Appx30624 at 800:3-16. Indeed, notably absent from the Dist.Ct.'s, and Invasix's expert's, analysis is any showing as to how or why these known concepts would be combined with Avrahami '060 aside from Invasix's expert's conclusory statements

of such. Appx00107-00108; *see* §V.C.1. Syneron's expert further noted that serial capacitors and isolating transformers being known is uninformative of whether the Asserted Claims, as a whole, are obvious. Further, at a minimum, such issues as to whether something simply "known" would be specifically obvious to combine in a way which results in the claimed invention of the Syneron Patents is entirely a disputed issue between the experts, which precludes summary judgment.

**D. The Dist.Ct. Erred In Granting Invasix's Daubert Motion On Syneron's Damages Expert**

1. *Erroneous exclusion of Syneron's damages expert's report and testimony*

Despite recommending the motions be denied in view of its granting summary judgment of invalidity, albeit erroneously, the Special Master separately granted Invasix's motions regarding Syneron's damages expert. *C.f.* Appx00117 (recommending denying motions (6) and (8));Appx00047. The Dist.Ct.'s ruling (Appx00046-00081) is fundamentally flawed, including based on an erroneous understanding of the law and clearly erroneous understanding of the report, requiring this Court to conduct a *de novo* review and reject and reverse the findings and conclusions, or, alternatively, resubmit issues to the Dist.Ct. for further proceedings.

One of the more egregious errors in the Dist.Ct.'s ruling is its failure to differentiate between the threshold requirements of reliability and relevance of an expert's testimony under FRE 702 and *Daubert* and the sufficiency and weight of said testimony. The Ninth Circuit, "contemplates a broad conception of expert

qualifications" requiring only that they be relevant and reliable, where *Daubert* set forth various non-exhaustive factors to consider, including potential for error and general acceptance of employed methods.[37] The test "is not the correctness of the expert's conclusions but the soundness of his methodology," and when an expert meets the threshold established by FRE 702, the expert may testify, and the fact finder, not the court, is left to decides how much weight to give that testimony. *Mass Engineered Design v. Planar Sys.*, 2017 WL 2642277, *2-*3 (D.Or. June 19, 2017) (*quoting City of Pomona v. SQM N. Am.*, 750 F.3d 1036, 1043-1044 (9thCir.2014)). Challenges going to the weight of the evidence are within the province of a fact finder, and a court should not take credibility determinations from the jury, except where judging candor. *Id*; *Cave Consulting*, 2015 WL 13413389 at *1; *Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed.Cir.2009). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Icon-IP*, 87 F. Supp. 3d at 938; *Labyrinth Optical Techs. v. Alcatel-Lucent USA*, 2015 WL 12720323, *2 (C.D.Cal. Mar. 10, 2015). Further, while "considerable deference [is due to] the credibility determinations of special masters…this does not mean that a special master can cloak the application of an erroneous legal standard

[37] *Icon-IP v. Specialized Bicycle Components*, 87 F.Supp.3d 928, 939 (N.D.Cal.2015); *see BurnLounge*, 753 F.3d at 888; *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993); *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 147-150 (1999)); *Cave Consulting v. OptumInsight,* 2015 WL 13413389, *1 (N.D.Cal. Feb. 20, 2015); Fed.R.Evid. 702

in the guise of a credibility determination, and thereby shield it from appellate review." *Id*. (citation omitted). Here, the Dist.Ct. simply substituted its own credibility determination for the proper legal tests under FRE 702 and *Daubert*.

In addition, the Dist.Ct. erred in failing to apply the proper legal tests regarding the scope and methodology permissible for a reasonable royalty analysis. "A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a [HRN] between the patentee and infringer based on the [comprehensive (but unprioritized and often overlapping) factors in *Georgia–Pacific*." *Wordtech v. Integrated Networks*, 609 F.3d 1308, 1319 (Fed.Cir.2010) (*citing Georgia–Pacific v. U.S. Plywood*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970)); *ResQNet.com v. Lansa*, 594 F.3d 860, 868-69 (Fed.Cir.2010). While an established royalty may be the best measure, the [HRN] or the 'willing licensor-willing licensee' approach, attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Nickson Indus. v. Rol Mfg.*, 847 F.2d 795, 798 (Fed.Cir.1988); *Lucent Techs. v. Gateway*, 580 F.3d 1301, 1324 (Fed.Cir.2009).

However, while generally the factors espoused in *Georgia-Pacific* are used, this Court has acknowledged that "there may be more than one reliable method for estimating a reasonable royalty." *Apple*, 757 F.3d at 1315. Even where a damages expert reviews various valuation methodologies in its analysis, such multiple analyses are proper, including because such market approach used looks at

comparable license agreements in order to determine a reasonable royalty. *See, e.g., StoneEagle Servs. v. Pay-Plus Sols.*, 2015 WL 3824170, *9-10 (M.D.Fla. June 19, 2015). "However, the Federal Circuit has indicated that it does not require that witnesses use any or all of the Georgia–Pacific factors when testifying about damages in patent cases." *Id*. (*citing Whitserve v. Computer Packages*, 694 F.3d 10, 31 (Fed.Cir.2012)). Yet the Dist.Ct. erroneously held Mr. Weinstein's analysis was not proper merely because it failed, in its eyes, to strictly comply with *Georgia-Pacific* and went "too far" without providing any notion as to where the "line" it believes Mr. Weinstein crossed sits. Appx00061;Appx00074.

All such errors were clear error and amount to, at a minimum, an abuse of discretion, including based on clear errors of law and fact.

2. *Report conducts a proper, reliable royalty analysis*

The Weinstein Report conducts a proper, reliable royalty analysis, including application of the *Georgia-Pacific* factors ("*GP* factors"), including a proper, reliable employment of the Book of Wisdom ("BoW") which has been explicitly sancstioned by both the Supreme Court and this Court.[38] Simply put, a reasonable royalty comprises a royalty rate applied to a royalty base. A reasonable royalty may be calculated by applying a unit royalty rate to a royalty base. Mr. Weinstein's

[38] Appx27589-27590 at ¶ 65, fn.156; *see Sinclair Refining v. Jenkins Petroleum Process*, 289 U.S. 689, 698 (1933); *Lucent*, 580 F.3d at 1333; *see also Sealant Sys. v. TEK Glob.*, 2014 WL 1008183, *33 (N.D.Cal. Mar. 7, 2014), *rev'd on o.g.*, 616 F.App'x 987 (Fed.Cir.2015).

analysis comprises the application of a unit royalty rate, based on the margins Syneron makes on its comparable, competing eMatrix product, to a royalty base, with proper apportionment for non-patented features, Invasix's Fractora tips and applicators, and platforms sold with Fractora applicators. Not only is this methodology proper under the law, it is also sufficiently reliable under FRE 702 and *Daubert*. Mr. Weinstein's methodology is based on sounds principles of economics, including looking to the pricing and profit margins of comparable, competing products which wholly comprise the patented features to determine a proper royalty rate.

Indeed, much of the Dist.Ct.'s erroneous findings and conclusions appear to stem from its conclusion simply because Mr. Weinstein's methodology is not the "best" or "most common" methodology, or the methodology suggested by Invasix, it is improper and unreliable. The Dist.Ct. erroneously discounted the analysis and erred in finding Mr. Weinstein failed to conduct a proper, reliable reasonable royalty analysis. There was nothing improper or unreliable in Mr. Weinstein's analysis.

3. *Erroneous findings/conclusions of Dist.Ct.*

   i. *Erroneous finding of improper royalty base*

The Dist.Ct. erred in finding Mr. Weinstein based his analysis on an improper royalty base and failed to perform a proper apportionment of the accused products. Appx00054. The Dist.Ct. also erroneously concludes Mr. Weinstein's use of Syneron's eMatrix as a basis for apportionment was "arbitrary," erroneously finding

a *lack of evidence* of the eMatrix as a single-use RF platform. Appx00056. In support of its erroneous legal conclusion that "[t]he law requires the apportionment of the accused product, not that of the accuser's," the Dist.Ct. cites to cases which simply do not support such a conclusion. Appx00056 (*quoting Finjan v. Blue Coat*, 879 F.3d 1299, 1309 (Fed.Cir.2018); *Mentor Graphics v. EVE-USA*, 870 F.3d 1298, 1299 (Fed.Cir.2017)). Rather, both cases stand for the unsurprising, well-established principle that some method of apportionment to the accused product's value is required when it comprises non-patented features, but not the only way. Indeed, as stated in *VirnetX* (which was cited in *Finjan*, and Syneron's briefing (*see* Appx23263-23264)), all a patentee is required to do is "take care to seek only those damages attributable to the infringing features" regardless of how the royalty is calculated, so long as it gives evidence of such apportionment. *VirnetX v. Cisco*, 767 F.3d 1308, 1326 (Fed.Cir.2014); *Finjan*, 879 F.3d at 1309 (*quoting Garretson v. Clark*, 111 U.S. 120, 121 (1884)). Nor does the Dist.Ct. provide support that its conclusion is an absolute requirement, including under FRE 702 or *Daubert*.

Moreover, there was no need to further apportion the Syneron products where, as Mr. Weinstein notes, the asserted claims cover the eMatrix product as a whole, including that it was a single-use RF platform and the sales thereof, are coextensive with the claimed features and the functional components driving product sales, per testimony from two Syneron 30(b)(6) witnesses and Dr. Webster. *See* Appx27560-27565;Appx27584-27587;Appx27608;Appx27643;Appx03122-03129 at 19:5-15 &

25:19-26:15;Appx06165-06167;Appx07232-07601;Appx05867-05888;Appx08086-08106; *see also AstraZeneca v. Apotex*, 782 F.3d 1324, 1338 (Fed.Cir.2015). The Dist.Ct. even specifically notes these bases for Mr. Weinstein's opinions, yet, in the very next sentence, erroneously discounts this evidence, finding he opines "without any supporting evidence." Appx00056. Mr. Weinstein further bases his determination of the value of the eMatrix in view of Syneron's opportunity costs, including that Syneron would stand to lose significant sales from licensing to Invasix. Appx27643; *see gen.* Appx27638-27369.

Mr. Weinstein then properly determined a unit royalty rate, which he determined the parties would agree on, based on the gross, and adjusted gross, margins or product operating margin Syneron makes on the eMatrix, a single-function product wholly embodying the patents (which the Dist.Ct. did not take issue with), and applied that rate to Invasix's products, which he properly apportioned (as detailed below). Appx27369. This determined rate was further supported by testimony from Dr. Kreindel regarding his understanding of patent royalties in the relevant market based upon his significant industry experience. *Id*. Such a conclusion was appropriate, including under the BoW (as discussed below), which the Dist.Ct. did not take issue with. *Id*. Thus, the foregoing properly apportioned out any value from non-patented features. *Id*.

*ii. Erroneous finding of EMV rule violation*

The Dist.Ct. further erroneously contends Mr. Weinstein failed to properly

apportion Invasix's products because the accused platforms and applicators support other functionalities beyond the asserted patents, and only one applicator is accused of infringement. Appx00054-00056. In addition to its above erroneous findings, the Dist.Ct. also erroneously states all analysis based on the smallest saleable patent practicing unit ("SSPPU") requires further apportionment. Appx00056-00057. The Dist.Ct. does not, however, state or conclude Mr. Weinstein failed to properly apportion Syneron's products used to derive the unit royalty rate, as discussed above. Nonetheless, Mr. Weinstein clearly ***did*** apportion for the value of the patented features in the Fractora products. *See* Appx27643 at ¶185.

As set forth in detail in his report, Mr. Weinstein fully accounts for, and properly apportions, where necessary, including consistent with this Court's guidelines. For example, Mr. Weinstein relies on Dr. Webster for the conclusion Invasix's platforms, applicators, and tips constitute a "single functional unit," and the "accused Fractora devices embody the demanded functionality taught by the Patents-in-Suit." Appx27607;Appx27600;Appx27627. Where, as here, the patented features comprise a major, or sole, basis for consumer demand (*see* Appx27608) – including operating as a single functional unit with no use absent the patented features, the application of the unit royalty rate to the entire product is proper, and no apportionment of applicators or tips was necessary. *See Lucent*, 580 F.3d at 1337; *Uniloc v. Microsoft*, 632 F.3d 1292, 1320 (Fed.Cir.2011)).

Using the unit royalty rate noted above, Mr. Weinstein then appropriately

applied his per unit royalty rates to the number of infringing units sold to arrive at royalty damage totals. Appx27369. For the tips, he opines no apportionment necessary because they lack of use beyond with Fractora applicators which, in turn, cannot function without the tips. Appx27640; *see gen.* Appx27635-27651. He further concludes no apportionment is required for accused Fractora *applicators* and *tips*. *See Lucent*, 580 at 1336.

However, for Fractora *platforms* Mr. Weinstein specifically states the "value generated from sales of platforms compatible with accused Fractora applicators should be apportioned since these platforms provide additional functionality besides that associated with accused Fractora applicators" and that "[t]his apportionment is described in the discussion of *Georgia-Pacific* 15." Appx27608-27609. Thus, Mr. Weinstein ***does*** apportion out value provided by non-accused applicators from multi-applicator platforms by adjusting the royalty rate for platforms (*see* Appx27608), including by relying on the eMatrix opportunity cost, as noted above. Appx27643. Further, in order to further ensure he did not capture platforms used in non-infringing configurations, Mr. Weinstein does not apply his royalty rate to the full value of the accused Invasix products, but, rather, as the Dist.Ct. notes (Appx00055, fn.5), excludes platforms not sold with Fractora applicators, ***even if purchasable later***. *See* Appx27608;Appx27640;Appx28335-28336 at 268:4-369:2. In other words, Mr. Weinstein does not apply his royalty rate to the full value of the accused Invasix products, but rather, he applies his rate to the SSPPU, as set forth above. The fact

that Mr. Weinstein "conceded that he did not apportion [Invasix's products] beyond excluding platforms" not sold with Fractora applicators (Appx00055, fn.5) is unsurprising, yet this same statement by the Dist.Ct. shows that Mr. Weinstein ***does*** apportion out the value of non-patented features from Invasix's products, including as discussed further below. Moreover, using the entire value of the eMatrix as the base, due to its embodying the patented features with no non-infringing uses, Mr. Weinstein observed the difference in average price between Invasix platforms and eMatrix platforms, further evidencing proper apportionment. *See* above and Appx27612-27613;Appx27644-27645.

The Dist.Ct.'s attempt to distinguish the *AstraZeneca* case by concluding "Mr. Weinstein does not identify 'the combination of the platform, applicator, and tips' as the [SSPPU]" (Appx00056-00057) fails to appreciate Mr. Weinstein does note the applicator and tips are, at first blush, the SSPPU, when considering what drives the demand and what is demanded, the rate should be applied to all components, as apportioned by Mr. Weinstein (noted above), including because they are necessary to function. *See* Appx27607;Appx27608-27610;Appx27640. As explained by Mr. Weinstein, he applied a fixed royalty rate to the SSPPU (*i.e.*, this combination of the platform, applicator, and tips), including because the specific combination comprises the entirety of the patented features which are the basis for demand of the products. Appx27608-27609;Appx27640; *see gen.* Appx27635-27651.

The Dist.Ct. also erroneously concludes Mr. Weinstein failed to apportion by

noting non-infringement of certain claims by Invasix's coated 24-pin tips and 20 pin tips, and then erroneously concluding apportionment was required for applicators. Appx00058, fn.8. However, Invasix had not sold the 24-pin tip in the U.S., and the 20-pin tip was discontinued due to unpopularity. Appx27577, fns.91-92.

Here, contrary to the Dist.Ct.'s erroneous conclusions Mr. Weinstein neither "carefully selected the royalty base or "adjust[ed] the royalty rate" to discount non-patented features (Appx00056), his analysis did both by determining a unit royalty rate based on Syneron's eMatrix product and apportioning Fractora platforms. *Exmark v. Briggs & Stratton Power Prod.*, 879 F.3d 1332, 1348 (Fed.Cir.2018). Indeed, Mr. Weinstein's analysis meets the "essential requirement under *Daubert*…that the ultimate reasonable royalty award [is] based on the incremental value that the patented invention adds to the end product," here, the applicators, tips, and platforms, as apportioned. *See* Appx00058 (*quoting Commonwealth Sci. v. Cisco*, 809 F.3d 1295, 1301 (Fed.Cir.2015)). At best, the Dist.Ct. can be said to have taken issue with Mr. Weinstein for his lack of technically detailed analysis regarding the accused products – something equally lacking from Invasix's damages expert's report (*see* Appx27081-27083). However, Mr. Weinstein's analysis of the reasonable royalty, including in view of Dr. Webster's infringement analysis, noting the co-extensiveness of the patented features with the accused products, was entirely proper and reliable and sufficient under FRE 702 and *Daubert*.

*iii. Erroneous finding of "de facto" lost profits analysis*

The Dist.Ct. erroneously concludes Mr. Weinstein's damages opinions constitutes a "de facto" lost profits analysis. Appx00050-00054. Then, based solely on this erroneous conclusion, further concludes Mr. Weinstein failed to conduct a proper lost profits analysis, and, thus, his opinions are unreliable. *Id*. However, the Weinstein Report conducts an appropriate reasonable royalty analysis, not a *de facto* lost profits analysis or anything of the sort and is not unreliable or excludable under FRE 702 or *Daubert*. Nor do any of the cases cited by the Dist.Ct. support its erroneous findings and conclusions.

As an initial matter, the Dist.Ct.'s conclusion Syneron contends a patent owner could simply sidestep the heightened lost profits requirements is legally unsupported, logically incorrect, and misses the key distinction between a lost profits and reasonable royalty analysis – the ability to actually produce the products. Simply because a competitor-party to the HRN may agree to a royalty in an amount equal to potential lost profits does not equate to the ability of patent owners to argue that in any HRN they should get the amounts sold by the infringer. Without limitation, *GP* Factor 5 calls for examination of the commercial relationship between the licensor and the licensee, specifically with reference as to whether they are competitors in the same territory or same line of business. This factor is relevant because, other things equal, infringement by a competitor may impact sales that otherwise would have been made by the patent holder. At worst, this small overlap

between the two would only be applicable in narrow circumstances, such as, here, where a competitor in a narrow market makes sales which would have otherwise gone to the patent owner. On the other hand, in a crowded market, where the patent owner no longer practices, there would be no such overlap, including because the infringer would have no incentive at the HRN to cover the losses from entry of a new party to the market.

Indeed, Mr. Weinstein appropriately determined the HRN would have begun with a base rate based upon Syneron's margins. Appx27639. In fact, the Dist.Ct. correctly acknowledges a *GP* factor analysis includes consideration of the licensor's anticipated lost profits in calculating a reasonable royalty. Appx00052. As recognized by *GP*, when entities license their competitors, they consider the profitability associated with licensed products ***and*** their own products. Since Syneron and Invasix are head-to-head competitors, the HRN would, of necessity, reflect this consideration. Thus, Mr. Weinstein's analysis is not a lost profits analysis; instead, it properly reflects Syneron's bargaining position at the HRN given direct competition from Invasix.

Further, the Dist.Ct. takes issue with Mr. Weinstein's use of Syneron's margins, concluding, without support, it is nothing more than a substitute for profits. However, as noted by the Dist.Ct. (Appx00051-00052), Mr. Weinstein notes his rate is based on the *margins* Syneron receives from its sales, not from any lost profits from Invasix's sales. *See* Appx27639. As noted, this type of comparison between a

patentee's profits from patented features and a determined royalty for the market, as Mr. Weinstein notes is based on Syneron's margins, is entirely within the confines of a proper royalty analysis, as discussed further herein. Thus, it is no surprise Mr. Weinstein's opinions do not include discussions of the *Panduit* lost profit analysis factors, yet the Dist.Ct. erroneously faults him for failing to include such analysis.

At best, the Dist.Ct. erroneously concluded Mr. Weinstein relied too heavily upon Syneron's margins (not profits) when arriving at the unit royalty rate to be applied to the infringing products. However, such a conclusion should not result in exclusion; rather, it goes, if at all, to the testimony's weight, which is improper *Daubert* exclusion justification.

*iv. Erroneous failure to allow proper BoW application*

The Dist.Ct. erroneously found Mr. Weinstein's use of the BoW was improper but fails to state any specifics as to why. Rather, including as noted herein, Mr. Weinstein properly relied upon the BoW on timing and participants for the HRN. As the Dist.Ct. acknowledges (Appx00059-00060), as Syneron notes in its briefing (*see* Appx23256-23257), and as this Court is aware, it is entirely appropriate for damages experts to employ the BoW, and its knowledge, at the HRN to consider facts and circumstances occurring thereafter. *See* Appx23256-23257 (*citing* cases, noting the flexibility of, and lack of specific limits to, the BoW).

Using the standard, and well-accepted, BoW framework, Mr. Weinstein determined TransPharma would not have conducted the HRN without substantive

input from Syneron. Further, Mr. Weinstein observed that, "If it is determined that TransPharma also would participate in the [HRN] in the instant manner, my opinion as to the license terms that ultimately would emerge from the [HRN] would be unchanged, for reasons including the alignment of interests of Syneron and TransPharma." Appx27595, fn.178. The Dist.Ct. simply failed to appreciate this. As to the subsequent issue of the two Syneron patents, including as noted above, the parties to the HRN would have anticipated their issuance and negotiated including on that basis. It is also standard for the HRN to reach an agreement to cover subsequent patents.

*v. Erroneous finding of improprieties in HRN analysis, including relative to date, patents, and/or parties thereof*

The Dist.Ct.'s erroneous findings with respect to Mr. Weinstein's HRN analysis are both legally flawed and factually erroneous, and fails for several reasons. As an initial matter, The Dist.Ct. overarchingly faults and criticizes Mr. Weinstein for considering the HRN, and forming his opinions, based on, and in view of, events and facts occurring after the HRN that could not have been known to or predicated by the hypothesized negotiators, but such a conclusion is legally incorrect. *See Lucent*, 580 F.3d at 1333; §F.1.v, *supra*. Indeed, despite the Dist.Ct.'s recitation of applicable law, including that cited by Syneron, it goes on to erroneously apply and arbitrarily and capriciously limit the expansiveness of the BoW without any support. Appx00059-00061. However, while the Dist.Ct. does

complain Mr. Weinstein exceeded the bounds of the BoW, nowhere does it set forth what bounds he specifically exceeded. Rather, the cases cited by the Dist.Ct. as limiting the BoW do not support the Dist.Ct.'s finding Mr. Weinstein exceed the limits.

Consistent with testimony Syneron and TransPharma discussed acquisition of TransPharma at least as early as September 2011, with frequent conversations between their executives for three to four years prior to the March 2012 acquisition of TransPharma assets, under a proper use of the BoW, Syneron and Invasix would have understood Syneron would be acquiring the Transpharma patents in six months. Appx27554-27555, Appx27581-27582;Appx27594-27595;Appx02777-02778 at 32:16-33:16;Appx02726-02727 (noting board meetings in November 2011). This is further supported by the fact TransPharma ceased its business in November 2011, only two months after the HRN, as noted by Invasix's own expert. *See* Appx04311. Thus, Mr. Weinstein's placement of Syneron at the HRN with regard to the TransPharma Patents in place of TransPharma was entirely proper and correct. *See TEK Global*, 2014 WL 1008183 at *32-34. Consistent with testimony Syneron began developing the later patented technology in 2009, and with the parent, continuation of application No. 12/505,576 having been filed in July 2009, "Syneron would have anticipated the issuance of the '036 patent and the '654 patent" at the HRN. Appx27594;Appx00211;Appx00224;Appx02889-02891 at 144:24-146:25. Thus, Mr. Weinstein's placement of Syneron at the HRN with regard to the Syneron

Patents which issued after the date of the HRN was entirely proper and correct.

Further, rather than point to any specific limit exceeded by Mr. Weinstein, the Dist.Ct. erroneously myopically focuses on the requirement the HRN must ***occur at*** the time of first infringement. Appx00060-00061 (*citing* cases). However, nothing in any of the Dist.Ct.'s cited cases stand for its ultimate proposition that only the events and occurrences as of the date of first infringement can be considered at the HRN. Indeed, such an erroneous legal conclusion is directly at odds with the well-established future-looking teachings of the BoW. Rather, the necessity for the date to be set at the time of first infringement stems from the necessity of knowing from when to calculate damages and from when to assess and contemplate future occurrences, not some barrier to the facts available for consideration.

The Dist.Ct. cites to the *Oracle* case in support of its erroneous conclusion, yet a look at the underlying facts shows its selective paraphrasing of the case ignores a large distinguishing feature relied on by the judge in that case – ***that Sun and Google had previous engaged in multiple licensing discussions***. *See Oracle v. Google*, 798 F.Supp. 2d 1111, 1117-1118 (N.D.Cal. 2011). Such a fact simply does not exist in this case.

The Dist.Ct. also erroneously attempts to distinguish the *Honeywell* case, yet, as noted by the Dist.Ct., that case specifically stands for the proposition future facts are to be considered at the HRN. Appx00064; *see Honeywell v. Hamilton Sundstrand*, 378 F.Supp.2d 459, 464 (D.Del.2005).

Including because the HRN occurs at the time of first infringement, with the benefit of future knowledge, Mr. Weinstein's discussion of the subsequent issuance being known prior to issuance is entirely proper. Other than conclusory rejections of Mr. Weinstein's opinions based on erroneous views of the law, the Dist.Ct. fails to show how Mr. Weinstein violates the BoW or otherwise provides an improper, unreliable HRN analysis. The Dist.Ct.'s criticisms that Mr. Weinstein relies too heavily on post-negotiation facts, is incorrect and not a valid ground for excluding his testimony because the extent of his reliance goes to the weight, not admissibility, of his testimony. *See, e.g.*, *Labryinth*, 2015 WL 12720323 at *1-2.

## VI. CONCLUSION AND PRAYER FOR RELIEF

Including as set forth above, the Dist.Ct.'s erroneous acceptance and adoption of the Special Master's Finding, Conclusions, and Recommendations, and the Finding, Conclusions, and Recommendations, themselves, are erroneous and should be reversed and/or remanded.

Dated: January 28, 2019

Respectfully submitted,

/s/ *John J. Edmonds*
John J. Edmonds
jedmonds@ip-lit.com
COLLINS, EDMONDS & SCHLATHER, PLLC
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (213) 973-7846
Facsimile: (213) 835-6996

Counsel for Plaintiff-Appellant,
SYNERON MEDICAL LTD.

## ADDENDUM

1. Final Judgment of invalidity under 35 U.S.C. § 103 and dismissal of claims, entered October 29, 2018 (Appx00001-00004)

2. Order Accepting Findings, Conclusions, and Recommendations of Special Master, entered September 28, 2018 (Appx00005-00008)

3. Special Master's Report and Recommendation on Claim Construction, entered September 5, 2018 (Appx00009-00045)

4. Special Master's Report and Recommendation on Motions to Strike/Exclude Damages Experts, entered September 5, 2018 (Appx00046-00081)

5. Special Master's Report and Recommendation on Syneron's Objections to the Tentative Special Master's Report and Recommendation on Motions for Summary Judgment, entered September 5, 2018 (Appx00082-00085)

6. Special Master's Report and Recommendation on Summary Judgment and Other Pending Motions, entered September 5, 2018 (Appx00086-00122)

7. U.S. Patent No. 6,148,232, issued November 14, 2000 (Appx00173-00191)

8. U.S. Patent No. 6,615,079, issued September 2, 2003 (Appx00192-00210)

9. U.S. Patent No. 8,496,654, issued July 30, 2013 (Appx00211-00223)

10. U.S. Patent No. 9,108,036, issued August 18, 2015 (Appx00224-00237)

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

SYNERON MEDICAL LTD.,

Plaintiff,

v.

INVASIX, INC. and INMODE MD LTD.,

Defendants.

Case No. 8:16-cv-00143-DOC-KES

**JUDGMENT [318]**

Ctrm: 9D
Judge: Honorable David O. Carter

IT IS ORDERED AND ADJUDGED as follows:

Judgment is entered in favor of Defendants InMode MD Ltd. and Invasix, Inc. (collectively "Defendants") on Plaintiff Syneron Medical Ltd.'s ("Syneron") claims for infringement pursuant to the Court's ORDER RE: APLICATIONS TO FILE UNDER SEAL [211] [268] [271] [274] [277] [280] [284] [292] [299]; AND ORDER ACCEPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF SPECIAL MASTER [261] [262] [263] [265] (ECF No. 306) dated September 28, 2018. Syneron shall take nothing on its claims against Defendants and its claims against Defendants are DISMISSED WITH PREJUDICE.

Judgment is entered in favor of Defendants on their counterclaims as to requests for declaratory judgement of invalidity pursuant to that same ruling as follows: claims 1–4, 7–10, 13–14, 16–17, 19–21, 23–25, 27, and 30 of U.S. Patent No. 8,496,654 ("the '654 patent"); claims 1–7, 10–13, 16–18, 20–22, and 24–28 of U.S. Patent No. 9,108,036 ("the '036 patent"); claim 29 of U.S. Patent No. 6,148,232 ("the '232 patent"); and claims 10, 11, and 18 of U.S. Patent No. 6,615,079 ("the '079 patent") are invalid as anticipated and claims 11, 12, 28, and 29 of the '654 patent; claims 14 and 15 of the '036 patent; claim 30 of the '232 patent; and claim 25 of the '079 patent are invalid as obvious.

Defendants' counterclaims as to requests for declaratory judgement of non-infringement are DISMISSED WITHOUT PREJUDICE as moot.

Defendants are prevailing parties in this litigation.

All relief not specifically granted herein is hereby denied. All pending motions not previously ruled on are hereby denied as moot. This judgment thus disposes of all claims and counterclaims before the Court. This judgment and its dismissals are entered subject to and without waiver of appellate rights. This is a final, appealable judgment. The Court retains jurisdiction solely with respect to requests for costs and fees, if any are made.

DATED: October 29, 2018

David O. Carter

Honorable David O. Carter
UNITED STATES DISTRICT JUDGE

**Jesse Villegas**

---

**From:** cacd_ecfmail@cacd.uscourts.gov
**Sent:** Monday, October 29, 2018 16:02
**To:** ecfnef@cacd.uscourts.gov
**Subject:** Activity in Case 8:16-cv-00143-DOC-KES Syneron Medical Ltd. v. Invasix, Inc. et al Judgment

**Follow Up Flag:** Follow up
**Flag Status:** Completed

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** There is no charge for viewing opinions.**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

## Notice of Electronic Filing

The following transaction was entered on 10/29/2018 at 2:01 PM PDT and filed on 10/29/2018
**Case Name:** Syneron Medical Ltd. v. Invasix, Inc. et al
**Case Number:** 8:16-cv-00143-DOC-KES
**Filer:**
**WARNING: CASE CLOSED on 09/28/2018**
**Document Number:** 320

**Docket Text:**
**JUDGMENT by Judge David O. Carter. Judgment is entered in favor of Defendants Inmode MD Ltd., Invasix, Inc. against Syneron Medical Ltd. Syneron shall take nothing on its claims against Defendants and its claims against Defendants are DISMISSED WITH PREJUDICE. All relief not specifically granted herein is hereby denied. All pending motions not previously ruled on are hereby denied as moot. Related to: Stipulation for Judgment [318]. (twdb)**

**8:16-cv-00143-DOC-KES Notice has been electronically mailed to:**

Lester J Savit info@onellp.com, lsavit@onellp.com, lester.savit@gmail.com, nlichtenberger@onellp.com, 1666374420@filings.docketbird.com, lthomas@onellp.com, rgolder@onellp.com

Brandon G Moore bmoore@ip-lit.com

Benjamin B Au bau@durietangri.com, calendar@durietangri.com, ben-au-1404@ecf.pacerpro.com

Adam Robert Brausa calendar@durietangri.com, adam-brausa-durie-tangri-2154@ecf.pacerpro.com, abrausa@durietangri.com

Shea N Palavan spalavan@ip-lit.com, iplit-staff@ip-lit.com

Andrew Louis Perito calendar@durietangri.com, aperito@durietangri.com

Sonal Naresh Mehta sonal-mehta-durie-tangri-4025@ecf.pacerpro.com, calendar@durietangri.com, records@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, smehta@durietangri.com

John J Edmonds spalavan@ip-lit.com, jedmonds@ip-lit.com, ecarr@ip-lit.com, iplit-staff@ip-lit.com, sschlather@ip-lit.com

Stephen F Schlather iplit-staff@ip-lit.com, sschlather@ip-lit.com

Margaret A. Nagle mnagle@jamsadr.com

Timothy Chen Saulsbury calendar@durietangri.com, timothy-saulsbury-durie-tangri-3113@ecf.pacerpro.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, tsaulsbury@durietangri.com

Eric R Carr ecarr@ip-lit.com

Ryan M Kent rkent@durietangri.com, calendar@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, ryan-kent-durie-tangri-3472@ecf.pacerpro.com

**8:16-cv-00143-DOC-KES Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

JS-6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**SYNERON MEDICAL LTD.,**

**Plaintiff,**

**vs.**

**INVASIX, INC., et al.,**

**Defendants.**

**Case No.: SA CV 16-0143-DOC (KESx)**

**ORDER RE: APLICATIONS TO FILE UNDER SEAL [211] [268] [271] [274] [277] [280] [284] [292] [299]; AND ORDER ACCEPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF SPECIAL MASTER [261] [262] [263] [265]**

Before the Court are Applications to File Under Seal (Dkts. 211, 268, 271, 274, 277, 280, 284, 292, 299). The Court GRANTS the following Applications to File under Seal (Dkts. 211, 268, 271, 274, 277, 280, 284, 292). The Court DENIES Plaintiff's Application to File under Seal (Dkt. 299) Syneron's Notice of Record re: Special Master Proceedings, for the reasons explained in Defendants' Response (Dkt. 303).

Also before the Court are Plainff Syneron Medical Ltd. and Defendants Inmode MD Ltd. and Invasix, Inc.'s Objections (Dkts. 266, 283, 284-2, 286, 287) to the Special Master's Reports and Recommendations with respect to: (1) Claim Construction (Dkt. 261); (2) Motions to Strike Testimony of Roy Weinstein and Christopher Bakewill (Dkt. 262); (3) Motions for Summary Judgment and Other Pending Motions (Dkt. 265); and (4) Plaintiff's Objections to the Tentative Special Master's Report and Recommendations on Motions for Summary Judgment (Dkt. 263) (collectively, "R&Rs"). The Court heard oral argument on September 24 and 27, 2018.

Pursuant to Fed. R. Civ. P. 53(f)(3)–(4) and pursuant to the Order Appointing Special Master (Dkt. 220), the Court has engaged in a *de novo* review of those portions of the R&Rs to which the parties have objected. Having reviewed the papers and considered the parties' arguments, the Court APPROVES and ACCEPTS the Special Master's Reports and Recommendations.

It is therefore ORDERED that Summary Judgment is GRANTED in favor of Defendants on the ground of invalidity of the asserted claims of the patents-in-suit.

DATED: September 28, 2018

David O. Carter

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

## Jesse Villegas

**From:** cacd_ecfmail@cacd.uscourts.gov
**Sent:** Friday, September 28, 2018 17:25
**To:** ecfnef@cacd.uscourts.gov
**Subject:** Activity in Case 8:16-cv-00143-DOC-KES Syneron Medical Ltd. v. Invasix, Inc. et al Order on Motion for Leave to File Document Under Seal

**Follow Up Flag:** Follow up
**Flag Status:** Completed

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

## Notice of Electronic Filing

The following transaction was entered on 9/28/2018 at 3:24 PM PDT and filed on 9/28/2018

**Case Name:** Syneron Medical Ltd. v. Invasix, Inc. et al
**Case Number:** 8:16-cv-00143-DOC-KES
**Filer:**
**Document Number:** 306

**Docket Text:**
**ORDER RE: APPLICATIONS TO FILE UNDER SEAL [211][268][271][274][277][280][284][292][299]; AND ORDER ACCEPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF SPECIAL MASTER [261][262][263][265] by Judge David O. Carter: The Court GRANTS the following Applications to File under Seal (Dkts. 211, 268, 271, 274, 277,280, 284, 292). The Court DENIES Plaintiff's Application to File under Seal (Dkt. 299). The Court APPROVES and ACCEPTS the Special Master's Reports and Recommendations. [266], [283], [284-2], [286], [287]. It is therefore ORDERED that Summary Judgment is GRANTED in favor of Defendants on the ground of invalidity of the asserted claims of the patents-in-suit. SEE DOCUMENT FOR FURTHER INFORMATION. RE: [261][262] [265] [263].( MD-JS6) CASE TERMINATED. (twdb)**

**8:16-cv-00143-DOC-KES Notice has been electronically mailed to:**

Lester J Savit info@onellp.com, lsavit@onellp.com, lester.savit@gmail.com, nlichtenberger@onellp.com, 1666374420@filings.docketbird.com, lthomas@onellp.com, rgolder@onellp.com

Brandon G Moore bmoore@ip-lit.com

Benjamin B Au bau@durietangri.com, calendar@durietangri.com, ben-au-1404@ecf.pacerpro.com

Adam Robert Brausa calendar@durietangri.com, adam-brausa-durie-tangri-2154@ecf.pacerpro.com, abrausa@durietangri.com

Shea N Palavan spalavan@ip-lit.com, iplit-staff@ip-lit.com

Andrew Louis Perito calendar@durietangri.com, aperito@durietangri.com

Sonal Naresh Mehta sonal-mehta-durie-tangri-4025@ecf.pacerpro.com, calendar@durietangri.com, records@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, smehta@durietangri.com

John J Edmonds spalavan@ip-lit.com, jedmonds@ip-lit.com, ecarr@ip-lit.com, iplit-staff@ip-lit.com, sschlather@ip-lit.com

Stephen F Schlather iplit-staff@ip-lit.com, sschlather@ip-lit.com

Margaret A. Nagle mnagle@jamsadr.com

Timothy Chen Saulsbury calendar@durietangri.com, timothy-saulsbury-durie-tangri-3113@ecf.pacerpro.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, tsaulsbury@durietangri.com

Eric R Carr ecarr@ip-lit.com

Ryan M Kent rkent@durietangri.com, calendar@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, ryan-kent-durie-tangri-3472@ecf.pacerpro.com

**8:16-cv-00143-DOC-KES Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

FILED
CLERK, U.S. DISTRICT COURT
9/5/18
CENTRAL DISTRICT OF CALIFORNIA
BY: D.L. DEPUTY

Hon. Margaret A. Nagle (Ret.)
JAMS
555 West 5th Street
32nd Floor
Los Angeles, CA 90013
213-253-9740

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

SYNERON MEDICAL LTD.,

Plaintiff,

vs.

INVASIX, INC. and INMODE MD LTD.,

Defendants.

Case No: 8:16-cv-00143-DOC-KES

JAMS Ref. No: 1220057351

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON CLAIM CONSTRUCTION**

## I. INTRODUCTION

Plaintiff Syneron Medical Ltd. ("Syneron") filed this patent infringement action against Defendants Invasix, Inc. and InMode MD Ltd. (collectively, "Invasix") alleging infringement of U.S. Patent Nos. 6,148,232 ("the '232 patent"), 6,615,079 ("the '079 patent"), 8,496,654 ("the '654 patent"), and 9,108,036 ("the '036 patent") (collectively, "the patents-in-suit").

The parties dispute the meanings of six claim terms in the patents-in-suit. The matter comes before the Special Master pursuant to the Court's Order Appointing Special Master (Dkt. 220) to hear and adjudicate, *inter alia*, claim construction. The parties submitted their respective opening briefs on October 19, 2017, and their respective responsive briefs on November 1, 2017. A claim construction hearing was held on November 16, 2017. Thereafter, the Special Master issued a Tentative Report and Recommendations on Claim Construction ("Report") on February 8, 2018, construing the parties' six disputed claim terms. Syneron and Invasix submitted their respective objections to the Report on February 28, 2018, and submitted responses to the respective objections on March 7, 2018. A hearing regarding the parties' objections was held on April 4, 2018. Having read and considered the parties' submissions and having heard and considered the parties' oral arguments, the Special Master makes the following recommendations.

## II. THE PATENTS-IN-SUIT

The '232 and '079 patents ("the TransPharma patents"), which Syneron acquired from TransPharma Medical Ltd., were filed in 1998. The two patents have the same specification and the same figures, but different claims.[1] Although the titles of these patents ("Transdermal drug delivery and analyte extraction") as well as their shared specification are directed to drug delivery and analyte extraction through skin ablation using RF energy, the claims are not so limited. In fact, the asserted independent claims[2] are broadly directed to devices and methods for ablating the top layer of a subject's skin (the stratum corneum) by applying RF energy (i.e.,

[1] The '079 patent was issued from a divisional application of the application that was issued as the '232 patent.

[2] Claim 29 of the '232 patent and claim 10 of the '079 patent.

alternative electrical current) to the skin through a plurality of electrodes that are in direct contact with the skin.

The '654 and '036 patents ("the Syneron patents") also share a materially identical specification, and they both claim priority to a parent application that was filed in 2009. The disclosures in these patents are directed to cosmetic RF skin treatment and, in particular, to the use of alternating electric current delivered through electrodes to a subject's skin to cause ablation of the skin, thereby stimulating the skin to rejuvenate. The asserted claims of the Syneron patents are directed to the relative sizes and placement of various electrodes that come into direct contact with a subject's skin in such a way that the possibility of an undesirable current causing pain and damaging the subject's skin is minimized.

## III. LEGAL STANDARDS

Claim construction is a question of law that is to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996). The words of a claim are generally given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (*en banc*). Furthermore, claims must be read in view of the specification. *Id.* at 1315. Indeed, the specification is "the single best guide to the meaning of a disputed term," *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), and "is, thus, the primary basis for construing the claims," *Phillips*, 415 F.3d at 1315 (internal quotation marks and citation omitted). The Court departs from the ordinary and customary meaning in only two instances: when the patentee acts as his own lexicographer in redefining a claim term, or when the patentee disavows the full scope of the claim term in the specification or during prosecution. *Poly-America, L.P. v. API Industries, Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016), citing *Hill–Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). Furthermore, "the standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature." *Poly-America*, 839 F.3d at 1136.

However, "while disavowal must be clear and unequivocal, it need not be explicit." *Id.* (citing *Trustees of Columbia University in the City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363–64 (Fed. Cir. 2016). Accordingly, redefinition of claim terms may be found by implication as long as the meaning may be ascertained by reading the specification. *Trs. of Columbia Univ.*, 811 F.3d at 1364 (internal citation omitted). In any case, "[a]mbiguous language cannot support disavowal." *Poly-America*, 839 F.3d at 1136 (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323–26 (Fed. Cir. 2003)).

## IV. THE DISPUTED TERMS

### 1. "electrodes, which are adapted to be applied to the skin of the subject" ('232 patent, claim 29)

The parties' proposed constructions are as follows:

| Syneron's Proposed Construction | Invasix's Proposed Construction |
|---|---|
| "electrode" means "a conductor used to establish electrical contact with a non-metallic part of a circuit (such as the body)," and the remainder of the phrase means "capable of, or suitable for, being applied to the skin of the subject" | "electric-current conductors, which are shaped to be put on top of the skin" |

Although the parties propose different constructions for the word "electrode," the parties agree that they do not have any substantive dispute over this word and that a construction of "electric-current conductors used to establish electrical contact with a non-metallic part of a circuit" is acceptable to both of them.[3]

Therefore, the disputes over the construction of this term boil down to 1) whether "adapted to" should be construed broadly as "capable of, or suitable for" as Syneron contends or

[3] *See, e.g.*, Syneron's Opening Claim Construction Brief ("Syneron Opening") at 5:24–6:2 and Invasix's Responsive Brief ("Invasix Responsive") at 20:20–21:2). In its Opening Brief, Syneron further argues that, unlike Invasix's overly broad proposed construction, its proposed construction would not read on liquids, such as water and electrolytic solutions. However, the parties subsequently agreed during the hearing that this is more of an invalidity issue that is to be resolved in a later proceeding. *See, e.g.*, Claim Construction Hearing Transcript ("Transcript") at 74:21–77:2. Furthermore, the Special Master finds that there is insufficient reason to further construe the term, because it is not part of the proposed construction and neither party has provided adequate briefing on the issue.

narrowly as "shaped to" as Invasix contends, and 2) whether "applied to" should be given plain and ordinary meaning as Syneron contends or construed as "put on top of" as Invasix contends.

To support its construction for "adapted to," Syneron points out that "adapted to" was added at the suggestion of an Examiner during prosecution to overcome an indefiniteness objection.[4] Syneron contends that this amendment, unlike one that is added to overcome prior art, was not added to limit the claims. Therefore, Syneron contends that "adapted to" should be given its broad ordinary meaning of "capable of" or "suitable for" as indicated in *In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282, 1286 (Fed. Cir. 2016), and *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012). In *Aspex*, which *In re Man Mach. Interface Techs.* cited and on which it relied, the Federal Circuit noted, with citations to dictionary definitions, that "the phrase 'adapted to' is frequently used to mean 'made to,' 'designed to,' or 'configured to,' but it can also be used in a broader sense to mean 'capable of' or 'suitable for.'" *Aspex Eyewear*, 672 F.3d at 1349. Nonetheless, the Federal Circuit in both *Aspex* and *In re Man Mach. Interface Techs.* found "adapted to" to mean "configured to" in view of the patent as a whole. *Id.*; *In re Man Mach. Interface Techs.*, 822 F.3d at 1286.

Here, the Special Master finds that, in the context of the '232 patent, "adapted to" is most naturally understood by a person of ordinary skill in the art ("POSITA") as "made to," "designed to," or "configured to." As noted in both *Aspex* and *In re Man Mach. Interface Techs.*, while "adapted to" **can be** used to mean "capable of" or "suitable for," it is **generally and frequently** used to mean "made to," "designed to," or "configured to." *See Aspex Eyewear*, 672 F.3d at 1349; *In re Man Mach. Interface Techs.*, 822 F.3d at 1286. In the context of asserted independent claim 29 of the '232 patent, the sole recited function of the claimed "electrodes" is to be "applied to the skin." As such, these "electrodes" are most naturally understood by a POSITA as being "made to," "designed to," or "configured to" be

---

[4] In a January 12, 2000 Office Action, the Examiner wrote: "Claims 1 and 29 are vague and indefinite because they claim that the device is applied to the skin of a patient, which makes the skin a positively recited part of the device claim, which is not permitted. To correct, applicant should insert --adapted to be-- prior to the word 'applied'." Syneron Opening, Ex. 2 ('232 File History, 1/12/00 Office Action) at 91.

put in actual contact with the skin, not simply having the more abstract and vague "capability of" or "suitability for" contacting the skin.

Although Invasix proposes construing "adapted to" narrowly as "shaped to," it fails to proffer any convincing evidence to support such a construction. As previously discussed, the plain and ordinary meaning of "adapted to" in the context of this patent is "made to," "designed to," or "configured to." Invasix cites no evidence in the specification to support the contention that the claimed "electrodes" are "shaped to be put on top of the skin" — nor could they, as the specification says nothing about adapting the shape of the electrodes for application to skin. Invasix's expert testimony — that a POSITA would understand that the shape of the electrodes is the only means for adaptation[5] — is persuasively rebutted by Syneron's expert testimony that, besides shape adaptation, a POSITA would understand that the claimed "electrodes" could also be adapted for, among others purposes, flexibility and adhesiveness as well as application to different parts of the body against which the electrodes are intended to be placed.[6] Therefore, Invasix's argument that "adapted to" should be so narrowly construed is unavailing.

The parties' remaining dispute focuses on the proper construction of "applied to." Syneron contends that "applied to the skin" is clear and unambiguous to a POSITA and, thus, does not need construction. Invasix similarly contends that the term's plain and ordinary meaning governs here[7] and proposes construing "applied to" as "put on top of." However, in their briefs, the parties go beyond their proposed constructions and squabble over whether "applied to the skin" entails insertion/penetration into the skin; Syneron contends it does not, whereas Invasix contends it does.

As a preliminary matter, the Special Master notes that neither of the parties' proposed constructions offers any clue as to whether insertion/penetration does or does not take place when the electrodes are "applied to the skin." The dictionary definitions proffered by Syneron

---

[5] *See* Invasix's Opening Brief ("Invasix Opening") at 18:3–11.
[6] *See* Invasix Opening, Ex. 12 at 554:1–560:22.
[7] *See* Invasix Responsive at 14:15–25; Invasix Opening at 19:20–20:7.

for "apply" include "to place in contact"[8] and "to bring into contact with something."[9] The dictionary definitions proffered by Invasix include "to put or spread (something) on a surface"[10] and "to put on or upon another thing."[11] Neither "bringing/placing one thing in contact with another" nor "putting one thing on another" necessarily entails insertion/penetration. Common sense informs that "applying" a first thing on a second thing does not rule out the possibility that the first thing penetrates the second; it all depends on, for example, what those two things are. Invasix's own example of "putting a first thing [butter] on top of another [toast]"[12] is elucidating in that a POSITA would readily understand that whether the applied butter penetrates the toast depends on, for example, the strength of application and the consistency of the butter; a forceful application or a melting butter would inevitably cause the butter to penetrate the toast whereas a light placement of a frozen piece of butter on the toast would not. Here, whether claimed electrodes would penetrate the skin upon application depends on, among other factors, the rigidity, the sharpness, and the shape of the electrodes of the alleged infringing products as well as the penetrability of typical human skin by such electrodes.

Such fact-based analysis generally speaks more to an infringement analysis than to claim construction, as Invasix concedes.[13] Invasix further accuses Syneron of pre-arguing infringement.[14] Nevertheless, both parties' Opening Claim Construction Briefs as well as their Responsive Claim Construction Briefs present pages upon pages of argument devoted to this penetration issue. Moreover, Invasix further argues, albeit in a footnote, that "[r]egardless of the construction by the Court, that construction should not include needle-shaped electrodes," because "[t]he specification contains a clear disavowal of needles being part of the claimed

---

[8] Merriam Webster Online Dictionary definition of "apply" at https://www.merriam-webster.com/dictionary/apply

[9] American Heritage Dictionary of the English Language definition of "apply" at https://www.ahdictionary.com/word/search.html?q=apply

[10] Invasix Opening at 20:3–4, citing New Oxford Dictionary of English (1998)

[11] Invasix Opening at 20:4–5, citing American Heritage Dictionary (1998)

[12] Invasix Opening at 19:22–20:1.

[13] *See, e.g.*, Transcript at 69:6–14.

[14] Invasix repeatedly accuses Syneron of "pre-argu[ing] its infringement position." *See, e.g.*, Invasix Responsive at 15:3–7 and 21:17–19.

invention"[15] It appears to the Special Master that an issue so extensively addressed by the parties, even though recognized as perhaps one that may be viewed as an infringement issue, must be addressed here. *O2 Micro International, Ltd. v. Beyond Innovation Technology Co.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate … when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute. … When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

To support its contention that the patentee has disavowed "needle-shaped electrodes," Invasix cites the '232 patent's specification in col. 1, ll. 22–39, which discloses a prior use of microneedles to ablate the skin, to show that the patentee intended to distinguish his invention from the prior art use of microneedles. But a careful examination of the cited passage reveals no evidence of distinction or criticism, let alone disavowal. The cited passage merely describes an IEEE article that discloses "a method of mechanically puncturing the skin with microneedles." To the extent that there is any discernable criticism of this prior art method, it is that "[t]he needles are created with a predetermined length," which may injure the underlying epidermal tissue if the needles are longer than the skin's local thickness or creates incomplete channels if the needles are too short. This hardly rises to meet the "exacting" standard for disavowal, which requires "clear and unequivocal evidence that the claimed invention includes or does not include a particular feature." *Poly-America*, 839 F.3d at 1136. *See also, e.g., Pacing Technologies, LLC v. Garmin Intern., Inc.*, 778 F.3d 1021, 1024–25 (2015) ("We have found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes ...' or 'the present invention is ...' or 'all embodiments of the present invention are ....' We have found disclaimer when the specification indicated that, for 'successful manufacture,' a particular step was 'require[d].' We have found disclaimer when the specification indicated that the invention

[15] *See* footnote 16 in Invasix's Opening ("Regardless of the construction adopted by the Court, that construction should not include needle-shaped electrodes. The specification contains a clear disavowal of needles being part of the claimed invention — distinguishing prior-art needles from the claimed invention because those needles would penetrate to their length regardless of how thick the skin is in that location.")

operated by 'pushing (as opposed to pulling) forces,' and then characterized the 'pushing forces' as 'an important feature of the present invention.' We also have found disclaimer when the patent repeatedly disparaged an embodiment as 'antiquated,' having 'inherent inadequacies,' and then detailed the 'deficiencies [that] make it difficult' to use. Likewise, we have used disclaimer to limit a claim element to a feature of the preferred embodiment when the specification described that feature as a 'very important feature ... in an aspect of the present invention,' and disparaged alternatives to that feature. When a patentee 'describes the features of the 'present invention' as a whole,' he alerts the reader that 'this description limits the scope of the invention'" (internal citations omitted).).

Invasix also points to various passages in the '232 patent, as well as its inventor's testimony, to support the contention that the patent is directed to "delivering molecules by creating a hole through the outer most layer of skin" and that "the asserted claim 29 requires this hole to be created by electric current," not by manual insertion.[16] Invasix's argument fails, because claim 29 only requires the use of electric current "to cause ablation of the stratum corneum"; it does not require electric current to be the only cause. More specifically, the claim does not preclude other causes of ablation, such as, for example, the incidental and partial insertion of the electrodes into the outer most layer of skin (the stratum corneum). Reading all other causes out of the plain language of the claim would require, once again, "clear and unequivocal evidence" that the patentee disavowed those features. *Poly-America*, 839 F.3d at 1136.

With regard to the inventor's testimony that he "didn't consider penetrating the skin with electrodes" and that "[i]t was out of scope of the invention as a drug delivery device," such statements are unreliable and unconvincing for at least the following reasons: 1) they are an extrinsic record and thus of lesser value than the intrinsic record; 2) they are not contemporaneous statements and, thus, are less trustworthy; and 3) the inventor was paid for his testimony and, thus, subjected to bias.[17] *See, e.g.*, *Phillips*, 415 F.3d at 1318. Furthermore, even if the inventor's statements were to be taken at face value, they are far from being "clear

[16] *See* Invasix Opening at 20:9–18 and 22:2–16.

[17] *See, e.g.*, Zohar Avrahami's February 27, 2017 Deposition Transcript at 115:21–117:6.

and unequivocal" evidence that would preclude incidental insertions of the electrodes into the skin upon their application.

Accordingly, the Special Master construes "electrodes, which are adapted to be applied to the skin of the subject" as "electric current conductors that are configured, designed, or made to be put on or put in contact with the skin of the subject." The Special Master finds Syneron's proposed additional language of "used to establish electrical contact with a non-metallic part of a circuit (such as the body)" to be unnecessary, because the claim subsequently specifies that the electrodes are "configured for contacting epidermis of skin of a patient."

**2. "placing a plurality of electrodes against the subject's skin" ('079 patent, claim 10)**

The parties' proposed constructions are as follows:

| Syneron's Proposed Construction | Invasix's Proposed Construction |
|---|---|
| See above re. "electrode." Otherwise, plain and ordinary meaning, no construction necessary | "putting more than one electric-current conductor on top of the subject's skin" |

As with the prior term, both Syneron and Invasix contend that the plain and ordinary meaning of this term supports their claim construction. However, as with the prior term, Invasix further contends that the plain language of the claim "indicates that the electrodes are put on the surface of the skin, which is also the top of the skin."[18] Notably, the two dictionary definitions Invasix proffers for the meaning of "against" — "touching or hitting the surface of something"[19] and "in or into physical contact with (something), typically so as to be supported by or collide with it: she stood with her back against the door"[20] — say nothing of "on top of."

Invasix further points to the file history of the '079 patent, in which the patentee identified a passage in the specification as exemplary support for the added new claims that include the phrase "placed against the skin," to bolster its contention that the claimed "electrodes" are meant to be put on top of the skin. In particular, Invasix contends that the identified passage in the specification "points to disclosure surrounding Fig. 4, which discloses

[18] Invasix's Opening at 23:15–16.
[19] Invasix Opening at 23:11–12, citing MacMillan English Dictionary (2002).
[20] Invasix Opening at 23:12–15, citing The New Oxford Dictionary of English (1998).

flat electrodes placed on top of the skin."[21] However, Invasix's argument is unavailing, because in referencing the specification, the patentee [Syneron] explicitly stated that it is an example and, thus, is not meant to be the only support.[22]

Therefore, the Special Master finds that, to the extent that the term "placing a plurality of electrodes against the subject's skin" needs to be construed, it should be construed as "placing more than one electric-current conductor in contact with the subject's skin."

**3. "ground electrode[s]" ('654 patent, ind. claims 1, 19, and 24)**

The parties' proposed constructions are as follows:

| Syneron's Proposed Construction | Invasix's Proposed Construction |
|---|---|
| See above re. "electrode." Otherwise, "ground electrode" means "an electrode that provides a return path for current" | "an electric-current conductor that is connected to the ground or earth" |

Both parties contend that the plain and ordinary meaning of the term controls its construction,[23] yet they propose very different constructions. Syneron seeks to define the term functionally ("provides a return path for current"), whereas Invasix seeks to define it by how it should be connected ("connected to the ground or earth").

As a preliminary matter, the Special Master finds that the dictionary definitions proffered by the parties are less than helpful for elucidating the plain and ordinary meaning of this term. Syneron proffers an undated online encyclopedia entry that defines "ground" as follows: "In electrical engineering, ground or earth is the reference point in an electrical circuit from which voltages are measured, a common return path for electric current, or a direct physical connection to the Earth" (The Free Dictionary Encyclopedia). Although this definition helps establish the understanding that, in electrical engineering, "ground" could have multiple meanings, the fact that it is from an undated online dictionary entry makes it a less-than-ideal source for understanding the term's meaning "at the time of the invention." *Phillips*

[21] Invasix Opening at 23:18–27.

[22] Invasix Opening, Ex. 17 ('079 File History, 10/15/01 Response to Office Action) at SYN013982–83 ("Literal support for this limitation is found in the specification, **for example**, on page 29, lines 23–29") (emphasis added).

[23] *See, e.g.*, Invasix Opening at 24:7–8 and Syneron Responsive at 24:26–28; *see also, e.g.*, Transcript at 97:15–21.

*v. AWH Corp.*, 415 F.3d at 1313 ("We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application.").

Invasix proffers definitions for "ground electrode" from two contemporaneous technical dictionaries: "A conductor or group of conductors **in intimate contact with the ground** for the purpose of providing a connection with the ground" (IEEE Standard Dictionary of Electrical and Electronics Terms (1996)); and "One or more conductors which are **buried in the ground**, and which serve to provide a ground connection. Also called grounding electrode, or earth electrode" (Wiley Electrical and Electronics Engineering Dictionary (2004)) (emphasis added). However, these definitions only describe a very specific type of "ground electrode" — namely, a metal rod that is buried in the ground to provide a grounding connection for the electric systems connected to it.

Invasix's assertion that the claimed "ground electrode" is such an electrode would require the claimed ground electrodes themselves be buried in (or in intimated contact with) the ground, not just be electrically connected to it. Such a reading would contradict not only each and every disclosed embodiment in the patent, with none showing the ground electrodes being buried in the ground, but also the clear language of asserted claim 1, which states that the "ground electrodes" are "arranged on the applicator tip" and are "being configured for contacting epidermis of skin of a patient and being further configured for connection to a circuit for delivering RF energy to the skin." *See, e.g., Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d at 1584 (extrinsic evidence "may not be used to vary or contradict the claim language"). Even if these dictionary definitions support an interpretation that the claimed "ground electrode" is necessarily "connected to the ground," which they do not, it would still exclude all the preferred embodiments as shown in Figs. 4, 5, and 7 (with Fig. 4 reproduced below), which show that all electrodes (216) are arranged on an applicator tip 212 isolated from the rest of the circuit by an "isolating transformer 404." *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) ("A claim interpretation that

excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." (internal quotation omitted)).



Fig. 4

Furthermore, the specification only describes the "ground electrodes" being connected to "one RF output port,"[24] just as it is shown in Figs. 4, 5, and 7; nowhere in the specification does it describe the "ground electrodes" being "connected to the ground."[25]

Invasix further proffers the testimony of its expert, Dr. Tucker, to support its contention that "a 'ground electrode' refers to an electrode connected to the ground, as in the earth."[26] In particular, Dr. Tucker opines that: "Its [sic] been that way for a hundred years. It's relatively well known. That's just the definition of ground electrode" and that "[i]t's just a [sic] well known in the art down to the high school level that a ground electrode is ground."[27] However, Dr. Tucker's testimony is conclusory, and his assertion that a "ground electrode is ground" makes little sense. *See, e.g., Phillips*, 415 F.3d at 1318 ("conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."); *see also, e.g., Intelligent Computer Sols., Inc. v. Voom Techs., Inc.*, 509 F. Supp. 2d 847, 861 (C.D. Cal. 2006) ("extrinsic expert testimony is not helpful if it consists merely of conclusory, unsupported assertions as to the definition of a claim term."). To the extent that Dr. Tucker's testimony supports Invasix's contention that the "ground electrode" is necessarily "connected

[24] '654 patent at 7:12–16.
[25] *See, e.g.*, Transcript at 89:3–7. ("Mr. Kent: … And with respect to the connection to the ground, that isn't described or -- what they're connected to isn't described at all in the specification, except for the fact that it is connected to one RF output port.")
[26] Invasix Opening at 24:21–26.
[27] *Id.*

to the ground," it is clearly at odds with the preferred embodiments disclosed in the specification as previously discussed. *Phillips*, 415 F.3d at 1318 ("a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.") (internal quotation marks and citation omitted). Syneron's expert testimony is equally unhelpful, because it is either conclusory or unreliable, as it cites online dictionaries with questionable provenance.[28]

As a result, the Special Master looks to the specification of the '654 patent to understand what "ground electrode" means in the context of this patent. *Vitronics*, 90 F.3d at 1582 (the specification is "the single best guide to the meaning of a disputed term"). The specification mentions the term "ground electrode" only once in the following context: "Tip 800 has one or more (a cluster) large 'ground' electrodes 804 located in the peripheral area of substrate 808 and connected to one RF output port."[29] The quotation marks around the word "ground" are revealing, as they suggest to a POSITA that the word should not to be taken literally. This understanding is bolstered by the fact that the word "ground" is used two more times in the specification: Each time the use is without quotation marks, and each time it refers to a literal connection to the ground.[30] Such discerning uses of the word "ground" in the specification clearly show the patentee's intention to distinguish one "ground" from the others.

Invasix does not appear to dispute that the "ground" from an electrical engineering standpoint does not necessarily mean earth ground. Nor could it. For example, even Invasix's own expert, Dr. Pearce, concedes that "ground" in "ground electrode" may sometimes be used interchangeably with "return." In particular, when asked whether he is "aware of any other terms for a return electrode," Dr. Pearce answered, "It's also sometimes called a ground

---

[28] *See, e.g.*, Syneron Opening Ex. 9 at 102–103.
[29] '654 patent at 7:12–16.
[30] *Id.* at 5:2–7 ("In the course of operation, transformer 404 reduces or completely eliminates currents flowing through the subject body … and the ground"), and 7:35–37 ("The isolating transformer is located very close to the application tip to reduce ground currents through parasitic capacitance."); *see also*, Invasix's Opening at 21:11–14.

electrode."[31] When Dr. Pearce was asked about his "understanding of the difference between the use of return electrode versus ground electrode," he answered that "from an engineering point of view, return electrodes may or may not be connected to earth ground. If they are, [if] [sic] you call them ground electrodes .... In isolated systems it's not -- the way the International Electrode Technical [sic] Commission describes them, neither of the electrodes is connected to earth ground."[32] Here, not only did Dr. Pearce reaffirm that a POSITA may sometimes use "ground" interchangeably with "return," but he also conceded that the International Electrotechnical Commission, an international standards organization that prepares and publishes international standards for all electrical, electronic, and related technologies, allows that "ground electrode" is not required to be connected to earth ground. Even more importantly, Dr. Pearce provides that in an isolated system, which is what the claimed invention is by virtue of using an "isolating transformer 404" to "isolate the RF energy supply [from] the subject treated,"[33] the ground electrode is not to be connected to earth ground, thereby rendering it a "return electrode" per Dr. Pearce's definition.

In sum, there is nothing in the specification that requires the claimed "ground electrode" to be directly connected to earth ground. In fact, if anything, as previously discussed, the specification supports the finding that the "ground" in the claimed "ground electrode" likely means something other than earth ground. Further, per Dr. Pearce's testimony, "ground electrode" in an isolated system, of which the present invention is one, is not to be connected to earth ground.

Accordingly, the Special Master finds that the proper construction for "ground electrode" is "return electrode or electrode that provides a return path for current."

**4. "RF application elements" ('654 patent ind. claims 1, 19, 24)**

The parties' proposed constructions are as follows:

---

[31] Plaintiff's Markman Presentation, November 9, 2017, at 45, referencing Pearce Depo. at 145:4–147:12.
[32] *Id.*
[33] *See, e.g.*, '654 patent at 2:29–32.

| Syneron's Proposed Construction | Invasix's Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary. Not governed by 112(f). Additionally, or alternatively, if any clarification is needed, this phrase is used interchangeably with "electrode(s)." See above re "electrodes." Alternatively, to the extent this limitation is erroneously deemed to be a means-plus-function term under 112(f), which it is not, the function would be applying RF, and the corresponding structures would comprise elements 116, 216, 330, and/or 812, plus equivalents. | The term "RF application elements" is a means-plus-function limitation wherein the function is "applying RF energy to the skin" and the corresponding structures are "domed shaped voltage-to-skin application elements that protrude from the tip surface as shown in Figure 8 and described in 2:32–35 and 7:16–18" along with equivalents. |

The parties dispute whether the term is a means-plus-function claim that must be construed under 35 U.S.C. § 112, ¶ 6.[34] Syneron contends that it is not, whereas Invasix contends otherwise. Section 112, ¶ 6 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.

The use of the word "means" triggers a rebuttable presumption that § 112, ¶ 6 applies, while its absence creates a rebuttable presumption that it does not. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). This latter presumption may be rebutted, if a challenger can show that the claim term "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (internal quotation marks omitted). "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1349. In determining whether this presumption has been rebutted, the challenger must establish by a preponderance of the evidence that the disputed term is to be

[34] 35 U.S.C. § 112 was amended and subsections were renamed by the America Invents Act, Pub. L. No. 112–29 ("AIA"), which took effect on September 16, 2012. Because the '654 patent claims priority to an application (No. 12/505,576 filed on July 20, 2009) that predates that date, this opinion refers to the pre-AIA version of § 112.

governed by § 112, ¶ 6. *See, e.g.*, *Advanced Ground Information Systems, Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (2016).

Invasix contends that the presumption is rebutted, because the word "element" is, just like the word "means," a generic word that does not connote any definite structure.[35] Invasix further contends that the prefix "RF application" does not impart structure to "elements" because it merely identifies the function to be performed by the "elements" while offering no hint as to how that function is to be performed. As a result, Invasix contends that it fails to transform the claim term into a sufficiently definite structure.[36]

The Federal Circuit in *Williamson* explicitly called out "element" as one of those nonce words, which include "mechanism," "module," and "device," that "reflect nothing more than verbal constructs" and observed that these terms "may be used in a claim in a manner that is tantamount to using the word 'means' because they typically do not connote sufficiently definite structure." *Williamson*, 792 F.3d at 1350 (internal quotation marks and citation omitted). Furthermore, the prefix "RF application" adds little to the term other than specifying its function, which the claim further elaborated as "for delivering RF energy to the skin."[37] As such, it neither informs about the structural character of "elements" nor otherwise imparts any structure to "RF application elements." However, that is not the end of the analysis, because what is important is not simply whether the term is defined in terms of what it does, but whether "the term, as the name for structure, has a reasonably well understood meaning in the art." *See, e.g.*, *Greenberg v. Ethicon Endo– Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996). For that determination, the focus is not just on the term itself but also on the remainder of the claim as well as the specification. *See, e.g.*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2014), overruled on other grounds by *Williamson* ("Even if a patentee elects to use a 'generic' claim term, such as 'a nonce word or a verbal construct,' properly construing that term (in view of the specification, prosecution history, etc.) may still provide sufficient structure such that the presumption against means-plus-function claiming remains intact"); *see*

---

[35] Invasix Opening at 8:8.
[36] *Id.* at 8:14–18.
[37] *See* Claim 1 of the '654 patent.

*also, e.g.*, *Telebrands Corp. v. GMC Ware, Inc.*, No. 15-cv-03121, 2016 WL 6237917, at *8 (C.D. Cal. Aug. 17, 2016) (finding that the terms "driving element," "actuating element," and "engaging element" are not governed by § 112(f), because the remainder of the claims in which the terms are found recite sufficiently definite structure).

Although the term "RF application elements" as a name, by itself, may not readily connote structure to a POSITA,[38] read in context with the remainder of the claim language as well as the specification, it is clear that it does. For example, the remainder of claim 1 provides sufficiently definite structure to "the plurality of RF application elements" by requiring them to be "arranged on the applicator tip," "having a combined surface area" that is "substantially smaller than the ground electrode surface area," "free of any ground electrode therebetween," and "configured for connection to the circuit," which is the same circuit to which the "ground electrode" is connected. This recitation of the number, location, placement, arrangement, relative surface area, and connectivity makes clear to a POSITA that these "RF application elements" are electric-current conductors that work in concert with the ground electrode to deliver RF energy to the skin of a subject. *See, e.g.*, *Bonutti Research, Inc. v. Lantz Med., Inc.*, No. 1:14-cv-00609-SEB-MJD, *2016 WL 247752, at *16 (S.D. Ind. Jan. 21, 2016)* (finding "bending mechanism" not to be a means-plus-function term, because the claim "describes both the structural components of the 'bending mechanism' as well as the manner in which the parts are connected"). Invasix contends that these disclosures "[do] not provide any **structural detail** about what is an 'RF application element'"[39] (emphasis added). Invasix's argument is misplaced, because "specific structure" is not required to take a term out of the ambit of § 112, ¶ 6; a recitation of "some structure" is sufficient. *See, e.g.*, *GoDaddy.com, LLC v. RPost*

---

[38] *See, e.g.*, Invasix Opening Ex. 9 (Tucker Tr.) at 205:18–23 ("I can't go down to RadioShack and walk in and say 'I'd like to buy an RF application element.'") Syneron has made no attempt to rebut this assertion.

[39] Invasix Opening at 8:28–9:4. During the claim construction hearing, Invasix advanced a similar argument that the recitation of structural elements of the "RF application elements" in the claim is not sufficient, that "'RF application elements are arranged on the [] applicator tip' … tells you you have an applicator tip and some black box is arranged on it. It doesn't tell you what that black box is." Transcript at 144. *See also, e.g.*, Transcript at 148 ("all of the evidence indicates that when someone looks at 'RF application element,' they don't know a structure for that.")

*Commc'ns Ltd.*, No. CV-14-00126-PHX-JAT, 2016 WL 212676, at *55 (D. Ariz. Jan. 19, 2016) (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359–60), overruled on other grounds by *Williamson* ("[T]he Federal Circuit only requires ...that the claim recite some structure to avoid § 112(6) and has repeatedly rejected as 'unduly restrictive' the argument that 'specific structure' is necessary.").

Furthermore, the way the patentee uses the word "elements" in the specification is revealing: It is used repeatedly and consistently to denote one specific type of structure in the preferred embodiments of the claimed invention as well as prior art — active electrodes that deliver RF energy to the skin of a subject. *Vitronics*, 90 F.3d at 1582 (the specification is "the single best guide to the meaning of a disputed term"). For example, in the Background section, the patent recites: "RF based fractional skin treatment produces a scanning pattern of micron size holes in the skin a [sic] similar to laser. Typically, the energy is delivered to the skin by an applicator equipped by a tip having a plurality of **voltage to skin applying/delivering elements** or **contact elements** arranged in a matrix or in an array"[40] (emphasis added). Then, in the Brief Summary, the patent recites: "The apparatus includes an applicator with a tip that is populated by a plurality of **voltage applying dome shaped elements** protruding from the tip surface and organized in one common cluster and a cluster of electrodes bounding the dome shaped elements and having an area larger than the dome shaped elements have"[41] (emphasis added). Further in the Detail Description of Exemplary Embodiments, the patent recites: "A pattern of conductors 124 and 128 shown in broken lines arranged on the back or second side of substrate 104 enables addressing of all **elements** 116, a cluster of **elements** 116, or each of **elements** 116 individually"[42] (emphasis added). In the same section, the patent further recites: "The source provides RF voltage to applicator tip 212, and in particular to **voltage to skin delivering elements 216**"[43] (emphasis added). This is only a small sample of all the "elements" recited in the specification.

---

[40] '654 patent at 1:38–41.
[41] *Id.* at 2:32–37.
[42] *Id.* at 3:26–30.
[43] *Id.* at 3:47–49.

Although one may fault the patentee for not using a unified term for the same family of structures, one thing is clear and unmistakable: All these "elements" have only one function, which is to apply RF to the skin of the subject, just like the claimed "RF application elements." Moreover, they all share the same distinct structure — namely, conductors that are depicted in Fig. 1 as "elements 116," in Fig. 2 as "voltage to skin delivering elements 216," in Fig. 3 as "contact elements 330," in Figs. 4, 5, and 7 as "voltage to skin delivering elements 216," and in Fig. 8 as "voltage to skin application elements." Just like the claimed "RF application elements," these depicted "elements" are "arranged on the applicator tip" to apply RF energy to the skin of the subject. In one particular instance, the patentee uses the term "electrodes 216" to denote a previously identified "elements 216."[44] Such interchangeable use of "electrodes" and "elements" by the patentee is not surprising, given that the disclosed elements are functioning just as electrodes. It is no wonder that, during the prosecution of the '654 patent, the Examiner instinctively equated the two when he identified "active electrodes 4" in a prior art reference as "RF application elements 4."[45] Therefore, the intrinsic record of the '654 patent clearly informs a POSITA that "elements" is not being used as a nonce word, but as a word denoting electrodes that deliver RF energy to the skin of a subject.

Invasix contends that, even if there are "numerous places where the specification refers to 'elements' as being 'electrodes,'" it "does not make 'element' **the same as** 'electrodes.' It would make 'elements' **a particular type of electrode** -- as Dr. Tucker explained, the 'nubs' of the conductive material"[46] (emphasis in the original). However, by contending that the claimed "elements" are "a particular type of electrode," Invasix inadvertently shows a POSITA's understanding that the claimed "elements" indeed connote a structural meaning, because "a particular type of electrode" is still an electrode, which undisputedly has a definite structure.[47] Similarly, when Dr. Tucker states that the claimed "elements" are "nubs of the

---

[44] *Id.* at 5:18–22.
[45] *See, e.g.*, Syneron Opening Ex. 6 at page 66.
[46] Invasix Opening Ex. 9 (Tucker Tr.) at 256:11–265:12.
[47] At no point does either party contend that an "electrode" is not structural. Indeed, Invasix proposed a construction for "electrode" as an "electric current conductor," which is a clear and definite structure.

conductive material," Invasix inadvertently demonstrates a POSITA's understanding that "elements" are structural, because the nubs of the conductive material are, nevertheless, a structure. During the hearing, Invasix presented a slide depicting a large circle, labelled as "electrodes," that encompassed thumbnail images of three specific types of electrodes as well as a small circle labelled as "RF Application Elements?".[48] Invasix used this slide to convey a similar idea that "RF application elements" are not the same as "electrodes" but, rather, are a subset of "electrodes."[49]

Invasix's argument reflects an unfounded belief that a finding of "sufficiently definite structure" under *Williamson* requires showing a "specific structure." That is not the case. *Williamson* only requires a showing that the term is understood by a POSITA to have a "sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1349. Therefore, "[t]o determine whether a claim recites sufficient structure, it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017) (citing *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013) (internal quotation marks omitted). Here, both the language in the remainder of the claim as well as the specification make clear that the word "elements" is used by POSITAs to designate structure.

Invasix further contends that "elements" should not be equated with "electrodes," because the Federal Circuit instructs that "different claim terms are presumed to have different meanings."[50] *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008); *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."). Invasix's contention is inapplicable here, because the term in dispute is "RF application elements," not "elements,"

[48] Invasix's Claim Construction Presentation at 63.
[49] Transcript at 119:20–24.
[50] *See*, Invasix Opening at 9:8–16.

and would be understood by a POSITA as a specific kind of electrode — one that "delive[rs] RF energy to the skin" — not just any "electrodes." Further, the inquiry here is not whether "elements" are "electrodes," but whether the word "elements" and the term "RF application elements," read in the context of this patent, connote structure.

Viewed in the context of the claims as well as the specification, the Special Master finds that the term "RF application elements," as a name for structure, connotes a sufficiently definite structure to keep it out of the ambit of § 112, ¶ 6. As Invasix does not have any proposed construction for this term in the event that it is not an MPF term, no further construction is needed.

**5. "voltage to skin elements" ('036 patent ind. claims 1 and 21)**

The parties' proposed constructions are as follows:

| Syneron's Proposed Construction | Invasix's Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary. Not governed by 112(f). Additionally, or alternatively, if any clarification is needed, this phrase is used interchangeably with "electrode(s)." See above re "electrodes." Alternatively, to the extent this limitation is erroneously deemed to be a means-plus-function term under 112(f), which it is not, the function would be applying RF, and the corresponding structures are "voltage to skin delivering elements 216, contact elements 330, and/or skin application elements 812, plus equivalents." | The term "voltage to skin elements" is a means-plus-function limitation wherein the function is "applying RF voltage to the skin" and the corresponding structures are "domed shaped voltage-to-skin application elements that protrude from the tip surface as shown in Figure 8 and described in 2:33–35 and 7:15–19" along with equivalents. |

Compared with "RF application elements," the remainder of the claim language in the asserted claims informs that the term "voltage to skin elements" connotes even more structure. Asserted claims of the '036 patent inform a POSITA that the "voltage to skin elements" are "configured for contacting a stratum corneum layer of skin external to a patient's body" and are further configured for connection to a circuit"; are "of a first size," "arranged in a cluster," and part of "a plurality of electrodes," which also includes "a plurality of electrodes sized substantially larger than the first size"; and they are "free of any portion of the larger sized

electrode therebetween."[51] Therefore, the patent clearly uses the term "voltage to skin elements" to denote a specific kind of electrode that "delive[rs] RF energy to cause fractional skin treatment."[52]

Indeed, such is the understanding of Invasix[53] as well as its expert, Dr. Tucker, who identifies "voltage to skin elements" as "a particular type of electrodes."[54] As previously discussed in Section 4 above, "electrodes" is undeniably a structural term; thus, "a subset of electrodes" or "a particular type of electrodes," being a member of the class of "electrodes," must be structural as well. Furthermore, just like "RF application elements," the specification of the '036 patent, which shares the same specification as the '654 patent, clearly shows that "voltage to skin elements" refers to the same group of elements that deliver/apply RF energy to the skin of a subject, thereby informing a POSITA of the structural nature of the term.

Therefore, the Special Master finds that, viewed in the context of the claims as well as the specification, the term "voltage to skin elements" sufficiently connotes a definite structure to keep it out of the ambit of § 112, ¶ 6. As Invasix does not have any proposed construction for this term in the event that it is not an MPF term, the Special Master finds that no further construction is needed.

**6. "processor ... configured to control RF energy supplied to [an RF/a removable] applicator tip" ('654 patent, ind. claim 24; '036 patent, ind. claim 21)**

The parties' proposed constructions are as follows:

---

[51] '036 patent, claims 1 and 21 ("a plurality of *electrodes* configured for contacting a stratum corneum layer of skin ... the plurality of *electrodes* including: a plurality of *voltage to skin elements* of a first size ... and a plurality of electrodes sized substantially larger than the first size.").

[52] *See, e.g.*, independent claims 1 and 21 of the '036 patent.

[53] Invasix Responsive at 2:20–22 ("electrodes include the set of all "electric-current conductors" of which "RF application elements" would be a subset because they conduct electric current").

[54] Invasix Responsive at 2:19.

| Syneron's Proposed Construction | Invasix's Proposed Construction |
|---|---|
| Not governed by 112(f). Otherwise, plain and ordinary meaning, no construction necessary. Alternatively, to the extent this limitation is erroneously deemed to be a means-plus-function term under 112(f), which it is not, the function would be "controlling RF energy supplied to an RF applicator tip," for the '654 patent, and "controlling RF energy supplied to a removable applicator tip," for the '036 patent, and the corresponding algorithm would comprise the following: "monitoring resistance or impedance and controlling or cutting off the RF pulses or breaking the RF circuit when resistance or impedance falls outside of preset limits." | A means-plus-function limitation wherein the function is "controlling RF energy supplied to the applicator tip." One of ordinary skill in the art, however, would not have understood the specification to disclose a structure clearly linked to the performance of that function. |

The parties dispute whether this is an MPF term that falls under the ambit of § 112, ¶ 6. Invasix contends that, under *Williamson*, a term is an MPF limitation "not only when it fails to recite sufficiently definite structure, but also when it 'recites function **without reciting sufficient structure for** performing **that function**'"[55] (emphasis in the original). Invasix further contends that, because a "processor" alone cannot perform the recited function of "configured to control RF energy supplied to [] applicator tips" without specific and additional programming and because nothing else in the claim provides the necessary structure to perform that function, the presumption against application of § 112, ¶ 6 is overcome under *Williamson*, and the term should be construed as an MPF term.[56]

Syneron contends that the word "processor" alone connotes structure and that multiple courts have construed "processor" as having a structural meaning.[57] Syneron further contends that the language in the specification and claims provides sufficiently definite structure to keep the term out of § 112, ¶ 6's ambit.[58] Although Syneron acknowledges that "[g]enerally, a 'processor …' term is a means-plus-function term only when the term 'recites function without

[55] Invasix Opening at 14:19–24 (quoting *Williamson*, 792 F.3d at 1349).
[56] Invasix Opening at 14:25–15:7.
[57] Syneron Opening at 23:4–7.
[58] Syneron Opening at 23:16–24:26.

reciting sufficient structure for performing that function'" under *Williamson*,[59] it insists that the more important determination is "whether the stated objectives and operation of the processor connote [a] sufficiently definite structure," a so-called "objectives and operation test" that traces it origin to *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004).[60]

As a threshold matter, the Special Master must determine whether the "objectives and operation" test is more applicable than *Williamson's* second prong, as Syneron contends. The "objectives and operation" test appears to have been first developed by the Federal Circuit in *Linear Tech* to determine whether terms such as "circuit for monitoring a signal from the output terminal to generate a first feedback signal" are means-plus-function limitations governed by 35 U.S.C. § 112, ¶ 6. The *Linear Tech* court first finds that "[t]echnical dictionaries, which are evidence of the understandings of persons of skill in the technical arts, plainly indicate that the term 'circuit' connotes structure." *Linear Tech.*, 379 F.3d at 1320. However, that finding does not end the inquiry. The *Linear Tech* court further found that, "when the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112, ¶ 6 presumptively will not apply." *Id.* Appling this principle to the disputed term, the *Linear Tech* court first identified "monitoring a signal from the output terminal" as the circuit's "objective," and then identified "generat[ing] a first feedback signal" as the "desired output of the circuit." *Id.* Based on these findings, the *Linear Tech* court held that "because the term 'circuit' is used in each of the disputed limitations … with a recitation of the respective circuit's operation **in sufficient detail** to suggest structure to persons of ordinary skill in the art, the 'circuit' and 'circuitry' limitations of such claims are not means-plus-function limitations subject to 35 U.S.C. § 112, ¶ 6." *Id.* at 1320–21 (emphasis added).

A survey of a string of post-*Williamson* cases decided in the Eastern District of Texas, which are cited by Syneron[61] for following this approach, shows that, in each case, the court

---

[59] Syneron Opening at 23:11–13.
[60] Syneron Opening at 23:13–15.
[61] Syneron Opening at footnote 43. In the footnote, Syneron also cites *Finjan, Inc., v. Proofpoint, Inc.*, 2015 WL 7770208 (N.D. Cal. 2015) as one of these post-*Williamson* cases that

identifies an "objective" as well as a separate "operation" with sufficient detail to find that the disputed "processor ..." terms connote sufficient structure. To the Special Master, the requirement of this so-called "objectives and operation" test is not distinguishable from the *Williamson* requirement of reciting a sufficient structure for performing the recited function; the "objective" is simply the "recited function" while the "operation" is simply the "structure for performing the recited function."

Notably, *Finjan, Inc. v. Proofpoint, Inc.*, 2015 WL 7770208 (N.D. Cal. 2015), which is one of the cases cited by Syneron for its use of the "objectives and operation" test, in fact applies *Williamson* in a way that is consistent with this understanding. In particular, the *Finjan* court finds that the term "a content processor (i) for processing content received over a network, the content including a call to a first function, and the call including an input, and (ii) for invoking a second function with the input, only if a security computer indicates that such invocation is safe" has a sufficiently specific structure, because the claim "describes how the 'content processor' interacts with the invention's other components (the transmitter and receiver), which informs the term's character." *Id.* at *11. There, the claim language clearly recites the structures for performing, or the "operation of," the recited functions of "processing content received over a network" and "invoking a second function with the input," which are "including a call to a first function, and the call including an input" and "only if a security computer indicates that such invocation is safe," respectively. The *Finjan* court further points to a dependent claim, which provides even more structure by reciting that "said content processor (i) suspends processing of the content after said transmitter transmits the input to the security computer, and (ii) resumes processing of the content after said receiver receives the indicator from the security computer." *Id.*

The parties do not dispute that the "objective/recited function" of the term is "to control RF energy supplied to [] applicator tip." However, the "operation/structure for performing the recited function" is nowhere to be found in the claim, nor could Syneron identify any. Syneron contends that "the **stated** objective and operation of the processor" is "to control RF energy

---

uses the "objectives and operation" test. However, a review of this case does not support the conclusion that the *Finjan* court was using that test.

supplied to an RF applicator tip by monitoring resistance or impedance and controlling or cutting off the RF pulses or breaking the RF circuit when resistance or impedance falls outside of preset limits"[62] (emphasis added). However, the purported "operation" of "monitoring … and controlling or cutting off …" is not "stated" in the claim; rather it appears to be an amalgam of elements in the specification performed by a "controller." This is not the type of "operation" found in *Linear Tech* and its post-*Williamson* progeny in the Eastern District of Texas, which all require and find sufficiently detailed recitation of "operation" within the claim.[63]

For example, in *Panoptis Patent Management, LLC v. Blackberry Ltd.*, 2017 WL 497571 (E.D. Tex. 2017), the court found that "a processor for associating a text message with an attachment" is not an MPF term, because the claim "set forth detail regarding the operation of the 'processor' … such as 'adding information to the text message that identifies a server' and 'sending the attachment to a server.'" *Panoptis*, 2017 WL at *19. In contrast, the same judge applies the same test in *St. Isidore Research, LLC v. Comerica Inc.*, No. 2:15-CV-1390, 2016 WL 4988246 (E.D. Tex. 2016), but finds that, although "in many instances, the term 'processor' itself connotes sufficient structure and is not a 'nonce' or 'functional' word that is subject to the limitations of § 112, ¶ 6," the terms "[p]rocessor configured to verify the authenticity of the account access request based on the response" and "processor configured to identify a second device associated with the account" are nevertheless MPF terms, because "each processor is defined only by the function it performs." *St. Isidore Research*, 2016 WL at *14.

That is the situation here, because the disputed "processor …" terms are defined only by the function they perform. Syneron contends that the claim "further elaborates specifically on the processor's objective and operation, namely, [to be] configured to control RF energy

[62] Syneron Opening at 23:16–24:3.

[63] Indeed, during the Hearing, Syneron's attorney demonstrated this understanding by stating "the objectives and operations test looks to the objectives and operations of the processor. You look within the claim language." Transcript at 175:1–3; *see also, e.g.*, Transcript at 180:17–19 ("But the objectives and operations test -- the main focus of it is on the claim language.")

supplied to the RF applicator tip in a manner such that energy is applied to the stratum corneum layer through the plurality of voltage to skin elements of the first size, and such that energy is collected from the stratum corneum on the at least one electrode sized substantially larger and arranged at a periphery of the cluster and spaced from the cluster."[64] However, this claim language only specifies the pathway by which RF energy is applied to the skin of the subject; it says nothing about how the "processor" operates to "control RF energy supplied to the RF applicator tip."

Therefore, the Special Master finds that the "processor … configured to control RF energy supplied to [an RF/a removable] applicator tip" limitation fails to recite a sufficiently definite structure and that the presumption against means-plus-function claiming is rebutted. Accordingly, this limitation in the '654 and '036 patents is subject to the provisions of 35 U.S.C. § 112, ¶ 6.

Because this term is an MPF limitation, the Special Master looks to the specifications to determine whether a sufficient structure that corresponds to the claimed function is disclosed. *Williamson*, 792 F.3d at 1351. This is a two-step process:

> The court must first identify the claimed function. Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function. Where there are multiple claimed functions, ... the patentee must disclose adequate corresponding structure to perform all of the claimed functions. If the patentee fails to disclose adequate corresponding structure, the claim is indefinite.

*Id.* at 1351–52 (internal citation omitted). Because a finding of indefiniteness would invalidate the patent, it requires a showing of clear and convincing evidence. *See, e.g.*, *Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 n.10 (2014).

Here, because the claim calls for a processor to perform more than a general function, an algorithm is required for the corresponding structure. *See, e.g.*, *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623 (Fed. Cir. 2015) ("A microprocessor or general

[64] Syneron Opening at 24:8–15.

purpose computer lends sufficient structure only to basic functions of a microprocessor. All other computer-implemented functions require disclosure of an algorithm."). The parties agree that the function is "controlling RF energy supplied to the applicator tip," but they disagree on the corresponding algorithm. Syneron contends that the corresponding algorithm is "monitoring resistance or impedance and controlling or cutting off the RF pulses or breaking the RF circuit when resistance or impedance falls outside of preset limits." Invasix contends that the specification does not disclose any algorithms that are clearly linked to the performance of the recited function.

The word "processor" is mentioned only once in the specification in the following context: "A controller 432 governing operation of all of the apparatus devices may be located in housing 204. Controller 432 may have a processor, a memory, and other devices necessary for controlling the treatment process." This passage establishes that the claimed processor is a part of a controller that is responsible for "governing operation of all of the apparatus devices," and, in particular, "controlling the treatment process."[65] The specification then provides detailed descriptions of various "treatment processes" that involve the "control" or "cut off" of RF pulses (or energy/current flow) "delivered to skin," based on the monitoring of "skin impedance," "skin resistance," or "current flowing in the voltage to skin delivering elements circuit," to achieve "desired skin effect and not causing adverse side effects such as pain, burnings and other."[66] Because it is well-established that a processor is the brain of any computer system, and because the claim explicitly states that the function of the claimed processor is to "control[] RF energy supplied to the applicator tip," a POSITA would readily understand that the "treatment processes" that specifically involve the "control" or "cut off" of RF pulses (or energy/current flow) "delivered to skin" are the corresponding algorithms of the claimed processor.

[65] '654 patent at 5:7–11.
[66] *Id.* at 5:66–6:50.

Invasix contends that it would be a "massive leap" to attribute the disclosed operations of the controller to the processor.[67] Indeed, it would be a mistake to attribute everything the controller does to the processor. However, the Special Master finds that, because the processor is the only disclosed "brain" of the controller, it is entirely appropriate to attribute any controller operation that corresponds to the recited function of "controlling RF energy supplied to the applicator tip" to the claimed processor.

Invasix further contends that the specification fails to inform "how to actually achieve the function using the processor."[68] The Special Master finds this argument unpersuasive, as the specification is replete with specific examples of how the controller may actually achieve the recited function. For example, the specification provides that "when the resistance falls below the pre-set threshold of e.g. 600 Ohms, the time of the RF pulse increased by the control, until the control unit identifies or detects the beginning of an increase in the resistance."[69] For another example, the specification provides:

> It is possible to generalize the skin behavior under pulse into at least two typical cases, although a mixture of these cases and other skin behavior may be present: a) skin resistance remains high through all of the RF pulse application time and b) skin resistance drops down below the lower resistance limit and after it reaches (the function reaches) a plateau it begins to rise. Accordingly, by monitoring the current flowing in the voltage to skin delivering elements circuit,

---

[67] Transcript at 191:24–192:14 ("We don't dispute that the controller has a processor. Then they make a massive leap. And the leap they make is in the next line. They say, 'The operation of the controller is described as including,' and then they list out a bunch of stuff that the controller does. And the leap is because the controller has a processor, everything that the patent describes in the context of the controller somehow is tied to the processor. That's not the way this works. A controller can have a processor; it can have a lot of other things. In fact, the patent describes it as having other structures. And the controller may do things, but it's not doing what the -- it's not doing what the processor is supposed to be doing, and it doesn't tell you anywhere how to actually achieve the function using the processor.")

[68] *See* footnote 71 *supra*.

[69] '654 patent at 6:19–22.

> it is possible to set proper treatment parameters resulting in a desired skin effect and not causing adverse side effects such as pain, burnings and other.[70]

Such detail and specific examples provide a POSITA with a clear roadmap on how to program the processor in the controller so as to achieve its recited function of "controlling RF energy supplied to the applicator tip." *See, e.g.*, *TecSec, Inc.*, 731 F.3d at 1349 ("the examples here provide detailed prose that shows how the specific software products operate to implement the claimed functions. This court does not impose a lofty standard in its indefiniteness cases. Short of providing source code, it is difficult to envision a more detailed disclosure.") (internal quotation marks and citation omitted).

Therefore, the Special Master finds that Invasix has failed to show, by clear and convincing evidence, that the '654 and '036 patents' specification fails to disclose corresponding structure for the MPF limitation of "processor … configured to control RF energy supplied to [an RF / a removable] applicator tip."

---

[70] *Id.* at 6:33–43.

## V. CONCLUSION

The Special Master recommends that the disputed terms be construed as follows:

| Term | Patent(s) | Construction |
|---|---|---|
| electrodes, which are adapted to be applied to the skin of the subject | '232 patent, claim 29 | electric current conductors that are configured, designed, or made to be put on or put in contact with the skin of the subject |
| placing a plurality of electrodes against the subject's skin | '079 patent, claim 10 | placing more than one electric-current conductor in contact with the subject's skin |
| ground electrode[s] | '654 patent, claims 1, 19, and 24 | return electrode or electrode that provides a return path for current |
| RF application elements | '654 patent ind. claims 1, 19, 24 | not governed by § 112, ¶ 6; no further construction necessary |
| voltage to skin elements | '036 patent ind. claims 1 and 21 | not governed by § 112, ¶ 6; no further construction necessary |
| processor … configured to control RF energy supplied to [an RF / a removable] applicator tip | '654 patent, ind. claim 24; '036 patent, ind. claim 21 | governed by § 112, ¶ 6; the function is "controlling RF energy supplied to the applicator tip"; the corresponding structure is: a processor programmed to perform the various RF energy controlling algorithms described at 5:66–6:50. Specifically, these algorithms include: monitoring resistance (or impedance/current flow) and controlling (or cutting off) RF pulse (or energy/current flow) delivered to skin when the resistance (or impedance/current flow) falls outside of preset limits, and their equivalents. |

DATED: August 24, 2018

Margaret A. Nagle

Hon. Margaret A. Nagle (Ret.)
Special Master

**PROOF OF SERVICE BY EMAIL & U.S. MAIL**

Re: Syneron Medical Ltd. vs. Invasix, Inc., et al.
Reference No. 1220057351

I, Lulu Santos, not a party to the within action, hereby declare that on August 27, 2018, I served the attached SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON CLAIM CONSTRUCTION on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Los Angeles, CALIFORNIA, addressed as follows:

Adam R. Brausa Esq.
Benjamin Au Esq.
Leeron Morad Esq.
Durie Tangri LLP
217 Leidesdorff St.
San Francisco, CA 94111
Phone: 415-362-6666
abrausa@durietangri.com
bau@durietangri.com
lmorad@durietangri.com
Parties Represented:
Inmode MD Ltd.
Invasix, Inc.

Ryan M. Kent Esq.
Timothy Saulsbury Esq,
Sonal Mehta Esq.
Durie Tangri LLP
217 Leidesdorff St.
San Francisco, CA 94111
Phone: 415-362-6666
rkent@durietangri.com
tsaulsbury@durietangri.com
smehta@durietangri.com
Parties Represented:
Inmode MD Ltd.
Invasix, Inc.

Shea N. Palavan Esq.
Stephen F. Schlather Esq.
John J. Edmonds Esq.
Collins Edmonds Pogorzelski et al.
1616 S. Voss Rd.
Suite 125
Houston, TX 77007
Phone: 281-501-3425
spalavan@ip-lit.com
sschlather@ip-lit.com
jedmonds@ip-lit.com
Parties Represented:
Syneron Medical Ltd.

Brandon G. Moore Esq.
Eric R. Carr Esq.
Collins Edmonds Pogorzelski et al.
1616 S. Voss Rd.
Suite 125
Houston, TX 77007
Phone: 281-501-3425
bmoore@ip-lit.com
ecarr@ip-lit.com
Parties Represented:
Syneron Medical Ltd.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA on August 27, 2018.

_______________________________

Lulu Santos
lsantos@jamsadr.com

**PROOF OF SERVICE BY U.S. MAIL**

Re: Syneron Medical Ltd. vs. Invasix, Inc., et al.
Reference No. 1220057351

I, Lulu Santos, not a party to the within action, hereby declare that on August 28, 2018, I served the attached SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON CLAIM CONSTRUCTION on the parties in the within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, Los Angeles, CALIFORNIA, addressed as follows:

Adam R. Brausa Esq.
Benjamin Au Esq.
Leeron Morad Esq.
Durie Tangri LLP
217 Leidesdorff St.
San Francisco, CA 94111
Parties Represented:
Inmode MD Ltd.
Invasix, Inc.

Ryan M. Kent Esq.
Timothy Saulsbury Esq,
Sonal Mehta Esq.
Durie Tangri LLP
217 Leidesdorff St.
San Francisco, CA 94111
Parties Represented:
Inmode MD Ltd.
Invasix, Inc.

Shea N. Palavan Esq.
Stephen F. Schlather Esq.
John J. Edmonds Esq.
Collins Edmonds Pogorzelski et al.
1616 S. Voss Rd.
Suite 125
Houston, TX 77007
Parties Represented:
Syneron Medical Ltd.

Brandon G. Moore Esq.
Eric R. Carr Esq.
Collins Edmonds Pogorzelski et al.
1616 S. Voss Rd.
Suite 125
Houston, TX 77007
Parties Represented:
Syneron Medical Ltd.

Hon. David O. Carter
US District Court
Ronald Regan Federal Bldg: Court Room 9D
411 W. Fourth St., #1053
Santa Ana, CA 92701-4516

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA, on August 28, 2018.

Lulu Santos

**Jesse Villegas**

**From:** cacd_ecfmail@cacd.uscourts.gov
**Sent:** Wednesday, September 5, 2018 15:43
**To:** ecfnef@cacd.uscourts.gov
**Subject:** Activity in Case 8:16-cv-00143-DOC-KES Syneron Medical Ltd. v. Invasix, Inc. et al Report

**Follow Up Flag:** Follow up
**Flag Status:** Completed

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

## Notice of Electronic Filing

The following transaction was entered on 9/5/2018 at 1:42 PM PDT and filed on 9/5/2018

**Case Name:** Syneron Medical Ltd. v. Invasix, Inc. et al
**Case Number:** 8:16-cv-00143-DOC-KES
**Filer:** Margaret A. Nagle
**Document Number:** 261

**Docket Text:**
**SPECIAL MASTER'S REPORT of AND RECOMMENDATIONS ON CLAIM CONSTRUCTION filed by Special Master Margaret A. Nagle. (yl)**

**8:16-cv-00143-DOC-KES Notice has been electronically mailed to:**

Adam Robert Brausa abrausa@durietangri.com, adam-brausa-durie-tangri-2154@ecf.pacerpro.com, calendar@durietangri.com

Andrew Louis Perito aperito@durietangri.com, calendar@durietangri.com

Benjamin B Au bau@durietangri.com, ben-au-1404@ecf.pacerpro.com, calendar@durietangri.com

Brandon G Moore bmoore@ip-lit.com

Eric R Carr ecarr@ip-lit.com

John J Edmonds jedmonds@ip-lit.com, ecarr@ip-lit.com, iplit-staff@ip-lit.com, spalavan@ip-lit.com, sschlather@ip-lit.com

Lester J Savit lsavit@onellp.com, 1666374420@filings.docketbird.com, evescance@onellp.com, info@onellp.com, lester.savit@gmail.com, lthomas@onellp.com, nlichtenberger@onellp.com, rgolder@onellp.com

Margaret A. Nagle mnagle@jamsadr.com

Ryan M Kent rkent@durietangri.com, calendar@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, ryan-kent-durie-tangri-3472@ecf.pacerpro.com

Shea N Palavan spalavan@ip-lit.com, iplit-staff@ip-lit.com

Sonal Naresh Mehta smehta@durietangri.com, calendar@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, records@durietangri.com, sonal-mehta-durie-tangri-4025@ecf.pacerpro.com

Stephen F Schlather sschlather@ip-lit.com, iplit-staff@ip-lit.com

Timothy Chen Saulsbury tsaulsbury@durietangri.com, calendar@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, timothy-saulsbury-durie-tangri-3113@ecf.pacerpro.com

**8:16-cv-00143-DOC-KES Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\SA16CV0143DOC-SPECIAL MASTER REPORT CLAIM CONSTRUCTION.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=9/5/2018] [FileNumber=26213233-0]
[502a05a20d26914e3b0234bc2e6e2bafd6cfb4ad355bf9a7d2c715eb0f15a0f0c9d2
7c2a775bf871a0a4aecafeae5d0dfe92bf7fc8e85ce5fa13e4815d9ee3ab]]

FILED
CLERK, U.S. DISTRICT COURT
9/5/18
CENTRAL DISTRICT OF CALIFORNIA
BY: D.L. DEPUTY

Hon. Margaret A. Nagle (Ret.)
JAMS
555 West 5th Street
32nd Floor
Los Angeles, CA 90013
213-253-9740

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| SYNERON MEDICAL LTD., Plaintiff, vs. INVASIX, INC. and INMODE MD LTD., Defendants. | Case No: 8:16-cv-00143-DOC-KES<br>JAMS Ref. No: 1220057351<br><br>**SPECIAL MASTER'S REPORT AND RECOMMENDATION THAT: 1) DEFENDANTS' MOTION TO STRIKE THE REPORT AND TESTIMONY OF ROY WEINSTEIN BE GRANTED; 2) DEFENDANTS' MOTION TO STRIKE PORTIONS OF ROY WEINSTEIN'S EXPERT REPORT BE DENIED; AND 3) PLAINTIFF'S MOTION TO STRIKE THE EXPERT REPORT AND TESTIMONY OF W. CHRISTOPHER BAKEWLL BE DENIED AS MOOT** |

## INTRODUCTION

Pending before the Special Master are motions to exclude expert testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), filed by plaintiff, Syneron Medical Ltd. ("Syneron"), and defendants, Invasix, Inc. and Inmode MD Ltd. ("Invasix"). Invasix seeks to exclude the testimony of Syneron's damages expert Roy Weinstein and strike his expert report. (D.I. 109 and 112.) Syneron seeks to exclude the testimony of Invasix's rebuttal damages expert W. Christopher Bakewell and strike his rebuttal damages report. (D.I. 102.) A hearing on these matters was held on March 27, 2018. For the reasons discussed below, the Special Master finds that certain fundamental and integral aspects of Mr. Weinstein's damages opinions are so inherently and patently flawed that an exclusion of his entire damages testimony is warranted.[1] Accordingly, the Special Master recommends granting Invasix's Motion To Strike the expert report of Roy Weinstein (D.I. 109), denying Invasix's Motion To Strike portions of Mr. Weinstein's expert report pursuant to Fed. R. Civ. P 37(c) (D.I. 112), and denying Syneron's Motion To Strike the expert report of Mr. Bakewell (D.I. 102) as moot.

---

[1] The Special Master finds that, due to the compound, integral, and fundamental nature of the errors in Mr. Weinstein's damages report, giving Mr. Weinstein leave to amend or supplement his opinion would essentially permit Syneron a complete "do-over," which would require an additional deposition of Mr. Weinstein, an additional rebuttal report from Invasix, and possibly a new round of briefing related to Syneron's amended/supplemental report. Such a do-over would be unjust to Invasix, unless Syneron agrees to reimburse Invasix for the considerable fees and costs that it will be incurred in connection with such a do-over.

The Special Master finds that requiring such reimbursement of Invasix would be warranted as a condition of permitting Syneron to resurrect its damages expert, because a significant portion of Mr. Weinstein's opinion demonstrates a lack of respect for some of the most fundamental precepts of patent damages calculation, such as the need to properly apportion damages based on well-established principles, in an apparent effort to inflate the damages award. To reward such an attempt with a free do-over would be unjust to Invasix and would encourage future infractions.

## LEGAL STANDARDS

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court explained that Rule 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Regional circuit law governs the admissibility of expert testimony pursuant to Rule 702 and *Daubert*. *See, e.g., Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1294 (Fed. Cir. 2015) ("Whether proffered evidence is admissible at trial is a procedural issue not unique to patent law, and we therefore review the district court's decision to admit expert testimony under the law of the regional circuit.").

To be admissible under Rule 702, the expert's testimony must be both relevant and reliable. *See e.g., Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). According to Ninth Circuit precedent, the bar for relevancy is low, as it only demands that "the evidence logically advances a material aspect of the proposing party's case." *See e.g., Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quotation marks and citation omitted). With regard to the reliability evaluation, the focus is "solely on principles and methodology, not on the conclusions that they generated." *Wendell*, 858 F.3d at 1232, quoting *Daubert*, 509 U.S. at 595. In other words, the district court's task "is to analyze not what the

experts say, but what basis they have for saying it." *Id.* at 1232 (citing *Daubert v. Merrell Dow Pharm., Inc.* 43 F.3d 1311, 1316 (9th Cir. 1995) (*Daubert II*)). The Ninth Circuit has emphasized that the inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). The party offering expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n. 10.

With regard to damages in patent cases, the Federal Circuit applies "regional circuit law to procedural issues and Federal Circuit law to substantive and procedural issues pertaining to patent law." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 26 (Fed. Cir. 2012) (citation omitted). The Federal Circuit requires that "damages awarded for patent infringement must reflect the value attributable to the infringing features of the product, and no more." *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) ("[G]iven the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented — using whatever methodology — is sufficiently reliable to support a damages award" (citation and internal quotation marks omitted).).

## DISCUSSION

### I. Roy Weinstein's Damages Report[2]

Invasix contends that Mr. Weinstein's opinions are fundamentally unreliable and improperly inflate Syneron's alleged damages. Specifically, Invasix contends that Mr. Weinstein's opinions are unreliable because he 1) backdoors a lost profits opinion under the guise of a reasonable royalty, 2) fails to isolate the value of the patented features, 3) employs a legally erroneous hypothetical negotiation framework, 4) relies on non-comparable licenses and

[2] Weinstein's damages expert report dated May 26, 2017. (*See* Declaration of Timothy Saulsbury in support of Defendants' *Daubert* Motion to Strike the Expert Report and Exclude the Trial Testimony of Roy Weinstein ("Saulsbury Decl."), Ex. 5, Expert Report of Roy Weinstein ("Weinstein Report"), D.I. 109–5).

ignores probative agreements,[3] and 5) improperly opines on injunctive relief. (*See* Invasix's *Daubert* Motion to Strike the Expert Report and Exclude the Trial Testimony of Roy Weinstein ("Weinstein Motion I"), D.I. 109, at 1–2) The Special Master addresses each of these points in turn.

### A. Reasonable Royalty or Lost Profit

Invasix contends that, although Mr. Weinstein "acknowledges that he lacked sufficient information to conduct a lost profits analysis," he nevertheless "backdoor[s] a lost profits award by claiming that the hypothetical negotiation would have resulted in a per-unit royalty in the amount of the profits Syneron would have made had it made the sale instead of Invasix." (Weinstein Motion I at 2) Syneron rejects Invasix's characterization of Mr. Weinstein's reasonable royalty analysis and argues that, to the extent that Mr. Weinstein discusses profits (as opposed to lost profits), such discussion is authorized under *Georgia-Pacific*. (*See* Syneron's Response in Opposition to Defendants' *Daubert* Motion to Strike the Expert Report and Exclude the Trial Testimony of Roy Weinstein ("Weinstein Opp'n."), D.I. 156, at 16 (citing *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1121 (S.D.N.Y. 1970))

The statute governing patent damages, 35 U.S.C. § 284, provides for "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." The statutory language suggests that reasonable royalties exist as a floor for those who cannot prove that they have lost profits as a result of infringement. Mark A. Lemley, *Distinguishing Lost Profits from Reasonable Royalties*, 51 Wm. & Mary L. Rev. 655, 655 (2009) ("The rationale is that an infringed patent is valuable and could be licensed for a fee even by patent owners who don't employ the patent in the marketplace.").

---

[3] In a separate motion, Invasix further moves to exclude Mr. Weinstein's reliance on four of the challenged licenses, because Syneron allegedly "improperly hid [the licenses] from discovery." *See* Memorandum in Support of Invasix, Inc. and Inmode MD Ltd.'s Motion to Strike Portions of Roy Weinstein's Expert Report ("Weinstein Motion II"), D.I. 112. The Special Master addresses this motion in Section I(D)(2)(a) below.

Proving lost profits is difficult, because the law requires the patent owner to "demonstrate that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989); *see also, e.g., Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 671 (1988) ("Our precedent is in agreement that a lost profits award is appropriate only if [the patent owner] proved that it would have made sales of its water purifier product "but for" [the infringer]'s infringement, i.e., that causation existed."). Therefore, a patent owner claiming that it "lost sales equal in quantity to the infringing sales" must prove (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made. *Id.* at 672 (citing the four-part test set forth in *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 197 USPQ 726 (6th Cir.1978)). In some instances, "sophisticated economic analysis of the interrelationship between price and demand" is also required. *See, e.g.*, Lemley at 657–58 ("For instance, claims of price erosion must be discounted to the extent that the higher prices a patentee could have charged absent competition would have driven away some consumers. The cases also require inquiry into how the patentee would divide sales with other companies in the market that were either licensed or selling noninfringing goods.").

Syneron ostensibly claims damages in the form of a reasonable royalty. In his report, Mr. Weinstein premises his reasonable royalty evaluation upon the "hypothetical negotiation" approach (Weinstein Report at ¶¶ 170–191), which attempts to ascertain the "results of hypothetical negotiations between the patentee and infringer (both hypothetically willing) at the time infringement began." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996). Mr. Weinstein determines that Syneron and Invasix would have begun negotiations for a reasonable royalty from a base rate of 6% of the revenue generated from sales of the accused Fractora products. (Weinstein Report at ¶¶ 172) This 6% base rate is a measurement of Syneron's "product operating margin," which Mr. Weinstein calls the "adjusted gross margin." (*Id.* at ¶ 173) Mr. Weinstein further opines that various considerations warrant an increase of the base rate to 52%, which is apparently derived from Syneron's average company-wide gross

margin from 2011 to 2016. (*Id.* at ¶¶ 173–179 and Exhibit 3A) Next, Mr. Weinstein applies these two rates to the average sales price of Syneron's eMatrix platform, RF applicators, and RF tips, to arrive at what he calls "Syneron's opportunity cost" of $1,276 – $11,058 per platform, $518 – $4493 per applicator, and $1.96 – $17.00 per applicator tip. (*Id.* at ¶¶ 182–191) Finally, Mr. Weinstein applies these "opportunity costs" to a royalty base comprised of sales of the accused infringing Invasix products, to arrive at a "reasonable" royalty amount ranging from $1,097,819 to $9,516,724. (*Id.* at ¶¶ 192–93) These figures are, unmistakably, the profits Syneron would have earned had it made Invasix's sales (i.e., Syneron's lost profit but for Invasix's infringement), assuming that there are no other competitors. *See, e.g., State Indus.*, 883 at 1578 ("In the two-supplier market, it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales.")

Syneron contends that Mr. Weinstein never made "any claim for lost profits" in his report and that, to the extent that there are discussions of profits, such profits are "properly within the confines of the determination of a reasonable royalty." (Weinstein Opp'n. at 14–16) Syneron further contends that *Georgia Pacific* allows consideration of "the anticipated amount of profits that the prospective licensor reasonably thinks he would lose as a result of licensing the patent as compared to the anticipated royalty income." (*Id.* at 16)

Syneron's argument is unpersuasive, because the fact that Mr. Weinstein did not use the phrase "lost profits" in his report does not shelter him from a finding that his reasonable royalty calculation is based on the principle of lost profits calculation. Furthermore, although *Georgia Pacific* sanctions consideration of the licensor's anticipated lost profits in calculating a reasonable royalty, it does not authorize the direct setting of the reasonable royalty in the amount of the licensor's lost profits, as Mr. Weinstein does in his report. Otherwise, a patent owner could always sidestep the heightened requirements of proving lost profits by recasting his request for lost profits as a reasonable royalty in the amount of his lost profits.

Syneron also contends that this and other courts have rejected similar arguments that an expert's royalty calculation was improperly based on lost profits analysis. Specifically, Syneron

cites this Court's decision in *Texchem Advanced Prod. Inc. Sdn. Bhd. v. e.PAK Int'l Inc.*, No. 12-cv-1341, 2014 WL 12589656 (C.D. Cal. June 11, 2014), which it contends rejected an attempt to characterize an expert's reasonable royalty analysis as a "lost profits" analysis. However, contrary to Syneron's representation, *Texchem* merely denied the defendant's motion to exclude the patent owner's expert testimony regarding lost profits after the patent owner stated that it did not intend to offer the expert testimony on the issue of lost profits. *Id.* at *6.

Syneron also cites *z4 Techs., Inc. v. Microsoft Corp.*, No. 6:06-CV-142, 2006 WL 2401099 (E.D. Tex. Aug. 18, 2006), and contends that the *z4* court rejected the defendant's argument that the plaintiff's expert's royalty calculation was "improperly based on a lost profits model." (Weinstein Opp'n. at 16) Again, contrary to Syneron's representation, *z4* is inapposite here, as it did not involve setting a reasonable royalty in the amount of the profits plaintiff would have made from infringing sales. In *z4*, the defendant complained that "the royalty calculation was improperly based on a lost profit model," because it was based on a "business plan that was speculative and assumed the production of an actual product." *z4*, 2006 WL at *10. Finding that the expert's calculations "were based on documents and evidence that were properly before the jury and that were not objected to by Defendants," the district court held that "there was a factual basis for the damage calculation presented by z4 at trial and relevant evidence to support the jury's determination of damages." *Id.*

To support a claim of lost profits, Syneron must prove that it would have made every sale of the accused products "but for" Invasix's infringement. *Water Technologies*, 850 F.2d at 671. However, Mr. Weinstein conceded during his deposition[4] that he did not offer an opinion on a lost profits model, because "it would be difficult to determine accurately the sales made by Invasix that would have been made by Syneron but for infringement." (Weinstein Tr. at 11:11–12:7) Mr. Weinstein further conceded that he did not consider the possibility that, but for Invasix's alleged infringement, the sale would have gone to a third party instead of Syneron. (Weinstein Tr. at 260:13–19)

[4] Saulsbury Decl., Ex. 7, Videotaped Deposition of Roy Weinstein dated on July 6, 2017 ("Weinstein Tr."), D.I. 109–6.

Therefore, because Mr. Weinstein proffers a reasonable royalty damages calculation that is mathematically indistinguishable from that of a lost profit calculation, but makes no attempt meet the required showings to establish an entitlement to a lost profit award, the Special Master finds that Mr. Weinstein's analysis in this regard is fundamentally unsound and unreliable under Rule 702 and *Daubert*. *See VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014) ("While questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury, a critical prerequisite is that the underlying methodology be sound."). Thus, Mr. Weinstein's reasonable royalty damages calculation should be stricken.

**B. Isolation of the Damages to the Value of the Patented Features**

Invasix contends that Mr. Weinstein's damages model fails to apportion between the patented feature and the unpatented features of the accused products, because the accused platforms and applicators support other functionalities that have nothing to do with the asserted patents. (Weinstein Motion I at 5) For example, Invasix contends that, although its multi-function platforms support up to nine separate handpieces ("applicators"), each of which uses one or more technologies that include laser, intense pulsed light, bipolar RF, negative pressure, RF-assisted lipolysis, and fractional RF, only one of these applicators (i.e., the fractional RF "Fractora" applicator) is accused of infringing the patents-in-suit. (*Id.*)

Syneron responds that Mr. Weinstein recognized the need to apportion "the value generated from sales of platforms compatible with accused Fractora applicators," because his report expressly acknowledged that "these platforms provide additional functionality besides that associated with accused Fractora applicators" and addresses the necessary apportionment as "described in the discussion of *Georgia-Pacific* factor No. 15." (Weinstein Opp'n at 11)

Despite Mr. Weinstein's acknowledgement, his report undertakes no such apportionment; the only apportionment analysis Mr. Weinstein provides under *Georgia-Pacific*

factor No. 15 relates to Syneron's eMatrix platform, not to the accused Invasix platform.[5] For example, although Mr. Weinstein acknowledges that "Invasix platforms perform other functions in addition to controlling and powering accused Fractora applicators," he analyzes Syneron's eMatrix platform and opines that, because "[t]he only function the eMatrix provided was the control and powering of an RF ablative applicator, the opportunity cost associated with granting a license for sales of eMatrix is the appropriate base to apply to all Invasix platforms sold with accused Fractora applicators." (Weinstein Report at ¶¶ 184–185) Thus, Syneron appears to argue that, because "the [eMatrix platform] embod[ies] the claimed features and is coextensive with them," an apportionment analysis can be performed on the Syneron eMatrix platform, instead of the accused product.[6] (Weinstein Opp'n. at 14)

Syneron's argument is unpersuasive. The basic precept of apportionment is well-established and straightforward: "calculate the value of those features that infringe, and cut out the value of all the rest." *Good Tech. Corp. v. Mobileiron, Inc.*, No. 5:12-CV-05826-PSG, 2015 WL 4090431, at *1 (N.D. Cal. July 5, 2015) ("a careful inspection of *Lucent, LaserDynamics, VirnetX* and the rest shows the basic methodological rule for expert analysis remains the same: calculate the value of those features that infringe, and cut out the value of all the rest.") The law requires the apportionment of the accused product, not that of the accuser's. *See, e.g., Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018) ("When the accused technology does not make up the whole of the accused product, apportionment is required."); *Mentor Graphics v. EVE–USA*, 870 F.3d 1298, 1299 (Fed. Cir. 2017) (order denying rehearing en banc) ("[W]here an infringing product is a multi-component product with patented and unpatented components, apportionment is required."). A showing that a Syneron

[5] During his deposition, Mr. Weinstein conceded that he did not apportion the accused Invasix platforms and applicators beyond excluding base platforms that were never sold with an accused Fractora applicator from the royalty base. (*See, e.g.*, Weinstein Tr. at 268:4–269:2)

[6] Syneron cites *Accentra Inc. v. Staples, Inc.*, No. 07-cv-5862-ABC (RZx), 2010 WL 8569058, *2 (C.D. Cal. Nov. 1, 2010), and *Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 602–603 (N.D. Cal. 2008), to support its contention. However, these two cases are irrelevant to Syneron's argument, as they only pertain to a patentee's need to establish a nexus between the claimed invention and the marketed product in order to demonstrate non-obviousness.

product does not require apportionment does little to inform whether the accused Invasix product requires apportionment. Therefore, Mr. Weinstein's alleged apportionment of the Syneron product is of little, if any, value to the present inquiry.

Even if we presume that Mr. Weinstein's method — *i.e.*, isolating the value of a patented feature using an arbitrarily selected product that "embod[ies] the claimed features and is coextensive with them" — could provide some measure of apportionment, Mr. Weinstein's superficial and conclusory analysis in this regard would still be far from adequate. Specifically, Mr. Weinstein's entire "analysis" consists of one paragraph in which he first asserts, based solely on the deposition testimony of Syneron Rule 30(b)(6) marketing witnesses Ann Berzak and Annie Kaufman, that "the eMatrix is a single-use platform and is compatible only with the Sublative RF applicator." (Weinstein Report at ¶ 185) He then opines, without any supporting evidence, that "[t]he only function the eMatrix provided was the control and powering of an RF ablative applicator." (*Id.*) From that, Mr. Weinstein concludes that "the opportunity cost associated with granting a license for sales of eMatrix is the appropriate base to apply to all Invasix platforms sold with accused Fractora applicators," which captures "only the value of controlling and powering RF ablative applicators" and "apportions out the value of all other non-RF-ablative functions incorporated in multi-function platforms." (*Id.*) Mr. Weinstein's superficial and conclusory "analysis" falls far short of supporting any apportionment analysis.

Syneron alternately contends that the combination of the accused platform, applicator, and tips is the smallest saleable patent practicing unit and that Federal Circuit precedent provides that "apportionment principles do not apply when the accused product is the smallest saleable unit, and the asserted claims 'cover[ ] the infringing product as a whole, not a single component of a multi-component product.'" (Weinstein Opp'n. at 12–13 (citing *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015)) However, *AstraZeneca* is inapposite here, not only because Mr. Weinstein's report does not identify "the combination of the

platform, applicator, and tips" as the smallest saleable unit,[7] but also because the outcome in *AstraZeneca* is dictated by its unique facts. Specifically, the asserted pharmaceutical formulation claims in *AstraZeneca* contain just "three key elements — the drug core, the enteric coating, and the subcoating," and the accused omeprazole tablets contain all three claimed elements. Because of this unique fact, the Federal Circuit in *AstraZeneca* found that "no unpatented or non-infringing feature[s] in the product" needed to be apportioned out of the royalty base. *Id.* Notably, the Federal Circuit explicitly stated in *AstraZeneca* that "[t]his case does not fit the pattern in which the entire market value rule applies," thereby indicating that the unique facts of the case absolved the patentee from the general requirement that "the patentee must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and unpatented features." *Id.* (internal quotation marks and citations omitted). More importantly, the *AstraZeneca* court reiterated the well-established principle that, "even when the accused infringing product is 'the smallest salable unit,' the patentee 'must do more to estimate what portion of the value of that product is attributable to the patented technology' if the accused unit is 'a multi-component product containing several non-infringing features with no relation to the patented feature.'" *Id.* (quoting *VirnetX*, 767 F.3d at 1327). Subsequent Federal Circuit decisions demonstrate that further apportionment is required where, as here, the accused product is a multi-component product containing non-infringing features. *See e.g., Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("[T]he patent owner must apportion or separate the damages between the patented improvement and the conventional components of the multicomponent product."); *CSIRO*, 809 F.3d at 1301 (requiring apportionment between patented and unpatented features of a multicomponent product).

In this case, it is not disputed that the accused platforms contain non-infringing components, such as the hardware and software associated with the eight non-Fractora RF handpieces. Therefore, further apportionment of the accused platforms is required.

[7] *See, e.g.*, Weinstein Report at ¶ 158, stating only that "the accused Fractora applicator with tip is the smallest saleable patent practicing unit."

Apportionment can be addressed by either the "careful selection of the royalty base to reflect the value added by the patented feature" or by "adjustment of the royalty rate so as to discount the value of a product's non-patented features." *Exmark., LLC*, 879 F.3d at 1348. Mr. Weinstein did neither.

The Special Master finds that Mr. Weinstein's report fails to properly apportion royalty damages to the invention's value, rendering his analysis in this regard fundamentally flawed and unreliable under Rule 702 and *Daubert*. Accordingly, this analysis should be stricken.[8] *See e.g., CSIRO*, 809 F.3d at 1301 ("[T]he essential requirement for reliability under *Daubert* is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." (internal quotation marks omitted)).

**C. Mr. Weinstein's Hypothetical Negotiation Framework**

In his expert report, Mr. Weinstein uses the financial data produced by Invasix to determine that the accused Fractora applicators were first sold in the U.S. no later than September 2011. He thus premises his damages analysis on a single hypothetical negotiation between Syneron and Invasix in or around September 2011, for all four asserted patents. (Weinstein Report at ¶¶ 71–75)

Invasix contends that Mr. Weinstein's hypothetical negotiation framework is fundamentally flawed, because Syneron did not actually own any of the four asserted patents at the time of the premised hypothetical negotiation. Specifically, Invasix contends that: 1) TransPharma Medical ("TransPharm"), not Syneron, was the sole owner of two of the asserted patents — namely, U.S. Pat. 6,148,232 and U.S. Pat. 6,615,079 ("TransPharma Patents") — at

[8] Invasix also contends that Mr. Weinstein failed to apportion the patented and non-patented elements of the Fractora handpieces themselves, because they are also capable of non-infringing uses. (*See, e.g.*, Weinstein Motion I at 4–5) In particular, Invasix contends that Syneron's own technical expert conceded that the use of Invasix's accused applicators with Invasix's coated 24–pin tips does not infringe on the TransPharma Patents and that Invasix's 20-pin tips do not infringe on the Syneron Patents. (*Id.*) To the extent that such evidence is not disputed, the same apportionment principle should have been applied to the applicators as well.

the time of the hypothesized negotiation;[9] and 2) the other two asserted patents, — namely, U.S. Pat. 8,496,654 and U.S. Pat. 9,108,036 ("Syneron Patents") — did not exist at the time of the hypothetical negotiation.[10] (Weinstein Motion I at 1) Invasix contends that, by failing to include the rightful owner, TransPharma, in the hypothetical negotiation and by including two patents that did not exist at the time of the negotiation, Mr. Weinstein posits a legally erroneous negotiation framework that improperly inflates his reasonable royalty calculation. (*Id.* at 6–8)

Syneron responds that Mr. Weinstein's damages analysis, although premised on a hypothetical negotiation that took place six months before Syneron acquired the TransPharma Patents and years before the issuance of the Syneron Patents, is "entirely proper under settled law," because Mr. Weinstein "relies on the well-known principles of the Book of Wisdom, ... which provides those at the hypothetical negotiation with knowledge of subsequent experience, including, in this case, knowledge that Syneron would ultimately acquire the TransPharma Patents and that the Syneron Patents would ultimately issue." (Weinstein Opp'n. at 5) According to Syneron, "the flexibility of the book of wisdom permits Mr. Weinstein to view future events during the hypothetical negotiations." (*Id.* at 8)

The book of wisdom doctrine was first set out by the Supreme Court in *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689 (1933), to justify the consideration of "[t]he use that has been made of the patented device" to aid "the appraisal of the value of the patent at the time of the breach." *Sinclair Ref.*, 289 U.S. at 697 ("[A] different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.").

The Federal Circuit, in *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568 (Fed. Cir. 1988), *overruled on other grounds by Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) (*en banc*), applied the book of wisdom

[9] Syneron acquired the two patents six months later on March 14, 2012.

[10] The application for U.S. Pat. 8,496,654 was filed on March 23, 2013, and the patent was issued on July 30, 2013. The application for U.S. Pat. 9,108,036 was filed on June 16, 2014, and the patent was issued on August 18, 2015.

directly to the hypothetical negotiation analysis and expressly permitted courts "to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Fromson*, 853 F.2d at 1575 (describing the hypothetical negotiation as "encompassing fantasy and flexibility; fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look at events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesizing negotiators.").

Notably, despite the *Fromson* court's expansive statements regarding the need "to look at events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesizing negotiators," the range of post-infringement evidence that the *Fromson* court instructed the district court to consider on remand was limited to quantitative information relating to the usage of the alleged infringer. *Id.* at 1577–78 ("[T]he district court on remand is, of course, at liberty to craft a royalty on such bases as it may deem most fair. The royalty may, for example, be measured as a percentage of Western's gross or net profit dollars, or as a set amount per infringing plate sold, or as a percentage of the gross or net price received for each infringing plate.").

Subsequent Federal Circuit case law "affirms the availability of post-infringement evidence as probative **in certain circumstances**." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009) (emphasis added). In *Lucent*, the Federal Circuit found that the "[c]onsideration of **evidence of usage** after infringement started can, under appropriate circumstances, be helpful to the jury and the court in assessing whether a royalty is reasonable," because "**[u]sage** (or similar) **data** may provide information that the parties would frequently have estimated during the negotiation." *Id.* at 1333–34 (emphasis added).

However, a reasonable royalty based on a hypothetical negotiation between willing negotiators remains a fundamental determination that "must relate to the time infringement occurred, and not be an after-the-fact assessment." *Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002); *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 869–70

(Fed. Cir. 2003), *vacated*, 545 U.S. 193, 125 S. Ct. 2372, 162 L. Ed. 2d 160 (2005) ("A reasonable royalty calculation envisions and ascertains the results of a hypothetical negotiation between the patentee and the infringer at a time before the infringing activity began."). Not surprisingly, then, the Federal Circuit has repeatedly emphasized the importance of the correct determination of the hypothetical negotiation date. *Integra Lifesciences*, 331 F.3d at 870 ("[t]he correct determination of [the hypothetical negotiation] date is essential for properly assessing damages."); *LaserDynamics*, 694 F.3d at 75 ("In general, the date of the hypothetical negotiation is the date that the infringement began. We have consistently adhered to this principle." (internal citation omitted)); *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384–85 (Fed. Cir. 2001) ("[T]he negotiation must be hypothesized as of the time infringement began.").

Therefore, although it is clear that, "in certain circumstances," the book of wisdom allows the use of post-infringement evidence, such as quantitative information concerning the post-infringement usage/sales of the infringing product as in *Sinclair* and *Lucent*, to support a reasonable royalty analysis, it cannot be used to overturn the fundamental precept that requires an *ex ante* hypothetical negotiation between the patentee and infringer at a time before the infringement began. *See, e.g.*, *Lucent*, 580 F.3d at 1325 ("The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement."). To hold otherwise would permit an exception such as the book of wisdom to swallow the foundational rule that requires assessing a reasonable royalty based on "a hypothetical negotiation between the patentee and the infringer **at a time before the infringing activity began.**" *Integra Lifesciences*, 331 F.3d at 869–70 (emphasis added).

**1. The Proper Parties to the Hypothetical Negotiation**

In his report, based upon *Georgia-Pacific* factor No. 5, Mr. Weinstein justifies a "significant increase to the royalty rate," from 6% to as much as 52%, on the premise that "Invasix and Syneron are direct competitors in the medical-aesthetic device industry." Factor No. 5 inquires about "the commercial relationship between the licensor and licensee, such as,

whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter." (Weinstein Report at ¶¶ 91–101) Such a "significant increase," which is the only one that great in his report, could not have been justified if TransPharma — the sole owner of the two issued patents at any time before the infringement began — is put in place at the hypothetical negotiation instead of Syneron, because, while Invasix and Syneron were direct competitors in the medical-aesthetic device business, TransPharma was not.

TransPharma was a "pharmaceutical company focused on developing and commercializing transdermal drug delivery technology." (*Id.* at ¶¶ 9, 27, and 38) Thus, a hypothetical negotiation between TransPharma and Invasix, unlike the one between Syneron and Invasix as Mr. Weinstein envisions, would likely focus on cooperation rather than competition. *See, e.g.*, *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1304 (Fed. Cir. 2015) ("[A] basic premise of the hypothetical negotiation is the opportunity for making substantial profits if the two sides [are] willing to join forces by arriving at a license of the technology." (citation and internal quotation marks omitted)). Furthermore, because TransPharma had been in talks with Syneron concerning a potential acquisition in September 2011, which eventually led to its distressed sale (Weinstein Report at ¶ 44) to Syneron for $3,600,000 six months later in March 2011 (*id.* at ¶ 73), it would be reasonable to expect that TransPharma would have been a more eager negotiator with Invasix than Syneron would have been in such a hypothetical negotiation, because TransPharma's financial state was apparently dire.

Therefore, Mr. Weinstein's failure to include the proper party in the hypothetical negotiation drastically inflates the resulting reasonable royalty. *See, e.g.*, *Integra Lifesciences*, F.3d at 870 (rejecting a reasonable royalty award partly because "[t]he value of a hypothetical license negotiated in 1994 could be drastically different from one undertaken in 1995 due to the more nascent state of the RGD peptide research in 1994," and the earlier 1994 date would "change the risks and expectations of the parties" because the defendant would not have then had an expectation of obtaining FDA approval as it would have in 1995.).

Other courts have reached the same conclusion under similar circumstances. For example, in *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111 (N.D. Cal. 2011), Oracle's expert premised a reasonable royalty determination on a hypothetical negotiation between Oracle and Google even though Sun (which Oracle later acquired) owned the asserted patents at the time the alleged infringement began. The *Oracle* court held that Oracle's expert "erred in hypothesizing a negotiation between Google and Oracle, instead of one between Google and Sun," because Sun was the patentee "at the time infringement began." *Id.* at 1117 ("At the time the alleged infringement began, Sun was the patentee, not Oracle.... Oracle and Sun were different companies with different interests. Injecting Oracle into the bargaining room was wrong.").

Syneron cites *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895 (Fed. Cir. 1986), and *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459 (D. Del. 2005), to support its contention that "courts have denied similar arguments to Invasix's which attempted to discuss what would have happened with a predecessor." (Weinstein Opp'n. at 9) Syneron's reliance on *TWM* is misplaced, because the Federal Circuit in *TMW* did not deny an attempt "to discuss what would have happened with a predecessor," as Syneron contends, but rather found that such consideration would be of little value under the facts of the case, because the lower court's royalty findings were justified by numerous other considerations.[11] *TWN*, 789 F.2d at

---

[11] Specifically, in *TWM*, the defendant-appellant (Dura) contended that the special master erred in "failing to analyze all factors delineated in *Georgia-Pacific*" when she relied solely on a so-called analytical approach under *Georgia-Pacific* to arrive at a 30% reasonable royalty. *TWM*, 789 F.2d at 899. Dura argued that a proper evaluation, which included all *Georgia-Pacific* factors, would show that "the 30% royalty was exorbitant and totally at odds with the result indicated by the other factors"; for example, "[the predecessor] had an unproven product he was desperate to license to a company like Dura with marketing and manufacturing expertise, and there was a market leader with an established non-infringing product." *Id.* at 899. The Federal Circuit rejected Dura's argument, finding "[t]hat [the predecessor] might have agreed to a lesser royalty is of little relevance, for to look only at that question would be to pretend that the infringement never happened." *Id.* at 900. Therefore, the Federal Circuit in *TMW* did not deny an attempt "to discuss what would have happened with a predecessor," as Syneron contends, but instead found that such consideration would be of little value under the facts of the case, because the 30% royalty was justified by numerous other considerations, such as the invention's immediate commercial success, its satisfaction of a long-felt need, the absence of noninfringing

899–901. Notably, the Federal Circuit in *TMW* explicitly affirmed that the district court has "correctly focused on the date when the infringement began" and rejected the defendant's alternate approach that "deal[t] mostly with events subsequent to its initial infringement." *Id.* at 899.

Syneron's reliance on *Honeywell* is similarly misplaced. Specifically, the *Honeywell* court merely repeated the general rules that "the hypothetical negotiation approach must be flexibly applied as a device in the aid of justice" and that "information not available as of [the date of the hypothetical negotiation] must necessarily be considered by the factfinder" to support its decision to use post-negotiation sales projections to calculate damages in order to compensate the licensor for the "unexpected increase" in sales after "the unforeseen and tragic events of September 11, 2001." *Honeywell*, 378 F. Supp. 2d at 463–66 (citation and internal quotation mark omitted).

Therefore, neither *TMW* nor *Honeywell* supports Syneron's contention that a successor may completely substitute a predecessor in the hypothetical negotiation. Mr. Weinstein's failure to include the proper party in the hypothesized negotiation renders his damages analysis unreliable.

**2. The Proper Patents to be Considered in the Hypothetical Negotiation**

Invasix contends that Mr. Weinstein's lumping of the two Syneron Patents into the same September 2011 hypothetical negotiation with the TransPharma Patents is also improper, because the Syneron Patents did not exist in September 2011, and thus could not have been infringed on at the time of the hypothesized negotiation. (Weinstein Motion I at 6–7) Syneron responds that, by September 2011, Syneron "would have known of the now-patented features and been in the process of obtaining the '654 and '036 patents"; furthermore, the book of wisdom "provides those at the hypothetical negotiation with knowledge of subsequent events — including that the patents did ultimately issue." (Weinstein Opp'n. at 7–8)

---

alternatives, and the defendant's convenient "loss" of documents necessary to prove lost profits. *Id.* at 899–901.

Syneron's argument is unpersuasive, because, as discussed above, the book of wisdom is not an unbounded doctrine that provides those in the hypothetical negotiation with knowledge of any and all subsequent events. Rather, it is more of an exception — to an otherwise *ex ante* process — that permits consideration of certain post-infringement evidence under appropriate circumstances. *Lucent*, 580 F.3d at 1333. To allow Mr. Weinstein to use the book of wisdom to include two patents that had not yet been filed[12] — let alone issued — in a hypothetical negotiation trivializes the requirement that the hypothetical negotiation is to occur "at the time infringement began." *Mahurkar*, 79 F.3d at 1579.

Furthermore, by lumping the TransPharma and Syneron Patents together in the same hypothetical negotiation, Syneron significantly skews the reasonable royalty calculation in its favor. For example, Mr. Weinstein justifies an increase in royalty rate under *George-Pacific* factor No. 7, which relates to "the duration of the patents and the term of the license," by treating all asserted patents as having the same expiration date, when, in fact, the TransPharma Patents have "legal lives" that are less than half of those of the Syneron Patents. (*See* Weinstein Report at ¶ 119 ("The hypothetical negotiation between Syneron and Invasix takes place in September 2011. It is my understanding that the '232 patent and the '079 patent expire on November 9, 2018. It is my understanding that the '654 patent and the '036 patent expire on July 20, 2029. Hence, the legal lives of the Patents-in-Suit as of the September 2011 hypothetical negotiation were approximately 18 years.").) Therefore, Mr. Weinstein's lumping of the Syneron Patents into the same hypothetical negotiation as the TransPharma Patents also makes his analysis unreliable.

Accordingly, the Special Master finds that Mr. Weinstein employs a legally erroneous hypothetical negotiation framework, rendering his opinions flawed and unreliable under Fed. R.

[12] Though the Syneron Patents ('654 and '036 patents) are continuations of, and thus entitled to claim priority to, the same parent application file in July 2009, their applications were not filed until 2012 and 2014, respectively. Therefore, at the time of the hypothetical negotiation in September 2011, the claims of the Syneron Patents, which are essential and indispensible for assessing the value of the patents, likely were not yet finalized.

Evid. 702 and *Daubert*. Thus, Mr. Weinstein's hypothetical negotiation analysis should be stricken.

**D. Non-comparable Agreements/Licenses**

Invasix takes issue with Mr. Weinstein's consideration of five agreements: one under *Georgia-Pacific* factor No. 1 ("Factor 1") and four under *Georgia-Pacific* factor No. 12 ("Factor 12").

**1. *Georgia-Pacific* factor No. 1**

Under *Georgia-Pacific* factor No. 1, which inquires about the "royalties received by the patentee for the licensing of the Patents-In-Suit, proving or tending to prove an established royalty," Mr. Weinstein considers an agreement that settled litigation brought by Syneron against EndyMed Medical Ltd. ("EndyMed") and Eclipse Aesthetics, LLC ("Eclipse") ("EndyMed Settlement Agreement"). (Weinstein Report at ¶ 81) Under that agreement, "EndyMed and Eclipse agreed to cease sales of all fractional skin resurfacing products in the United States subject to certain exceptions" pursuant to the terms of the agreement.[13] (*Id.*) However, while the agreement involves one of the patents-in-suit, Mr. Weinstein acknowledges that the agreement "does not contemplate compensation." (*Id.*) Invasix contends that the EndyMed Settlement Agreement is irrelevant to the consideration of Factor 1, because neither of the defendants in that case took a license to any of the asserted patents nor did any money change hands. (Weinstein Motion I at 19–20)

The Special Master agrees. The EndyMed Settlement Agreement sheds no light on "the licensing of the Patents-In-Suit," as required by Factor 1, because it does not contemplate a license, let alone a license involving the patents-in-suit. Similarly, the agreement sheds no light on "royalties received by the patentee" or an "established royalty" as required by Factor 1,

[13] Invasix contends that "the terms of the agreement are express that EndyMed and Eclipse simply agreed to withdraw certain products from the United States market '[t]o avoid the expense and the disruption associated with continuing' the litigation." (Weinstein Motion I at 19) Syneron does not dispute this contention.

because it does not contemplate compensation. Therefore, the agreement is irrelevant to the consideration of Factor 1.

Furthermore, given the Federal Circuit's "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages," even if the agreement provided some credible insight into an "established royalty," which it does not, any probative value it might have would be "substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury." *LaserDynamics*, 694 F.3d at 77 (noting that agreements that are "tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty is a logical extension of *Georgia–Pacific*, the premise of which assumes a voluntary agreement will be reached between a willing licensor and a willing licensee, with validity and infringement of the patent not being disputed."); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870–72 (Fed. Cir. 2010) (noting that "litigation itself can skew the results of the hypothetical negotiation" but permitting reliance on license that arose out of litigation).

Therefore, the Special Master finds that Mr. Weinstein's reliance on the EndyMed Settlement Agreement under *Georgia-Pacific* factor No. 1 was improper and should be excluded.

**2. *Georgia-Pacific* factor No. 12**

Under *Georgia-Pacific* factor No. 12, which inquires about the "portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions," Mr. Weinstein considers the following four license agreements:

- an agreement that settled patent litigation brought by Syneron against Viora and Copper Leaf Day Spa & Salon ("Viora Settlement Agreement"), wherein Syneron granted Viora a license to a patent that allegedly relates to RF skin treatment in return for "running royalties ranging from 7.5 to 15 percent, depending on the number of systems sold in the U.S.";

- an agreement that settled litigation brought by Lumenis, Inc., against Syneron ("Lumenis Settlement Agreement"), wherein Lumenis granted Syneron a worldwide, non-exclusive right under the patents owned by Lumenis in return for a $1.5 million lump-sum payment from Syneron and a running royalty of 3% on sales of its products;
- an agreement that settled patent litigation brought by Palomar against Syneron ("Palomar Settlement Agreement"), wherein Palomar granted Syneron a non-exclusive, worldwide sublicense to two U.S. patents and 11 foreign patents and patent applications to make and sell hair-removal products to non-consumer customers in return for a $31 million lump-sum payment to Palomar; and
- a license and development agreement between Reliant Technologies, Inc. ("Reliant"), and Surgical Laser Technologies, Inc. ("SLT") ("Reliant Agreement"), wherein Reliant granted SLT "a worldwide license under six U.S. Patents to make, have made, use, import, and sell surgical products" in return for various credits, payments, and royalty, among others.

(Weinstein Report at ¶¶ 147–154)

Invasix challenges Mr. Weinstein's reliance on these licenses on two grounds: one procedural and the other substantive. First, Invasix moves, in a separate motion, to strike Mr. Weinstein's opinions regarding these licenses under Fed. R. Civ. P. 37(c), because Syneron improperly failed to disclose these licenses prior to his reliance on them in his damages report. (*See* Weinstein Motion II) Second, Invasix contends that, putting the asserted procedural deficiency aside, Syneron must carry its burden of proving that these licenses are sufficiently comparable before Mr. Weinstein may rely on them. (Weinstein Motion I at 20) As discussed below, the Special Master finds that, although exclusion under Rule 37(c) is not warranted, Mr. Weinstein's reliance on these licenses is nevertheless to be excluded under Fed. R. Evid. 702 and *Daubert*.

**a) Whether Mr. Weinstein's opinions regarding these licenses should be stricken for improper failure to disclose**

Invasix contends that Mr. Weinstein's reliance on these licenses should be stricken, because Syneron "improperly hid [the licenses] from discovery." (Weinstein Motion II at 5) Specifically, Invasix contends that, because Syneron was a signatory to three out of four of the licenses — the latest of those agreements was effective June 4, 2015, and the fourth license was executed 15 years ago in 2002 — Syneron has no excuse for its failure to disclose its contentions regarding these licenses sooner than May 26, 2017, when Mr. Weinstein served his damages report. (*Id.*)

Under Fed. R. Civ. P. 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Under Ninth Circuit precedent, Syneron bears the burden of showing that one of those exceptions applies. *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). The Ninth Circuit has articulated several factors for the Court to consider when determining whether a violation of the expert discovery rules was harmless, including: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not disclosing the evidence." *Lanard Toys, Ltd. v. Novelty, Inc.*, 375 Fed. Appx. 705, 713 (9th Cir. 2010).

Syneron contends that it relied on its patent experts to identify documents relevant to a hypothetical royalty negotiation and/or the *Georgia-Pacific* factors, and Mr. Weinstein "independently conducted research and independently found the information he relied upon from public filings." (Syneron's Response in Opposition to Invasix, Inc. and Inmode MD Ltd.'s Motion to Strike Portions of Roy Weinstein's Expert Report ("Weinstein Opp'n. II"), D.I. 160 at 1–2) In other words, Syneron contends that it simply "did not understand the licenses to be relevant to the case" until Mr. Weinstein identified them. (*Id.* at 5) Syneron further contends that, in any event, the alleged failure is harmless, because the license agreements were cited in

Mr. Weinstein's opening report 30 days before the close of fact discovery, and thus, "Invasix had ample time to review the license agreements and take whatever additional discovery it deemed appropriate before serving the expert rebuttal report of Mr. Bakewell on June 26, 2017 and deposing Mr. Weinstein on July 6, 2017." (*Id.* at 4–5)

The Special Master finds that Syneron's failure to disclose the licenses was substantially harmless, because they were disclosed 30 days before the close of fact discovery. Invasix had the opportunity to take additional discovery if it deemed it to be necessary, but it chose not to. Invasix also had the opportunity to rebut Mr. Weinstein's report and did, in fact, provide a 14–page rebuttal a month later. (*See* Mr. Bakewell's Rebuttal Expert Report regarding Damages Issues ("Bakewell Rebuttal"), Plaintiff's Consolidated Ex. and Decl., Ex. 14 at 129–142) Furthermore, Invasix had the opportunity to depose Mr. Weinstein regarding these licenses and did, in fact, depose Mr. Weinstein regarding theses licenses on July 6, 2017. Therefore, Syneron has demonstrated that its delay in disclosing the licenses is substantially harmless. Thus, exclusion is not warranted. *See, e.g., ART+COM Innovationpool GmbH v. Google Inc.*, 155 F. Supp. 3d 489, 511 (D. Del. 2016) (rejecting motion to strike noninfringing alternative disclosed just prior to service of defendant's expert report, because plaintiff's experts were afforded an ample opportunity to respond, and did respond, in their reports," and defendant's expert was "deposed about his opinions on this non-infringing alterative.").

Accordingly, the Special Master recommends denying Invasix's Motion To Strike portions of Mr. Weinstein's expert report based on its contention that Syneron improperly hid the disputed license agreements from discovery.

**b) Whether these four licenses are sufficiently comparable to the patents-in-suit**

Invasix further contends that Mr. Weinstein's reliance on these licenses should be stricken because Syneron fails to carry its burden of proving that these licenses are sufficiently comparable. (Weinstein Motion I at 20) Syneron responds that Mr. Weinstein is not relying on

these licenses "as comparable, but, rather, as a check that his chosen royalty rate is acceptable." (Weinstein Opp'n. at 17)

Syneron's argument is unpersuasive. Whether these licenses are being proffered as "comparable" or a "check," Mr. Weinstein must first establish that these licenses are admissible by a preponderance of evidence. *See, e.g.*, *Mass Engineered Design, Inc. v. Planar Sys., Inc.*, No. 3:16-CV-1510-SI, 2017 WL 2642277, at *3 (D. Or. June 19, 2017) (citing *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)), and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993)); *ResQNet*, 594 F.3d at 869 ("This court has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies other than the patent in suit.").) Here, under *Georgia-Pacific* factor No. 12, Syneron carries the threshold burden to establish that these licenses are for "comparable businesses" and involve "analogous inventions." *See e.g.*, *Ravo v. Covidien LP*, 55 F. Supp. 3d 766, 777 (W.D. Pa. 2014).

Moreover, it is undisputed[14] that Mr. Weinstein and Syneron's technical expert, Dr. Webster, expressly disclaimed performing any evaluation of the comparability of these licenses. For example, with regard to the Viora Settlement Agreement, Mr. Weinstein admitted that he: 1) had done no "analysis of the technological comparability" of the licensed patent and any of the four patents-in-suit in this case; 2) did not ask "Dr. Webster as to the technological comparability"; 3) did not "ask any Syneron witness about the technological comparability" of the patents; and 4) did nothing else "to investigate the technological comparability." (Saulsbury Decl. Ex. 7 ("Weinstein Tr.") at 271:18–272:8) Mr. Weinstein made similar admissions with regard to the other three licenses. (*See id.* at 274:17–282:9) Mr. Webster likewise admitted that he had not "done any technical analysis of any of the patents that were at issue in those license

---

[14] Invasix contends, in its motion, that Syneron "necessarily cannot carry this burden because both Mr. Weinstein and Syneron's technical expert, Dr. Webster, expressly disclaimed having performed any evaluation of the comparability of those licenses" and cited statements made by Mr. Weinstein and Dr. Webster in their depositions to support these assertions. (Weinstein Motion I at 20–21) Syneron made no attempt to dispute these assertions either in their Opposition or during the hearing.

agreements" on which Mr. Weinstein relied. (Saulsbury Decl. Ex. 4 ("Webster Tr.") at 227:7–15)

Instead of responding directly to Invasix's primary contention that its experts have expressly disclaimed performing any evaluation of the comparability of these licenses, Syneron argues that other courts do not require licenses to be "perfectly analogous" to be admitted and that, as long as the licenses are not "radically different" from the hypothetical agreement under consideration, "any disagreements between the parties or their experts regarding comparability go to the weight of the evidence." (Weinstein Opp'n. at 17–19 (internal quotations and citations omitted)) Syneron's argument is misplaced, because the threshold question does not concern the "weight of the evidence," but rather whether there is any competent evidence to weigh. By failing to rebut Invasix's showings that its experts expressly disclaimed having done any comparability analysis on the disputed licenses, there is simply no basis for Mr. Weinstein to rely on those licenses.

Furthermore, three out of four of these licenses are settlement agreements. As previously discussed in Section I(D)(1), any probative value they might otherwise have would be "substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury." *LaserDynamics*, 694 F.3d at 77. With regard to the only non-settlement agreement in the group — namely, the Reliant Agreement — it includes the transfer of tangible assets and trademark rights in addition to a patent license. (Weinstein Tr. at 280:23–281:2; Weinstein Rpt. ¶ 153) But Mr. Weinstein admitted that he could not "apportion the consideration that was paid as part of that agreement to any patent rights versus the non-patent rights that were granted under the agreement." (Weinstein Tr. at 281:12–16) Without such apportionment, the agreement cannot provide any guidance as to the portion of profit or selling price to "allow for the use of the invention" under Factor 12.

Therefore, the Special Master finds that Mr. Weinstein's reliance on these four agreements under *Georgia-Pacific* factor No. 12 was improper and should be excluded.[15]

**E. Injunctive Relief**

After Invasix moved to exclude Mr. Weinstein's irreparable harm opinions, Syneron mooted this issue by agreeing not to present Mr. Weinstein's opinions on injunctive relief to the jury. (Weinstein Opp'n. at 22) Nevertheless, Syneron contends that Mr. Weinstein should be permitted to offer the jury part of his injunctive relief opinions that "overlap" with his royalty opinions. (*Id.* at 23) However, Syneron fails to identify any specific portions that overlap with royalty opinions.[16]

In any event, in view of the Special Master's determination that Mr. Weinstein's report should be excluded due to its fundamental and integral flaws, as previously discussed in Sections I(A), I(B), and I(C), the Special Master finds that this issue is moot. In the event that Syneron chooses to amend/supplement Mr. Weinstein's report and compensate Invasix for any necessary fees and cost, Syneron may incorporate any such opinion into the reasonable royalty section in the amended/supplemental report.

---

[15] Invasix further faults Mr. Weinstein for failing to consider two allegedly probative agreements. Syneron responds that Mr. Weinstein did not regard these agreements as being probative of a reasonable royalty in this case, because they are assets purchase agreements, not patent license agreements. (Weinstein Opp'n. at 20) The Special Master finds that Syneron has provided sufficient rational for rejecting these agreements. Invasix generally would be free to challenge the credibility of Mr. Weinstein's analysis by proffering these agreements as contrary evidence at trial and to cross-examine Mr. Weinstein on his failure to consider these agreements. Therefore, exclusion on this ground is not warranted. *See e.g.*, *VirnetX*, 767 F.3d at 1328 (noting that "questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury"); *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 594, 596) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

[16] Out of a total of 56 paragraphs pertaining to Mr. Weinstein's injunction opinions, Syneron identifies 51 paragraphs as overlapping with his royalty opinions, omitting only those paragraphs setting forth background legal principles for injunctions. (*See* Weinstein Opp'n. at 23 (citing Dkt. 109-05 (Weinstein Rpt.) ¶¶ 204–254))

**II. Christopher Bakewell's Rebuttal Report**

Syneron moves to strike Bakewell's rebuttal report. (*See* Plaintiff's *Daubert* Motion and Motion to Strike and Exclude the Expert Report and Exclude the Testimony of Defendants' Damages Expert W. Christopher Bakewell, D.I. 102) However, given the Special Master's findings above, which, if adopted, would result in the exclusion of Mr. Weinstein's report in its entirety, Bakewell's rebuttal report would be rendered moot. Thus, the Special Master does not address it.

## CONCLUSION

Notwithstanding Mr. Weinstein's extensive experience in IP valuation and patent infringement damages calculation, a significant portion of his opinion in his damages report demonstrates an utter lack of appreciation and/or respect for some of the most fundamental precepts of patent damages calculation in an apparent effort to inflate the damages award.

First, under the guise of reasonable royalty determination, Mr. Weinstein proffers a damages calculation that is mathematically indistinguishable from a lost profit calculation, thereby circumventing longstanding precedent requiring rigorous showings to establish an entitlement to a lost profit award.

Second, Mr. Weinstein ignores the well-established and common sense rule that a damages apportionment analysis is to be performed on the accused, infringing products. Instead, he arbitrarily selects and superficially examines a Syneron product that allegedly "embod[ies] the claimed features and is coextensive with them," and then concludes that his analysis "apportions out the value of all other non-RF-ablative functions incorporated in multi-function platforms." Not only is Mr. Weinstein's analysis of the Syneron product conclusory and unreliable, but also his failure to perform apportion analysis on the accused product, which Mr. Weinstein has acknowledged to have the capability to "perform other functions in addition to [the patented features]," runs afoul of the well-settled principle that requires the patentee to

apportion value between the patented features and non-patented features emboidied in the accused products.

Third, Mr. Weinstein justifies as much as an eight-fold increase of the reasonable royalty in a hypothetical negotiation that took place in September 2011, by improperly replacing TransPharma (which was the owner of the TransPharma Patents at the time of the infringement began and was not a competitor of Invasix) with Syneron (which did not acquire the patents until six months later and was/is a direct competitor of Invasix). Such substitution violates the fundamental precept that the hypothetical negotiation for determining reasonable royalty is to be between the patentee and the infringer at the time of the infringement began.

The Special Master finds that these fundamental errors infect the integrity of the whole of Mr. Weinstein's report, and an exclusion of his opinion in its entirety is warranted.

Accordingly, the Special Master recommends the Court rule as follows: 1) Invasix's *Daubert* Motion To Strike the expert report and exclude the trial testimony of Roy Weinstein should be GRANTED; 2) Invasix's Motion To Strike portions of Roy Weinstein's expert report pursuant to Fed. R. Civ. P 37(c) should be DENIED; and 3) Syneron's *Daubert* Motion and Motion To Strike and Exclude the expert report and testimony of Invasix's rebuttal damages expert W. Christopher Bakewell should be DENIED as moot.

DATED: August 27, 2018

Margaret A. Nagle

Hon. Margaret A. Nagle (Ret.)
Special Master

**PROOF OF SERVICE BY E-Mail**

Re: Syneron Medical Ltd. vs. Invasix, Inc., et al.
Reference No. 1220057351

I, Jo-El Fequiere, not a party to the within action, hereby declare that on August 28, 2018, I served the attached Special Master's Report and Recommendation That: 1) Defendants' Motion To Strike The Report And Testimony Of Roy Weinstein Be Granted; 2) Defendants' Motion To Strike Portions Of Roy Weinstein's Expert Report Be Denied; and 3) Plaintiff's Motion To Strike The Expert Report And Testimony Of W. Christopher Bakewell Be Denied As Moot on the parties in the within action by electronic mail at Los Angeles, CALIFORNIA, addressed as follows:

Adam R. Brausa Esq.
Benjamin Au Esq.
Leeron Morad Esq.
Durie Tangri LLP
217 Leidesdorff St.
San Francisco, CA 94111
Phone: 415-362-6666
abrausa@durietangri.com
bau@durietangri.com
lmorad@durietangri.com
Parties Represented:
Inmode MD Ltd.
Invasix, Inc.

Ryan M. Kent Esq.
Timothy Saulsbury Esq,
Sonal Mehta Esq.
Durie Tangri LLP
217 Leidesdorff St.
San Francisco, CA 94111
Phone: 415-362-6666
rkent@durietangri.com
tsaulsbury@durietangri.com
smehta@durietangri.com
Parties Represented:
Inmode MD Ltd.
Invasix, Inc.

Shea N. Palavan Esq.
Stephen F. Schlather Esq.
John J. Edmonds Esq.
Collins Edmonds Pogorzelski et al.
1616 S. Voss Rd.
Suite 125
Houston, TX 77007
Phone: 281-501-3425
spalavan@ip-lit.com
sschlather@ip-lit.com
jedmonds@ip-lit.com
Parties Represented:
Syneron Medical Ltd.

Brandon G. Moore Esq.
Eric R. Carr Esq.
Collins Edmonds Pogorzelski et al.
1616 S. Voss Rd.
Suite 125
Houston, TX 77007
Phone: 281-501-3425
bmoore@ip-lit.com
ecarr@ip-lit.com
Parties Represented:
Syneron Medical Ltd.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA on August 28, 2018.

Jo-El Fequiere
JAMS
jfequiere@jamsadr.com

**PROOF OF SERVICE BY U.S. MAIL**

Re: Syneron Medical Ltd. vs. Invasix, Inc., et al.
Reference No. 1220057351

I, Stephanie Barraza, not a party to the within action, hereby declare that on August 29, 2018, I served the attached SPECIAL MASTER'S REPORT AND RECOMMENDATION THAT: 1) DEFENDANTS' MOTION TO STRIKE THE REPORT AND TESTIMONY OF ROY WEINSTEIN BE GRANTED; 2) DEFENDANTS' MOTION TO STRIKE PORTIONS OF ROY WEINSTEIN'S EXPERT REPORT BE DENIED; AND 3) PLAINTIFF'S MOTION TO STRIKE THE EXPERT REPORT AND TESTIMONY OF W. CHRISTOPHER BAKEWLL BE DENIED AS MOOT on the parties in the within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, Los Angeles, CALIFORNIA, addressed as follows:

Adam R. Brausa Esq.
Benjamin Au Esq.
Leeron Morad Esq.
Durie Tangri LLP
217 Leidesdorff St.
San Francisco, CA 94111
Parties Represented:
Inmode MD Ltd.
Invasix, Inc.

Ryan M. Kent Esq.
Timothy Saulsbury Esq.
Sonal Mehta Esq.
Durie Tangri LLP
217 Leidesdorff St.
San Francisco, CA 94111
Parties Represented:
Inmode MD Ltd.
Invasix, Inc.

Shea N. Palavan Esq.
Stephen F. Schlather Esq.
John J. Edmonds Esq.
Collins Edmonds Pogorzelski et al.
1616 S. Voss Rd.
Suite 125
Houston, TX 77007
Parties Represented:
Syneron Medical Ltd.

Brandon G. Moore Esq.
Eric R. Carr Esq.
Collins Edmonds Pogorzelski et al.
1616 S. Voss Rd.
Suite 125
Houston, TX 77007
Parties Represented:
Syneron Medical Ltd.

Hon. David O. Carter
US District Court
Ronald Regan Federal Bldg: Court Room 9D
411 W. Fourth St., #1053
Santa Ana, CA 92701-4516
(VIA MAIL ONLY)

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA, on August 29, 2018.

Stephanie Barraza

**Jesse Villegas**

| | |
|---|---|
| **From:** | cacd_ecfmail@cacd.uscourts.gov |
| **Sent:** | Wednesday, September 5, 2018 16:14 |
| **To:** | ecfnef@cacd.uscourts.gov |
| **Subject:** | Activity in Case 8:16-cv-00143-DOC-KES Syneron Medical Ltd. v. Invasix, Inc. et al Order on Motion to Exclude |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

## Notice of Electronic Filing

The following transaction was entered on 9/5/2018 at 2:13 PM PDT and filed on 8/27/2018

| | |
|---|---|
| **Case Name:** | Syneron Medical Ltd. v. Invasix, Inc. et al |
| **Case Number:** | 8:16-cv-00143-DOC-KES |
| **Filer:** | |
| **Document Number:** | 262 |

**Docket Text:**
**SPECIAL MASTERS REPORT AND RECOMMENDATION THAT: 1) DEFENDANT'S MOTION TO STRIKE THE REPORT AND TESTIMONY OF ROY WEINSTE8N BE GRANTEDP 2) DEFENDANT'S MOTION TO STRIKE PORTIONS OF ROY WEINSTEIN'S EXPERT REPORT BE DENIED, AND 3)PLAINTIFF'S MOTION TO STRIKE THE EXPERT REPORT AND TESTIMONY OF W. CHRISTOPHER BAKEWILL BE DENIED by Special Master HON. MARGARET A. NAGLE. (yl)**

**8:16-cv-00143-DOC-KES Notice has been electronically mailed to:**

Lester J Savit evescance@onellp.com, info@onellp.com, nlichtenberger@onellp.com, 1666374420@filings.docketbird.com, lthomas@onellp.com, lsavit@onellp.com, lester.savit@gmail.com, rgolder@onellp.com

Brandon G Moore bmoore@ip-lit.com

Benjamin B Au bau@durietangri.com, calendar@durietangri.com, ben-au-1404@ecf.pacerpro.com

Adam Robert Brausa adam-brausa-durie-tangri-2154@ecf.pacerpro.com, abrausa@durietangri.com, calendar@durietangri.com

Shea N Palavan spalavan@ip-lit.com, iplit-staff@ip-lit.com

Andrew Louis Perito aperito@durietangri.com, calendar@durietangri.com

Sonal Naresh Mehta sonal-mehta-durie-tangri-4025@ecf.pacerpro.com, calendar@durietangri.com, records@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, smehta@durietangri.com

John J Edmonds spalavan@ip-lit.com, ecarr@ip-lit.com, sschlather@ip-lit.com, jedmonds@ip-lit.com, iplit-staff@ip-lit.com

Stephen F Schlather sschlather@ip-lit.com, iplit-staff@ip-lit.com

Margaret A. Nagle mnagle@jamsadr.com

Timothy Chen Saulsbury timothy-saulsbury-durie-tangri-3113@ecf.pacerpro.com, tsaulsbury@durietangri.com, calendar@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com

Eric R Carr ecarr@ip-lit.com

Ryan M Kent rkent@durietangri.com, ryan-kent-durie-tangri-3472@ecf.pacerpro.com, calendar@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com

**8:16-cv-00143-DOC-KES Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

Hon. Margaret A. Nagle (Ret.)
JAMS
555 West 5th Street
32nd Floor
Los Angeles, CA 90013
213-253-9740

FILED
CLERK, U.S. DISTRICT COURT
9/7/18
CENTRAL DISTRICT OF CALIFORNIA
BY: D.L. DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| SYNERON MEDICAL LTD., Plaintiff, vs. INVASIX, INC. and INMODE MD LTD., Defendants. | Case No: 8:16-cv-00143-DOC-KES<br>JAMS Ref. No: 1220057351<br><br>**SPECIAL MASTER'S MEMORANDUM ORDER RE: SYNERON'S OBJECTIONS TO THE TENTATIVE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON MOTIONS FOR SUMMARY JUDGMENT** |

Pursuant to the Court's Order Appointing Special Master (D.I. 220) to hear and adjudicate, *inter alia*, motions for summary judgment, and after carefully considering the evidence and authorities presented by the parties, the Special Master issued a Tentative Report and Recommendation on Motions for Summary Judgment and Other Pending Motions ("Report") on August 24, 2018. In the Report, the Special Master recommends, *inter alia*, granting Invasix's Motion for Summary Judgment (D.I. 110) on the sole ground of invalidity of the asserted claims of the patents-in-suit and denying Syneron's Motion for Summary Judgment (D.I. 103) in its entirety.

On September 4, 2018, Syneron submitted its 63 page Objections to and Motion to Modify the Report ("Objections"), challenging most, if not all, of the Special Master's invalidity findings and requesting that the Special Master modify the Report. Having reviewed Syneron's Objections, the Special Master finds the Objections to be, in essence, an overly long and inappropriate attempt to reargue the contentions presented in Syneron's Response in Opposition to Defendants' Motion for Summary Judgment ("Opposition") (D.I. 158) and an untimely and impermissible effort to advance new arguments and authorities that were not previously presented by Syneron. The Special Master rejects the Objections to the extent they endeavor to belatedly expand the record on which the Report is based.

The Special Master now concludes that no modification of the Report is warranted, even giving due consideration to Syneron's Objections. Therefore, the Special Master will file the Report with the Court deleting only its designation as "Tentative."

**IT IS SO ORDERED.**

DATED: September 7, 2018

Margaret A. Nagle

Hon. Margaret A. Nagle (Ret.)
Special Master

**Jesse Villegas**

| | |
|---|---|
| **From:** | cacd_ecfmail@cacd.uscourts.gov |
| **Sent:** | Friday, September 7, 2018 17:22 |
| **To:** | ecfnef@cacd.uscourts.gov |
| **Subject:** | Activity in Case 8:16-cv-00143-DOC-KES Syneron Medical Ltd. v. Invasix, Inc. et al Order |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

## Notice of Electronic Filing

The following transaction was entered on 9/7/2018 at 3:22 PM PDT and filed on 9/7/2018

| | |
|---|---|
| **Case Name:** | Syneron Medical Ltd. v. Invasix, Inc. et al |
| **Case Number:** | 8:16-cv-00143-DOC-KES |
| **Filer:** | |
| **Document Number:** | 263 |

**Docket Text:**
**SPECIAL MASTER'S MEMORANDUM ORDER Re: Syneron's Objections to the Tentative Special Master's Report and Recommendations on Motions for Summary Judgment by Special Master Hon. Margaret A Nagle (Ret.) (jp)**

**8:16-cv-00143-DOC-KES Notice has been electronically mailed to:**

Lester J Savit evescance@onellp.com, info@onellp.com, nlichtenberger@onellp.com, 1666374420@filings.docketbird.com, lthomas@onellp.com, lsavit@onellp.com, lester.savit@gmail.com, rgolder@onellp.com

Brandon G Moore bmoore@ip-lit.com

Benjamin B Au bau@durietangri.com, calendar@durietangri.com, ben-au-1404@ecf.pacerpro.com

Adam Robert Brausa adam-brausa-durie-tangri-2154@ecf.pacerpro.com, abrausa@durietangri.com, calendar@durietangri.com

Shea N Palavan spalavan@ip-lit.com, iplit-staff@ip-lit.com

Andrew Louis Perito aperito@durietangri.com, calendar@durietangri.com

Sonal Naresh Mehta sonal-mehta-durie-tangri-4025@ecf.pacerpro.com, calendar@durietangri.com, records@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, smehta@durietangri.com

John J Edmonds spalavan@ip-lit.com, ecarr@ip-lit.com, sschlather@ip-lit.com, jedmonds@ip-lit.com, iplit-staff@ip-lit.com

Stephen F Schlather sschlather@ip-lit.com, iplit-staff@ip-lit.com

Margaret A. Nagle mnagle@jamsadr.com

Timothy Chen Saulsbury timothy-saulsbury-durie-tangri-3113@ecf.pacerpro.com, tsaulsbury@durietangri.com, calendar@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com

Eric R Carr ecarr@ip-lit.com

Ryan M Kent rkent@durietangri.com, ryan-kent-durie-tangri-3472@ecf.pacerpro.com, calendar@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com

**8:16-cv-00143-DOC-KES Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

Hon. Margaret Nagle (Ret.)
JAMS
555 West 5th Street
32nd Floor
Los Angeles, CA 90013
213-253-9740

FILED
CLERK, U.S. DISTRICT COURT
SEP 13 2018
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| SYNERON MEDICAL LTD., Plaintiff, vs. INVASIX, INC. and INMODE MD LTD., Defendants. | Case No: 8:16-cv-00143-DOC-KES<br>JAMS Ref. No: 1220057351<br>**SPECIAL MASTER'S REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT AND OTHER PENDING MOTIONS** |

## INTRODUCTION

Pending before the Special Master are the summary judgment motions of plaintiff, Syneron Medical Ltd. ("Syneron"), and defendants, Invasix, Inc. and Inmode MD Ltd. ("Invasix"). Syneron moves for partial summary judgment on the following issues: infringement of the accused Invasix products and validity of the patents-in-suit (the "Syneron Motion").[1] (Docket Index No. ("D.I.") 103) Invasix opposes the motion and affirmatively moves for summary judgment on a number of discrete issues: invalidity of the asserted claims of the patents-in-suit; non-infringement of two accused products; no infringement under the doctrine of equivalent (DOE) as a matter of law; no willful infringement; and Syneron's failure to mark its products (the "Invasix Motion"). (D.I. 110) The motions were heard on May 15, 2018. Having considered the parties' submissions and the arguments of counsel, the Special Master recommends denying Syneron's motion for summary judgment, and granting Invasix's motion for summary judgment on the invalidity of the asserted claims of the patents-in-suit.

## BACKGROUND

The '232 and '079 patents ("the TransPharma Patents"), which Syneron acquired from TransPharma Medical Ltd., were filed in 1998. The two patents have the same specification and the same figures, but different claims.[2] Although the titles of these patents ("Transdermal Drug Delivery and Analyte Extraction") as well as their shared specification are directed to drug delivery and analyte extraction through skin ablation using RF energy, the claims are not so limited. In fact, the asserted independent claims[3] are broadly directed to devices and methods for ablating the top layer of a subject's skin (the stratum corneum) by applying RF

---

[1] Syneron further moves for claim construction of three terms. The constructions of those terms are separately considered in the Special Master's Report and Recommendations on Claim Construction.

[2] The '079 patent was issued from a divisional application of the application that was issued as the '232 patent.

[3] Claim 29 of the '232 patent and claim 10 of the '079 patent.

energy (*i.e.*, alternative electrical current) to the skin through a plurality of electrodes that are in direct contact with the skin.

The '654 and '036 patents ("the Syneron Patents") also share a materially identical specification, and they both claim priority to a parent application that was filed in 2009. The disclosures in these patents are directed to cosmetic RF skin treatment and, in particular, to the use of alternating electric current delivered through electrodes to a subject's skin to cause ablation of the skin, thereby stimulating the skin to rejuvenate. The asserted claims of the Syneron Patents are directed to the relative sizes and placement of various electrodes that come into direct contact with a subject's skin in such a way that the possibility of an undesirable current causing pain and damaging the subject's skin is minimized.

On January 26, 2016, Syneron commenced this patent infringement action against Invasix, alleging that multiple skin treatment products sold by Invasix infringe the Syneron and TransPharma Patents. (D.I. 1) Invasix has asserted various affirmative defenses, including noninfringement and invalidity of the patents-in-suit. (D.I. 25)

The matter comes before the Special Master pursuant to the Court's Order Appointing Special Master to hear and adjudicate all pending motions. (D.I. 220)

## LEGAL STANDARDS

### Summary Judgment

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and that one party is entitled to judgment as a matter of law. *See Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984). The moving party bears the burden of "informing the district court of the basis for its motion" and identifying the matters that "it believes demonstrate the absence

of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). In order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Disputes over facts that could alter the outcome are "material," and a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

During this process, the Court must "view the evidence presented in a light most favorable to the nonmoving party and ... draw all reasonable inferences in favor of the nonmoving party." *C.R. Bard, Inc. v. Advanced Cardio. Sys., Inc.*, 911 F.2d 670, 672 (Fed. Cir. 1990). Also, the Court is not to "make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

**Invalidity**

A patent granted by the United States Patent and Trademark Office (the "PTO") is presumed to be valid. 35 U.S.C. § 282(a); *Microsoft Corp. v. i4i Ltd. P'ship,* 131 S. Ct. 2238, 2245-46 (2011). Since patent claims enjoy a presumption of validity, the party seeking to prove invalidity must do so by clear and convincing evidence. *See Abbott Labs. v. Baxter Pharm. Prods.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006). "Clear and convincing" evidence is that which gives the finder of fact "an abiding conviction that the truth of [the proponent's] factual contentions [is] highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (citation and internal quotation marks omitted). The moving party seeking to invalidate a patent on summary judgment "must submit clear and convincing evidence of invalidity so that no

reasonable jury could find otherwise." *Eli Lilly & Co. v. Barr Lab. Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

**35 U.S.C. § 102 Anticipation**

A claim is anticipated under 35 U.S.C. § 102[4] if:

> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for the patent in the United States …
>
> (e) the invention was described in — (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent ….

A patent claim is anticipated if each and every limitation is found, either expressly or inherently, in a single prior art reference. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

Anticipation is a question of fact, which may be resolved on summary judgment if there is no genuine issue of material fact. *Zenith Electronics Corp. v. PDI Communication Systems, Inc.*, 522 F.3d 1348, 1356-57 (Fed. Cir. 2008).

**35 U.S.C. § 103 Obviousness**

A claim is obvious under 35 U.S.C. § 103[5] if:

---

[4] The version of 35 U.S.C. § 102 in effect prior to the passage of the Leahy-Smith America Invents Act ("AIA") governs here, as this pre-AIA version of Section 102 applies to all patents with an effective filing date (also known as the priority date) of on or before March 16, 2013, including all asserted patents in this action. *See Solvay S.A. v. Honeywell Int'l Inc.*, 742 F.3d 998, 1000 n.1 (Fed. Cir. 2014) (noting that the "AIA amendments apply only to applications and patents with an effective filing date of March 16, 2013, or later").

[5] Again, the version of 35 U.S.C. § 103 in effect prior to the passage of the AIA governs here.

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains ....

Obviousness is a question of law based on underlying facts. *See KSR Int'l Co. v. Teleflex Inc.*, 530 U.S. 398, 127 S. Ct. 1727, 1745 (2007) ("The ultimate judgment of obviousness is a legal determination," and summary judgment is appropriate if "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors.") (citing *Graham*, 383 U.S. at 17).

## DISCUSSION

In its motion for summary judgment, Invasix contends, *inter alia*, that all of the asserted claims are invalid as anticipated or obvious. In particular, Invasix contends that: U.S. Patent No. 6,708,060 to Zohar Avrahami ("Avrahami '060") anticipates or renders obvious all asserted claims of the Syneron Patents; and U.S. Patent No. 6,022,316 to Jonathan A. Eppstein ("Eppstein '316") anticipates or renders obvious all asserted claims of the TransPharma Patents. Because a finding that all of the asserted claims are invalid would renders all other issues moot, the Special Master addresses the invalidity issue first.

### I. Anticipation and obviousness of the asserted claims of the Syneron Patents in view of Avrahami '060

Invasix moves for summary judgment on the grounds that the asserted claims of the Syneron Patents are invalid because: (1) the asserted claims 1–4, 7–10, 13–14, 16–17, 19–21, 23–25, 27, and 30 of the '654 patent and claims 1–7, 10–13, 16–18, 20–22, and 24–28 of the '036 patent are anticipated by Avrahami '060; and (2) the remaining asserted claims (claims 11,

12, 28, and 29 of the '654 patent and claims 14 and 15 of the '036 patent) are rendered obvious by Avrahami '060 in view of the knowledge of a person of ordinary skill in the art. (Invasix Motion at 5–11) Syneron opposes Invasix's motion and cross-moves for summary adjudication that Avrahami '060 neither anticipates nor renders obvious the asserted claims of the Syneron Patents. (Syneron Opp'n. at 7–11; Syneron Motion at 20–22) The Special Master addresses these two motions in turn.

### A. Invasix's Motion

#### 1) Anticipation

Avrahami '060 was cited in the "References Cited" sections of the '654 and '036 patents and was a continuation-in-part of the same application that led to the TransPharma Patents. Because Avrahami '060 was issued on March 16, 2004 — more than one year prior to the effective filing dates of the '654 and '036 patents — it constitutes prior art to the Syneron Patents under the "statutory bar" of 35 U.S.C. § 102(b).

Similar to the TransPharma Patents, Avrahami '060 discloses a skin treatment device that places a plurality of electrodes in contact with the skin and applies a current between the electrodes. (Avrahami '060 at Abstract) Avrahami '060 describes its preferred embodiments as having two components:

> (a) a skin patch, with at least two electrodes in contact with the skin of a subject; and (b) a control unit, coupled to the patch, which causes a current to pass between the electrodes through the stratum corneum epidermidis, in order to generate at least one micro-channel in the stratum corneum.

(*Id.* at 3:8–15)

Invasix contends that its expert on invalidity, Dr. John A. Pearce, provided a limitation-by-limitation analysis showing how Avrahami '060 discloses every limitation of the above-listed asserted claims of the Syneron Patents. (Invasix Motion at 5–6) In particular, Invasix contends that Dr. Pearce identified a "patch embodiment" in Avrahami '060 that discloses all of

the limitations of independent claims 1, 19, and 24 of the '654 patent and independent claims 1 and 21 of the '036 patent, as well as a majority of the asserted dependent claims. (*Id.* at 6–9)

In analyzing Invasix's anticipation contention, the Special Master will initially focus on independent claim 1 of the '654 patent, which is representative of the subject matter claimed in the Syneron Patents. To assist the analysis, claim 1 is divided into four elements, shown below using the bracketed and bolded capital letters A though D.

Claim 1 of the '654 patent states:

1. **[A]** A skin treatment device, comprising:

> **[B]** an applicator tip;
>
> **[C]** a ground electrode arranged on the applicator tip, the ground electrode being configured for contacting epidermis of skin of a patient and being further configured for connection to a circuit for delivering RF energy to the skin, the ground electrode having a ground electrode surface area; and
>
> **[D]** a plurality of RF application elements arranged on the applicator tip, the RF application elements having a combined application element surface area substantially smaller than the ground electrode surface area,
>
> > wherein the plurality of RF application elements are configured for connection to the circuit for delivering RF energy to the skin,
> >
> > wherein the plurality of RF application elements are free of any ground electrode therebetween.[6]

---

[6] The parties dispute the meaning of "ground electrode" and "RF application elements." In the Special Master's Report and Recommendations on Claim Construction ("Claim Construction R&R"), "ground electrode" is construed as a "return electrode or electrode that provides a return path for current." With "RF application elements," the parties dispute only whether it is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6. In the Claim Construction R&R, the Special Master finds that it is not a means-plus-function term.

Invasix contends that Dr. Pearce provided a limitation-by-limitation analysis showing how Avrahami '060 discloses every limitation of asserted claim 1 of the '654 patent. (Invasix Motion at 5) More specifically, Invasix contends that the patch embodiments shown in Figs. 1 and 17 of Avrahami '060 disclose every limitation of claim 1 of the '654 patent. (*Id.* at 5–6)

Invasix further contends that Syneron's rebuttal expert, Dr. John G. Webster, "left Dr. Pearce's opinions about the patch embodiments unrebutted," because he "focused almost exclusively on [a] separate, roller embodiment." (*Id.* at 6) Invasix also contends that, where Dr. Webster's testimony refers to the patch embodiment, "Dr. Webster agreed that it discloses the limitations of the independent claims." (*Id.* at 6–7) For example, with regard to element A, Invasix contends that, *inter alia*, "Dr. Webster confirmed that Avrahami '060 discloses a skin treatment device." (*Id.*) With regard to element B, Invasix contends that, *inter alia*, the patch itself is an applicator tip and that Dr. Webster agreed as such. (*Id.* at 7) With regard to element C, Invasix contends that, *inter alia*, "Dr. Webster agreed that the patches include a return electrode" and "did not rebut the remaining analysis in Dr. Pearce's report." (*Id.*) With regard to element D, Invasix contends that, *inter alia*, "Dr. Pearce opined that Avrahami '060 discloses this limitation" and that "Dr. Webster did not respond to Dr. Pearce's analysis." (*Id.*)

Syneron pins its substantive defense on its contention that the patch embodiments in Avrahami '060 fail to disclose element B – namely, "an applicator tip." (Syneron Opp'n. at 10) Specifically, with regard to the patch embodiment depicted in Fig. 17, Syneron contends that it "has a roller, which is not an applicator tip, and also a patch, which is not an applicator tip." With regard to the patch embodiment depicted in Fig. 1, Syneron contends that it "has only a patch, which is not an applicator tip." (*Id.*) In short, Syneron argues that the patch disclosed in Avrahami '060 is not an applicator tip — a position that is diametrically opposed to that of Invasix.

The Special Master finds that the dispute over whether Avrahami '060 discloses "an applicator tip" boils down to two questions: (1) what is an applicator tip, as it is disclosed in the Syneron Patents; and (2) does Avrahami '060 disclose such an applicator tip. The first, being a claim construction question, is a question of law that is to be determined by the Court.

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996). The second, being a question of anticipation, is a question of fact that may be resolved on summary judgment if there is no genuine issue of material fact. *Zenith Electronics Corp. v. PDI Communication Systems, Inc.*, 522 F.3d 1348, 1356–57 (Fed. Cir. 2008).

With regard to the first question, the specification of the '654 patent explicitly defines "applicator tip" in the following passage:

> The term "carrier" in the context of the present disclosure means a substrate having an array of voltage to skin application elements, a two dimensional array or matrix of voltage to skin application elements. … Carrier 100, having formed on it, the voltage to skin delivering elements is configured to allow quick attachment to an applicator and will be termed in the present document as a "tip" or an "applicator tip."

('654 patent at 3:19–33) In essence, the patentee, acting as its own lexicographer, redefined the term "applicator tip" as a "substrate having an array of voltage to skin application elements," wherein "the voltage to skin delivering elements is [sic] configured to allow quick attachment to an applicator."[7] *See Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365–66 (Fed. Cir. 2012) (providing that a patentee may redefine a term by "set[ting] out a definition and act[ting] as his own lexicographer.")

With regard to the second question, the Special Master finds that Invasix's contention that the patch disclosed in Avrahami '060 is the "applicator tip" is well supported by the record. For example, Avrahami '060's description of the "patch" shown in Fig. 1A as: "compris[ing] two or more electrodes **60**, preferably an array **75** of electrodes, which pass current into and out of the skin" (Avrahami '060 at 14:42–44) is consistent with the '654 patent's definition of the "applicator tip" as a "substrate having an array of voltage to skin application elements" ('654

---

[7] To the extent that the word "attachment" requires any further construction, the Special Master finds that the plain and ordinary meaning of "to be joined" or "to be connected" controls. *See, e.g.*, Merriam-Webster.com, Merriam-Webster, www.merriam-webster.com/dictionary/attach, which defines "attach" as "to be or become joined or connected."

patent at 3:19–33).[8] Furthermore, Avrahami '060's description that the "patch" in Fig. 1A is "removably attached" to a "control unit **30**" (Avrahami '060 at 14:51–53) is consistent with the '654 patent's definition of the "applicator tip" as a "configured to allow quick attachment to an applicator" ('654 patent at 3:19–33).

Indeed, Dr. Webster confirmed, during his deposition, that the "skin patch **40**" shown in Fig. 1A and the "electrode patch **70**" shown in Fig. 1B are applicator tips and labeled them as such.[9] (D.I. 110-2, Ex. 3 (Webster Tr.) at 598:13– 600:5; D.I. 110-5, Ex. 6 (Exhibit 5 to Webster Tr.)) Specifically, when asked whether "Figure 1B disclose[s] to a person of ordinary skill in the art an applicator tip," Dr. Webster answered "Yes." (Webster Tr. at 597:20–25) When asked to identify the "part of Figure 1B [that] discloses the applicator tip," Dr. Webster answered: "I see four electrodes placed against the skin, and this would constitute an applicator tip." (*Id.* at 598:2–12) When asked to "highlight what [he had] just identified as the applicator tip," Dr. Webster circled and labeled the applicator tips in both Fig. 1A and Fig. 1B as shown below:




FIG. 1A




FIG. 1B

[8] There is no genuine dispute that the "voltage to skin application elements" disclosed in Avrahami '060 are "electrodes" or "a particular type of electrodes." *See* Claim Construction R&R at 16–24. Also, in construing the term "electrodes, which are adapted to be applied to the skin of the subject," the Special Master notes that "the parties agree that they do not have any substantive dispute over [the word 'electrode'] and that a construction of "electric-current conductors used to establish electrical contact with a non-metallic part of a circuit" is acceptable to both of them." *Id.* at 4.

[9] In his deposition, Dr. Webster labeled Fig. 1A on the '232 patents, which shares the identical figure and a substantially-overlapping disclosure with Avrahami '060.

Although Syneron contends that Dr. Webster later "retracted and corrected" his testimony (*see* Syneron Opp'n. at 10), he never said that those labels were wrong, nor did he retract or correct his notation on Fig. 1A. (D.I. 189–10 (Webster Tr.) 792:16–795:9) Therefore, the Special Master finds the record contains clear and convincing evidence that Fig. 1 of Avrahami '060 discloses an "applicator tip" as it is explicitly defined in the '654 patent and that no reasonable jury could find otherwise.

Fig. 17 of Avrahami '060 (reproduced below with added red labels for the numbered parts) similarly discloses an "applicator tip," as it is defined in the '654 patent. Specifically, with regard to the "patch" shown in Fig. 17, Avrahami '060 states that it "typically comprises a set of monopolar receiving electrodes **610** and a return strip **614**," which "preferably pass through patch [**602**] from the top surface thereof (FIG. 17A) to the bottom surface thereof (FIG. 17B), so as to contact skin **22** when the patch is placed on the skin." (Avrahami '060 at 26:40–45) When operating, "the handheld unit is passed over the patch, driving electrode **650** preferably comes into contact with each of receiving electrodes **610**, and drives current through these electrodes into skin **22**." (*Id.* at 26:47–50.) In short, Fig. 17 of Avrahami '060 depicts an array of electrodes that deliver voltage to the skin, which is quintessentially the same as the "applicator tip" as it is explicitly defined in the '654 patent.

FIG. 17A



FIG. 17B




Syneron cannot point to any opinion in Dr. Webster's rebuttal report which rebuts Dr. Pearce's opinion that the patch disclosed in Fig. 17 is the applicator tip. Instead, Syneron attempts to explain away Dr. Webster's failure to rebut this by arguing that: (1) Dr. Webster has "no obligation to rebut Dr. Pearce's analysis," because it is "conclusory at best" and fails to "[meet] a threshold burden of proving anything that Syneron needs to refute" (Syneron Opp'n. at 7–9); and (2) Dr. Webster's opinion regarding the roller in Fig. 16 is applicable to Fig. 17, because the embodiment shown in Fig. 17 "comprises a handheld roller similar to that which is depicted in Fig. 16" (Syneron Opp'n. at 9).

The Special Master finds neither argument to be persuasive. With regard to Syneron's first argument that Dr. Pearce failed to "[meet] a threshold burden of proving anything that Syneron needs to refute," Syneron proffers no evidence to substantiate this assertion. A review of Dr. Pearce's report reveals that, contrary to Syneron's representation, Dr. Pearce provides a detailed and thorough analysis to support his conclusion that Avrahami '060 anticipates the asserted claims of the Syneron Patents. In contrast, Dr. Webster appears to have cut and pasted conclusory statements in his rebuttal report without supporting analysis or explanation.

For example, with regard to the "applicator tip," Dr. Pearce opines that:

> 763. For example, a person of ordinary skill in the art would have understood that the devices disclosed in Avrahami '060 are handheld devices that have a tip touching the skin and that this tip, with the electrodes on it, would be an applicator tip. For example, Avrahami '060 discloses that "the handheld

> apparatus ablates the stratum corneum so as to prepare the skin for drug delivery or analyte extraction by a separate drug delivery unit or analyte extraction unit." 7:45–48. Further, a person of ordinary skill in the art would have understood that the material with electrodes disclosed in Avrahami '060 is an applicator tip, including because it applies the electric energy to the skin. 26:30–59. A person of ordinary skill in the art would also understand this as disclosing an applicator tip based on the disclosure of "an ablation head" in the device, 26:14–15.

(D.I. 110-4, Ex. 5 (Pearce Report) at ¶ 763)

Dr. Webster's response to this assertion, in its entirety, is a conclusory statement that appears repeatedly throughout his rebuttal report: "In response to ¶ 763, it is my opinion that a person of ordinary skill in the art would not have found Avrahami '060 to disclose this limitation." (D.I. 110-3, Ex. 4 (Webster Rebuttal) at 747) Such a conclusory statement does not create a genuine issue of material fact. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001) ("Broad conclusory statements offered by . . . experts are not evidence and are not sufficient to establish a genuine issue of material fact."). Consequently, the Special Master finds no merit in Syneron's argument that Dr. Webster need not refute Dr. Pearce's opinion and concludes that, to the extent Dr. Webster made any effort to refute Dr. Pearce's opinion, that effort was wholly inadequate.

With regard to Syneron's second argument that Dr. Webster's opinion regarding the roller in Fig. 16 is applicable to Fig. 17 because the embodiment shown in Fig. 17 "comprises a handheld roller similar to that which is depicted in Fig. 16," the Special Master finds it irrelevant to the present analysis, as Invasix's motion is premised on the assertion that the patch depicted in Fig. 17 is the applicator tip and the roller depicted in Fig. 16 does not have a patch. Therefore, Dr. Webster's opinion that the roller depicted in Fig. 16 does not have an applicator tip is irrelevant to the issue of whether the patch depicted in Fig. 17 is an applicator tip.

During the hearing on the motions for summary judgment, the parties argued over whether the cylinder-shaped structure labeled "handle unit 302" in Fig. 17 is a roller. (Hearing Tr. at 22:6–26:7) Again, the Special Master finds this dispute to be irrelevant to the

question of whether the patch itself is an applicator tip. The reason is the claim does not dictate how the applicator tip is to be connected to the rest of the device; it only requires that "the plurality of RF application elements [on the applicator tip] are configured for connection to the circuit for delivering RF energy to the skin." Therefore, even if it is assumed, *arguendo*, that the "handheld unit 302" depicted in Fig. 17 is a roller, that does not negate the undisputed fact that the electrodes on the "patch **602**" in Avrahami '060 meet the limitation of being "configured for connection to the circuit for delivering RF energy to the skin."

In summary, the Special Master finds that, contrary to Syneron's contention, Dr. Webster has an obligation to refute Dr. Pearce's showing that the patch disclosed in Fig. 17 is an "applicator tip." Dr. Webster has failed to do so. Accordingly, the Special Master finds that, even viewing the evidence in the light most favorable to Syneron, there is no genuine issue of material fact that Avrahami '060 discloses an "applicator tip" in the embodiment shown in Fig. 1 as well as in the embodiment shown in Fig. 17.

With regard to the remaining elements of A, C, and D in claim 1 of the '654 patent, Invasix provides a detailed analysis in its Opening Brief, demonstrating that Dr. Webster has either conceded that the claim limitations are met or has offered only conclusory testimony regarding the limitations. For example, with respect to element A, Invasix contends, *inter alia*, that Dr. Webster confirms that Avrahami '060 discloses "a skin treatment device." (Invasix Motion at 6–7) Indeed, Dr. Webster states in his rebuttal report that "it is my opinion that Avrahami '060 describes a device for treating skin." (D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Ex. O at 1) Thus, there is no dispute that element A is met.

With regard to element C, Dr. Pearce provides a detailed analysis showing that Avrahami '060 discloses a "return electrode" arranged on an applicator tip and "configured for contacting [the] epidermis of skin of a patient and … for connection to a circuit for delivering RF energy to the skin." (D.I. 110-4, Ex. 5 (Pearce Report) at ¶¶ 765–66, Exhibit O at 6–12) In his rebuttal report, Dr. Webster summarily contends that Avrahami '060 fails to disclose this element, but he provides no substantive evidence to support this contention, other than to repeat the above-addressed argument that, "[t]o the extent Avrahami '060 discloses electrodes on

a patch, the electrodes are not on the applicator tip." (*See* D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit O at 5–7) As previously established, the patch disclosed in Avrahami '060 is indeed "an applicator tip"; thus, Syneron fails to demonstrate any genuine issue of material fact to negate the conclusion that Avrahami '060 discloses element C.

With regard to element D, Dr. Pearce provides a detailed analysis showing that Avrahami '060 discloses RF application electrodes with a total contact area substantially smaller than that of the "ground electrodes." (D.I. 110-4, Ex. 5 (Pearce Report) at ¶¶ 768–70, Exhibit O at 12–19) More specifically, Dr. Pearce opined that:

> 768. For example, Avrahami '060 discloses that the applicator tip has multiple RF application elements or electrodes on it and that the surface area of these electrodes is smaller than that of the much larger return strip or ground electrode surface area. Avrahami '060, for example, states that its "electrodes which are widely spaced produce a field — and current flow responsive thereto — which extends relatively deep into the skin," 4:3–6, and that "the patch comprises an array of electrodes, preferably closely-spaced electrodes, which act together to produce a high micro-channel density in an area of the skin under the patch." 4:25–28. It also states in the embodiments disclosed that they include "a plurality of electrodes, which are adapted to be placed in contact with the skin and then moved across the skin while maintaining electrical contact with the skin," 8:59–61, and "a plurality of electrodes, disposed on a surface of the housing, which are adapted to be placed in contact with the skin," 10:8–10, as is also seen in Figures 1A, 1B, 16, 17A, and 17B, for example. A person of ordinary skill in the art would have understood this as disclosing that there are RF application elements. As noted above, *see* ¶ 766, the current delivered is in the RF frequency range.
>
> 769. Further, Avrahami '060 discloses that the return electrodes, as described above, are large because the larger surface area causes there to be less heating and no ablation in the area of the larger electrode. For example Avrahami

> ’060 discloses that “[b]ecause of the typically larger size of the return electrodes, there is usually no substantial heating of the skin thereunder,” 26:26–29, and that “the strip preferably has a significantly larger contact area than the total contact area of each of electrodes 610.” 26:57–59. This is also seen clearly in Figures 17A an 17B, which a person of ordinary skill in the art would have understood as showing the market surface area ground strip, which connects to the electrode delivers the current from the skin. These figures also show that there are no ground electrodes between the RF application elements.

(D.I. 110-4, Ex. 5 (Pearce Report) at ¶¶ 768–69)

In his rebuttal report, Dr. Webster summarily contends that Avrahami ’060 fails to disclose “the RF application elements having a combined application element surface area substantially smaller than the ground electrode surface area” and “a plurality of RF application elements being free of any ground electrode therebetween”; but he provides neither substantive analysis nor evidence to support his contentions. (*See* D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit O at 11–13) For example, with respect to Dr. Pearce’s above-quoted opinion, Dr. Webster’s response, in its entirety, is: “In response to ¶ 768, it is my opinion that a person of ordinary skill in the art would not have found Avrahami ’060 to disclose this limitation” and “[i]n response to ¶ 769, it is my opinion that a person of ordinary skill in the art would not have found Avrahami ’060 to disclose this limitation.” (D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit O at 12) Again, such a conclusory statement is insufficient to create a genuine issue of material fact. *See Telemac*, 247 F.3d at 1329.

Independent claim 19 of the ’654 patent is materially the same as independent claim 1, except that it adds the limitation of “a plurality of ground electrodes arranged on the applicator tip.” Dr. Pearce opined that:

> 802. As noted, for example, Avrahami ’060 discloses that “any of the drug delivery or analyte extraction devices described hereinabove may similarly comprise a plurality of current-driving electrodes and one or more return electrodes .... Because of the typically larger size of the return electrodes,

> there is usually no substantial heating of the skin thereunder." 26:20–29. A person of ordinary skill in the art would have understood this as disclosing a plurality of return electrodes.

(D.I. 110-4, Ex. 5 (Pearce Report) at ¶ 802) Dr. Webster offered the following conclusory testimony, devoid of any supporting analysis, in response: "In response to ¶ 802, it is my opinion that a person of ordinary skill in the art would not have found Avrahami '060 to disclose this limitation." (D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit O at 52)

Independent claim 24 of the '654 patent adds two elements: "a housing" and "at least one processor within the housing and configured to control RF energy supplied to an RF applicator tip." With respect to the "housing," Dr. Pearce opined that:

> 812. Avrahami '060 discloses that the devices it describes include a housing: "There is still further provided, in accordance with a preferred embodiment of the present invention, a device for treating skin on the body of a subject, including: a housing ...." 10:4–7. Avrahami '060 also refers to the housing in discussing the handheld apparatus it discloses. *See* 6:60–63. A person of ordinary skill in the art would have understood these disclosures to mean that the devices in Avrahami '060 have a housing.
>
> 813. Further, a person of ordinary skill in the art would have understood that Avrahami '060 discloses a housing because of its disclosure of a control unit or processor. *E.g.*, Figs. 3, 12, 13. A person of ordinary skill in the art would have understood that a processor would be in a housing to protect the electronics in it.

(D.I. 110-4, Ex. 5 (Pearce Report) at ¶ 812–13)

Again, aside from repeating the same conclusory statement that "it is my opinion that a person of ordinary skill in the art would have found Avrahami '060 to disclose this limitation," Dr. Webster did not offer any rebuttal. (D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit O at 67)

With respect to the "at least one processor ..." limitation, Dr. Pearce opined that:

> 815. For example, Avrahami '060 discloses that it includes "a control unit, which is adapted to receive the sensor signal, to determine, responsive thereto, a physical disposition of the device, and to control current flow to the plurality of electrodes responsive to determining the physical disposition," 10:13–17, and that "the control unit comprises switching circuitry to control the magnitude and/or duration of the electric field at the electrode," 3:17–19, which a person of ordinary skill in the art would have understood as describing a processor within the housing that is configured to control the RF energy that is provided to the electrodes on the applicator tip.
>
> 816. Further, Avrahami '060 discloses that the control unit in its devices "[m]onitor[s] changes in voltage, current, and/or phase for each electrode," and that this "may require, in certain implementations, a significant amount of circuitry." 6:35–37. The complex circuit would be understood by a person of ordinary skill in the art as also including a CPU, as Avrahami '060 describes that "[s]witching unit preferably comprises a CPU which actively controls the voltage V(t) applied to sixteen conductors leading to electrodes," and that the CPU "preferably communicates with and controls electrodes through eight data lines and four control lines." 15:62–16:11 (figure reference numerals omitted). A person of ordinary skill in the art would have understood this as disclosing that the CPU controls the RF energy that the electrodes receive and emit.

(D.I. 110-4, Ex. 5 (Pearce Report) at ¶ 815–16)

Yet again, aside from repeating the same conclusory statement that "it is my opinion that a person of ordinary skill in the art would have found Avrahami '060 to disclose this limitation," Dr. Webster did not offer any rebuttal. (D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit O at 71)

The limitations in the independent claim 1 of the '036 patent track the limitations in the

independent claim 1 of the ’654 patent, despite some differences in claim language. Independent claim 1 of the ’036 patent states:

> 1. A skin treatment device, comprising:
>
> an applicator tip;
>
> a plurality of electrodes configured for contacting a stratum corneum layer of skin external to a patient's body, the plurality of electrodes including:
>
> a plurality of voltage to skin elements of a first size, arranged in a cluster, and being further configured for connection to a circuit for delivering RF energy to cause fractional skin treatment; and
>
> a plurality of electrodes sized substantially larger than the first size and arranged at a periphery of the cluster and spaced from the cluster, and wherein the cluster of voltage to skin elements are free of any portion of the larger sized electrode therebetween.

Here, the “voltage to skin elements of a first size, arranged in a cluster, and being further configured for connection to a circuit for delivering RF energy to cause fractional skin treatment” tracks the description of the “RF application elements” in independent claim 1 of the ’654 patent. Similarly, the “plurality of electrodes sized substantially larger than the first size and arranged at a periphery of the cluster and spaced from the cluster” in claim 1 of the ’036 patent tracks the description of the “ground electrode” in independent claim 1 of the ’654 patent. As a result, both Dr. Pearce’s anticipation analysis (D.I. 110-4, Ex. 5 (Pearce Report) at ¶ 949–59; Ex. R at 2–24) and Dr. Webster’s responses (D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit R at 1–18) are materially indistinguishable from those presented regarding claim 1 of the ’654 patent. Indeed, Syneron’s Opposition Brief does not provide any additional non-anticipatory argument for the asserted claims of the ’036 patent.[10] (Syneron

---

[10] In its opposition, Syneron contends, in a single sentence, that “the Avrahami ‘060 patent fails to disclose every limitation of asserted claims 1–7, 10–13, 16–18, 20–22, 24–28 of the ‘036 patent” and points to an exhibit identified as “Ex. [‘036 vs ‘060 chart]” for support. Such a blanket conclusion — devoid of any factual analysis — cannot defeat summary judgment. *See*

Opp'n at 7–10) Therefore, the Special Master's previous finding regarding the anticipation of claim 1 of the '654 patent by Avrahami '060 applies to claim 1 of the '036 patent with equal force.

Independent claim 21 of the '036 patent adds the same "housing" limitation and substantially the same "processor … configured to control RF energy" limitation as introduced by claim 24 of the '654 patent. As before, Dr. Pearce provided a detailed analysis showing that Avrahami '060 discloses these limitations (D.I. 110-4, Ex. 5 (Pearce Report) at ¶ 987–90; Exhibit R at 58–79), yet Dr. Webster merely responded with the same conclusory statement that "it is my opinion that a person of ordinary skill in the art would have found Avrahami '060 to disclose this limitation." (D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit R at 59–64) Therefore, the Special Master's previous finding regarding the anticipation of claim 24 of the '654 patent by Avrahami '060 applies to claim 21 of the '036 patent with equal force.

For the remaining dependent claims on which Invasix moves for judgment of anticipation (claims 2–4, 7–10, 13–14, 16–17, 20–21, 23, 25, 27, and 30 of the '654 patent, and claims 2–7, 10–13, 16–18, 20, 22, and 24–28 of the '036 patent), all that Syneron has done is offer Dr. Webster's conclusory statements that "a person of ordinary skill in the art would not have found Avrahami '060 to disclose [those] limitation[s]" or statements that he disagrees with Dr. Pearce's opinion. (D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit O at 17–79, Exhibit R at 19–81) Such conclusory assertions, devoid of factual analysis, are insufficient to defeat summary judgment. *See Telemac*, 247 F.3d at 1329.

Therefore, the Special Master finds that the record, taken in the light most favorable to Syneron, supports the finding that there is clear and convincing evidence that Avrahami '060 discloses every limitation of claims 1–4, 7–10, 13–14, 16–17, 19–21, 23–25, 27, and 30 of the '654 patent and claims 1–7, 10–13, 16–18, 20–22, and 24–28 of the '036 patent, and that no

---

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.") (internal quotation marks omitted).

reasonable jury could find otherwise. Accordingly, summary judgment is warranted on this anticipation issue.

**2) Obviousness**

Invasix contends, and Syneron does not dispute, that the remaining asserted claims (claims 11, 12, 28, and 29 of the '654 patent and claims 14 and 15 of the '036 patent) add only two limitations to the independent claims: (1) an "isolating transformer configured to reduce ground currents"; and (2) a "capacitor serially connected between the isolating transformer and the plurality of" RF application or voltage to skin elements. (Invasix Motion at 9) Invasix further contends, and Syneron does not dispute, that Dr. Webster conceded that "the concept of using an isolating transformer to reduce ground currents was well known to persons of ordinary skill in the art prior to the two Syneron patents." (*Id.* at 9–10; Ex. 3 (Webster Tr.) at 800:10–16 (Q: "And will you agree with me that the concept of using an isolating transformer to reduce ground currents was well known to persons of ordinary skill in the art prior to the two Syneron patents?" A: "Yes." (objection omitted)) Invasix also points to Dr. Pearce's report in which he opined that, *inter alia*, "[a] person of ordinary skill in the art would have found it obvious to use such an isolating transformer in order to obtain the predictable result of reducing the connection to ground that a patient may have and subsequent leakage of current from the patient to ground" and that "[c]apacitors were well-known components of electronic circuitry, including in skin treatment devices, and a person of ordinary skill in the art would have found it obvious to incorporate them where they help make the devices more useful for patients," including in series as was done since the 1970s to eliminate shock and pain to patients. (Invasix Motion at 10; D.I. 110-4, Ex. 5 (Pearce Report) at ¶1115 and 1116)

Syneron's opposition does not respond to any of these factual assertions. Instead, it merely refers back to Invasix's allegedly "improper anticipation analysis." (Syneron Opp'n at 10–11) In other words, Syneron's sole non-obviousness argument for these dependent claims is

that Invasix has failed to establish anticipation of the independent claims on which these dependent claims depend.[11]

As the Special Master finds there is no genuine issue of material fact that could negate the conclusion that Avrahami '060 anticipates the independent claims of the '654 and the '036 patents, it follows that there is no genuine dispute that Avrahami '060, in view of the knowledge of a person of ordinary skill in the art, renders obvious claims 11, 12, 28, and 29 of the '654 patent and claims 14 and 15 of the '036 patent.

### B. Syneron's Cross Motion

Syneron cross-moves for summary judgment that Avrahami '060 does not anticipate the asserted claims of the '654 or '036 patents. However, if the Court adopts the findings and conclusions recommended in this Report that Avrahami '060 anticipates the asserted claims of the '654 or '036 patents, then Syneron's cross motion must be denied.

## II. Anticipation and obviousness of the asserted claims of the TransPharma Patents in view of Eppstein '316

Invasix moves for summary judgment on the ground that the TransPharma Patents are invalid because: (1) asserted claim 29 of the '232 patent and claims 10, 11, and 18 of the '079

---

[11] Syneron also cites to the whole of Dr. Webster's Report regarding Invasix's obviousness contention, as well as, *inter alia*, two charts spanning 160 pages to support its contention that "Avrahami '060 in view of the knowledge of a person of ordinary skill in the art do[es] not render obvious any claims of the '654 or '036 patent for the reasons stated above." (Syneron Opp'n. at 11) As a threshold matter, such broad citations and conclusory attorney arguments do not meet the burden of "informing the district court of the basis for its motion" or specifically identifying the matters that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Furthermore, a review of relevant sections in the cited testimony shows that Dr. Webster merely offers conclusory and vacuous statements of disagreement that are devoid of details. For example, in response to Dr. Pearce's opinions regarding the "isolating transformer" and the "capacitor," Dr. Webster only states:

> Thus, it is my opinion that, under either parties' proposed construction, one of ordinary skill in the art would not understand that Avrahami '060, alone … or in view of the knowledge of one of ordinary skill in the art, discloses, or renders obvious, [this claim].

(D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit O at 34, 37, 76–77; Exhibit R at 44, 47) Such conclusory responses are insufficient to create a material dispute on the record.

patent are anticipated by Eppstein '316; and (2) the remaining asserted claims (dependent claim 30 of the '232 patent and claim 25 of the '079 patent) are rendered obvious by Eppstein '316 in view of the knowledge of a person of ordinary skill in the art. (Invasix Motion at 11–16) Syneron opposes Invasix's motion and cross-moves for summary adjudication that Eppstein '316 neither anticipates nor renders obvious the asserted claims of the TransPharma Patents. (Syneron Opp'n. at 12–14; Syneron Motion at 16–18) The Special Master addresses these two motions in turn.

### A. Invasix's Motion

#### 1) Anticipation

Eppstein '316 was issued on February 8, 2000, from an application that was filed on March 6, 1998. Because Eppstein '316 was issued from an application that was filed before the effective filing dates of the '232 and '079 patents, it constitute prior art under 35 U.S.C. § 102(e).

Eppstein '316 is directed to an apparatus and method for electroporating tissue, which involves applying electrical voltage between at least two electrodes placed apart on the tissue to enhance the permeability of the tissue and "facilitate the collection from, or delivery of substances to, the tissue." (Eppstein '316 at 1:10–17) A key aspect of Eppstein '316 involves applying this electroporation step to tissue that has been previously breached by a microporation step, which involves the formation of micropores at a predetermined depth through the surface of the tissue. (*Id.* at Abstract) By breaching the tissue with micropores prior to the electroporation step, the effect of electroporation "can be targeted at tissue structures beneath the surface, such as capillaries, to greatly enhance the withdrawal of biological fluid, and the delivery for uptake of compounds into the tissue." (*Id.*) Eppstein '316 explicitly defines "tissue" as "an aggregate of cells of a particular kind" and further specifies that "[t]he preferred tissue is the skin." (*Id.* at 2:57–64)

Invasix contends that Eppstein '316 anticipates the above-listed asserted claims of the

TransPharma Patents, because it describes a skin ablation process that discloses all elements of these claims. (Invasix Motion at 11–12) In particular, Invasix contends that the microporation step, which is further detailed in a co-pending application that Eppstein '316 incorporated by reference (U.S. Patent Application No. 08/776,863 ("the '863 application"),[12] discloses all elements of the claims recited above. (*Id.*)

In analyzing Invasix's anticipation contention, the Special Master initially focuses on independent claim 29 of the '232 patent and independent claim 10 of the '079 patent. Although claim 29 of the '232 patent is a device claim and claim 10 of the '079 patent is a method claim, these two independent claims are quite similar in scope, and the three limitations of each track one another. To assist the analysis, these three claim limitations are shown below, using the bracketed and bolded capital letters A though C.

Claim 29 of the '232 patent states:

> 29. **[A]** A device for ablating stratum corneum epidermidis of skin on the body of a subject, comprising:
>
> **[B]** a plurality of electrodes, which are adapted to be applied to the skin of the subject at respective points; and
>
> **[C]** a power source, which is adapted to apply, between two or more of the plurality of electrodes, an alternating electric current so as to cause ablation of the stratum corneum.

Claim 10 of the '079 patent states:

> 10. **[A]** A method for ablating the stratum corneum epidermidis of a subject, comprising:
>
> **[B]** placing a plurality of electrodes against the subject's skin at respective points; and
>
> **[C]** applying electrical energy to the plurality of the electrodes so as to induce an electrical current to flow through the stratum corneum, causing

[12] The '863 application was subsequently issued as U.S. Patent No. 5,885,211 ("the '211 Patent"). For ease of reference, disclosures from the '863 application are cited to the column and line in this patent, which has an identical specification.

ablation of narrow channels through the stratum corneum at the respective points.

Invasix contends that Eppstein '316's microporation step discloses element A, because it discloses, *inter alia*, the "microporation of tissue, wherein the tissue surface, such as the skin or mucosal layer, is physically breached by the formation of micropores, approximately 1–1000 µm in diameter." (Invasix Motion at 12, quoting Eppstein '316 at 1:21–25) Invasix contends that Eppstein '316's microporation step additionally discloses element B, because it discloses, *inter alia*, that a plurality of electroporation electrodes "may also serve the function of participating in the microporation of the tissue." (*Id.*, quoting Eppstein '316 at 1:42–49) Finally, Invasix contends that the '863 application, which Eppstein '316 incorporated by reference, discloses element C, because it discloses, *inter alia*, that "the stratum corneum is first punctured with short pulses of electricity to form a micropore of up to about 100 µm diameter." (*Id.* at 13, quoting '211 at 44:12–14) During the hearing on the motions for summary judgment, Invasix bolstered this contention by pointing to an additional passage in the '863 application, which states "electroporation or short bursts or pulses of electrical current can be delivered to the stratum corneum with sufficient energy to form micropores." (Hearing Tr. at 51:13–52:9; Invasix's Hearing Presentation at 39; '211 Patent at 20:28–36) Invasix contends that Dr. Webster only addressed the electroporation step and failed to "offer an opinion on Eppstein '316's disclosure of the use of electric current for microporation or rebut Invasix's arguments that the microporation step discloses every limitation of the asserted claims." (Invasix Motion at 12)

Syneron first contends that the microporation step disclosed in the '863 application and the electroporation step disclosed in Eppstein '316 are "two separate and distinct steps" and that "[i]t is improper for Invasix and Dr. Pearce to combine disclosures from these two distinctive steps including because they do not line up with the claim elements and because it does not disclose all elements 'arranged as in the claims.'" (Syneron Opp'n. at 12, citing *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008))

In *Net MoneyIN*, the Federal Circuit considered whether it is appropriate to rely

upon a combination of elements in two separate and unrelated online payment processing methods disclosed in a single prior art document as a basis for anticipation. *Id.* at 1369. The Federal Circuit in *Net MoneyIN* held that, for a finding of anticipation, it is not sufficient for a single prior art reference to disclose all elements of the asserted claim; rather, the prior art reference "must clearly and unequivocally disclose the claimed invention or direct those skilled in the art to the invention without any need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference." *Id.* (quoting *In re Arkley*, 59 C.C.P.A. 804, 455 F.2d 586, 587 (1972)).

*Net MoneyIN* is inapplicable here, because Invasix's anticipation contention does not rely on the combination disclosures from the microporation step and the electroporation step, as Syneron contends; rather, it relies solely on the explicit teachings in the microporation step. (Invasix Motion at 11–12) Within the context of describing the microporation step, Eppstein '316 expressly discloses the modification of electroporation techniques and equipment to serve the purpose of forming micropores. Therefore, unlike the facts in *Net MoneyIN*, in which the defendant picks and chooses elements from two separate embodiments disclosed in a prior art document to form an anticipation contention, the prior art here expressly teaches the modification of a technique from one step (electroporation) to serve the purpose of the other (microporation).

Syneron next contends that the microporation step disclosed in Eppstein '316 "fails to disclose electrical current applied between electrodes, the electrical current causing (electrical) ablation, as required by the claims in the '232 and '079 patents." (Syneron Opp'n. at 13) More specifically, Syneron contends that "[a]ny disclosure of electrical energy in the '863 application either powers a light source for optical ablation, or causes the electrode to be heated for thermal ablation," not for causing ablation directly. (*Id.*)

Syneron's contention is contrary to the disclosure in the '863 application — namely, that optical ablation and thermal ablation are not the only microporation techniques taught in the '863 application. For example, the Abstract of the '863 application discloses at least seven microporation techniques: (1) optical ablation (by "concentrat[ing] the energy of [a] pulsed

light source"); (2) thermal ablation (using "a hot wire" or "localized rapid heating of water"); (3) mechanical ablation (using "a micro-lancet"); (4) sonic ablation (using "a tightly focused beam of sonic energy"); (5) hydraulic ablation (using "a high pressure jet"); and (6) electric ablation (by "puncturing the stratum corneum with short pulses of electricity to form a micropore of up to about 1000 μm in diameter"). ('211 Patent at Abstract)

The specification of the '863 application further explains that electric ablation can be accomplished by using an electroporation instrument:

> Additionally, electroporation or short bursts or pulses of electrical current can be delivered to the stratum corneum with sufficient energy **to form micropores**. Electroporation is known in the art for producing pores in biological membranes and electroporation instruments are commercially available. Thus, a person of skill in this art can select an instrument and conditions for use thereof without undue experimentation according to the guidelines provided herein.

(*Id.* at 20:23–36 (emphasis added)) In other words, the '863 application discloses that a commercially available electroporation instrument can be used to ablate the stratum corneum to form micropores by providing "sufficient" electrical energy to the electroporation instrument.

During the hearing on the motions for summary judgment, Syneron's attorney argued that the sentence "electroporation or short bursts or pulses of electrical current can be delivered to the stratum corneum with sufficient energy to form micropores" merely describes electroporation, a well-defined process that does not involve ablation. (Hearing Tr. at 54:10–55:6) The Special Master finds this argument unconvincing, because the sentence does not merely describe electroporation. Rather it describes a modification of the electroporation technique "to form micropores," which is the definition of "microporation" as used in the '863 application. (*See e.g.*, '211 Patent at 3:9–12 ("The formation of micropores (i.e. microporation) in the stratum corneum to enhance the delivery of drugs has been the subject of various studies and has resulted in the issuance.") The '863 application further defines "microporation" as "the formation of a small hole or pore in the stratum corneum." (*Id.* at 9:11–21) Further, the '863 application explicitly equates the term "microporation" with "ablation" and

"puncture": "To the extent that 'ablation' and 'puncture' accomplish the same purpose of poration, i.e. the creating a hole or pore in the stratum corneum without significant damage to the underlying tissues, these terms may be used interchangeably." (*Id.* at 9:33–36)

In sum, while it is well-known that conventional electroporation technique does not ablate the stratum corneum to form micropores, the '863 application explicitly discloses that the stratum corneum can be ablated to form micropores by elevating the electroporation current to a "sufficient" level. Furthermore, such use of electroporation equipment for microporation purpose (and *vice versa*) is explicitly provided for in Eppstein '316. (*See, e.g.*, '211 Patent at 1:49–51 ("electroporation electrodes may also serve the function of participating in the microporation of the tissue"); Abstract ("In a preferred embodiment, a device is provided having elements that are suitable for microporating the tissue and which serve as the electroporation electrodes."))

Syneron does not otherwise dispute Invasix's detailed element-by-element showing that Eppstein '316, together with the '863 application, disclose all elements of claim 29 of the '232 patent and claim 10 of the '079 patent.[13] A review of the relevant sections of Dr. Webster's rebuttal reveals that, besides repeating the same arguments addressed earlier, Dr. Webster merely offers conclusory and vacuous statements of disagreement that are devoid of substantive analysis. Therefore, the Special Master finds that Syneron has failed to show that there are genuine disputes of material fact related to Eppstein '316 anticipating claim 29 of the '232 patent and claim 10 of the '079 patent.

Claim 11 of the '079 patent depends on claim 10; it further adds the limitation of "wherein placing the plurality of the electrodes comprises placing at least one set of two or more electrodes against the skin, and wherein applying the electrical energy comprises inducing

[13] In addition to these two contentions, Syneron superficially contends that Eppstein "teaches away from the '079 and '232 patents" and that it fails to disclose element C in claim 29 of the '079 and claim 10 of the '232 patents. (Syneron Opp'n. at 12–14) However, it provides no analysis other than citing portions of Dr. Webster's rebuttal report. (*Id.*) The Special Master finds that the cited pages, besides repeating the same arguments addressed here, merely contain conclusory statements that provide no substantive support for the contentions. Therefore, they are not sufficient to create a material dispute about Eppstein '316 and the '863 application anticipating the '232 and '079 patents.

the current to flow between the electrodes in the at least one set." Invasix contends — and Syneron does not dispute — that "[t]here is no material dispute that Eppstein '316 meets the additional limitation of claim 11 of the '079 patent through its disclosure that 'an electrical voltage is applied between the electrodes.'" (Invasix Motion at 15, citing Eppstein '316 at 1:41–53)

In his rebuttal report, besides repeating the same arguments addressed earlier, Dr. Webster merely offers conclusory statements of disagreement without supporting analysis. Thus, the Special Master finds that Syneron has failed to show that there are genuine disputes of material facts related to Eppstein '316 anticipating claim 11 of the '079 patent. (D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit K at 16)

Claim 18 of the '079 patent also depends on claim 10, and it adds the limitation of "wherein applying the electrical energy comprises puncturing the skin." Invasix contends — and Syneron does not dispute — that "Dr. Pearce opined that Eppstein '316 satisfied this limitation, because the '863 application discloses that the '*stratum corneum* is first *punctured* with short pulses of electricity to form a micropore of up to about 100 μm diameter.'" (Invasix Motion at 15, citing '211 Patent at 44:11–14 (emphasis in the original)) In his rebuttal report, Dr. Webster again merely repeats the arguments and mantra addressed earlier. (D.I. 110-3, Ex. 4 (Webster Rebuttal Invalidity Report), Exhibit K at 16) Accordingly, the Special Master finds that Syneron has failed to show that genuine disputes of material facts exist related to Eppstein '316 anticipating claim 18 of the '079 patent.

In sum, the Special Master finds that the record, taken in the light most favorable to Syneron, supports the finding that there is clear and convincing evidence that Eppstein '316 discloses every limitation of asserted claim 29 of the '232 patent and claims 10, 11, and 18 of the '079 patent, and that no reasonable jury could find otherwise. Thus, summary judgment is appropriate on these anticipation issues.

**2) Obviousness**

Claims 30 of the '232 patent and claim 25 of the '079 patent further add the limitation

that the alternating current applied to the skin is at a frequency range over 100 Hz. Invasix points to Dr. Pearce's testimony that it would have been obvious to a person of ordinary skill in the art to use high frequency currents with electrodes in Eppstein '316, because of the "benefit of reducing shock to patients when HF AC current is used." (Invasix Motion at 15, citing Pearce Report at 127 and 154) Invasix further contends that Dr. Webster "admits that those of ordinary skill in the art knew that currents at above 100 Hz could be applied to electrodes and that these frequencies could be used for microporation." (*Id.* at 16, citing Webster Tr. at 695:17–20, 751:22–752:9)

Syneron does not dispute either Invasix's contentions or Dr. Webster's alleged admission. Instead, it repeats the same non-anticipation argument addressed earlier that "Dr. Pearce's analysis of Eppstein '316 is based on the faulty premise that the disclosures of the microporation step disclosed in the '863 application apply to the electroporation step disclosed in Eppstein '316." (Syneron Opp'n. at 14)

Therefore, the Special Master finds that Syneron has failed to show that genuine disputes of material fact exist related to Eppstein '316 rendering obvious claims 30 of the '232 patent and claim 25 of the '079 patent in view of the knowledge of a person of ordinary skill in the art. According, summary judgment is appropriate on the obviousness issues.

### B. Syneron's Cross Motion

Syneron cross-moves for summary judgment that Eppstein '316 does not anticipate the asserted claims of the '232 and '079 patents. However, if the Court adopts the findings and conclusions recommended in this Report that Eppstein '316 anticipates the asserted claims of the '232 and'079 patents, then Syneron's cross motion must be denied.

## III. The Remaining Motions for Summary Judgment

In view of the above-recommended findings and conclusion that all asserted claims of the patents-in-suit are invalid, the Special Master recommends denying Invasix's motion for summary judgment on the following issues as moot: (1) that Invasix's 20-pin and coated 24-pin

tips do not infringement the asserted claims; (2) that the accused products do not infringe under the doctrine of equivalents; (3) that there is no willful infringement of the asserted claims; and (4) that Syneron failed to mark its products under 35 U.S.C. § 287. The Special Master recommends denying Syneron's motion for summary judgment in its entirety.

## IV. The Other Pending Motions

In view of the above-recommended findings and conclusion that all asserted claims of the patents-in-suit are invalid, the Special Master further recommends denying the following currently-pending motions as moot: (1) Syneron's motion to strike and exclude evidence and Invasix's reliance thereon (D.I. 99); (2) Syneron's motion to strike and exclude portions of Dr. Robert Tucker's rebuttal expert report (D.I. 100); (3) Syneron's motion to exclude certain unreliable testimony of Dr. Robert Tucker (D.I. 101); (4) Syneron's motion to strike and exclude the expert report and exclude the testimony of defendants' damages expert W. Christopher Bakewell (D.I. 102); (5) Syneron's motion to strike new evidence and new arguments in Invasix's replies (D.I. 200); (6) Invasix's motion to strike the expert report and exclude the trial testimony of Roy Weinstein (D.I. 109); (7) Invasix's motion to strike portions of the infringement and claim construction reports by John G. Webster, Ph.D. (D.I. 111); (8) Invasix's motion to strike portions of Roy Weinstein's expert report (D.I. 112); (9) Invasix's motion to strike portions of the expert reports and exclude the trial testimony of Dr. John G. Webster (D.I. 113); and (10) Invasix's motion to strike new arguments and overlength pages from Syneron's motion for summary judgment reply (D.I. 199).

## CONCLUSION

For the reasons set forth above, the Special Master recommends GRANTING Invasix's Motion for Summary Judgment on the sole ground of invalidity of the asserted claims of the patents-in-suit and DENYING Syneron's Motion for Summary Judgment in its entirety.

In view of these findings, the Special Master further recommends DENYING the following pending motions as moot:

(1) Syneron's motion to strike and exclude evidence (D.I. 99);

(2) Syneron's motion to strike and exclude portions of Dr. Robert Tucker's rebuttal expert report (D.I. 100);

(3) Syneron's motion to exclude certain unreliable testimony of Dr. Robert Tucker (D.I. 101);

(4) Syneron's motion to strike and exclude the expert report and exclude the testimony of defendants' damages expert W. Christopher Bakewell (D.I. 102);

(5) Syneron's motion to strike new evidence and new arguments in Invasix's replies (D.I. 200);

(6) Invasix's motion to strike the expert report and exclude the trial testimony of Roy Weinstein (D.I. 109);

(7) Invasix's motion to strike portions of the infringement and claim construction reports by John G. Webster, Ph.D (D.I. 111);

(8) Invasix's motion to strike portions of Roy Weinstein's expert report (D.I. 112);

(9) Invasix's motion to strike portions of the expert reports and exclude the trial testimony of Dr. John G. Webster (D.I. 113); and

(10) Invasix's motion to strike new arguments and overlength pages from Syneron's motion for summary judgment reply (D.I. 199)

DATED: September 7, 2018

Margaret A. Nagle

Hon. Margaret A. Nagle (Ret.)
Special Master

**PROOF OF SERVICE BY EMAIL & U.S. MAIL**

Re: Syneron Medical Ltd. vs. Invasix, Inc., et al.
Reference No. 1220057351

I, Stephanie Barraza, not a party to the within action, hereby declare that on September 07, 2018, I served the attached SPECIAL MASTER'S REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT AND OTHER PENDING MOTIONS on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Los Angeles, CALIFORNIA, addressed as follows:

Adam R. Brausa Esq.
Benjamin Au Esq.
Leeron Morad Esq.
Durie Tangri LLP
217 Leidesdorff St.
San Francisco, CA 94111
Phone: 415-362-6666
abrausa@durietangri.com
bau@durietangri.com
lmorad@durietangri.com
Parties Represented:
Inmode MD Ltd.
Invasix, Inc.

Ryan M. Kent Esq.
Timothy Saulsbury Esq,
Sonal Mehta Esq.
Durie Tangri LLP
217 Leidesdorff St.
San Francisco, CA 94111
Phone: 415-362-6666
rkent@durietangri.com
tsaulsbury@durietangri.com
smehta@durietangri.com
Parties Represented:
Inmode MD Ltd.
Invasix, Inc.

Shea N. Palavan Esq.
Stephen F. Schlather Esq.
John J. Edmonds Esq.
Collins Edmonds Pogorzelski et al.
1616 S. Voss Rd.
Suite 125
Houston, TX 77007
Phone: 281-501-3425
spalavan@ip-lit.com
sschlather@ip-lit.com
jedmonds@ip-lit.com
Parties Represented:
Syneron Medical Ltd.

Brandon G. Moore Esq.
Eric R. Carr Esq.
Collins Edmonds Pogorzelski et al.
1616 S. Voss Rd.
Suite 125
Houston, TX 77007
Phone: 281-501-3425
bmoore@ip-lit.com
ecarr@ip-lit.com
Parties Represented:
Syneron Medical Ltd.

Hon. David O. Carter
US District Court
Ronald Regan Federal Bldg: Court Room 9D
411 W. Fourth St., #1053
Santa Ana, CA 92701-4516
(US MAIL ONLY)

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA on September 07, 2018.

Stephanie Barraza
SBarraza@jamsadr.com

**Jesse Villegas**

**From:** cacd_ecfmail@cacd.uscourts.gov
**Sent:** Thursday, September 13, 2018 16:36
**To:** ecfnef@cacd.uscourts.gov
**Subject:** Activity in Case 8:16-cv-00143-DOC-KES Syneron Medical Ltd. v. Invasix, Inc. et al Report and Recommendations - Special Master

**Follow Up Flag:** Follow up
**Flag Status:** Completed

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

## Notice of Electronic Filing

The following transaction was entered on 9/13/2018 at 2:35 PM PDT and filed on 9/13/2018

**Case Name:** Syneron Medical Ltd. v. Invasix, Inc. et al
**Case Number:** 8:16-cv-00143-DOC-KES
**Filer:**
**Document Number:** 265

**Docket Text:**
**SPECIAL MASTER'S REPORT AND RECOMMENDATION of Special Master ON MOTIONS FOR SUMMARY JUDGMENT AND OTHER PENDING MOTIONS. For the reasons set forth above, the Special Master recommends GRANTING Invasix's Motion for Summary Judgment on the sole ground of invalidity of the asserted claims of the patents-in-suit and DENYING Syneron's Motion for Summary Judgment in its entirety. In view of these findings, the Special Master further recommends DENYING the following pending motions as moot: SEE DOCUMENT FOR FURTHER INFORMATION. re SEALED NOTICE OF MOTION AND MOTION *for Partial Summary Judgment [98][103] filed by Syneron Medical Ltd., SEALED NOTICE OF MOTION AND MOTION , Daubert Motion, to Exclude Certain Unreliable Testimony of Dr. Robert Tucker [101] filed by Syneron Medical Ltd., for Order [200] filed by Syneron Medical Ltd., SEALED NOTICE OF MOTION AND MOTION to Strike and Exclude Portions of Dr. Robert Tucker's Rebuttal Expert Report Based on Improper and Untimely Evidence [100] filed by Syneron Medical Ltd., SEALED NOTICE OF MOTION AND MOTION to Strike and Exclude Evidence and Invasix's Reliance Thereon [99] filed by Syneron Medical Ltd. (twdb)***

***8:16-cv-00143-DOC-KES Notice has been electronically mailed to:***

*Lester J Savit evescance@onellp.com, info@onellp.com, nlichtenberger@onellp.com, 1666374420@filings.docketbird.com, lthomas@onellp.com, lsavit@onellp.com, lester.savit@gmail.com, rgolder@onellp.com*

*Brandon G Moore bmoore@ip-lit.com*

*Benjamin B Au bau@durietangri.com, calendar@durietangri.com, ben-au-1404@ecf.pacerpro.com*

*Adam Robert Brausa adam-brausa-durie-tangri-2154@ecf.pacerpro.com, abrausa@durietangri.com, calendar@durietangri.com*

*Shea N Palavan spalavan@ip-lit.com, iplit-staff@ip-lit.com*

*Andrew Louis Perito aperito@durietangri.com, calendar@durietangri.com*

*Sonal Naresh Mehta sonal-mehta-durie-tangri-4025@ecf.pacerpro.com, calendar@durietangri.com, records@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com, smehta@durietangri.com*

*John J Edmonds spalavan@ip-lit.com, ecarr@ip-lit.com, sschlather@ip-lit.com, jedmonds@ip-lit.com, iplit-staff@ip-lit.com*

*Stephen F Schlather sschlather@ip-lit.com, iplit-staff@ip-lit.com*

*Margaret A. Nagle mnagle@jamsadr.com*

*Timothy Chen Saulsbury timothy-saulsbury-durie-tangri-3113@ecf.pacerpro.com, tsaulsbury@durietangri.com, calendar@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com*

*Eric R Carr ecarr@ip-lit.com*

*Ryan M Kent rkent@durietangri.com, ryan-kent-durie-tangri-3472@ecf.pacerpro.com, calendar@durietangri.com, dt-calendaring-durie-tangri-1625@ecf.pacerpro.com*

***8:16-cv-00143-DOC-KES Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :***

US006148232A

# United States Patent [19]

**Avrahami**

[11] **Patent Number: 6,148,232**

[45] **Date of Patent: Nov. 14, 2000**

[54] **TRANSDERMAL DRUG DELIVERY AND ANALYTE EXTRACTION**

[75] Inventor: **Zohar Avrahami**, Rehovot, Israel

[73] Assignee: **Elecsys Ltd.**, Rishon Le Zion, Israel

[21] Appl. No.: **09/189,170**

[22] Filed: **Nov. 9, 1998**

[51] **Int. Cl.**[7] .................... **A61N 1/30**; A61B 5/04

[52] **U.S. Cl.** .................... **604/20**; 600/372

[58] **Field of Search** .................... 604/19–21; 607/2, 607/3, 152; 600/391, 372

[56] **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 5,328,452 | 7/1994 | Sibalis | 604/20 |
| 5,571,149 | 11/1996 | Liss et al. | 607/72 |
| 5,674,267 | 10/1997 | Mir et al. | 607/72 |
| 5,688,232 | 11/1997 | Flower | 604/20 |
| 5,697,896 | 12/1997 | McNichols et al. | 604/20 |
| 5,911,223 | 6/1999 | Weaver et al. | 128/898 |
| 5,964,726 | 10/1999 | Korenstein et al. | 604/20 |
| 5,983,130 | 11/1999 | Phipps et al. | 604/20 |
| 5,983,131 | 11/1999 | Weaver et al. | 604/20 |
| 6,009,344 | 12/1999 | Flower et al. | 604/20 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0 547 482 | 6/1993 | European Pat. Off. | 604/20 |
| WO 93/10854 | 6/1993 | WIPO | 604/20 |
| WO 94/16765 | 8/1994 | WIPO | 604/20 |
| WO 94/27671 | 12/1994 | WIPO | 604/20 |


*Primary Examiner*—Sharon Kennedy
*Attorney, Agent, or Firm*—Abelman, Frayne & Schwab

[57] **ABSTRACT**

A device for ablating the stratum corneum epidermidis of a subject, including a plurality of electrodes, which are applied to the subject's skin at respective points. A power source applies electrical energy between two or more of the plurality of electrodes, in order to cause ablation of the stratum corneum primarily in an area intermediate the respective points.

**36 Claims, 6 Drawing Sheets**






FIG. 1A




FIG. 1B




FIG. 2

FIG. 3


FROM BUTTONS 54
TO DISPLAY 56
92
OSCILLATOR
80
50
MEMORY
CPU
89
81
8
4
85
5
4
FROM BATTERY 52
82
A/D, D/A
83
1
84
86
88
MULTIPLEXING
90
TO ELECTRODES 60

FIG. 4


94
50
SWITCHING
96
98
120
124
22
100



TO CPU 80
110
112
114
120
120
22
100
102


FIG. 5



TO CPU 80
130
112
134
136
V
120
120
132
22
100
102


FIG. 6




FIG. 7




FIG. 8A




FIG. 8B

FIG. 9


210
212
+
V
-
216
214
120
120
22

FIG. 10


222
220
224
234
226
236
230
240
232
22
120

FIG. 11A




FIG. 11B



# TRANSDERMAL DRUG DELIVERY AND ANALYTE EXTRACTION

## FIELD OF THE INVENTION

The present invention relates generally to methods and devices for drug delivery and analyte extraction, and specifically to medical methods and devices for puncturing the outer layer of living skin and to methods and devices for transdermal drug delivery and analyte extraction.

## BACKGROUND OF THE INVENTION

A number of different methods have been developed to perform transdermal drug delivery and/or analyte extraction, including passive diffusion of a drug or analyte between a skin patch and skin, as well as active processes such as iontophoresis, sonophoresis, electroporation, and chemically enhanced diffusion. These methods are primarily used for generating transdermal movement of small molecules, but generally do not enhance the motion of large molecules through the 10–50 micron thick outermost layer of the skin, the stratum corneum epidermidis.

In an article, "Micromachined needles for the transdermal delivery of drugs," IEEE 11th Annual International Workshop on Micro-Electro-Mechanical Systems (1998), pp. 494–498, which is incorporated herein by reference, Henry et al. discuss a method of mechanically puncturing the skin with microneedles in order to increase the permeability of skin to a test drug. In the article, microfabrication techniques are described to etch an array of needles in silicon, and experiments performed on cadaver skin with the needle array demonstrated an increase in permeability subsequent to puncture of the skin. The needles are created with a predetermined length, and penetrate to the same depth from the skin surface, regardless of the local thickness of the stratum corneum. It is known that if the needles are longer than the local thickness, then the underlying epidermal tissue may be injured, while if the needles are too short, channel formation through the stratum corneum may be incomplete.

U.S. Pat. Nos. 4,775,361, 5,165,418, and 5,423,803, and PCT Publication WO 97/07734, the disclosures of which are incorporated herein by reference, describe methods of using laser pulses to locally heat the stratum corneum to about 120° C., thereby causing local ablation, in order to cause a single hole to develop in the stratum corneum through which large molecules may pass. Whereas some selectivity of ablation depth can be attained by varying the wavelength of the laser pulse, no feedback mechanism is disclosed whereby the laser pulses are terminated upon generation of the necessary damage to the stratum corneum.

PCT Publication WO 97/07734 also discloses thermal ablation of the stratum corneum using an electrically resistive element in contact with the stratum corneum, such that a high current through the element causes a general heating of tissue in its vicinity, most particularly the stratum corneum. As above, no means are disclosed to terminate current flow upon sufficient disruption of the stratum corneum. Additionally, thermal characteristics of skin vary highly across different areas of an individual's skin, as well as among a group of subjects, making optimal thermal dosages, which produce the desired ablation without causing pain, very difficult to determine. Lastly, increasing transdermal molecular flow by increasing the permeability of the stratum corneum, whether using microneedles, laser energy, or resistive heating of tissue, is inherently a two step process: (a) position apparatus to generate holes, and (b) apply a patch to the skin, through which the molecules will flow.



Electroporation is also well known in the art as a method to increase pore size by application of an electric field. This process is described in an article by Chizmadzhev et al., entitled "Electrical properties of skin at moderate voltages," *Biophysics Journal*, February, 1998, 74(2), pp. 843–856, which is incorporated herein by reference. Electroporation is disclosed as a means for transiently decreasing the electrical resistance of the stratum corneum and increasing the transdermal flux of small molecules by applying an electric field to increase the size of existing pores. Electroporation generally does not produce pores of sufficient diameter to pass large molecules therethrough. Additionally, optimal voltage profiles are difficult to determine because of naturally occurring variations as described hereinabove, as well as the lack of an accurate feedback mechanism to indicate achievement of the desired pore enlargement. If excessive voltage is applied, an irreversible breakdown occurs, resulting in damage to the skin and possible sensations of pain.

U.S. Pat. No. 5,019,034 to Weaver et al., whose disclosure is incorporated herein by reference, describes apparatus for applying high voltage, short duration electrical pulses on the skin to produce electroporation, and states that ". . . reversible electrical breakdown . . . along with an enhanced tissue permeability, is the characteristic effect of electroporation."

## SUMMARY OF THE INVENTION

It is an object of some aspects of the present invention to provide improved apparatus and methods for transdermal delivery of an active substance.

It is a further object of some aspects of the present invention to provide improved apparatus and methods for transdermal analyte extraction.

It is yet a further object of some aspects of the present invention to provide improved apparatus and methods for creating narrow channels through the stratum corneum of living skin by puncturing.

It is still a further object of some aspects of the present invention to provide improved apparatus and methods for reducing sensation and minimizing damage to skin underlying the stratum corneum during channel creation.

It is an additional object of some aspects of the present invention to provide improved apparatus and methods for controlling the timing of channel creation.

It is yet an additional object of some aspects of the present invention to provide improved apparatus and methods for regulating channel creation responsive to properties of the skin.

It is another object of some aspects of the present invention to provide improved apparatus and methods for puncturing the skin and/or transdermally delivering an active substance and/or transdermally extracting an analyte, using a miniature, self-contained device.

It is yet another object of some aspects of the present invention to provide improved apparatus and methods for transdermally delivering an active substance using a standard medical skin patch.

In preferred embodiments of the present invention, a device for enhancing transdermal movement of a substance comprises: (a) a skin patch, with at least two electrodes in contact with the skin of a subject; and (b) a control unit, coupled to the patch, which causes a current to pass between the electrodes through the stratum corneum epidermidis, in order to generate at least one micro-channel in the stratum corneum to enable or augment transdermal movement of the substance. Preferably, the control unit comprises switching

circuitry to control the magnitude and/or duration of the electric field at the electrode.

The term "micro-channel" as used in the context of the present patent application and in the claims refers to a pathway generally extending from the surface of the skin through all or a significant part of the stratum corneum, through which pathway molecules can diffuse. Preferably, micro-channels allow the diffusion therethrough of large molecules at a greater rate than the same molecules would diffuse through pores generated by electroporation. It is believed that such micro-channels are formed due to local power dissipation leading to ablation of the stratum corneum when an electric field of sufficient magnitude is applied to a small area of the skin, in contact with the electrodes, for a certain period of time. Unlike methods of electrically-promoted drug delivery known in the art, such as iontophoresis and electroporation, the present invention enables relatively large channels to be formed, through which even large molecules of the active substance can pass rapidly, without the necessity of ionizing or polarizing the molecules.

The current flow between the electrodes can be described as having two components: (a) a perpendicular component, which is generally perpendicular to the skin surface (and, if the associated electric field is sufficiently large, may cause current to go through the stratum corneum into the underlying epidermal tissue and dermis) ; and (b) a lateral component, generally parallel to the skin surface, which remains generally within the stratum corneum. Substantially all of the current generated at one electrode ultimately emerges from the skin and is taken up by an adjacent electrode.

In preferred embodiments of the present invention, methods and/or apparatus are employed to increase the relative value of the lateral component with respect to the perpendicular component. In general, the stratum corneum epidermidis (the superficial layer of the epidermis) demonstrates a significantly higher resistance to the passage of molecules therethrough than does the underlying epidermal tissue. It is therefore an object of these preferred embodiments of the present invention to form micro-channels in the stratum corneum by ablating the stratum corneum in order to increase conductance of the substance therethrough, and to generally not directly affect or damage epidermal tissue underlying the stratum corneum or in the innervated dermis. Additionally, limiting current flow substantially to the non-innervated stratum corneum is expected to decrease or eliminate the subject's sensations, discomfort, or pain responsive to use of the present invention, particularly as compared with other procedures known in the art.

A voltage applied between two electrodes on the skin generates an electric field that is to a large extent confined to the volume in a vicinity of the electrodes. Thus, electrodes which are widely spaced produce a field—and current flow responsive thereto—which extends relatively deep into the skin. Conversely, electrodes which are closely spaced do not generate significant current flow at deeper layers. Therefore, in some preferred embodiments of the present invention, the electrodes of the device are separated by distances smaller than about 100 microns (but for some applications by distances of up to approximately 500 microns), in order to generate a current flow which is largely confined to a thin layer, comprising most or all of the stratum corneum. This effectively results in a desired larger value of the ratio of the lateral component to the perpendicular component, as described hereinabove.

In some of these preferred embodiments of the present invention, a high-frequency AC current with an optional DC current added thereto is applied between the closely-spaced electrodes in order to generate lateral capacitive currents in the stratum corneum and to cause breakdown and micro-channel formation in the stratum corneum.

In some preferred embodiments of the present invention, the patch comprises an array of electrodes, preferably closely-spaced electrodes, which act together to produce a high micro-channel density in an area of the skin under the patch. Preferably, the control unit and/or associated circuitry sequentially or simultaneously evaluates the current flow through each electrode, or a subset of the electrodes, in order to determine when one or more micro-channels have formed responsive to the applied field. Responsive thereto, the control unit discontinues application of the field. Since the formation of a micro-channel is typically marked by a local drop in electrical resistance of the skin, the control unit may, for example, reduce the voltage or current applied at any electrode wherein the current has exceeded a threshold. By reducing current flow upon or shortly after micro-channel formation, the likelihood of skin burns or pain sensations is minimized.

In some preferred embodiments of the present invention, a relatively high voltage is applied to the electrodes initially, so as to induce formation of micro-channels through the skin. A property of the current flow is detected, and the current is reduced or terminated when the property reaches a predetermined threshold. Preferably, the detected property of the current flow is secondary to changes in a conduction property of the skin, responsive to formation of one or more micro-channels through the stratum corneum.

Alternatively or additionally, a time-varying voltage V(t), characterized, for example, by the formula $V(t)=V_0+kt^n$, is applied between a first electrode and a second electrode in the skin patch until a shut-off signal is generated. (Constants k and n are nonnegative.) Other forms of V(t) may include a sinusoid, an exponential term, or a series of pulses. A current I(t), flowing responsive to the applied field, is measured by the control unit, as described hereinabove. Calculations of the values of $\int I(t)dt$, $dI/dt$ and/or $d^2I/dt^2$ are frequently performed. Comparisons of I and/or $\int I(t)dt$ and/or $dI/dt$ and/or $d^2I/dt^2$ with respective threshold values are used as indicators of micro-channel formation and/or to determine when to generate the shut-off signal for the electrodes.

Further alternatively or additionally, in embodiments in which V(t) is sinusoidal, the control unit preferably calculates changes in a phase shift between V(t) and I(t) during application of the electric field, and controls the field responsive to these changes. It is believed that cells in the stratum corneum demonstrate capacitance, which causes the phase shift, and that ablation of the stratum corneum decreases the capacitance and is evidenced by a decrease in the phase shift.

Still further alternatively or additionally, the total charge which is passed through the skin is limited by a capacitor, inductor, or other energy-storage device. An appropriate choice of values for these components sets an absolute maximum quantity of charge which can pass through the skin, and thus limits any damage that can be caused thereby.

In some preferred embodiments of the present invention, one or more of the electrodes comprise or are coupled to an electrically conductive dissolving element, where the dissolving rate is generally proportional to the current passing through the electrode. When a sufficient quantity of charge has passed through the dissolving element, the electrode ceases to conduct electricity. Thus, a maximum total charge,

$Q_{total}$, is associated with an electrode, such that current flows through the element for only as long as $q(t)\equiv\int I(t)dt<Q_{total}$. This serves as a safety feature, reducing the possibility of skin burns secondary to applied electric fields. Alternatively or additionally, the dissolving element is constructed so that it becomes non-conductive after a quantity of charge has passed therethrough which is sufficient to ablate the stratum corneum.

In some further preferred embodiments of the present invention, the electrodes are "printed" directly on the skin, preferably by stamping or by employing a transfer patch of a conductive substance (such as, for example, a conductive ink containing silver grains). In applications of such embodiments of the present invention for transdermal drug delivery, the conductive substance preferably comprises a matrix holding the drug to be administered to a subject.

Preferably, the printed electrodes demonstrate a substantially complete loss of conductance therethrough upon ablation of the stratum corneum responsive to the applied electric field. Further preferably, each printed electrode comprises a material which is conductive only when current flowing therethrough remains below a threshold value. If the current exceeds the threshold, then thermal fusion of the material causes it to become largely nonconductive, i.e. the material acts as a fuse. Still further preferably, current continues to flow through the other electrodes until they reach the threshold current, at a time which is generally associated with the time required for ablation of the stratum corneum, as described hereinabove. In some of these embodiments, the control unit may be made substantially simpler than as described regarding other embodiments, and generally does not need other circuitry in order to determine whether to generate a shut-off signal.

In still further preferred embodiments of the present invention, two electrodes on the patch form a concentric electrode pair, in which an inner electrode generates a current which passes through the stratum corneum to an outer electrode surrounding the inner electrode. The distance between the inner and outer electrodes is preferably between about 50 and about 200 microns, in order to maintain the ratio of the lateral to the perpendicular component of the current at a high value, as described hereinabove.

In some preferred embodiments of the present invention, a conductance-enhancing substance, preferably comprising a conductive cream or ink, is applied to the skin in order to increase the ratio of the lateral to the perpendicular component of current flow. Alternatively or additionally, the conductance-enhancing substance comprises a composition with a high diffusion coefficient, which diffuses into the lipid layers of the stratum corneum and further augments the selective power dissipation therein, in order to ablate the stratum corneum with substantially little damage to the underlying tissue. In some applications, the substance has an electrical charge associated therewith, such that when a small lateral field is applied, lateral diffusion of the substance within the stratum corneum is enhanced (i.e., iontophoresis of the substance).

In some of these preferred embodiments which utilize a conductance-enhancing substance, the substance further comprises an active substance, for example, a pharmaceutical product, dissolved or mixed therein. Since breakdown of the stratum corneum is often associated with removal of the enhanced conductivity path afforded by the conductance-enhancing substance, it is preferable in many of these embodiments to use a substantially constant voltage source to generate current at the electrodes. Removal of the enhanced conductivity path will result in a desired reduced power dissipation in the stratum corneum ($P=V^2/R$), since the voltage remains constant while resistance increases.

In other preferred embodiments of the present invention, ablation of the stratum corneum is accomplished using a current-limited source to power the electrodes. It is believed that the stratum corneum generally displays high electrical resistance, while epidermal tissue underlying the stratum corneum has significantly lower electrical resistance. Ablation of the stratum corneum (i.e., removal of the high-resistance tissue) is therefore associated with a net decrease of electrical resistance between the electrodes, and the power dissipated in the epidermis following electrical breakdown will decrease, typically proportional to the change in resistance ($P=I^2R$).

Monitoring changes in voltage, current, and/or phase for each electrode in the control unit may require, in certain implementations, a significant amount of circuitry. Therefore, in some preferred embodiments of the present invention, the control unit comprises one or more clusters of electrodes, in which monitoring and control are performed for each cluster rather than for the individual electrodes therein. The cluster is preferably over a relatively small area of skin, for example, from about 1 $mm^2$ to about 100 $mm^2$, in which properties of the skin are assumed to be substantially constant.

In some preferred embodiments of the present invention, the device is a stand-alone device, which enables transdermal delivery of an active substance or enhances transdermal motion of an analyte. Alternatively, the device creates micro-channels as described hereinabove and is then removed from the skin, in order to enhance the transdermal delivery of a substance into or out of a commercially-available skin patch subsequently placed on the skin. In other preferred embodiments of the present invention, the device is an add-on to commercially available transdermal drug delivery/analyte extraction devices, and serves primarily to create the micro-channels in the stratum corneum, and optionally to act as a vehicle through which the substance may pass.

There is therefore provided, in accordance with a preferred embodiment of the present invention, a device for ablating the stratum corneum epidermidis of a subject, including:

a plurality of electrodes, which are applied to the subject's skin at respective points; and

a power source, which applies electrical energy between two or more of the plurality of electrodes, to cause ablation of the stratum corneum primarily in an area intermediate the respective points.

Preferably, skin layers beneath the stratum corneum are substantially not ablated. In a preferred embodiment of the present invention, the ablation of the stratum corneum causes a puncturing thereof.

Preferably, the device ablates the area of the stratum corneum in order to allow a substance to pass therethrough. Further preferably, the substance includes a drug that is delivered through the skin. Alternatively, the substance includes an analyte that is extracted through the skin.

Preferably, the power source generates an electric field which causes a current to flow through the stratum corneum, and the device reduces power dissipated in the stratum corneum responsive to variation of a characteristic of the current. Further preferably, the characteristic is drawn from a list consisting of: the magnitude of the current; a time-integration of the current; a first time-derivative of the current; and a second time-derivative of the current.

Alternatively or additionally, current through one of the plurality of electrodes is reduced substantially independently of the current through another one of the plurality of electrodes.

Further alternatively or additionally, at least one of the plurality of electrodes is coupled to receive the current through a limited-conduction unit, which unit allows current below a threshold value to flow therethrough substantially unimpeded, and becomes substantially non-conductive if the current flowing therethrough exceeds a limited-conduction threshold value.

Preferably, at least one of the plurality of electrodes is coupled to an electrically-conductive dissolving element characterized by a dissolving rate generally proportional to the current passing therethrough, which becomes substantially nonconductive responsive to a function of the current. In a preferred embodiment, the function includes a time-integral of the current having passed through the dissolving element.

Preferably, the dissolving element includes:

an electrolyte solution within the element; and

a first node and a common node immersed in the electrolyte solution,

wherein current flows from the first node to the common node through the electrolyte solution, the current flow causing the common node to be consumed at a rate generally proportional to the current passing therethrough, such that the dissolving element becomes substantially nonconductive when the total charge having passed through the common node exceeds a common node threshold value.

Further preferably, the dissolving element also includes a second node, immersed in the electrolyte solution, wherein the power source generates alternating current, and wherein the device further includes:

a first diode, coupled in series between the power source and the first node, which conducts current from the power source to the first node when the alternating current is in a positive phase thereof; and

a second diode, coupled in series between the power source and the second node, which conducts current from the second node to the power source when the alternating current is in a negative phase thereof,

such that the dissolving element becomes substantially nonconductive when the total charge having passed through the common node exceeds a common node threshold value.

Alternatively, the dissolving element includes:

an electrolyte solution within the element;

a large-area anode immersed in the electrolyte solution; and

a plurality of cathodes, immersed in the electrolyte solution, each of the cathodes being coupled to a respective one of the plurality of electrodes,

wherein current flows from the large-area anode to the plurality of cathodes through the electrolyte solution, the current flow causing at least one of the cathodes to be consumed at a rate generally proportional to the current passing therethrough, and wherein the at least one cathode becomes substantially nonconductive responsive to a function of the current having passed therethrough.

Preferably, the current through at least one of the plurality of electrodes is reduced responsive to the variation of the characteristic of the current through another one of the plurality of electrodes.



In a preferred embodiment, the device also includes a voltage sensing unit coupled to measure a voltage drop across two of the plurality of electrodes, and current from the power source is reduced responsive to the measurement made by the sensing unit. Preferably, the power source includes a current source, and current from the current source is reduced responsive to a measurement made by the sensing unit which indicates that the electrical potential between the two electrodes is below a voltage-threshold value.

Alternatively or additionally, the device includes a resistive element coupled to one of the two electrodes and to the power source, and the voltage sensing unit is further coupled to measure a voltage drop across the resistive element in order to determine a current passing therethrough. The power source includes an alternating current source, such that the measurements of the voltage drop across the two electrodes and the current through the resistive element determine a phase shift. The current from the alternating current source is reduced responsive to the phase shift being below a threshold value.

In a preferred embodiment, the device includes:

a resistive element coupled to one of the plurality of electrodes and to the power source; and

a voltage sensing unit coupled to measure a voltage drop across the resistive element in order to determine a current passing therethrough.

In this preferred embodiment, the power source includes a voltage source, and the voltage is reduced responsive to a measurement made by the sensing unit which indicates that the current through the resistive element is above a current-threshold value.

In another preferred embodiment, at least one of the plurality of electrodes is printed directly on the skin and becomes substantially electrically nonconductive responsive to the value of the current passing therethrough being greater than a threshold value.

In yet another preferred embodiment, the device includes:

a capacitor, coupled to two of the plurality of electrodes; and

a switch, coupled to the power source and the capacitor, such that the switch, in a closed phase thereof, allows current to flow from the power source to the capacitor and to the two electrodes, and such that the switch, in an open phase thereof, substantially terminates current flow from the power source to the capacitor and to the two electrodes.

In this embodiment, the power source charges the capacitor during the closed phase, and the capacitor discharges current through the electrodes during the open phase.

Preferably, the distance between two of the plurality of electrodes is less than about 0.3 mm. Further preferably, the distance between two of the plurality of electrodes is between about 0.01 mm and about 0.1 mm.

Preferably, the plurality of electrodes include:

a common electrode, which has a plurality of perforations therethrough; and

a plurality of positive electrodes, each positive electrode passing through a respective perforation of the common electrode,

such that current from the power source flows from each positive electrode through the skin to the common electrode.

In a preferred embodiment, the power source generates alternating current, a frequency thereof being above about 100 Hz. Preferably, the frequency is between about 1 kHz

and about 300 kHz. Alternatively or additionally, the power source modulates a frequency of the alternating current between a first frequency value and a second frequency value.

There is further provided, in accordance with a preferred embodiment of the present invention, a device for passing electrical current through the skin of a subject, including:

a power source, which generates the current;

a plurality of electrodes, which are applied to the skin at respective points; and

an electrically conductive dissolving element coupled to at least one of the electrodes, the element being characterized by a dissolving rate generally proportional to the current passing therethrough, and becoming substantially nonconductive responsive to a function of the current passing therethrough.

There is also provided, in accordance with a preferred embodiment of the present invention, a method for ablating the stratum corneum epidermidis of a subject, including:

placing a plurality of electrodes against the subject's skin at respective points; and

applying electrical energy between two or more of the plurality of electrodes, in order to cause ablation of the stratum corneum primarily in an area intermediate the respective points.

Preferably, skin layers beneath the stratum corneum are substantially not ablated. In a preferred embodiment, applying the electrical energy includes puncturing the skin.

Preferably, applying the energy includes ablating the area of the stratum corneum in order to allow a substance to pass through the area. Further preferably, the method includes delivering a drug or extracting an analyte through the area.

Preferably, applying electrical energy includes:

causing a current to flow through the points on the skin; and

substantially reducing the current flow through the skin responsive to variation of a characteristic of the current.

In a preferred embodiment, the characteristic is drawn from a list consisting of: a magnitude of the current; a time-integration of the current; a first time-derivative of the current; and a second time-derivative of the current.

In another preferred embodiment, causing the current to flow includes passing current to the one or more points on the skin through one or more respective limited-conduction units, wherein the units allow current below a threshold value to flow therethrough substantially unimpeded, and wherein the units become substantially nonconductive if the current flowing therethrough exceeds a limited-conduction threshold value.

In another preferred embodiment, causing the current to flow includes passing current to the one or more points on the skin through one or more respective electrically conductive dissolving elements, each element characterized by a dissolving rate generally proportional to the current passing therethrough, and each element becoming substantially nonconductive when the total charge having passed therethrough exceeds a dissolving element threshold value.

In yet another preferred embodiment, reducing the current flow includes reducing the current at one of the respective points substantially independently of the current at another one of the respective points.

In still another preferred embodiment, reducing current flow includes:

monitoring the current flow through one of the plurality of electrodes; and

reducing the current flow through another one of the plurality of electrodes responsive thereto.

Preferably, placing the plurality of electrodes includes placing two of the plurality of electrodes at a separation therebetween that is less than about 0.3 mm. Further preferably, placing the plurality of electrodes includes placing the two of the plurality of electrodes at a separation between about 0.01 mm and about 0.1 mm.

In a preferred embodiment, placing the plurality of electrodes includes:

applying a conduction-enhancing material to an area on the surface of the subject's skin in order to enhance current flow through the skin; and

placing the electrodes on the material,

wherein the electrical resistance of the conduction-enhancing material increases responsive to a function of the current flow therethrough.

Preferably, placing the plurality of electrodes includes:

placing on the skin a common electrode which has a plurality of perforations therethrough; and

placing on the skin a plurality of positive electrodes, each positive electrode passing through a respective perforation in the common electrode,

such that current from the power source flows from each positive electrode through the skin to the common electrode.

Further preferably, the method includes positioning in a vicinity of the electrodes a medical patch containing the substance, such that ablation of the stratum corneum increases a transport rate of the substance from the patch into the skin.

In a preferred embodiment, applying electrical energy includes generating alternating current, a frequency thereof being above about 100 Hz. Preferably, the frequency is between about 1 kHz and about 300 kHz. Alternatively or additionally, applying electrical energy includes modulating a frequency of the alternating current between a first frequency value and a second frequency value.

There is additionally provided, in accordance with a preferred embodiment of the present invention, a method for passing electrical current through the skin of a subject, including:

placing a plurality of electrodes against the skin at respective points;

applying the current through the electrodes; and

coupling to at least one of the electrodes an electrically conductive dissolving element, the element being characterized by having a dissolving rate generally proportional to the current passing therethrough, and by becoming substantially nonconductive responsive to a function of the current passing therethrough.

The present invention will be more fully understood from the following detailed description of the preferred embodiments thereof, taken together with the drawings in which:

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1**A is a schematic, partly sectional illustration of a device for transdermal transport of a substance, in accordance with a preferred embodiment of the present invention;

FIG. **1**B is a schematic, partly sectional illustration of another device for transdermal transport of a substance, in accordance with a preferred embodiment of the present invention;

FIG. **2** is a schematic bottom view of the device of FIG. **1**A, in accordance with a preferred embodiment of the present invention;

FIG. **3** is a schematic illustration of a switching unit in the device of FIG. **1**A, in accordance with a preferred embodiment of the present invention;

FIG. **4** is a schematic illustration of an electrode assembly, in accordance with a preferred embodiment of the present invention;

FIG. **5** is a schematic illustration of another electrode assembly, in accordance with a preferred embodiment of the present invention;

FIG. **6** is a schematic illustration of yet another electrode assembly, in accordance with a preferred embodiment of the present invention;

FIG. **7** is a schematic illustration of still another electrode assembly, in accordance with a preferred embodiment of the present invention;

FIGS. **8**A and **8**B are schematic illustrations of charge-limited electrode assemblies, in accordance with preferred embodiments of the present invention;

FIG. **9** is a schematic illustration of another charge-limited electrode assembly, in accordance with a preferred embodiment of the present invention;

FIG. **10** is a schematic illustration of yet another charge-limited electrode assembly, in accordance with a preferred embodiment of the present invention;

FIG. **11**A is a schematic side view of a concentric electrode assembly, in accordance with a preferred embodiment of the present invention; and

FIG. **11**B is a schematic top view of a common electrode layer in the concentric electrode assembly of FIG. **11**A, in accordance with a preferred embodiment of the present invention.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

FIG. **1**A is a schematic, partly sectional illustration of a skin puncturing device **20** for transdermal delivery of an active substance and/or transdermal extraction of an analyte, in accordance with a preferred embodiment of the present invention. Device **20** comprises a control unit **30** attached to a skin patch **40**, which is preferably fixed to a suitable area of a subject's skin **22**. Device **20** preferably administers an active substance through the normally substantially-impermeable stratum corneum layer of the skin by passing a controlled electric current therethrough, thereby ablating the stratum corneum and generating micro-channels through which the substance can pass. Alternatively or additionally, device **20** is used to generate micro-channels in the stratum corneum in order to allow passage of molecules to patch **40** from the underlying tissue, generally for diagnostic purposes.

When device **20** drives current through the stratum corneum, this tissue is heated resistively, so that when a sufficient quantity of energy has passed therethrough in a short time period, the tissue is ablated by the total energy dissipated therein. This ablation creates the desired micro-channels, i.e. physical gaps in the tissue. It has been found that application of a current to a small area of the skin leads to formation of such micro-channels, through which even large molecules can pass relatively freely, without the necessity of ionizing or polarizing the molecules, and without causing pain or substantial trauma to the dermis and epidermal tissue underlying the stratum corneum.

Control unit **30** preferably comprises a switching unit **50**, a battery **52** (such as a lithium coin cell battery), and an optional user-interface comprising buttons **54** and a sensible signal generator **56**, which may comprise a display and/or a buzzer. In a simplest embodiment, buttons **54** initialize and terminate analyte extraction or delivery of the active substance, although buttons **54** preferably also programmably control extraction or dosage rate and duration.

Patch **40** comprises two or more electrodes **60**, preferably an array **75** of electrodes, which pass current into and out of the skin. In applications of device **20** for transdermal drug delivery, when a micro-channel has formed responsive to current flow between the electrodes, the active substance stored in patch **40** flows therethrough. In the patch, the active substance is preferably stored in or applied to inter-electrode regions **68** and flows directly therefrom into the micro-channels created in the skin.

Control unit **30**, containing switching unit **50** and battery **52**, is preferably designed for repeated use, to be removably attached to disposable skin patch **40**. Before use, control unit **30** is fitted onto patch **40**, and a protective tab (not shown) on the lower surface of patch **40** is preferably removed, exposing the one or more electrodes **60**, and, in drug delivery systems, the active substance. One or more optional alignment pins **32** are preferably incorporated into control unit **30** and/or skin patch **40** to maintain proper alignment therebetween. Fitting control unit **30** to patch **40** also couples electrical contacts **62** on a lower surface of control unit **30** with electrical contacts **58** on an upper surface of skin patch **40**. In some other preferred embodiments of the present invention (not shown), control unit **30** and skin patch **40** are constructed as one integrated unit.

FIG. **1**B is a schematic, partly sectional illustration of another device **21** for transdermal transport of a substance, in accordance with a preferred embodiment of the present invention. Device **21** operates in substantially the same manner as device **20**, described hereinabove, but device **21** is preferably used in an add-on configuration with commercially available medical patches. Typically, a medical patch **74** is coupled to a porous, thin, flexible, and disposable electrode patch **70**, which is used to create micro-channels in skin **22** so as to enable enhanced flow of an active substance stored within medical patch **74** through electrode patch **70** and into skin **22**.

Electrode patch **70** is preferably constructed such that electrical contacts **58** thereof are coupled to electrical contacts **62** of control unit **30** and carry charge through flexible leads **76** and **78** internal to patch **70**, in order to create an electric field between electrodes **120** placed against the surface of skin **22**. Prior to use, medical patch **74** is placed onto electrode patch **70**, typically on the opposite side of patch **70** from electrodes **120**. An adhesive on the underside of medical patch **74** preferably secures the two patches together. Subsequently, electrode patch **70** is folded over, as shown in FIG. **1**B, such that an upper surface of patch **74** is secured through an adhesive **72** to electrode patch **70**. During operation of device **21**, the active substance preferably diffuses from the lower surface of patch **74** into, and then through, patch **70** into skin **22**. Device **21** is thus compatible with a broad range of currently available active or passive medical patches, which are typically of the same general construction (thin shell, internal reservoir of active substance, porous and adhesive-coated undersurface).

It is understood, of course, that device **21** as described is only one of many ways to implement some aspects of the present invention. Alternatively, for example, electrode patch **70** is not folded over; instead, control unit **30** is placed next to medical patch **74** on top of electrode patch **70**. Further alternatively, control unit **30** has electrical contacts on its upper surface to which are coupled the electrical contacts of the electrical patch.

FIG. **2** is a schematic bottom view of skin patch **40** from FIG. **1**A, showing array **75** of electrodes **60**, in accordance

with a preferred embodiment of the present invention. Although array **75** as shown comprises sixteen electrodes, it is understood that in some implementations the array might be smaller, while in others the array might be larger, for example 50×50 or even more, so as to enable a greater amount of the active substance to be delivered or analyte to be extracted. Electrodes **60** in this embodiment are preferably organized into eight electrode sets **77**, such that most of the charge leaving one electrode in a set goes to the other electrode in that set, and generally does not go to electrodes in an adjacent set. Electrode sets **77** are further preferably densely packed in order to maximize the transdermal transfer rate. By way of illustration and not limitation, the density may range from 4–100 electrode sets/$cm^2$. Each electrode set typically generates at least one micro-channel before a threshold of current or total charge transfer is passed, responsive to which switching unit **50** preferably causes current to the electrode set to be terminated or reduced, as described herein.

FIG. **3** is a schematic illustration of switching unit **50** in device **20** of FIG. **1**A, configured to control a 4×4 array of electrodes **60**, as in FIG. **2**, in accordance with a preferred embodiment of the present invention. Switching unit **50** preferably comprises a CPU **80** which actively controls the voltage V(t) applied to sixteen conductors **90** leading to electrodes **60**. CPU **80** monitors the current flow, I(t), through each of conductors **90** leading to electrodes **60** in order to determine whether a characteristic of the current (e.g., time-integrated current, I, dI/dt, $d^2I/dt^2$) has surpassed a threshold, indicating micro-channel formation. The CPU terminates current flow to any electrode for which the threshold has been surpassed. Alternatively or additionally, in some applications, some of electrodes **60** are generally not used to initiate channel formation, but serve primarily to allow CPU **80** and/or other circuitry to monitor electrical properties of skin **22**.

CPU **80**, which receives a clock signal from an oscillator **92**, preferably communicates with and controls electrodes **60** through eight data lines **81** and four control lines **85** which lead to an A/D-D/A converter **82**, and by five address lines **84** and four control lines **86** which lead to a multiplexing unit **88**. It will be understood by one skilled in the art that there are many methods to monitor and control current through a plurality of conductors, and that using a CPU, A/D-D/A converter and multiplexing unit as described herein is just one of these. Generally, data lines **81** carry in alternation a low byte and a high byte of data between the CPU and A/D-D/A converter **82**. Typically, 10 bits of data, representing a desired voltage for one of the sixteen electrodes, are converted to an analog voltage in A/D-D/A converter **82**, and this voltage is passed by multiplexing unit **88** to an appropriate electrode, the electrode selection being determined by the binary values represented in address lines **84**. In many applications, fewer than 10 bits are required to define voltages for the respective electrodes, and circuitry within switching unit **50** is accordingly simpler.

Intermittently, CPU **80** enters a current-sensing mode, wherein switching unit **50** continues to drive current through conductors **90**, but the CPU changes the state of control lines **85** and **86** in order to measure the current flow through conductors **90**. Responsive to the change in control lines **86**, multiplexing unit **88** measures a current through one of conductors **90**, converts this measurement to a voltage, and passes the voltage to A/D-D/A converter **82** which in turn passes the digital value representing the current to the CPU. Preferably, CPU **80** scans through each of the sixteen electrodes, detects a present current flow value, stores this



value in an optional memory unit **89**, optionally compares the value with prior values for the same electrode in order to calculate $\int I(t)dt$, dI/dt and/or $d^2I/dt^2$, and regulates the potential of that electrode responsive to the current measurement and/or optional calculation. It will be understood by one skilled in the art that CPU **80**, oscillator **92**, and memory **89** could be replaced by other circuitry able to perform generally the same functions.

FIG. **4** is a schematic illustration of an electrode assembly **94**, comprising a plurality of electrodes **120**, which are placed on skin **22** in order to generate micro-channels in the stratum corneum **100**, in accordance with a preferred embodiment of the present invention. Electrodes **120** in assembly **94** are grouped in sometimes overlapping sets of two or more electrodes, forming a plurality of electrode sets **124**, one of which is indicated with a dashed line in FIG. **4**. Current, coming from switching unit **50**, generally flows from one electrode in each electrode set to the other electrodes of the set. An arrow going between the two electrodes in set **124** indicates the preferred flow of current.

Preferably, the spacing between electrodes in each electrode set is smaller than about 0.1 mm, although for some applications it may range from (by way of illustration and not limitation) 0.1 mm to about 0.3 mm. Generally, the distance is set such that an electric field penetration depth is achieved which is substantially of the same magnitude as the thickness of the stratum corneum, so that the current mostly does not enter epidermal tissue underlying the stratum corneum. Experimental results have shown that the depth of deepest ablation is generally similar to the electrode spacing, so maintaining the spacing between about 0.01 mm and about 0.1 mm optimizes generation of micro-channels while substantially reducing damage, sensation and/or pain in the innervated dermis and in the epidermal tissue below the stratum corneum.

At any point in the skin in a vicinity of two electrodes placed thereon, the electric field generated between the electrodes can be viewed as having fundamentally two components: a component perpendicular to the skin, which generally causes current flow perpendicular to the skin; and a lateral component, which generally causes current flow parallel to the skin. At a point in the skin infinitesimally below one of the electrodes, the perpendicular component is generally large and/or greater than the lateral component. The present invention seeks generally to maximize the ratio of the lateral component to the perpendicular component at the depth corresponding to the interface between the deepest portion of the stratum corneum and the most superficial portion of the remainder of the epidermis. An electric field at the base of the stratum corneum having a relatively large lateral component generates current flow predominantly in the stratum corneum, with relatively little current flow into the underlying epidermal tissue. Thus, using methods and apparatus of the present invention, tissue ablation occurs mostly in the stratum corneum, as desired, and largely does not occur in the underlying tissue.

In some applications of the embodiment shown in FIG. **4**, it is preferred to print electrodes **120** directly on skin **22**, typically (a) by stamping the electrodes thereon; (b) by employing a transfer patch of a conductive substance; and/or (c) by other techniques known in the art. Switching unit **50** preferably sends current to the printed electrodes via printed ports (not shown) on the upper surface of the electrodes. In uses of the present invention for transdermal drug delivery, the conductive substance preferably contains an active substance, typically dissolved or suspended therein. Alternatively or additionally, it is desirable for the printed elec-

trode to disconnect from the switching unit or power source at substantially the same time as ablation of the stratum corneum is completed. This "self-quenching" feature of the printed electrodes is typically achieved by controlling fabrication of the electrodes, in particular by regulating the thickness and/or chemical composition thereof. Printed electrodes comprising a silver-based emulsion ink preferably undergo thermal fusion within the ink responsive to high current flow, resulting in a decrease in electrical conduction therethrough.

As discussed hereinabove with reference to FIG. **3**, switching unit **50** monitors current flow to electrodes **60** (or electrodes **120**, shown in FIG. **1**B and subsequent figures), and selectively terminates the flow to one or more electrodes upon a determination that ablation of stratum corneum **100** has occurred. Making reference to FIG. **4**, a cluster **96** of electrodes is a grouping of electrodes **120**, which are typically in very close mutual proximity, and are therefore assumed to overlie an area of skin **22** which has generally uniform properties. By way of illustration and not limitation, cluster sizes generally range from about 4 $mm^2$ to about 100 $mm^2$. Switching unit **50** preferably monitors and terminates the current flow through the electrodes in cluster **96** collectively (i.e. for all of the electrodes, not individually for each electrode). Alternatively or additionally, current through electrodes **120** in cluster **96** is determined by monitoring the current in only a subset of the electrodes, and assuming the value derived therefrom to be generally representative of current through each of the other electrodes. Upon a determination by switching unit **50** that stratum corneum **100** under cluster **96** has been ablated, the current flow to all of the electrodes in cluster **96** is substantially terminated. Monitoring of clusters of electrodes generally simplifies control circuitry associated with the invention, while not substantially decreasing the performance thereof.

Optional resistive elements **98**, coupled in series between switching unit **50** and electrodes **120**, limit the power dissipation in the skin following the large increase of conductivity in the epidermis associated with ablation of the stratum corneum. Typical values for resistive elements **98** range from 1 kOhm–100 kOhms, but in some applications may have values outside of this range.

FIG. **5** is a schematic illustration of another electrode assembly **110**, comprising a current source **114** coupled to drive charge through electrodes **120** on skin **22**, in accordance with a preferred embodiment of the present invention. Current source **114** preferably comprises a source of electrical power (for example, a battery) connected in series with an inductive element which, due to pulse charging, exhibits properties of a current source, thereby limiting the power dissipated in underlying epidermal tissue **102** following the drop in resistance of the epidermis associated with substantially complete ablation of stratum corneum **100**. Alternatively or additionally, current-limited source **114** comprises active components such as transistors, op-amps, commercially-available "ideal" current sources, etc., which maintain the current through the skin generally constant after ablation of the stratum corneum, so that the power dissipated ($P=I^2R$) will decrease with the reduced resistance of the skin upon the electrical breakdown of stratum corneum **100**.

Prior to breakdown, the impedance between electrodes **120** is high, producing a generally large voltage drop therebetween, so the energy dissipated in the skin (P=VI) has a desired high value. The energy dissipation rate is preferably sufficient to cause electrical breakdown of stratum corneum **100** in a short time, which is typically less than



50 milliseconds, but may range from about 1 to about 1000 milliseconds. Reported values of the voltage needed to break down stratum corneum **100** spread over a range of approximately 5–1000 volts. For the purposes of the present invention, it has been found that an inter-electrode voltage of approximately 100 volts generally ablates stratum corneum **100** without causing significant damage to underlying tissue **102**. It is understood, however, that for some applications or types of subjects/patients, lower or higher inter-electrode voltages may be more suitable.

Intermittently or continuously during application of the electric field to skin **22**, an optional voltage sensing unit **112** preferably measures the interelectrode voltage and sends a signal corresponding thereto to CPU **80** or other circuitry in switching unit **50**, which regulates the current produced by source **114** responsive to the signal. Alternatively or additionally, voltage sensing unit **112** comprises a comparator which intermittently or continuously compares the inter-electrode voltage to a pre-determined threshold value, and signals source **114** when the voltage is below the threshold. In either case, the CPU, circuitry and/or comparator preferably control source **114** to reduce or terminate current flow responsive to a drop of the interelectrode voltage below the threshold value.

FIG. **6** is a schematic illustration of another electrode assembly **130**, comprising a voltage source **136** coupled in series through an optional resistive element **134** to two electrodes **120** on the surface of skin **22**, in accordance with a preferred embodiment of the present invention. Optional voltage sensing unit **112** measures the voltage drop across resistive element **134** in order to determine the current passing therethrough. In a manner substantially similar to that described hereinabove with reference to FIG. **5**, unit **112** and/or CPU **80** and/or other circuitry in switching unit **50** regulate the output of voltage source **136** responsive to the measurement made by unit **112**. Preferably, when the voltage drop across element **134** exceeds a predetermined threshold value, this is used as an indication of stratum corneum ablation and causes the voltage generated by source **136** to be reduced or terminated responsive thereto.

In applications of the embodiment shown in FIG. **6**, if optional resistive element **134** and optional voltage sensing unit **112** are not used, it is preferable to employ other means for significantly reducing the current flow through electrodes **120** after micro-channel formation. This is preferably done by using "self-quenching" printed electrodes, as described hereinabove with reference to FIG. **4**.

Alternatively or additionally, a conductivity-enhancing substance **132** is applied to skin **22** prior to placement of electrodes **120** thereon. Substance **132** typically improves current flow into skin **22** by decreasing the electrical resistance at the interface between electrodes **120** and skin **22**. Experimental results indicate that use of substance **132** has the additional desired effect of increasing the above-mentioned ratio of the lateral component of the electric field to the perpendicular component thereof. In particular, it is believed that substance **132** diffuses into stratum corneum **100** and reduces the lateral resistance and lateral breakdown strength of the stratum corneum. By virtue of the relationship $P=V^2/R$, the increased conductivity in stratum corneum **100** (prior to the breakdown thereof) deriving from the presence of substance **132** produces a relatively high rate of energy dissipation in the stratum corneum. However, as ablation occurs, it has been observed that the enhanced conductivity path due to substance **132** is substantially removed, resulting in an increase in resistance and the desired attendant decrease in energy dissipation in the skin.

Substance **132** typically comprises a conductive cream, gel and/or ink. In some applications of this embodiment, substance **132** additionally comprises a material which has a high diffusion coefficient into the skin and promotes the increased lateral component of the electric field relative to the perpendicular component, as described hereinabove. Alternatively or additionally, "pre"-iontophoresis, using a relatively weak electric field, is used to enhance the flow of substance **132** into the outer layer of the skin before application of the stronger electric fields which create the micro-channels. The presence of the conductive substance in the skin subsequent to the pre-iontophoresis is believed to increase the rate of micro-channel creation. Pre-iontophoresis is typically implemented by applying, for example, a 3 volt DC field between the electrodes for 30 seconds in order to drive substance **132** into the skin. Alternatively or additionally, a larger AC current which produces micro-channels is supplemented by a simultaneous small DC current which supports iontophoresis of substance **132** and thereby enhances micro-channel creation.

In some applications, when micro-channels are created in order to enhance transdermal delivery of an active substance, the active substance is preferably incorporated in substance **132**.

FIG. **7** is a schematic illustration of another electrode assembly **150**, comprising an AC current source **154** coupled in series with an optional resistive element **152** in order to drive current through electrodes **120** and skin **22**, in accordance with a preferred embodiment of the present invention. It has been reported that the driving frequency of current through skin has a significant effect on the sensation or pain experienced by a subject. See, for example, *Principles of Applied Biomedical Instrumentation*, by L. Geddes and L. Baker, John Wiley & Sons, 1989, which is incorporated herein by reference. For the purposes of the present invention, a 10 kHz driving frequency has been found to yield good results, although any frequency between about 100 Hz and about 10 MHz is appropriate for most applications. Depending on properties of a subject's skin, it is sometimes appropriate to use driving frequencies outside of this range. Optionally, the driving frequency is cyclically modulated between two endpoints (e.g., 2 kHz and 15 kHz) during application of the electric field, such that a graph representing frequency versus time (not shown) is typically sinusoidal or triangular in character.

Stratum corneum **100** generally displays properties of a simple insulator when exposed to DC current, but displays significant capacitance under AC stimulation, particularly when the driving frequency is above 1 kHz. At these frequencies, current flow through the stratum corneum dissipates energy therein, contributing to the heating and ultimate ablation of the stratum corneum. The pre-ablation capacitance produces a measurable phase shift between the voltage across the electrodes and the current flowing therebetween, which phase shift is seen to be significantly reduced upon commencement and completion of the ablation of the stratum corneum. Sensing unit **112** is typically used to detect this phase shift by measuring the inter-electrode voltage, as described hereinabove, and by determining the current flow through electrodes **120**, preferably by measuring the voltage drop across optional resistive element **152**. The change of the phase shift from baseline is preferably used by sensing unit **112** and/or CPU **80** and/or other circuitry in switching unit **50** to indicate breakdown of the stratum corneum, responsive to which current flow to electrodes **120** demonstrating such a change preferably is reduced or terminated.

As described hereinabove, in some applications, substance **132** is applied to skin **22**, and a DC current is superimposed on the AC current in order to cause iontophoresis of substance **132** during micro-channel creation.

Alternatively or additionally, in applications using AC and/or DC current delivery (as in FIGS. **5**, **6** and **7**), the duration of charge delivery is limited by means of an optional ordinary timer circuit (not shown). Further alternatively or additionally, the total charge delivered (or root mean squared charge in AC operation modes) is limited using methods known in the art. For example, energy storage components such as capacitors and/or inductors can be used to modulate charge delivery.

Although in the embodiments shown in FIGS. **5**, **6**, and **7**, passing a threshold of current or voltage is used as an indicator of when to reduce the current applied to the skin, other functions of the current and/or voltage, such as derivatives, time-integrals, and/or powers thereof may also be evaluated in order to determine when the current should be reduced.

FIG. **8**A is a schematic illustration of a charge-limited electrode assembly **170**, comprising an electrolyte cell **180** connected in series between a power source **172** and electrodes **120**, in accordance with a preferred embodiment of the present invention. Electrolyte cell **180** comprises an anode **174** and a cathode **176**, both immersed in an electrolyte solution **178**, which acts as a medium for current flow from anode **174** to cathode **176**. As current flows through cell **180**, cathode **176** is steadily consumed by electrolysis until electrolyte cell **180** becomes substantially non-conductive. In this manner, consumption of cathode **176** progresses at a rate which is generally proportional to the current flowing therethrough. By modifying the initial mass of cathode **176**, cell **180** can be built to allow a flow of charge that substantially does not exceed a predetermined value.

FIG. **8**B is a schematic illustration of another charge-limited electrode assembly **190**, comprising a power source **192** which sends current to a large-area anode **194** from which it flows through an electrolyte solution **196** to multiple cathodes **202**, in accordance with a preferred embodiment of the present invention. In general, the charge-limiting functions embodied in assembly **190** are similar to those described with respect to the embodiment shown in FIG. **8**A. Anode **194** comprises a fibrous material, such as paper, having fibers aligned in a generally vertical direction, perpendicular to the surface of skin **22**. Alternatively or additionally, anode **194** is in very close proximity to cathodes **202**, typically from about 0.1 mm to about 2 mm, in order to enhance independent termination of current through electrodes **198** coupled to cathodes **202**, by reducing lateral conduction within the electrolyte solution.

FIG. **9** is a schematic illustration of yet another charge-limited electrode assembly **210**, comprising a power source **212** in series with a controlled switch **214**, in accordance with a preferred embodiment of the present invention. Source **212** and switch **214** are connected in series with a capacitor **216** across electrodes **120**, which are applied to skin **22**. Capacitor **216** is preferably utilized in order to limit the total charge delivered through electrodes **120** to generally not more than the charge-holding capacity of capacitor **216** at a designated voltage generated by source **212**, given by the formula $q=CV$, wherein C is the capacitance of the capacitor. By way of illustration and not limitation, for an applied voltage of 50 volts, a capacitor whose capacitance ranges from about 1 nF to about 0.2 $\mu$F is appropriate.

A typical operational sequence in this preferred embodiment comprises: (a) turning on source **212**; (b) closing switch **214**, which results in substantially all of the current from source **212** going through and charging low-impedance capacitor **216**; (c) opening switch **214** and turning off source **212**; (d) allowing the discharge from capacitor **216** to drive the ablation of the stratum corneum; and (e) passively terminating the process responsive to complete discharge of capacitor **216**.

FIG. **10** is a schematic illustration of still another charge-limited electrode assembly **220**, comprising an AC source **222** coupled in series to an electrolyte cell **230**, electrode **120**, and skin **22**, in accordance with a preferred embodiment of the present invention. Cell **230** preferably comprises two alternating nodes **226** and **236** and a common node **240**, all nodes being immersed in an electrolyte solution **232**. Except as will be described below, the function of electrolyte cell **230** is substantially similar to that of electrolytic charge-limiting devices described hereinabove with reference to FIGS. **8**A and **8**B.

AC source **222** produces a voltage difference across electrodes **120** (only one electrode is shown), which cycles between positive and negative phases at a pre-determined frequency, in order to provide the energy to ablate stratum corneum **100** in skin **22**. During the positive phase, a diode **224** in electrolyte cell **230** passes current to cause alternating node **226** to act as an anode and common node **240** to act as a cathode, which is subsequently consumed by the electrolysis thereof during each positive phase. Conversely, during the negative phase, diode **224** blocks conduction through alternating node **226**, halting the consumption of common node **240** associated with the positive phase. In a similar manner, during the negative phase, a second diode **234** passes current which allows alternating node **236** to act as a cathode (which is consumed) and common node **240** to act as an anode. When a sufficient quantity of charge has passed through electrolyte cell **230**, common node **240** is completely consumed, and cell **230** becomes substantially non-conductive. Preferably, the properties of electrolyte cell **230** are determined so that the cell becomes non-conductive after passing a quantity of charge which correlates with breakdown of the stratum corneum.

Reference is now made to FIGS. **11**A and **11**B which are, respectively, a schematic side view of a concentric electrode assembly **250** and a schematic top view of a common electrode layer **252** in assembly **250**, in accordance with a preferred embodiment of the present invention. A substantially non-conductive substrate **260** overlies common electrode layer **252**. Perforations **254** in layer **252** allow passage therethrough of electrodes **262**, which receive charge through optional resistive members **256** from a charging bus **264** overlying substrate **260**. Electrodes **262**, which preferably comprise a plurality of conductive fibers, are electrically coupled to skin **22**, and cause charge to pass into skin **22** and subsequently out of skin **22** through common electrode layer **252**, in order to ablate stratum corneum **100**.

In some preferred applications, one or more pores **266** traversing substrate **260** allow flow of active substances/analytes through substrate **260** from/to a reservoir (not shown) above substrate **260**. It is noted that fabrication of concentric electrode assembly **250** is substantially similar to the process of flexible printed circuit production, which is well known in the art.

It will be appreciated generally that the preferred embodiments described above are cited by way of example, and the full scope of the invention is limited only by the claims.

What is claimed is:

**1**. A device for ablating stratum corneum epidermidis of skin on the body of a subject, comprising:

a plurality of electrodes, which are adapted to be applied to the skin of the subject at respective points; and

a power source, which is adapted to apply electrical energy between two or more of the plurality of electrodes, to cause ablation of an area of the stratum corneum during a first time period, so as to facilitate passage of a substance through the ablated area during a second time period, subsequent to the first time period.

**2**. A device according to claim **1**, wherein the power source is adapted to apply the electrical energy such that skin layers beneath the stratum corneum are substantially not ablated.

**3**. A device according to claim **1**, wherein the power source is adapted to apply the electrical energy such that the ablation of the stratum corneum causes a puncturing thereof.

**4**. A device according to claim **1**, wherein the power source is adapted to generate an electric field which causes a current to flow through the stratum corneum, and wherein the device is adapted to reduce power dissipated in the stratum corneum responsive to variation of a characteristic of the current.

**5**. A device according to claim **4**, wherein the characteristic of the current is drawn from a list consisting of: the magnitude of the current; a time-integration of the current; a first time-derivative of the current; and a second time-derivative of the current.

**6**. A device according to claim **4**, wherein the power source is adapted to modify the electric field so as to reduce current through one of the plurality of electrodes, substantially independently of the current through another one of the plurality of electrodes.

**7**. A device according to claim **4**, and comprising a limited-conduction unit, wherein at least one of the plurality of electrodes is coupled to receive the current through the limited-conduction unit, which unit allows current below a threshold value to flow therethrough substantially unimpeded, and becomes substantially non-conductive if the current flowing therethrough exceeds a limited-conduction threshold value.

**8**. A device according to claim **4**, and comprising an electrically-conductive dissolving element, wherein at least one of the plurality of electrodes is coupled to the electrically-conductive dissolving element, wherein the dissolving element is characterized by a dissolving rate generally proportional to the current passing therethrough, and wherein the dissolving element is adapted to become substantially nonconductive responsive to a function of the current.

**9**. A device according to claim **8**, wherein the dissolving element is adapted such that the function comprises a time-integral of the current having passed through the dissolving element.

**10**. A device according to claim **8**, wherein the dissolving element comprises:

an electrolyte solution within the element; and

a first node and a common node immersed in the electrolyte solution,

wherein the dissolving element is adapted so that current flows from the first node to the common node through the electrolyte solution, wherein the common node is adapted to be consumed by the current flow at a rate generally proportional to the current passing

therethrough, and wherein the dissolving element is adapted to become substantially nonconductive when the total charge having passed through the common node exceeds a common node threshold value.

**11**. A device according to claim **10**, wherein the dissolving element further comprises a second node, immersed in the electrolyte solution, wherein the power source is adapted to generate alternating current, and wherein the device further comprises:

a first diode, coupled in series between the power source and the first node, which is adapted to conduct current from the power source to the first node when the alternating current is in a positive phase thereof; and

a second diode, coupled in series between the power source and the second node, which is adapted to conduct current from the second node to the power source when the alternating current is in a negative phase thereof,

such that the dissolving element is adapted to become substantially nonconductive when the total charge having passed through the common node exceeds a common node threshold value.

**12**. A device according to claim **8**, wherein the dissolving element comprises:

an electrolyte solution within the element;

a large-area anode immersed in the electrolyte solution; and

a plurality of cathodes, immersed in the electrolyte solution, each of the cathodes being coupled to a respective one of the plurality of electrodes,

wherein the dissolving element is adapted such that current flows from the large-area anode to the plurality of cathodes through the electrolyte solution, wherein at least one of the cathodes is adapted to be consumed by the current flow at a rate generally proportional to the current passing therethrough, and wherein the at least one cathode is adapted to become substantially nonconductive responsive to a function of the current having passed therethrough.

**13**. A device according to claim **4**, wherein the power source is adapted to modify the electric field such that the current through at least one of the plurality of electrodes is reduced responsive to the variation of the characteristic of the current through another one of the plurality of electrodes.

**14**. A device according to claim **4**, and comprising a voltage sensing unit coupled to measure a voltage drop across two of the plurality of electrodes, and wherein the power source is adapted to modify the electric field so as to reduce the current responsive to the measurement made by the sensing unit.

**15**. A device according to claim **14**, wherein the power source comprises a current source, which is adapted to reduce the current responsive to a measurement made by the sensing unit which indicates that the electrical potential between the two electrodes is below a voltage-threshold value.

**16**. A device according to claim **14**, and comprising a resistive element coupled to one of the two electrodes and to the power source, wherein the voltage sensing unit is further coupled to measure a voltage drop across the resistive element in order to determine a current passing therethrough, wherein the power source comprises an alternating current source, such that the measurements of the voltage drop across the two electrodes and the current through the resistive element determine a phase shift, and wherein the alternating current source is adapted to reduce the current through the stratum corneum responsive to the phase shift being below a threshold value.



**17**. A device according to claim **4**, and comprising:

a resistive element coupled to one of the plurality of electrodes and to the power source; and

a voltage sensing unit coupled to measure a voltage drop across the resistive element in order to determine a current passing therethrough,

wherein the power source comprises a voltage source, and wherein the voltage source is adapted to reduce a voltage thereof responsive to a measurement made by the sensing unit which indicates that the current through the resistive element is above a current-threshold value.

**18**. A device according to claim **4**, wherein at least one of the plurality of electrodes is adapted to be printed directly on the skin and is adapted to become substantially electrically nonconductive responsive to the value of the current passing therethrough being greater than a threshold value.

**19**. A device according to claim **4**, and comprising:

a capacitor, coupled to two of the plurality of electrodes; and

a switch, coupled to the power source and the capacitor, such that the switch, in a closed phase thereof, is adapted to allow current to flow from the power source to the capacitor and to the two electrodes, and such that the switch, in an open phase thereof, is adapted to substantially terminate current flow from the power source to the capacitor and to the two electrodes,

wherein the power source is adapted to charge the capacitor during the closed phase, and wherein the capacitor is adapted to discharge current through the electrodes during the open phase.

**20**. A device according to claim **1**, wherein the distance between two of the plurality of electrodes is less than about 0.3 mm.

**21**. A device according to claim **20**, wherein the distance between the two electrodes is between about 0.01 mm and about 0.1 mm.

**22**. A device according to claim **1**, wherein the plurality of electrodes comprise:

a common electrode, which has a plurality of perforations therethrough; and

a plurality of positive electrodes, each positive electrode passing through a respective perforation of the common electrode,

wherein the power source is adapted such that current from the power source flows from each positive electrode through the skin to the common electrode.

**23**. A device according to claim **1**, wherein the power source is adapted to generate alternating current, a frequency thereof being above about 100 Hz.

**24**. A device according to claim **23**, wherein the power source is adapted to generate the alternating current such that the frequency is between about 1 kHz and about 300 kHz.

**25**. A device according to claim **1**, wherein the power source is adapted to generate alternating current and to modulate a frequency thereof between a first frequency value and a second frequency value.

**26**. A device according to claim **1**, wherein the power source is adapted to apply the electrical energy for less than about 1 second.

**27**. A device according to claim **26**, wherein the power source is adapted to apply the electrical energy for less than about 200 milliseconds.

**28**. A device for passing electrical current through skin on the body of a subject, comprising:

a power source, which is adapted to generate the current;

a plurality of electrodes, which are adapted to be applied to the skin at respective points; and

an electrically conductive dissolving element coupled to at least one of the electrodes, the element being adapted to have a dissolving rate generally proportional to the current passing therethrough, and to become substantially nonconductive responsive to a function of the current passing therethrough.

**29**. A device for ablating stratum corneum epidermidis of skin on the body of a subject, comprising:

a plurality of electrodes, which are adapted to be applied to the skin of the subject at respective points; and

a power source, which is adapted to apply, between two or more of the plurality of electrodes, an alternating electric current so as to cause ablation of the stratum corneum.

**30**. A device according to claim **29**, wherein the power source is adapted to apply the alternating current at a frequency above about 100 Hz.

**31**. A device according to claim **30**, wherein the power source is adapted to apply the alternating current at a frequency between about 1 kHz and about 300 kHz.



**32**. A device for ablating stratum corneum epidermidis of skin of a subject, comprising:

a plurality of electrodes, which are adapted to be applied to the skin of the subject at respective points, such that two of the points are spaced less than about 0.3 mm apart; and

a power source, which is adapted to apply electrical energy between the two electrodes applied to the skin at the two points, to cause ablation of the stratum corneum.

**33**. A device according to claim **32**, wherein the two points are spaced about 0.01–0.1 mm apart.

**34**. A device according to claim **32**, wherein the device is adapted to ablate the area of the stratum corneum in order to allow a substance to pass therethrough.

**35**. A device according to claim **34**, wherein the device is adapted to ablate the area of the stratum corneum so as to allow the substance to pass through the skin into the body of the subject.

**36**. A device according to claim **34**, wherein the device is adapted to ablate the area of the stratum corneum so as to allow the substance to pass through the skin from within the body.

* * * * *

US006615079B1

(12) **United States Patent**
**Avrahami**

(10) **Patent No.: US 6,615,079 B1**
(45) **Date of Patent: Sep. 2, 2003**

(54) **TRANSDERMAL DRUG DELIVERY AND ANALYTE EXTRACTION**

(75) Inventor: **Zohar Avrahami**, Rehovot (IL)

(73) Assignee: **Elecsys Ltd.**, Rishon le Zion (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/635,892**

(22) Filed: **Aug. 10, 2000**

**Related U.S. Application Data**

(62) Division of application No. 09/189,170, filed on Nov. 9, 1998, now Pat. No. 6,148,232.

(51) **Int. Cl.**[7] .................................................. **A61N 1/30**
(52) **U.S. Cl.** .......................................................... **604/20**
(58) **Field of Search** .......................... 604/19–21; 607/2, 607/3, 152; 600/391, 372

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,964,482 | A | | 6/1976 | Grestel |
| 4,775,361 | A | | 10/1988 | Jacques et al. |
| 4,943,290 | A | | 7/1990 | Rexroth et al. |
| 5,019,034 | A | | 5/1991 | Weaver et al. |
| 5,135,478 | A | | 8/1992 | Sibalis |
| 5,165,418 | A | | 11/1992 | Tankovich |
| 5,196,709 | A | | 3/1993 | Berndt et al. |
| 5,232,441 | A | | 8/1993 | Stephen et al. |
| 5,246,867 | A | | 9/1993 | Lakowicz et al. |
| 5,281,825 | A | | 1/1994 | Berndt et al. |
| 5,328,452 | A | | 7/1994 | Sibalis |
| 5,380,272 | A | | 1/1995 | Gross |
| 5,409,835 | A | | 4/1995 | Lakowicz et al. |
| 5,421,817 | A | | 6/1995 | Liss et al. |
| 5,423,803 | A | | 6/1995 | Tankovich et al. |
| 5,439,440 | A | | 8/1995 | Hoffman |
| 5,458,140 | A | | 10/1995 | Eppstein et al. |
| 5,485,530 | A | | 1/1996 | Lakowicz et al. |
| 5,500,437 | A | | 3/1996 | Saitoh et al. |
| 5,571,149 | A | | 11/1996 | Liss et al. |
| 5,582,168 | A | | 12/1996 | Samuels et al. |
| 5,624,847 | A | | 4/1997 | Lakowicz et al. |
| 5,628,310 | A | | 5/1997 | Rao et al. |
| 5,631,169 | A | | 5/1997 | Lakowicz et al. |
| 5,648,269 | A | | 7/1997 | Lakowicz et al. |
| 5,651,765 | A | * | 7/1997 | Haworth et al. .............. 604/20 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0547482 | 6/1993 |
| WO | WO9310854 | 6/1993 |
| WO | WO9416765 | 8/1994 |
| WO | WO9427671 | 12/1994 |
| WO | WO 00/69515 | 11/2000 |
| WO | WO 00/74767 | 12/2000 |

OTHER PUBLICATIONS

Henry et al., "Micromachined needles for the transdermal delivery of drug", IEEE 11th Annual International Workshop on Micro–Electro–Mechanical Systems, 1998, pp. 494–498.

Chizmadzhev, et al., "Electrical properties of skin at moderate voltages", Biophysics Journal, Feb. 1998, 74(2), pp. 843–856.

"Instructions Manual for the Force 2 Electrosurgical Generator", Valleylab/TycoHealthcare Group LP, Boulder, Colorado, 1999.

*Primary Examiner*—Sharon Kennedy
(74) *Attorney, Agent, or Firm*—Abelman, Frayne & Schwab

(57) **ABSTRACT**

A device for ablating the stratum corneum epidermidis of a subject, including a plurality of electrodes, which are applied to the subject's skin at respective points. A power source applies electrical energy between two or more of the plurality of electrodes, in order to cause ablation of the stratum corneum primarily in an area intermediate the respective points.

**32 Claims, 6 Drawing Sheets**



U.S. PATENT DOCUMENTS

5,660,991 A 8/1997 Lakowicz et al.
5,674,267 A 10/1997 Mir et al.
5,688,232 A 11/1997 Flower et al.
5,697,896 A 12/1997 McNichols et al.
5,720,772 A * 2/1998 Eckhouse .................... 607/88
5,722,397 A 3/1998 Eppstein
5,759,767 A 6/1998 Lakowicz et al.
5,792,049 A 8/1998 Eppstein et al.
5,860,421 A 1/1999 Epstein et al.
5,871,469 A * 2/1999 Eggers et al. ............... 604/114
5,885,211 A 3/1999 Eppstein et al.
5,902,272 A * 5/1999 Eggers et al. ............... 604/114
5,911,223 A 6/1999 Weaver et al.
5,924,981 A 7/1999 Rothfritz et al.
5,938,657 A * 8/1999 Assa et al. ..................... 606/9
5,964,726 A 10/1999 Korenstein et al.
5,983,130 A 11/1999 Phipps et al.
5,983,131 A 11/1999 Weaver et al.
6,002,482 A 12/1999 Rothfritz et al.
6,009,344 A 12/1999 Flower
6,022,316 A * 2/2000 Eppstein et al. ............ 600/309
6,024,733 A 2/2000 Eggers et al.
6,030,399 A 2/2000 Ignotz et al.
6,041,253 A 3/2000 Kost et al.
6,045,502 A 4/2000 Epstein et al.
6,050,988 A 4/2000 Zuch
6,055,451 A 4/2000 Bambot et al.
6,066,134 A * 5/2000 Eggers et al. ................. 606/32
6,076,012 A * 6/2000 Swanson et al. .............. 604/21
6,083,196 A 6/2000 Trautman et al.
6,088,606 A 7/2000 Ignotz et al.
6,090,106 A 7/2000 Goble et al.
6,104,952 A * 8/2000 Tu et al. ....................... 604/20
6,117,109 A * 9/2000 Eggers et al. ............... 604/114
6,142,939 A 11/2000 Eppstein et al.
6,142,992 A * 11/2000 Cheng et al. ................. 606/34
6,148,232 A 11/2000 Avrahami
6,159,194 A 12/2000 Eggers et al.
6,173,202 B1 1/2001 Eppstein et al.
6,183,434 B1 2/2001 Eppstein
6,192,734 B1 2/2001 Rothfritz et al.
6,210,402 B1 * 4/2001 Olsen et al. .................. 606/32
6,228,078 B1 * 5/2001 Eggers et al. ................. 606/32
6,235,020 B1 * 5/2001 Cheng et al. ................. 606/34
6,238,391 B1 * 5/2001 Olsen et al. .................. 606/41

* cited by examiner




FIG. 1A




FIG. 1B




FIG. 2


FROM BUTTONS 54
TO DISPLAY 56
92
OSCILLATOR
80
50
MEMORY
CPU
89
81
8
85
4
5
4
FROM BATTERY 52
82
A/D, D/A
1
84
86
88
MULTIPLEXING
90
TO ELECTRODES 60

FIG. 3


94
50
SWITCHING
96
98
124
120
22
100

FIG. 4


TO CPU 80
110
112
114
120
120
22
100
102

FIG. 5


TO CPU 80
130
112
134
136
V
120
120
132
22
100
102

FIG. 6




FIG. 7




FIG. 8A




FIG. 8B

FIG. 9


210
212
+
V
-
216
214
120
120
22

FIG. 10


222
220
224
234
226
236
230
240
232
22
120

FIG. 11A




FIG. 11B



# TRANSDERMAL DRUG DELIVERY AND ANALYTE EXTRACTION

This appln. is a divisional of Ser. No. 09/189,170 filed Nov. 9, 1998 now U.S. Pat. No. 6,148,232.

## FIELD OF THE INVENTION

The present invention relates generally to methods and devices for drug delivery and analyte extraction, and specifically to medical methods and devices for puncturing the outer layer of living skin and to methods and devices for transdermal drug delivery and analyte extraction.

## BACKGROUND OF THE INVENTION

A number of different methods have been developed to perform transdermal drug delivery and/or analyte extraction, including passive diffusion of a drug or analyte between a skin patch and skin, as well as active processes such as iontophoresis, sonophoresis, electroporation, and chemically enhanced diffusion. These methods are primarily used for generating transdermal movement of small molecules, but generally do not enhance the motion of large molecules through the 10–50 micron thick outermost layer of the skin, the stratum corneum epidermidis.

In an article, "Micromachined needles for the transdermal delivery of drugs," IEEE 11th Annual International Workshop on Micro-Electro-Mechanical Systems (1998), pp. 494–498, which is incorporated herein by reference, Henry et al. discuss a method of mechanically puncturing the skin with microneedles in order to increase the permeability of skin to a test drug. In the article, microfabrication techniques are described to etch an array of needles in silicon, and experiments performed on cadaver skin with the needle array demonstrated an increase in permeability subsequent to puncture of the skin. The needles are created with a predetermined length, and penetrate to the same depth from the skin surface, regardless of the local thickness of the stratum-corneum. It is known that if the needles are longer than the local thickness, then the underlying epidermal tissue may be injured, while if the needles are too short, channel formation through the stratum corneum may be incomplete.

U.S. Pat. Nos. 4,775,361, 5,165,418, and 5,423,803, and PCT Publication WO 97/07734, the disclosures of which are incorporated herein by reference, describe methods of using laser pulses to locally heat the stratum corneum to about 120° C., thereby causing local ablation, in order to cause a single hole to develop in the stratum corneum through which large molecules may pass. Whereas some selectivity of ablation depth can be attained by varying the wavelength of the laser pulse, no feedback mechanism is disclosed whereby the laser pulses are terminated upon generation of the necessary damage to the stratum corneum.

PCT Publication WO 97/07734 also discloses thermal ablation of the stratum corneum using an electrically resistive element in contact with the stratum corneum, such that a high current through the element causes a general heating of tissue in its vicinity, most particularly the stratum corneum. As above, no means are disclosed to terminate current flow upon sufficient disruption of the stratum corneum. Additionally, thermal characteristics of skin vary highly across different areas of an individual's skin, as well as among a group of subjects, making optimal thermal dosages, which produce the desired ablation without causing pain, very difficult to determine. Lastly, increasing transdermal molecular flow by increasing the permeability of the stratum corneum, whether using microneedles, laser energy, or resistive heating of tissue, is inherently a two step process: (a) position apparatus to generate holes, and (b) apply a patch to the skin, through which the molecules will flow.



Electroporation is also well known in the art as a method to increase pore size by application of an electric field. This process is described in an article by Chizmadzhev et al., entitled "Electrical properties of skin at moderate voltages," *Biophysics Journal*, February, 1998, 74(2), pp. 843–856, which is incorporated herein by reference. Electroporation is disclosed as a means for transiently decreasing the electrical resistance of the stratum corneum and increasing the transdermal flux of small molecules by applying an electric field to increase the size of existing pores. Electroporation generally does not produce pores of sufficient diameter to pass large molecules therethrough. Additionally, optimal voltage profiles are difficult to determine because of naturally occurring variations as described hereinabove, as well as the lack of an accurate feedback mechanism to indicate achievement of the desired pore enlargement. If excessive voltage is applied, an irreversible breakdown occurs, resulting in damage to the skin and possible sensations of pain.

U.S. Pat. No. 5,019,034 to Weaver et al., whose disclosure is incorporated herein by reference, describes apparatus for applying high voltage, short duration electrical pulses on the skin to produce electroporation, and states that ". . . reversible electrical breakdown . . . along with an enhanced tissue permeability, is the characteristic effect of electroporation."

## SUMMARY OF THE INVENTION

It is an object of some aspects of the present invention to provide improved apparatus and methods for transdermal delivery of an active substance.

It is a further object of some aspects of the present invention to provide improved apparatus and methods for transdermal analyte extraction.

It is yet a further object of some aspects of the present invention to provide improved apparatus and methods for creating narrow channels through the stratum corneum of living skin by puncturing.

It is still a further object of some aspects of the present invention to provide improved apparatus and methods for reducing sensation and minimizing damage to skin underlying the stratum corneum during channel creation.

It is an additional object of some aspects of the present invention to provide improved apparatus and methods for controlling the timing of channel creation.

It is yet an additional object of some aspects of the present invention to provide improved apparatus and methods for regulating channel creation responsive to properties of the skin.

It is another object of some aspects of the present invention to provide improved apparatus and methods for puncturing the skin and/or transdermally delivering an active substance and/or transdermally extracting an analyte, using a miniature, self-contained device.

It is yet another object of some aspects of the present invention to provide improved apparatus and methods for transdermally delivering an active substance using a standard medical skin patch.

In preferred embodiments of the present invention, a device for enhancing transdermal movement of a substance comprises: (a) a skin patch, with at least two electrodes in contact with the skin of a subject; and (b) a control unit, coupled to the patch, which causes a current to pass between

the electrodes through the stratum corneum epidermidis, in order to generate at least one micro-channel in the stratum corneum to enable or augment transdermal movement of the substance. Preferably, the control unit comprises switching circuitry to control the magnitude and/or duration of the electric field at the electrode.

The term "micro-channel" as used in the context of the present patent application and in the claims refers to a pathway generally extending from the surface of the skin through all or a significant part of the stratum corneum, through which pathway molecules can diffuse. Preferably, micro-channels allow the diffusion therethrough of large molecules at a greater rate than the same molecules would diffuse through pores generated by electroporation. It is believed that such micro-channels are formed due to local power dissipation leading to ablation of the stratum corneum when an electric field of sufficient magnitude is applied to a small area of the skin, in contact with the electrodes, for a certain period of time. Unlike methods of electrically-promoted drug delivery known in the art, such as iontophoresis and electroporation, the present invention enables relatively large channels to be formed, through which even large molecules of the active substance can pass rapidly, without the necessity of ionizing or polarizing the molecules.

The current flow between the electrodes can be described as having two components: (a) a perpendicular component, which is generally perpendicular to the skin surface (and, if the associated electric field is sufficiently large, may cause current to go through the stratum corneum into the underlying epidermal tissue and dermis); and (b) a lateral component, generally parallel to the skin surface, which remains generally within the stratum corneum. Substantially all of the current generated at one electrode ultimately emerges from the skin and is taken up by an adjacent electrode.

In preferred embodiments of the present invention, methods and/or apparatus are employed to increase the relative value of the lateral component with respect to the perpendicular component. In general, the stratum corneum epidermidis (the superficial layer of the epidermis) demonstrates a significantly higher resistance to the passage of molecules therethrough than does the underlying epidermal tissue. It is therefore an object of these preferred embodiments of the present invention to form micro-channels in the stratum corneum by ablating the stratum corneum in order to increase conductance of the substance therethrough, and to generally not directly affect or damage epidermal tissue underlying the stratum corneum or in the innervated dermis. Additionally, limiting current flow substantially to the non-innervated stratum corneum is expected to decrease or eliminate the subject's sensations, discomfort, or pain responsive to use of the present invention, particularly as compared with other procedures known in the art.

A voltage applied between two electrodes on the skin generates an electric field that is to a large extent confined to the volume in a vicinity of the electrodes. Thus, electrodes which are widely spaced produce a field—and current flow responsive thereto—which extends relatively deep into the skin. Conversely, electrodes which are closely spaced do not generate significant current flow at deeper layers. Therefore, in some preferred embodiments of the present invention, the electrodes of the device are separated by distances smaller than about 100 microns (but for some applications by distances of up to approximately 500 microns), in order to generate a current flow which is largely confined to a thin layer, comprising most or all of the stratum corneum. This effectively results in a desired larger value of the ratio of the lateral component to the perpendicular component, as described hereinabove.

In some of these preferred embodiments of the present invention, a high-frequency AC current with an optional DC current added thereto is applied between the closely-spaced electrodes in order to generate lateral capacitive currents in the stratum corneum and to cause breakdown and micro-channel formation in the stratum corneum.

In some preferred embodiments of the present invention, the patch comprises an array of electrodes, preferably closely-spaced electrodes, which act together to produce a high micro-channel density in an area of the skin under the patch. Preferably, the control unit and/or associated circuitry sequentially or simultaneously evaluates the current flow through each electrode, or a subset of the electrodes, in order to determine when one or more micro-channels have formed responsive to the applied field. Responsive thereto, the control unit discontinues application of the field. Since the formation of a micro-channel is typically marked by a local drop in electrical resistance of the skin, the control unit may, for example, reduce the voltage or current applied at any electrode wherein the current has exceeded a threshold. By reducing current flow upon or shortly after micro-channel formation, the likelihood of skin burns or pain sensations is minimized.

In some preferred embodiments of the present invention, a relatively high voltage is applied to the electrodes initially, so as to induce formation of micro-channels through the skin. A property of the current flow is detected, and the current is reduced or terminated when the property reaches a predetermined threshold. Preferably, the detected property of the current flow is secondary to changes in a conduction property of the skin, responsive to formation of one or more micro-channels through the stratum corneum.

Alternatively or additionally, a time-varying voltage V(t), characterized, for example, by the formula $V(t)=V_0+kt^n$, is applied between a first electrode and a second electrode in the skin patch until a shut-off signal is generated. (Constants k and n are nonnegative.) Other forms of V(t) may include a sinusoid, an exponential term, or a series of pulses. A current I(t), flowing responsive to the applied field, is measured by the control unit, as described hereinabove. Calculations of the values of $\int I(t)dt$, $dI/dt$ and/or $d^2I/dt^2$ are frequently performed. Comparisons of I and/or $\int I(t)dt$ and/or $dI/dt$ and/or $d^2I/dt^2$ with respective threshold values are used as indicators of micro-channel formation and/or to determine when to generate the shutoff signal for the electrodes.

Further alternatively or additionally, in embodiments in which V(t) is sinusoidal, the control unit preferably calculates changes in a phase shift between V(t) and I(t) during application of the electric field, and controls the field responsive to these changes. It is believed that cells in the stratum corneum demonstrate capacitance, which causes the phase shift, and that ablation of the stratum corneum decreases the capacitance and is evidenced by a decrease in the phase shift.

Still further alternatively or additionally, the total charge which is passed through the skin is limited by a capacitor, inductor, or other energy-storage device. An appropriate choice of values for these components sets an absolute maximum quantity of charge which can pass through the skin, and thus limits any damage that can be caused thereby.

In some preferred embodiments of the present invention, one or more of the electrodes comprise or are coupled to an

electrically conductive dissolving element, where the dissolving rate is generally proportional to the current passing through the electrode. When a sufficient quantity of charge has passed through the dissolving element, the electrode ceases to conduct electricity. Thus, a maximum total charge, $Q_{total}$, is associated with an electrode, such that current flows through the element for only as long as $q(t)\equiv\int I(t)dt<Q_{total}$. This serves as a safety feature, reducing the possibility of skin burns secondary to applied electric fields. Alternatively or additionally, the dissolving element is constructed so that it becomes non-conductive after a quantity of charge has passed therethrough which is sufficient to ablate the stratum corneum.

In some further preferred embodiments of the present invention, the electrodes are "printed" directly on the skin, preferably by stamping or by employing a transfer patch of a conductive substance (such as, for example, a conductive ink containing silver grains). In applications of such embodiments of the present invention for transdermal drug delivery, the conductive substance preferably comprises a matrix holding the drug to be administered to a subject.

Preferably, the printed electrodes demonstrate a substantially complete loss of conductance therethrough upon ablation of the stratum corneum responsive to the applied electric field. Further preferably, each printed electrode comprises a material which is conductive only when current flowing therethrough remains below a threshold value. If the current exceeds the threshold, then thermal fusion of the material causes it to become largely nonconductive, i.e. the material acts as a fuse. Still further preferably, current continues to flow through the other electrodes until they reach the threshold current, at a time which is generally associated with the time required for ablation of the stratum corneum, as described hereinabove. In some of these embodiments, the control unit may be made substantially simpler than as described regarding other embodiments, and generally does not need other circuitry in order to determine whether to generate a shut-off signal.

In still further preferred embodiments of the present invention, two electrodes on the patch form a concentric electrode pair, in which an inner electrode generates a current which passes through the stratum corneum to an outer electrode surrounding the inner electrode. The distance between the inner and outer electrodes is preferably between about 50 and about 200 microns, in order to maintain the ratio of the lateral to the perpendicular component of the current at a high value, as described hereinabove.

In some preferred embodiments of the present invention, a conductance-enhancing substance, preferably comprising a conductive cream or ink, is applied to the skin in order to increase the ratio of the lateral to the perpendicular component of current flow. Alternatively or additionally, the conductance-enhancing substance comprises a composition with a high diffusion coefficient, which diffuses into the lipid layers of the stratum corneum and further augments the selective power dissipation therein, in order to ablate the stratum corneum with substantially little damage to the underlying tissue. In some applications, the substance has an electrical charge associated therewith, such that when a small lateral field is applied, lateral diffusion of the substance within the stratum corneum is enhanced (i.e., iontophoresis of the substance).

In some of these preferred embodiments which utilize a conductance-enhancing substance, the substance further comprises an active substance, for example, a pharmaceutical product, dissolved or mixed therein. Since breakdown of the stratum corneum is often associated with removal of the enhanced conductivity path afforded by the conductance-enhancing substance, it is preferable in many of these embodiments to use a substantially constant voltage source to generate current at the electrodes. Removal of the enhanced conductivity path will result in a desired reduced power dissipation in the stratum corneum ($P=V^2/R$), since the voltage remains constant while resistance increases.

In other preferred embodiments of the present invention, ablation of the stratum corneum is accomplished using a current-limited source to power the electrodes. It is believed that the stratum corneum generally displays high electrical resistance, while epidermal tissue underlying the stratum corneum has significantly lower electrical resistance. Ablation of the stratum corneum (i.e., removal of the high-resistance tissue) is therefore associated with a net decrease of electrical resistance between the electrodes, and the power dissipated in the epidermis following electrical breakdown will decrease, typically proportional to the change in resistance ($P=I^2R$).

Monitoring changes in voltage, current, and/or phase for each electrode in the control unit may require, in certain implementations, a significant amount of circuitry. Therefore, in some preferred embodiments of the present invention, the control unit comprises one or more clusters of electrodes, in which monitoring and control are performed for each cluster rather than for the individual electrodes therein. The cluster is preferably over a relatively small area of skin, for example, from about 1 mm $^2$ to about 100 mm $^2$ in which properties of the skin are assumed to be substantially constant.

In some preferred embodiments of the present invention, the device is a stand-alone device, which enables transdermal delivery of an active substance or enhances transdermal motion of an analyte. Alternatively, the device creates micro-channels as described hereinabove and is then removed from the skin, in order to enhance the transdermal delivery of a substance into or out of a commercially-available skin patch subsequently placed on the skin. In other preferred embodiments of the present invention, the device is an add-on to commercially available transdermal drug delivery/analyte extraction devices, and serves primarily to create the micro-channels in the stratum corneum, and optionally to act as a vehicle through which the substance may pass.

There is therefore provided, in accordance with a preferred embodiment of the present invention, a device for ablating the stratum corneum epidermidis of a subject, including:

a plurality of electrodes, which are applied to the subject's skin at respective points; and

a power source, which applies electrical energy between two or more of the plurality of electrodes, to cause ablation of the stratum corneum primarily in an area intermediate the respective points.

Preferably, skin layers beneath the stratum corneum are substantially not ablated. In a preferred embodiment of the present invention, the ablation of the stratum corneum causes a puncturing thereof.

Preferably, the device ablates the area of the stratum corneum in order to allow a substance to pass therethrough. Further preferably, the substance includes a drug that is delivered through the skin. Alternatively, the substance includes an analyte that is extracted through the skin.

Preferably, the power source generates an electric field which causes a current to flow through the stratum corneum,

and the device reduces power dissipated in the stratum corneum responsive to variation of a characteristic of the current. Further preferably, the characteristic is drawn from a list consisting of: the magnitude of the current; a time-integration of the current; a first time-derivative of the current; and a second time-derivative of the current.

Alternatively or additionally, current through one of the plurality of electrodes is reduced substantially independently of the current through another one of the plurality of electrodes.

Further alternatively or additionally, at least one of the plurality of electrodes is coupled to receive the current through a limited-conduction unit, which unit allows current below a threshold value to flow therethrough substantially unimpeded, and becomes substantially non-conductive if the current flowing therethrough exceeds a limited-conduction threshold value.

Preferably, at least one of the plurality of electrodes is coupled to an electrically-conductive dissolving element characterized by a dissolving rate generally proportional to the current passing therethrough, which becomes substantially nonconductive responsive to a function of the current. In a preferred embodiment, the function includes a time-integral of the current having passed through the dissolving element.

Preferably, the dissolving element includes:

an electrolyte solution within the element; and

a first node and a common node immersed in the electrolyte solution,

wherein current flows from the first node to the common node through the electrolyte solution, the current flow causing the common node to be consumed at a rate generally proportional to the current passing therethrough, such that the dissolving element becomes substantially nonconductive when the total charge having passed through the common node exceeds a common node threshold value.

Further preferably, the dissolving element also includes a second node, immersed in the electrolyte solution, wherein the power source generates alternating current; and wherein the device further includes:

a first diode, coupled in series between the power source and the first node, which conducts current from the power source to the first node when the alternating current is in a positive phase thereof; and

a second diode, coupled in series between the power source and the second node, which conducts current from the second node to the power source when the alternating current is in a negative phase thereof,

such that the dissolving element becomes substantially nonconductive when the total charge having passed through the common node exceeds a common node threshold value.

Alternatively, the dissolving element includes:

an electrolyte solution within the element;

a large-area anode immersed in the electrolyte solution; and

a plurality of cathodes, immersed in the electrolyte solution, each of the cathodes being coupled to a respective one of the plurality of electrodes,

wherein current flows from the large-area anode to the plurality of cathodes through the electrolyte solution, the current flow causing at least one of the cathodes to be consumed at a rate generally proportional to the current passing therethrough, and wherein the at least one cathode becomes substantially nonconductive responsive to a function of the current having passed therethrough.

Preferably, the current through at least one of the plurality of electrodes is reduced responsive to the variation of the characteristic of the current through another one of the plurality of electrodes.

In a preferred embodiment, the device also includes a voltage sensing unit coupled to measure a voltage drop across two of the plurality of electrodes, and current from the power source is reduced responsive to the measurement made by the sensing unit. Preferably, the power source includes a current source, and current from the current source is reduced responsive to a measurement made by the sensing unit which indicates that the electrical potential between the two electrodes is below a voltage-threshold value.

Alternatively or additionally, the device includes a resistive element coupled to one of the two electrodes and to the power source, and the voltage sensing unit is further coupled to measure a voltage drop across the resistive element in order to determine a current passing therethrough. The power source includes an alternating current source, such that the measurements of the voltage drop across the two electrodes and the current through the resistive element determine a phase shift. The current from the alternating current source is reduced responsive to the phase shift being below a threshold value.

In a preferred embodiment, the device includes:

a resistive element coupled to one of the plurality of electrodes and to the power source; and

a voltage sensing unit coupled to measure a voltage drop across the resistive element in order to determine a current passing therethrough.

In this preferred embodiment, the power source includes a voltage source, and the voltage is reduced responsive to a measurement made by the sensing unit which indicates that the current through the resistive element is above a current-threshold value.

In another preferred embodiment, at least one of the plurality of electrodes is printed directly on the skin and becomes substantially electrically nonconductive responsive to the value of the current passing therethrough being greater than a threshold value.

In yet another preferred embodiment, the device includes:

a capacitor, coupled to two of the plurality of electrodes; and

a switch, coupled to the power source and the capacitor, such that the switch, in a closed phase thereof, allows current to flow from the power source to the capacitor and to the two electrodes, and such that the switch, in an open phase thereof, substantially terminates current flow from the power source to the capacitor and to the two electrodes.

In this embodiment, the power source charges the capacitor during the closed phase, and the capacitor discharges current through the electrodes during the open phase.

Preferably, the distance between two of the plurality of electrodes is less than about 0.3 mm. Further preferably, the distance between two of the plurality of electrodes is between about 0.01 mm and about 0.1 mm.

Preferably, the plurality of electrodes include:

a common electrode, which has a plurality of perforations therethrough; and

a plurality of positive electrodes, each positive electrode passing through a respective perforation of the common electrode,

such that current from the power source flows from each positive electrode through the skin to the common electrode.

In a preferred embodiment, the power source generates alternating current, a frequency thereof being above about 100 Hz. Preferably, the frequency is between about 1 kHz and about 300 kHz. Alternatively or additionally, the power source modulates a frequency of the alternating current between a first frequency value and a second frequency value.

There is further provided, in accordance with a preferred embodiment of the present invention, a device for passing electrical current through the skin of a subject, including:

a power source, which generates the current;

a plurality of electrodes, which are applied to the skin at respective points; and

an electrically conductive dissolving element coupled to at least one of the electrodes, the element being characterized by a dissolving rate generally proportional to the current passing therethrough, and becoming substantially nonconductive responsive to a function of the current passing therethrough.

There is also provided, in accordance with a preferred embodiment of the present invention, a method for ablating the stratum corneum epidermidis of a subject, including:

placing a plurality of electrodes against the subject's skin at respective points; and

applying electrical energy between two or more of the plurality of electrodes, in order to cause ablation of the stratum corneum primarily in an area intermediate the respective points.

Preferably, skin layers beneath the stratum corneum are substantially not ablated. In a preferred embodiment, applying the electrical energy includes puncturing the skin.

Preferably, applying the energy includes ablating the area of the stratum corneum in order to allow a substance to pass through the area. Further preferably, the method includes delivering a drug or extracting an analyte through the area.

Preferably, applying electrical energy includes:

causing a current to flow through the points on the skin; and

substantially reducing the current flow through the skin responsive to variation of a characteristic of the current.

In a preferred embodiment, the characteristic is drawn from a list consisting of: a magnitude of the current; a time-integration of the current; a first time-derivative of the current; and a second time-derivative of the current.

In another preferred embodiment, causing the current to flow includes passing current to the one or more points on the skin through one or more respective limited-conduction units, wherein the units allow current below a threshold value to flow therethrough substantially unimpeded, and wherein the units become substantially nonconductive if the current flowing therethrough exceeds a limited-conduction threshold value.

In another preferred embodiment, causing the current to flow includes -passing current to the one or more points on the skin through one or more respective electrically conductive dissolving elements, each element characterized by a dissolving rate generally proportional to the current passing therethrough, and each element becoming substantially nonconductive when the total charge having passed therethrough exceeds a dissolving element threshold value.

In yet another preferred embodiment, reducing the current flow includes reducing the current at one of the respective points substantially independently of the current at another one of the respective points.



In still another preferred embodiment, reducing current flow includes:

monitoring the current flow through one of the plurality of electrodes; and

reducing the current flow through another one of the plurality of electrodes responsive thereto.

Preferably, placing the plurality of electrodes includes placing two of the plurality of electrodes at a separation therebetween that is less than about 0.3 mm. Further preferably, placing the plurality of electrodes includes placing the two of the plurality of electrodes at a separation between about 0.01 mm and about 0.1 mm.

In a preferred embodiment, placing the plurality of electrodes includes:

applying a conduction-enhancing material to an area on the surface of the subject's skin in order to enhance current flow through the skin; and

placing the electrodes on the material,

wherein the electrical resistance of the conduction-enhancing material increases responsive to a function of the current flow therethrough.

Preferably, placing the plurality of electrodes includes:

placing on the skin a common electrode which has a plurality of perforations therethrough; and

placing on the skin a plurality of positive electrodes, each positive electrode passing through a respective perforation in the common electrode,

such that current from the power source flows from each positive electrode through the skin to the common electrode.

Further preferably, the method includes positioning in a vicinity of the electrodes a medical patch containing the substance, such that ablation of the stratum corneum increases a transport rate of the substance from the patch into the skin.

In a preferred embodiment, applying electrical energy includes generating alternating current, a frequency thereof being above about 100 Hz. Preferably, the frequency is between about 1 kHz and about 300 kHz. Alternatively or additionally, applying electrical energy includes modulating a frequency of the alternating current between a first frequency value and a second frequency value.

There is additionally provided, in accordance with a preferred embodiment of the present invention, a method for passing electrical current through the skin of a subject, including:

placing a plurality of electrodes against the skin at respective points;

applying the current through the electrodes; and

coupling to at least one of the electrodes an electrically conductive dissolving element, the element being characterized by having a dissolving rate generally proportional to the current passing therethrough, and by becoming substantially nonconductive responsive to a function of the current passing therethrough.

The present invention will be more fully understood from the following detailed description of the preferred embodiments thereof, taken together with the drawings in which:

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A is a schematic, partly sectional illustration of a device for transdermal transport of a substance, in accordance with a preferred embodiment of the present invention;

FIG. 1B is a schematic, partly sectional illustration of another device for transdermal transport of a substance, in accordance with a preferred embodiment of the present invention;

FIG. **2** is a schematic bottom view of the device of FIG. **1**A, in accordance with a preferred embodiment of the present invention;

FIG. **3** is a schematic illustration of a switching unit in the device of FIG. **1**A, in accordance with a preferred embodiment of the present invention;

FIG. **4** is a schematic illustration of an electrode assembly, in accordance with a preferred embodiment of the present invention;

FIG. **5** is a schematic illustration of another electrode assembly, in accordance with a preferred embodiment of the present invention;

FIG. **6** is a schematic illustration of yet another electrode assembly, in accordance with a preferred embodiment of the present invention;

FIG. **7** is a schematic illustration of still another electrode assembly, in accordance with a preferred embodiment of the present invention;

FIGS. **8**A and **8**B are schematic illustrations of charge-limited electrode assemblies, in accordance with preferred embodiments of the present invention;

FIG. **9** is a schematic illustration of another charge-limited electrode assembly, in accordance with a preferred embodiment of the present invention;

FIG. **10** is a schematic illustration of yet another charge-limited electrode assembly, in accordance with a preferred embodiment of the present invention;

FIG. **11**A is a schematic side view of a concentric electrode assembly, in accordance with a preferred embodiment of the present invention; and

FIG. **11**B is a schematic top view of a common electrode layer in the concentric electrode assembly of FIG. **11**A, in accordance with a preferred embodiment of the present invention.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

FIG. **1**A is a schematic, partly sectional illustration of a skin puncturing device **20** for transdermal delivery of an active substance and/or transdermal extraction of an analyte, in accordance with a preferred embodiment of the present invention. Device **20** comprises a control unit **30** attached to a skin patch **40**, which is preferably fixed to a suitable area of a subject's skin **22**. Device **20** preferably administers an active substance through the normally substantially-impermeable stratum corneum layer of the skin by passing a controlled electric current therethrough, thereby ablating the stratum corneum and generating micro-channels through which the substance can pass. Alternatively or additionally, device **20** is used to generate micro-channels in the stratum corneum in order to allow passage of molecules to patch **40** from the underlying tissue, generally for diagnostic purposes.

When device **20** drives current through the stratum corneum, this tissue is heated resistively, so that when a sufficient quantity of energy has passed therethrough in a short time period, the tissue is ablated by the total energy dissipated therein. This ablation creates the desired micro-channels, i.e. physical gaps in the tissue. It has been found that application of a current to a small area of the skin leads to formation of such micro-channels, through which even large molecules can pass relatively freely, without the necessity of ionizing or polarizing the molecules, and without causing pain or substantial trauma to the dermis and epidermal tissue underlying the stratum corneum.

Control unit **30** preferably comprises a switching unit **50**, a battery **52** (such as a lithium coin cell battery), and an optional user-interface comprising buttons **54** and a sensible signal generator **56**, which may comprise a display and/or a buzzer. In a simplest embodiment, buttons **54** initialize and terminate analyte extraction or delivery of the active substance, although buttons **54** preferably also programmably control extraction or dosage rate and duration.

Patch **40** comprises two or more electrodes **60**, preferably an array **75** of electrodes, which pass current into and out of the skin. In applications of device **20** for transdermal drug delivery, when a micro-channel has formed responsive to current flow between the electrodes, the active substance stored in patch **40** flows therethrough. In the patch, the active substance is preferably stored in or applied to inter-electrode regions **68** and flows directly therefrom into the micro-channels created in the skin.

Control unit **30**, containing switching unit **50** and battery **52**, is preferably designed for repeated use, to be removably attached to disposable skin patch **40**. Before use, control unit **30** is fitted onto patch **40**, and a protective tab (not shown) on the lower surface of patch **40** is preferably removed, exposing the one or more electrodes **60**, and, in drug delivery systems, the active substance. One or more optional alignment pins **32** are preferably incorporated into control unit **30** and/or skin patch **40** to maintain proper alignment therebetween. Fitting control unit **30** to patch **40** also couples electrical contacts **62** on a lower surface of control unit **30** with electrical contacts **58** on an upper surface of skin patch **40**. In some other preferred embodiments of the present invention (not shown), control unit **30** and skin patch **40** are constructed as one integrated unit.

FIG. **1**B is a schematic, partly sectional illustration of another device **21** for transdermal transport of a substance, in accordance with a preferred embodiment of the present invention. Device **21** operates in substantially the same manner as device **20**, described hereinabove, but device **21** is preferably used in an add-on configuration with commercially available medical patches. Typically, a medical patch **74** is coupled to a porous, thin, flexible, and disposable electrode patch **70**, which is used to create micro-channels in skin **22** so as to enable enhanced flow of an active substance stored within medical patch **74** through electrode patch **70** and into skin **22**.

Electrode patch **70** is preferably constructed such that electrical contacts **58** thereof are coupled to electrical contacts **62** of control unit **30** and carry charge through flexible leads **76** and **78** internal to patch **70**, in order to create an electric field between electrodes **120** placed against the surface of skin **22**. Prior to use, medical patch **74** is placed onto electrode patch **70**, typically on the opposite side of patch **70** from electrodes **120**. An adhesive on the underside of medical patch **74** preferably secures the two patches together. Subsequently, electrode patch **70** is folded over, as shown in FIG. **1**B, such that an upper surface of patch **74** is secured through an adhesive **72** to electrode patch **70**. During operation of device **21**, the active substance preferably diffuses from the lower surface of patch **74** into, and then through, patch **70** into skin **22**. Device **21** is thus compatible with a broad range of currently available active or passive medical patches, which are typically of the same general construction (thin shell, internal reservoir of active substance, porous and adhesive-coated undersurface).

It is understood, of course, that device **21** as described is only one of many ways to implement some aspects of the present invention. Alternatively, for example, electrode

patch **70** is not folded over; instead, control unit **30** is placed next to medical patch **74** on top of electrode patch **70**. Further alternatively, control unit **30** has electrical contacts on its upper surface to which are coupled the electrical contacts of the electrical patch.

FIG. **2** is a schematic bottom view of skin patch **40** from FIG. **1A**, showing array **75** of electrodes **60**, in accordance with a preferred embodiment of the present invention. Although array **75** as shown comprises sixteen electrodes, it is understood that in some implementations the array might be smaller, while in others the array might be larger, for example 50×50 or even more, so as to enable a greater amount of the active substance to be delivered or analyte to be extracted. Electrodes **60** in this embodiment are preferably organized into eight electrode sets **77**, such that most of the charge leaving one electrode in a set goes to the other electrode in that set, and generally does not go to electrodes in an adjacent set. Electrode sets **77** are further preferably densely packed in order to maximize the transdermal transfer rate. By way of illustration and not limitation, the density may range from 4–100 electrode sets/$cm^2$. Each electrode set typically generates at least one micro-channel before a threshold of current or total charge transfer is passed, responsive to which switching unit **50** preferably causes current to the electrode set to be terminated or reduced, as described herein.

FIG. **3** is a schematic illustration of switching unit **50** in device **20** of FIG. **1A**, configured to control a 4×4 array of electrodes **60**, as in FIG. **2**, in accordance with a preferred embodiment of the present invention. Switching unit **50** preferably comprises a CPU **80** which actively controls the voltage V(t) applied to sixteen conductors **90** leading to electrodes **60**. CPU **80** monitors the current flow, I(t), through each of conductors **90** leading to electrodes **60** in order to determine whether a characteristic of the current (e.g., time-integrated current, I, dI/dt, $d^2I/dt^2$) has surpassed a threshold, indicating micro-channel formation. The CPU terminates current flow to any electrode for which the threshold has been surpassed. Alternatively or additionally, in some applications, some of electrodes **60** are generally not used to initiate channel formation, but serve primarily to allow CPU **80** and/or other circuitry to monitor electrical properties of skin **22**.

CPU **80**, which receives a clock signal from an oscillator **92**, preferably communicates with and controls electrodes **60** through eight data lines **81** and four control lines **85** which lead to an A/D-D/A converter **82**, and by five address lines **84** and four control lines **86** which lead to a multiplexing unit **88**. It will be understood by one skilled in the art that there are many methods to monitor and control current through a plurality of conductors, and that using a CPU, A/D-D/A converter and multiplexing unit as described herein is just one of these. Generally, data lines **81** carry in alternation a low byte and a high byte of data between the CPU and A/D-D/A converter **82**. Typically, 10 bits of data, representing a desired voltage for one of the sixteen electrodes, are converted to an analog voltage in A/D-D/A converter **82**, and this voltage is passed by multiplexing unit **88** to an appropriate electrode, the electrode selection being determined by the binary values represented in address lines **84**. In many applications, fewer than 10 bits are required to define voltages for the respective electrodes, and circuitry within switching unit **50** is accordingly simpler.

Intermittently, CPU **80** enters a current-sensing mode, wherein switching unit **50** continues to drive current through conductors **90**, but the CPU changes the state of control lines **85** and **86** in order to measure the current flow through conductors **90**. Responsive to the change in control lines **86**, multiplexing unit **88** measures a current through one of conductors **90**, converts this measurement to a voltage, and passes the voltage to A/D-D/A converter **82** which in turn passes the digital value representing the current to the CPU. Preferably, CPU **80** scans through each of the sixteen electrodes, detects a present current flow value, stores this value in an optional memory unit **89**, optionally compares the value with prior values for the same electrode in order to calculate $\int I(t)dt$, dI/dt and/or $d^2I/dt^2$, and regulates the potential of that electrode responsive to the current measurement and/or optional calculation. It will be understood by one skilled in the art that CPU **80**, oscillator **92**, and memory **89** could be replaced by other circuitry able to perform generally the same functions.

FIG. **4** is a schematic illustration of an electrode assembly **94**, comprising a plurality of electrodes **120**, which are placed on skin **22** in order to generate micro-channels in the stratum corneum **100**, in accordance with a preferred embodiment of the present invention. Electrodes **120** in assembly **94** are grouped in sometimes overlapping sets of two or more electrodes, forming a plurality of electrode sets **124**, one of which is indicated with a dashed line in FIG. **4**. Current, coming from switching unit **50**, generally flows from one electrode in each electrode set to the other electrodes of the set. An arrow going between the two electrodes in set **124** indicates the preferred flow of current.

Preferably, the spacing between electrodes in each electrode set is smaller than about 0.1 mm, although for some applications it may range from (by way of illustration and not limitation) 0.1 mm to about 0.3 mm. Generally, the distance is set such that an electric field penetration depth is achieved which is substantially of the same magnitude as the thickness of the stratum corneum, so that the current mostly does not enter epidermal tissue underlying the stratum corneum. Experimental results have shown that the depth of deepest ablation is generally similar to the electrode spacing, so maintaining the spacing between about 0.01 mm and about 0.1 mm optimizes generation of micro-channels while substantially reducing damage, sensation and/or pain in the innervated dermis and in the epidermal tissue below the stratum corneum.

At any point in the skin in a vicinity of two electrodes placed thereon, the electric field generated between the electrodes can be viewed as having fundamentally two components: a component perpendicular to the skin, which generally causes current flow perpendicular to the skin; and a lateral component, which generally causes current flow parallel to the skin. At a point in the skin infinitesimally below one of the electrodes, the perpendicular component is generally large and/or greater than the lateral component. The present invention seeks generally to maximize the ratio of the lateral component to the perpendicular component at the depth corresponding to the interface between the deepest portion of the stratum corneum and the most superficial portion of the remainder of the epidermis. An electric field at the base of the stratum corneum having a relatively large lateral component generates current flow predominantly in the stratum corneum, with relatively little current flow into the underlying epidermal tissue. Thus, using methods and apparatus of the present invention, tissue ablation occurs mostly in the stratum corneum, as desired, and largely does not occur in the underlying tissue.

In some applications of the embodiment shown in FIG. **4**, it is preferred to print electrodes **120** directly on skin **22**, typically (a) by stamping the electrodes thereon; (b) by employing a transfer patch of a conductive substance; and/or

(c) by other techniques known in the art. Switching unit **50** preferably sends current to the printed electrodes via printed ports (not shown) on the upper surface of the electrodes. In uses of the present invention for transdermal drug delivery, the conductive substance preferably contains an active substance, typically dissolved or suspended therein. Alternatively or additionally, it is desirable for the printed electrode to disconnect from the switching unit or power source at substantially the same time as ablation of the stratum corneum is completed. This "self-quenching" feature of the printed electrodes is typically achieved by controlling fabrication of the electrodes, in particular by regulating the thickness and/or chemical composition thereof. Printed electrodes comprising a silver-based emulsion ink preferably undergo thermal fusion within the ink responsive to high current flow, resulting in a decrease in electrical conduction therethrough.

As discussed hereinabove with reference to FIG. **3**, switching unit **50** monitors current flow to electrodes **60** (or electrodes **120**, shown in FIG. **1**B and subsequent figures), and selectively terminates the flow to one or more electrodes upon a determination that ablation of stratum corneum **100** has occurred. Making reference to FIG. **4**, a cluster **96** of electrodes is a grouping of electrodes **120**, which are typically in very close mutual proximity, and are therefore assumed to overlie an area of skin **22** which has generally uniform properties. By way of illustration and not limitation, cluster sizes generally range from about 4 $mm^2$ to about 100 $mm^2$. Switching unit **50** preferably monitors and terminates the current flow through the electrodes in cluster **96** collectively (i.e. for all of the electrodes, not individually for each electrode). Alternatively or additionally, current through electrodes **120** in cluster **96** is determined by monitoring the current in only a subset of the electrodes, and assuming the value derived therefrom to be generally representative of current through each of the other electrodes. Upon a determination by switching unit **50** that stratum corneum **100** under cluster **96** has been ablated, the current flow to all of the electrodes in cluster **96** is substantially terminated. Monitoring of clusters of electrodes generally simplifies control circuitry associated with the invention, while not substantially decreasing the performance thereof.

Optional resistive elements **98**, coupled in series between switching unit **50** and electrodes **120**, limit the power dissipation in the skin following the large increase of conductivity in the epidermis associated with ablation of the stratum corneum. Typical values for resistive elements **98** range from 1 kOhm–100 kOhms, but in some applications may have values outside of this range.

FIG. **5** is a schematic illustration of another electrode assembly **110**, comprising a current source **114** coupled to drive charge through electrodes **120** on skin **22**, in accordance with a preferred embodiment of the present invention. Current source **114** preferably comprises a source of electrical power (for example, a battery) connected in series with an inductive element which, due to pulse charging, exhibits properties of a current source, thereby limiting the power dissipated in underlying epidermal tissue **102** following the drop in resistance of the epidermis associated with substantially complete ablation of stratum corneum **100**. Alternatively or additionally, current-limited source **114** comprises active components such as transistors, op-amps, commercially-available "ideal" current sources, etc., which maintain the current through the skin generally constant after ablation of the stratum corneum, so that the power dissipated ($P=I^2R$) will decrease with the reduced resistance of the skin upon the electrical breakdown of stratum corneum **100**.



Prior to breakdown, the impedance between electrodes **120** is high, producing a generally large voltage drop therebetween, so the energy dissipated in the skin (P=VI) has a desired high value. The energy dissipation rate is preferably sufficient to cause electrical breakdown of stratum corneum **100** in a short time, which is typically less than 50 milliseconds, but may range from about 1 to about 1000 milliseconds. Reported values of the voltage needed to break down stratum corneum **100** spread over a range of approximately 5–1000 volts. For the purposes of the present invention, it has been found that an inter-electrode voltage of approximately 100 volts generally ablates stratum corneum **100** without causing significant damage to underlying tissue **102**. It is understood, however, that for some applications or types of subjects/patients, lower or higher interelectrode voltages may be more suitable.

Intermittently or continuously during application of the electric field to skin **22**, an optional voltage sensing unit **112** preferably measures the interelectrode voltage and sends a signal corresponding thereto to CPU **80** or other circuitry in switching unit **50**, which regulates the current produced by source **114** responsive to the signal. Alternatively or additionally, voltage sensing unit **112** comprises a comparator which intermittently or continuously compares the interelectrode voltage to a pre-determined threshold value, and signals source **114** when the voltage is below the threshold. In either case, the CPU, circuitry and/or comparator preferably control source **114** to reduce or terminate current flow responsive to a drop of the interelectrode voltage below the threshold value.

FIG. **6** is a schematic illustration of another electrode assembly **130**, comprising a voltage source **136** coupled in series through an optional resistive element **134** to two electrodes **120** on the surface of skin **22**, in accordance with a preferred embodiment of the present invention. Optional voltage sensing unit **112** measures the voltage drop across resistive element **134** in order to determine the current passing therethrough. In a manner substantially similar to that described hereinabove with reference to FIG. **5**, unit **112** and/or CPU **80** and/or other circuitry in switching unit **50** regulate the output of voltage source **136** responsive to the measurement made by unit **112**. Preferably, when the voltage drop across element **134** exceeds a predetermined threshold value, this is used as an indication of stratum corneum ablation and causes the voltage generated by source **136** to be reduced or terminated responsive thereto.

In applications of the embodiment shown in FIG. **6**, if optional resistive element **134** and optional voltage sensing unit **112** are not used, it is preferable to employ other means for significantly reducing the current flow through electrodes **120** after micro-channel formation. This is preferably done by using "self-quenching" printed electrodes, as described hereinabove with reference to FIG. **4**.

Alternatively or additionally, a conductivity-enhancing substance **132** is applied to skin **22** prior to placement of electrodes **120** thereon. Substance **132** typically improves current flow into skin **22** by decreasing the electrical resistance at the interface between electrodes **120** and skin **22**. Experimental results indicate that use of substance **132** has the additional desired effect of increasing the above-mentioned ratio of the lateral component of the electric field to the perpendicular component thereof. In particular, it is believed that substance **132** diffuses into stratum corneum **100** and reduces the lateral resistance and lateral breakdown strength of the stratum corneum. By virtue of the relationship $P=V^2/R$, the increased conductivity in stratum corneum **100** (prior to the breakdown thereof) deriving from the

presence of substance **132** produces a relatively high rate of energy dissipation in the stratum corneum. However, as ablation occurs, it has been observed that the enhanced conductivity path due to substance **132** is substantially removed, resulting in an increase in resistance and the desired attendant decrease in energy dissipation in the skin.

Substance **132** typically comprises a conductive cream, gel and/or ink. In some applications of this embodiment, substance **132** additionally comprises a material which has a high diffusion coefficient into the skin and promotes the increased lateral component of the electric field relative to the perpendicular component, as described hereinabove. Alternatively or additionally, "pre"-iontophoresis, using a relatively weak electric field, is used to enhance the flow of substance **132** into the outer layer of the skin before application of the stronger electric fields which create the micro-channels. The presence of the conductive substance in the skin subsequent to the pre-iontophoresis is believed to increase the rate of micro-channel creation. Pre-iontophoresis is typically implemented by applying, for example, a 3 volt DC field between the electrodes for 30 seconds in order to drive substance **132** into the skin. Alternatively or additionally, a larger AC current which produces micro-channels is supplemented by a simultaneous small DC current which supports iontophoresis of substance **132** and thereby enhances micro-channel creation.

In some applications, when micro-channels are created in order to enhance transdermal delivery of an active substance, the active substance is preferably incorporated in substance **132**.

FIG. **7** is a schematic illustration of another electrode assembly **150**, comprising an AC current source **154** coupled in series with an optional resistive element **152** in order to drive current through electrodes **120** and skin **22**, in accordance with a preferred embodiment of the present invention. It has been reported that the driving frequency of current through skin has a significant effect on the sensation or pain experienced by a subject. See, for example, *Principles of Applied Biomedical Instrumentation*, by L. Geddes and L. Baker, John Wiley & Sons, 1989, which is incorporated herein by reference. For the purposes of the present invention, a 10 kHz driving frequency has been found to yield good results, although any frequency between about 100 Hz and about 10 MHz is appropriate for most applications. Depending on properties of a subject's skin, it is sometimes appropriate to use driving frequencies outside of this range. Optionally, the driving frequency is cyclically modulated between two endpoints (e.g., 2 kHz and 15 kHz) during application of the electric field, such that a graph representing frequency versus time (not shown) is typically sinusoidal or triangular in character.

Stratum corneum **100** generally displays properties of a simple insulator when exposed to DC current, but displays significant capacitance under AC stimulation, particularly when the driving frequency is above 1 kHz. At these frequencies, current flow through the stratum corneum dissipates energy therein, contributing to the heating and ultimate ablation of the stratum corneum. The pre-ablation capacitance produces a measurable phase shift between the voltage across the electrodes and the current flowing therebetween, which phase shift is seen to be significantly reduced upon commencement and completion of the ablation of the stratum corneum. Sensing unit **112** is typically used to detect this phase shift by measuring the inter-electrode voltage, as described hereinabove, and by determining the current flow through electrodes **120**, preferably by measuring the voltage drop across optional resistive element **152**. The change of the phase shift from baseline is preferably used by sensing unit **112** and/or CPU **80** and/or other circuitry in switching unit **50** to indicate breakdown of the stratum corneum, responsive to which current flow to electrodes **120** demonstrating such a change preferably is reduced or terminated.

As described hereinabove, in some applications, substance **132** is applied to skin **22**, and a DC current is superimposed on the AC current in order to cause iontophoresis of substance **132** during micro-channel creation.

Alternatively or additionally, in applications using AC and/or DC current delivery (as in FIGS. **5**, **6** and **7**), the duration of charge delivery is limited by means of an optional ordinary timer circuit (not shown). Further alternatively or additionally, the total charge delivered (or root mean squared charge in AC operation modes) is limited using methods known in the art. For example, energy storage components such as capacitors and/or inductors can be used to modulate charge delivery.

Although in the embodiments shown in FIGS. **5**, **6**, and **7**, passing a threshold of current or voltage is used as an indicator of when to reduce the current applied to the skin, other functions of the current and/or voltage, such as derivatives, time-integrals, and/or powers thereof may also be evaluated in order to determine when the current should be reduced.

FIG. **8**A is a schematic illustration of a charge-limited electrode assembly **170**, comprising an electrolyte cell **180** connected in series between a power source **172** and electrodes **120**, in accordance with a preferred embodiment of the present invention. Electrolyte cell **180** comprises an anode **174** and a cathode **176**, both immersed in an electrolyte solution **178**, which acts as a medium for current flow from anode **174** to cathode **176**. As current flows through cell **180**, cathode **176** is steadily consumed by electrolysis until electrolyte cell **180** becomes substantially non-conductive. In this manner, consumption of cathode **176** progresses at a rate which is generally proportional to the current flowing therethrough. By modifying the initial mass of cathode **176**, cell **180** can be built to allow a flow of charge that substantially does not exceed a predetermined value.

FIG. **8**B is a schematic illustration of another charge-limited electrode assembly **190**, comprising a power source **192** which sends current to a large-area anode **194** from which it flows through an electrolyte solution **196** to multiple cathodes **202**, in accordance with a preferred embodiment of the present invention. In general, the charge-limiting functions embodied in assembly **190** are similar to those described with respect to the embodiment shown in FIG. **8**A. Anode **194** comprises a fibrous material, such as paper, having fibers aligned in a generally vertical direction, perpendicular to the surface of skin **22**. Alternatively or additionally, anode **194** is in very close proximity to cathodes **202**, typically from about 0.1 mm to about 2 mm, in order to enhance independent termination of current through electrodes **198** coupled to cathodes **202**, by reducing lateral conduction within the electrolyte solution.

FIG. **9** is a schematic illustration of yet another charge-limited electrode assembly **210**, comprising a power source **212** in series with a controlled switch **214**, in accordance with a preferred embodiment of the present invention. Source **212** and switch **214** are connected in series with a capacitor **216** across electrodes **120**, which are applied to skin **22**. Capacitor **216** is preferably utilized in order to limit the total charge delivered through electrodes **120** to gener-

ally not more than the charge-holding capacity of capacitor **216** at a designated voltage generated by source **212**, given by the formula q=CV, wherein C is the capacitance of the capacitor. By way of illustration and not limitation, for an applied voltage of 50 volts, a capacitor whose capacitance ranges from about 1 nF to about 0.2 $\mu$F is appropriate.

A typical operational sequence in this preferred embodiment comprises: (a) turning on source **212**; (b) closing switch **214**, which results in substantially all of the current from source **212** going through and charging low-impedance capacitor **216**; (c) opening switch **214** and turning off source **212**; (d) allowing the discharge from capacitor **216** to drive the ablation of the stratum corneum; and (e) passively terminating the process responsive to complete discharge of capacitor **216**.

FIG. **10** is a schematic illustration of still another charge-limited electrode assembly **220**, comprising an AC source **222** coupled in series to an electrolyte cell **230**, electrode **120**, and skin **22**, in accordance with a preferred embodiment of the present invention. Cell **230** preferably comprises two alternating nodes **226** and **236** and a common node **240**, all nodes being immersed in an electrolyte solution **232**. Except as will be described below, the function of electrolyte cell **230** is substantially similar to that of electrolytic charge-limiting devices described hereinabove with reference to FIGS. **8**A and **8**B.

AC source **222** produces a voltage difference across electrodes **120** (only one electrode is shown), which cycles between positive and negative phases at a predetermined frequency, in order to provide the energy to ablate stratum corneum **100** in skin **22**. During the positive phase, a diode **224** in electrolyte cell **230** passes current to cause alternating node **226** to act as an anode and common node **240** to act as a cathode, which is subsequently consumed by the electrolysis thereof during each positive phase. Conversely, during the negative phase, diode **224** blocks conduction through alternating node **226**, halting the consumption of common node **240** associated with the positive phase. In a similar manner, during the negative phase, a second diode **234** passes current which allows alternating node **236** to act as a cathode (which is consumed) and common node **240** to act as an anode. When a sufficient quantity of charge has passed through electrolyte cell **230**, common node **240** is completely consumed, and cell **230** becomes substantially non-conductive. Preferably, the properties of electrolyte cell **230** are determined so that the cell becomes non-conductive after passing a quantity of charge which correlates with breakdown of the stratum corneum.

Reference is now made to FIGS. **11**A and **11**B which are, respectively, a schematic side view of a concentric electrode assembly **250** and a schematic top view of a common electrode layer **252** in assembly **250**, in accordance with a preferred embodiment of the present invention. A substantially non-conductive substrate **260** overlies common electrode layer **252**. Perforations **254** in layer **252** allow passage therethrough of electrodes **262**, which receive charge through optional resistive members **256** from a charging bus **264** overlying substrate **260**. Electrodes **262**, which preferably comprise a plurality of conductive fibers, are electrically coupled to skin **22**, and cause charge to pass into skin **22** and subsequently out of skin **22** through common electrode layer **252**, in order to ablate stratum corneum **100**.

In some preferred applications, one or more pores **266** traversing substrate **260** allow flow of active substances/analytes through substrate **260** from/to a reservoir (not shown) above substrate **260**. It is noted that fabrication of concentric electrode assembly **250** is substantially similar to the process of flexible printed circuit production, which is well known in the art.

It will be appreciated generally that the preferred embodiments described above are cited by way of example, and the full scope of the invention is limited only by the claims.

What is claimed is:

**1**. A method for ablating stratum corneum epidermidis of a subject, comprising:

applying electrical energy between points on the skin, so as to cause ablation of an area of the stratum corneum during a first time period; and

applying a drug to the ablated area during a second time period, subsequent to the first time period, so that passage of the drug through the stratum corneum is facilitated by the ablation.

**2**. A method according to claim **1**, wherein applying the electrical energy comprises applying the energy for less than about 1 second.

**3**. A method according to claim **2**, wherein applying the electrical energy comprises applying the energy for less than about 200 milliseconds.

**4**. A method for ablating stratum corneum epidermidis of a subject, comprising:

applying electrical energy between points on the skin, so as to cause ablation of an area of the stratum corneum during a first time period; and

extracting an analyte through the ablated area during a second time period, subsequent to the first time period, so that passage of the analyte through the stratum corneum is facilitated by the ablation.

**5**. A method according to claim **4**, wherein applying the electrical energy comprises applying the energy for less than about 1 second.

**6**. A method according to claim **5**, wherein applying the electrical energy comprises applying the energy for less than about 200 milliseconds.

**7**. A method for passing electrical current through the skin of a subject, comprising:

placing a plurality of electrodes against the skin at respective points;

applying the current through the electrodes; and

coupling to at least one of the electrodes an electrically conductive dissolving element, the element being characterized by having a dissolving rate generally proportional to the current passing therethrough, and by becoming substantially nonconductive responsive to a function of the current passing therethrough.

**8**. A method for ablating stratum corneum epidermidis of skin of a subject, comprising applying electrical energy to the skin of the subject between points on the skin which are spaced less than 0.3 mm apart, so as to cause ablation of the stratum corneum.

**9**. A method according to claim **8**, wherein applying the energy between the two points comprises applying the energy between points on the skin which are spaced about 001–0.1 mm apart.

**10**. A method for ablating the stratum corneum epidermidis of a subject, comprising:

placing a plurality of electrodes against the subject's skin at respective points; and

applying electrical energy to the plurality of the electrodes so as to induce an electrical current to flow through the stratum corneum, causing ablation of narrow channels through the stratum corneum at the respective points.

**11**. A method according to claim **10**, wherein placing the plurality of the electrodes comprises placing at least one set of two or more electrodes against the skin, and wherein applying the electrical energy comprises inducing the current to flow between the electrodes in the at least one set.

**12**. A method according to claim **10**, wherein placing the plurality of the electrodes comprises placing a common electrode and a plurality of individual electrodes against the skin, and wherein applying the electrical energy comprises inducing the current to flow between the plurality of individual electrodes and the common electrode.

**13**. A method according to claim **10**, wherein applying the energy comprises ablating the area of the stratum corneum in order to allow a substance to pass through the area.

**14**. A method according to claim **13**, wherein placing the plurality of electrodes comprises placing an array of the electrodes against the skin, wherein a density of the electrodes in the array is determined responsive to a desired transdermal transfer rate of the substance.

**15**. A method according to claim **13**, and comprising delivering a drug through the area.

**16**. A method according to claim **13**, and comprising extracting an analyte through the area.

**17**. A method according to claim **10**, wherein skin layers beneath the stratum corneum are substantially not ablated.

**18**. A method according to claim **10**, wherein applying the electrical energy comprises puncturing the skin.

**19**. A method according to claim **10**, wherein applying electrical energy comprises:

causing a current to flow through the points on the skin; and

substantially reducing the current flow through the skin responsive to variation of a characteristic of the current.

**20**. A method according to claim **19**, wherein the characteristic is drawn from a list consisting of: a magnitude of the current; a time-integration of the current; a first time-derivative of the current; and a second time-derivative of the current.

**21**. A method according to claim **19**, wherein causing the current to flow comprises passing current to the one or more points on the skin through one or more respective limited-conduction units, wherein the units allow current below a threshold value to flow therethrough substantially unimpeded, and wherein the units become substantially nonconductive if the current flowing therethrough exceeds a limited-conduction threshold value.

**22**. A method according to claim **19**, wherein causing the current to flow comprises passing current to the one or more points on the skin through one or more respective electrically conductive dissolving elements, each element characterized by a dissolving rate generally proportional to the current passing therethrough, and becoming substantially nonconductive when the total charge having passed therethrough exceeds a dissolving element threshold value.



**23**. A method according to claim **19**, wherein reducing the current flow comprises reducing the current at one of the respective points substantially independently of the current at another one of the respective points.

**24**. A method according to claim **19**, wherein reducing current flow comprises:

monitoring the current flow through one of the plurality of electrodes; and

reducing the current flow through another one of the plurality of electrodes responsive thereto.

**25**. A method according to claim **10**, wherein applying electrical energy comprises generating alternating current, a frequency thereof being above about 100 Hz.

**26**. A method according to claim **25**, wherein the frequency is between about 1 kHz and about 300 kHz.

**27**. A method according to claim **10**, wherein applying electrical energy comprises generating alternating current and modulating a frequency thereof between a first frequency value and a second frequency value.

**28**. A method according to claim **10**, wherein placing the plurality of electrodes comprises placing two of the plurality of electrodes at a separation therebetween that is less than about 0.3 mm.

**29**. A method according to claim **28**, wherein placing the plurality of electrodes comprises placing the two of the plurality of electrodes at a separation between about 0.01 mm and about 0.1 mm.

**30**. A method according to claim **10**, wherein placing the plurality of electrodes comprises:

applying a conduction-enhancing material to an area on the surface of the subject's skin in order to enhance current flow through the skin; and

placing the electrodes on the material,

wherein the electrical resistance of the conduction-enhancing material increases responsive to a function of the current flow therethrough.

**31**. A method according to claim **10**, wherein placing the plurality of electrodes comprises:

placing on the skin a common electrode which has a plurality of perforations therethrough; and

placing on the skin a plurality of positive electrodes, each positive electrode passing through a respective perforation in the common electrode,

such that current from the power source flows from each positive electrode through the skin to the common electrode.

**32**. A method according to claim **10**, and comprising positioning in a vicinity of the electrodes a medical patch containing the substance, such that ablation of the stratum corneum increases a transport rate of the substance from the patch into the skin.

* * * * *

US008496654B2

(12) **United States Patent**
**Adanny et al.**

(10) **Patent No.: US 8,496,654 B2**
(45) **Date of Patent: Jul. 30, 2013**

(54) **METHOD AND APPARATUS FOR FRACTIONAL SKIN TREATMENT**

(71) Applicants: **Yossef Ori Adanny**, Mitzpe (IL); **Genady Nahshon**, Binyamina (IL); **Baruch Levine**, Afula (IL); **Avner Rosenberg**, Beit-Shearim (IL)

(72) Inventors: **Yossef Ori Adanny**, Mitzpe (IL); **Genady Nahshon**, Binyamina (IL); **Baruch Levine**, Afula (IL); **Avner Rosenberg**, Beit-Shearim (IL)

(73) Assignee: **Syneron Medical Ltd.**, Yoqneam Illit (IL)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/682,116**

(22) Filed: **Nov. 20, 2012**

(65) **Prior Publication Data**

US 2013/0079766 A1 Mar. 28, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/505,576, filed on Jul. 20, 2009, now Pat. No. 8,357,150.

(51) **Int. Cl.**
*A61B 18/14* (2006.01)

(52) **U.S. Cl.**
USPC .................................. **606/41**; 606/50; 606/34

(58) **Field of Classification Search**
USPC .......................................... 606/32–35, 41–50
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 4,200,104 | A * | 4/1980 | Harris | 606/35 |
| 4,844,063 | A | 7/1989 | Clark | |
| 5,319,363 | A | 6/1994 | Welch et al. | |
| 5,383,874 | A * | 1/1995 | Jackson et al. | 606/1 |
| 5,681,282 | A | 10/1997 | Eggers et al. | |
| 5,755,753 | A | 5/1998 | Knowlton | |
| 5,873,855 | A | 2/1999 | Eggers et al. | |
| 6,148,232 | A | 11/2000 | Avrahami | |
| 6,413,255 | B1 | 7/2002 | Stern | |
| 6,440,121 | B1 | 8/2002 | Weber et al. | |
| 6,597,946 | B2 | 7/2003 | Avrahami et al. | |
| 6,611,706 | B2 | 8/2003 | Avrahami et al. | |
| 6,702,808 | B1 | 3/2004 | Kreindel | |
| 6,708,060 | B1 | 3/2004 | Avrahami et al. | |
| 7,022,121 | B2 | 4/2006 | Stern et al. | |
| 7,164,942 | B2 | 1/2007 | Avrahami et al. | |
| 7,435,247 | B2 | 10/2008 | Woloszko et al. | |
| 7,494,488 | B2 | 2/2009 | Weber | |
| 8,216,215 | B2 | 7/2012 | Flyash et al. | |
| 2004/0210214 | A1 | 10/2004 | Knowlton | |
| 2007/0191827 | A1 | 8/2007 | Lischinsky et al. | |
| 2008/0188846 | A1 * | 8/2008 | Palanker et al. | 606/32 |
| 2008/0214988 | A1 | 9/2008 | Altshuler et al. | |
| 2009/0054743 | A1 | 2/2009 | Stewart | |
| 2009/0105706 | A1 | 4/2009 | Livneh | |

* cited by examiner

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0569670 | A2 | 11/1993 |
| EP | 1852060 | A1 | 11/2007 |

OTHER PUBLICATIONS

Guidelines for Limiting Exposure to Time-Varying Electric, Magnetic, and Electromagnetic Fields (Up to 300 GHz), International Commission on Non-Ionizing Radiation Protection, ICNIRP Guidelines, Apr. 1998, vol. 74, No. 4, pp. 496-522.


*Primary Examiner* — Michael Peffley
(74) *Attorney, Agent, or Firm* — Finnegan, Henderson, Farabow, Garrett & Dunner, LLP

(57) **ABSTRACT**

An apparatus for cosmetic RF skin treatment where the RF energy supply is isolated from the patient treated, such that in course of treatment no undesired current flows through the subject body.

**30 Claims, 7 Drawing Sheets**






Fig. 1A

VIEW - A




Fig. 1B




Fig. 2




Fig. 3A




Fig. 3B




Fig. 3C


200
224
408
212
320,
324
420
424
404
216
412
204
432

Fig. 4


200
224
408
212
502
320,
324
216
420
424
404
504
412
204
432

Fig. 5


Subject resistance
2400
2100
1800
1500
1200
900
600
300
602
610
606
614
Time

Fig. 6




Fig. 7




Fig. 8

# METHOD AND APPARATUS FOR FRACTIONAL SKIN TREATMENT

## CROSS-REFERENCE TO RELATED REFERENCES

This application is a continuation of U.S. application Ser. No. 12/505,576, filed on Jul. 20, 2009, now issued as U.S. Pat. No. 8,357,150, which is incorporated herein by reference. This application is related to U.S. application Ser. No. 12/324,932, filed Nov. 28, 2010, now issued as U.S. Pat. No. 8,216,215, which is incorporated herein by reference.

## TECHNOLOGY FIELD

The method and apparatus generally relate to skin treatment procedures and in particular to cosmetic skin resurfacing and rejuvenation procedures.

## BACKGROUND

Fractional skin resurfacing or rejuvenation is a recently developed skin ablative technology. There are two types of devices used to ablate the skin: laser based devices and RF based devices. Both types of these devices ablate a pattern of extremely small diameter shallow holes or zones. The holes are microscopically small treatment zones surrounded by untreated skin areas. The treatment results in a very rapid healing or recovery and skin resurfacing of the treated. In the healing process of the treated zones, a layer of new skin appears, restoring a fresh, youthful complexion.

The pattern of small holes is typically produced by an X-Y scanning laser beam or by application of RF energy or voltage. The laser is focused on the skin and usually operates in pulse mode ablating micron size holes in the skin.

RF based fractional skin treatment produces a scanning pattern of micron size holes in the skin a similar to laser. Typically, the energy is delivered to the skin by an applicator equipped by a tip having a plurality of voltage to skin applying/delivering elements or contact elements arranged in a matrix or in an array. The voltage to skin applying elements are placed in contact with the segment of the skin to be treated and driven by a source of suitable power and frequency RF energy. Application of a high voltage RF pulse to the electrodes ablates the skin under the respective electrode forming a small hole.

In some instances application of laser or RF voltage pulses causes discomfort and even pain to the treated subject, although the experience based on the individual and as such, the pain sensation may be different from subject to subject. In other instances there may be a difference in the size of micro holes formed by the applicator at the same treatment session. Healing of larger size holes may take a longer period of time than the healing process for smaller size holes and in some instances, the larger holes may tend to result in causing damage to the skin rather than producing the desired skin effect.

In order to soften the discomfort and lessen the pain and other side effects associated with the fractional treatment, practitioners have started using topically applied lidocaine cream or even oral sedation.

Fractional skin treatment is applicable in the correction of almost all cosmetic skin defects such as signs of aging, wrinkles, discolorations, acne scars, tattoo removal, and other skin defects. The cost of the RF based products is lower than that of the products operating with laser radiation and they will most probably become widely used if the discomfort and occasional pain associated with their use could be eliminated.

US Patent Application Publication No. 2006/0047281 and U.S. patent application Ser. No. 12/324,932 to the same assignee disclose RF based products such as eMatrix™ suitable for fractional skin treatment.

## GLOSSARY

In the context of the present disclosure "RF voltage" and "RF energy" are used interchangeably and have the same meaning. The mathematical relationship between these two parameters is well known and knowledge of one of them allows easy determination of the other.

In the context of the present disclosure "skin resistance" and "skin impedance" are used interchangeably and have the same meaning. The mathematical relation between these two parameters is well known and knowledge of one of them allows easy determination of the other.

The term "desired skin effect" as used in the present disclosure means a result of RF energy application, which may be wrinkle removal, hair removal, collagen shrinking or destruction, skin rejuvenation, and other cosmetic and skin treatments.

The term "plateau" of a function is a part of its domain where the function has constant value.

## BRIEF SUMMARY

An apparatus for cosmetic RF skin treatment where the RF energy supply is isolated from the subject treated, such that in course of treatment no undesired current flows through the subject body. The apparatus includes an applicator with a tip that is populated by a plurality of voltage applying dome shaped elements protruding from the tip surface and organized in one common cluster and a cluster of electrodes bounding the dome shaped elements and having an area larger than the dome shaped elements have. The apparatus applies voltage to the elements with a magnitude sufficient to cause a desired skin effect. A current limiter limits the RF induced current thereby preventing skin damage. The apparatus continuously senses the treated skin segment impedance and varies the RF energy at a low skin impedance and/or stops the pulse in cases of too low or too high skin impedance.

## BRIEF DESCRIPTION OF THE FIGURES

FIGS. **1**A and **1**B, collectively referred to as FIG. **1**, are schematic illustrations of a prior art RF applicator tip for fractional skin treatment.

FIG. **2** is a schematic illustration of a prior art RF voltage supplying circuit for driving the RF applicator tip for fractional skin treatment.

FIGS. **3**A through **3**C are schematic illustrations of an equivalent electric circuit of the tip for fractional skin treatment.

FIG. **4** is a schematic illustration of an exemplary embodiment of the present tip for fractional skin treatment driving circuit.

FIG. **5** is a schematic illustration of another exemplary embodiment of the present tip for fractional skin treatment driving circuit.

FIG. **6** is a schematic illustration of skin resistance variation under the application of an RF energy pulse.

FIG. **7** is a schematic illustration of an exemplary embodiment of the present tip for fractional skin treatment control circuit.

FIG. **8** is a schematic illustration of an exemplary embodiment of the present RF applicator tip for fractional skin treatment.

## DETAILED DESCRIPTION OF EXEMPLARY EMBODIMENTS

The principles and execution of the method and the apparatus may be better understood with reference to the drawings and the accompanying description of the non-limiting, exemplary embodiments, shown in the Figures.

Reference is made to FIG. **1**, which is a schematic illustration of a prior art RF applicator tip for fractional skin treatment disclosed in the U.S. patent application Ser. No. 12/324,932 to the same assignee. A carrier **100** on which voltage to skin delivering elements or contact elements are formed may be a flexible or rigid article made of a polyimide film or similar material, with an exemplary thickness range of 0.5 mil to 6 mil (12.5 micron to 150 micron). The term "carrier" in the context of the present disclosure means a substrate having an array of voltage to skin application elements, a two dimensional array or matrix of voltage to skin application elements. Substrate **104** has on one of its surfaces **112** an array or matrix of miniature (microscopic), discrete, voltage to skin application elements **116** protruding from surface **112** and terminated by dome type shapes **120**. A pattern of conductors **124** and **128** shown in broken lines arranged on the back or second side of substrate **104** enables addressing of all elements **116**, a cluster of elements **116**, or each of elements **116** individually. Carrier **100**, having formed on it, the voltage to skin delivering elements is configured to allow quick attachment to an applicator and will be termed in the present document as a "tip" or an "applicator tip." An arrangement of RF contacts enabling connection to a source of radio frequency voltage is provided by forming on the back side of the carrier **104** contact points or strips **108** communicating with respective contact arrangements made in substrate **104**. Voltage to skin delivering elements **116** are arranged in a symmetric pattern with all even rows **124** connected to one of the RF supply contact strips or ports **124** and all uneven rows **128** connected to another or second contact strip or RF supply port **128**.

FIG. **2** is a schematic illustration of a prior art RF voltage supplying circuit for driving the RF applicator tip for fractional skin treatment. A source of RF voltage **200** may be located in stand alone housing **204**. Alternatively, the source of the RF voltage may be located in the applicator case **208** shown in broken lines. The source provides RF voltage to applicator tip **212**, and in particular to voltage to skin delivering elements **216** through a shielded harness **220**. Shield **224** is schematically shown in broken and doted lines. The length of the harness **220** is selected to enable convenient caregiver operation and may be one to two meters long, for example. There exists a certain parasitic capacitance **232** and **236** between the shield **224** and each of the RF current conducting lines **240** and **244**. The treated subject has also certain capacitance **248**. For skin treatment, tip **212** is placed in contact with a segment of the skin **228** to be treated. As a result of uneven contact of the voltage to skin delivering elements **216** organized into even **124** and uneven **128** rows or clusters with segment of the skin **228** to be treated, an undesired RF current path **252** may be formed. This current passes through the subject **228** and may cause a painful sensation and even an electric shock to the subject.

FIG. **3** is a schematic illustration of an equivalent electric circuit of the tip for fractional skin treatment **212** being in contact with the treated segment of the skin. FIG. **3**A schematically shows the tip **212** with all contact elements **330** located in uneven rows **1**, **3**, **5**, and **7** of the tip **212** collectively marked as **302** and shown as connected to a first RF port of RF voltage source **306** and all contact elements located in even rows **2**, **4**, **6**, and **8** collectively marked as **310** and shown as connected to a second RF port of RF voltage source **306**. All of the contact elements are in contact with the upper skin layer **320** for example, stratum corneum which has a relatively low conductivity, where numeral **324** marks dermis layer and even deeper skin layers that have a relatively high, as compared to stratum corneum, conductivity.

Referring to FIG. **3**B, the electrical channel from each contact element through the low conductance skin layer is represented as a resistor (for the simplicity of the explanation channel capacitance is neglected). The high conductivity dermis is represented as a common resistor Rs. Further equivalent electric scheme simplification is shown in FIG. **3**C, where all uneven resistors have been replaced by an equivalent resistor Ru and even rows resistors by Re. Typically, each of the individual contact element resistors is 50K-100K Ohms, therefore Ru and Re are about 2K Ohms each, whereas Rs is an order of magnitude smaller, about 200 Ohms and it can be neglected for the purpose of the discussion.

Because not all of the voltage to skin delivering elements or contact elements **330** (FIG. **3**A) may be properly attached to the skin and some of them may bear some dirt and other residuals from the previous treatment, and different skin segments may have different resistance, there is a difference in the resistance to current passing through each of the contact elements and accordingly through the clusters (even or uneven clusters) they form. If the RF voltage or energy flows into any of the Ru or Re resistors, it increases its resistance it generates a positive feedback under which the larger resistor gets more energy than the smaller one, its resistance increases more rapidly, therefore it gets even more energy, and so on. The end result is that the one of Ru or Re clusters, which had initially greater value finally takes most of the energy and leaves a different imprint on the skin (for example, only contact elements located in even or uneven rows may leave an imprint). This reduces the efficacy of the treatment and generates undesired skin effects, excessive pain, and even electric shock.

In order to resolve this problem, as disclosed in the U.S. patent application Ser. No. 12/324,932 assigned to the same assignee, it is possible to address individually each contact element or pin and connect it to the source of voltage through a large impedance, which can be a resistor, a small capacitor, a large inductor, or a combinations of all of them. This would stabilize the RF induced current to each individual channel reducing the "competition" between the contact elements and clusters of contact elements. For sterilization and hygiene purposes use of disposable tips is preferred to the use of reusable tips. Addressing of each individual contact element however, complicates and increases manufacturing cost of such tips.

Another way to equalize the resistance or impedance of each contact element and reduce the pain sensation and potential electric shocks to the treated subject is to bring the skin by some initial treatment to an optimal and more uniform resistance value, which for example may be about 3000 Ohms. There will always be however, segments of skin where the resistance is low and any slight sweating may drive the skin to lower impedances.

FIG. **4** is a schematic illustration of an exemplary embodiment of the present tip driving circuit. The embodiment of FIG. **4** eliminates or at least, greatly reduces the pain sensation and electric shock that could affect the treated subject. A low capacitance for example, 4 pF to 10 pF isolating trans-

former **404** is located in close proximity to the tip **212** with the voltage to skin delivering elements **216**. In the course of operation, transformer **404** reduces or completely eliminates currents flowing through the subject body due to parasitic capacitances **408** and **412** formed by the subject skin **320**, **324** and the ground and between the shield **224** and each of the RF conducting lines **420** and **424**. A controller **432** governing operation of all of the apparatus devices may be located in housing **204**. Controller **432** may have a processor, a memory, and other devices necessary for controlling the treatment process.

FIG. **5** is a schematic illustration of an additional exemplary embodiment of the present tip **212** driving circuit that eliminates, or greatly reduces, pain sensation and electric shock that could affect the treated subject. In addition to the low capacitance transformer **404** one or more capacitors **502** and **504** located in the current path and connected in series to the electrodes **216** form a high pass filter. In the course of apparatus operation, the high pass filter filters out the low frequency currents, to which the sensitivity of the treated subject is high, generated by plasma formed at the voltage to skin delivering elements **216** being in contact with the skin **320**, **324** and flowing through the subject body in course of the apparatus/applicator operation. (reference can be made to Guidelines for Limiting Exposure to Time-Varying Electric, Magnetic, and Electromagnetic Fields up to 300 GHz; International Commission on Non-Ionizing Radiation Protection, Page 10.

Electrical resistance of skin differs from subject to subject and complicates proper RF energy value selection and application of the RF energy for cosmetic skin treatment. Further to this, resistance of the subject may vary under application of RF energy. FIG. **6** is a schematic illustration of skin resistance variation under the application of RF energy in a pulse mode. Lines **602** and **606** mark different skin behavior under an RF energy pulse and lines **610** and **614** mark the upper and lower skin resistance or impedance values that result in a desired skin effect, although because of the large variability of the treated subjects skin properties, there may be a need to set experimentally other values matching a particular subject properties. The length of the pulse, as will be explained later, may vary from few milliseconds to hundreds of milliseconds or even seconds.

In order to establish proper treatment parameters prior to the treatment, a system operator or user can calibrate the apparatus and operational treatment parameters derived as a result of the calibration are loaded into a look-up-table (LUT) that may be stored in the memory of the controller **432**. For the purpose of calibration, a known variable resistance modeling the subject and the tip behavior is connected instead of a subject to the RF voltage supply. In one of the calibrations, a current flowing in the circuit at different RF voltages and different resistance value is recorded and in another calibration the RF energy applied to the variable resistance, modeling different skin impedance is recorded.

When skin is wet its resistance is low and with the application of the RF energy it continues to fall (line **606**). Without being bound by a specific theory it is believed that most of the RF energy applied to the skin is initially wasted to dry the skin and when the skin under the influence of RF energy becomes dry, the skin resistance begins growing to higher values. Resistance increase is believed to be connected with vaporization, accompanied or followed by tissue ablation. It is considered a good treatment (desired skin effect) when ablation is created in the tissue below the electrodes.

It has been experimentally established that treatment resulting in a desired skin effect takes place when the resistance of the subject's skin is between Rlow and Rhigh, where the specific values depend on the number of electrodes in the tip and their arrangement and on the skin properties. For a typical tip shown in FIG. **1**, with 64 electrodes and a diameter of 250 μm each, Rlow is about 1500 Ohms and Rhigh is about 4000 Ohms. For the asymmetrical tip of FIG. **8**, Rlow is about 600 Ohms and Rhigh is about 1600 Ohms. When the skin resistance (or impedance) falls below the lower limit, most of the RF energy applied to the skin is wasted on drying the skin and not on causing the desired skin effect. Generally, the upper skin resistance limit is in the vicinity of the stratum corneum resistance with the lower limit corresponding to wet skin. When the skin resistance is within the indicated resistance limits, as shown by broken lines **610** and **614**, application of RF to the skin through the voltage to skin delivering elements results in a desired skin effect. Continuous or pseudo continuous monitoring of the skin impedance during the RF pulse enables control of the energy delivered to skin. For example, when the resistance falls below the pre-set threshold of e.g. 600 Ohms, the time of the RF pulse may be increased by the control, until the control unit identifies or detects the beginning of an increase in the resistance. From the time that the beginning of the resistance increase is detected, the amount of energy delivered is either fixed or it takes into consideration the energy delivered up to that point, thereby allowing or ensuring the proper skin effect. It is also possible to cut off the RF pulses when the skin impedance is below a pre-set impedance or resistance value and notify operator, to exclude inefficient pulses. Another possibility is to notifying the operator on the low value of skin resistance and the need to dry out the skin. It is also possible to set the apparatus to deliver a pre-set amount of energy to the skin.

It is possible to generalize the skin behavior under an RF pulse into at least two typical cases, although a mixture of these cases and other skin behavior may be present: a) skin resistance remains high through all of the RF pulse application time and b) skin resistance drops down below the lower resistance limit and after it reaches (the function reaches) a plateau it begins to rise. Accordingly, by monitoring the current flowing in the voltage to skin delivering elements circuit, it is possible to set proper treatment parameters resulting in a desired skin effect and not causing adverse side effects such as pain, burnings and other. It was found that resistances above Rhigh correspond to dirty tip and/or are caused by improper attachment of the tip to the skin. In both cases, the pulses may cause undesired pain. In order to reduce the pain, current limiter **704** (FIG. **7**) or a control system immediately cuts the pulse when the resistance is above a certain pre-set threshold. The control will notify the operator to check proper attachment of the tip to skin and/or clean the tip.

FIG. **7** is a schematic illustration of another exemplary embodiment of the present tip for fractional skin treatment driving circuit that eliminates pain sensation and electric shock that could affect the treated subject. A sensing element **700** senses the current flowing in the immediate to the tip for fractional skin treatment circuit. The sensing and sampling may be continuous or performed at very short time intervals, for example every few tens of a microsecond. A fast response RF induced current limiter **704** in course of operation sets a maximum to the current which flows into the skin. Immediately, with the current increase above a pre-set value, it operates a fast switch **708** that closes the circuit directing the current to an energy absorbing element **712**, which dissipates the excessive energy as heat. The RF energy absorbing element **712** may be packaged or even be a part of current limiter **704**. The switch may be a bi-polar transistor, a MOSFET switch, an IGBT switch or any other fast switch. If the switch

is operated in the analogue regime, it can stabilize the current to the pre-set maximum value or below that value. The energy absorbing element **712** may be a bank of resistors, bridge of diodes or similar devices. This protects the subject from electric shock, skin burn, and other potential treatment side effects.

FIG. **1** illustrates a prior art tip, which is basically a symmetrical tip including even and uneven arrays of electrodes. FIG. **8** is a schematic illustration of an exemplary embodiment of the present RF applicator tip for fractional skin treatment that eliminates or significantly reduces the "competition" between the tip electrodes. Although the tip **800** is for a bi-polar treatment, it is an asymmetrical tip. Tip **800** has one or more (a cluster) large "ground" electrodes **804** located in the peripheral area of substrate **808** and connected to one RF output port. All of the miniature discrete, voltage to skin application elements **812** protruding from the substrate surface and terminated by dome type shapes are connected together to the other port of the RF output transformer. The particular tip has 64 elements, although other designs with different number of elements are possible. The further advantage of this solution is that the resistance variations may be more obvious since there is no competition between the electrodes located in the even and uneven contact strips, thus preventing the undesired partial imprint on the skin and the accompanied pain. The area of the voltage to skin application elements **804** is substantially larger than the area of the terminated by dome type shapes elements **812**. Tip **800** possesses a mechanism **820** enabling quick removal and attachment of the tip to the applicator and RF voltage connection elements (not shown).

The electric scheme and the tip structure disclosed above eliminate electrical shock feeling, reduce or eliminate the pain associated with the treatment and increase the treatment efficacy. The isolating transformer is located very close to the application tip to reduce ground currents through parasitic capacitance. Series capacitors located in the path to the electrodes filter out low frequency currents which are produced by plasma formed at the electrodes and fast current limiter sets a maximum to the current which flows into the skin.

Typical operating parameters of the apparatus are:

Voltage on high impedance load: 850 Vp-p

Current: 50-400 mA

Pulse length: 10-150 msec

Energy per pulse (Actual energy delivered to the skin): 0.5-4 J, more typical 1-2 J.

Frequency of the RF: 1 MHz, although 100 kHz up to 10 MHz may be considered.

Typical control parameters for the asymmetrical tip, 64 pins, 250 microns each:

High resistance limit for cutting of pulses for pain reduction: >1600 Ohms (for 64 pins asymmetrical tip)

Low resistance limit for cutting low efficiency pulses: <200 Ohms (for 64 pins asymmetrical tip)

Range of resistance where control adds energy to dry the skin: 200-600 Ohms (for 64 pins asymmetrical tip)

We claim:

**1**. A skin treatment device, comprising:

an applicator tip;

a ground electrode arranged on the applicator tip, the ground electrode being configured for contacting epidermis of skin of a patient and being further configured for connection to a circuit for delivering RF energy to the skin, the ground electrode having a ground electrode surface area; and

a plurality of RF application elements arranged on the applicator tip, the RF application elements having a combined application element surface area substantially smaller than the ground electrode surface area, wherein the plurality of RF application elements are configured for connection to the circuit for delivering RF energy to the skin,

wherein the plurality of RF application elements are free of any ground electrode therebetween.



**2**. The skin treatment device of claim **1**, wherein the plurality of RF application elements are arranged in a cluster of a plurality of rows and a plurality of columns on the applicator tip, and wherein the ground electrode is arranged on one side of a periphery of the cluster, segregated from the plurality of rows and columns with a gap between the ground electrode and the cluster.

**3**. The skin treatment device of claim **2**, further comprising at least one additional ground electrode, the at least one additional ground electrode arranged at the periphery of the cluster of RF application elements, segregated from the plurality of rows and columns with a gap between the additional ground electrode and the cluster, and wherein a combined ground electrode surface area of the ground electrode and the at least one additional ground electrode is substantially greater than the combined application element surface area of the plurality of RF application elements.

**4**. The skin treatment device of claim **3**, wherein the cluster of RF application elements are arranged between at least two ground electrodes.

**5**. The skin treatment device of claim **3**, wherein the at least one additional ground electrode includes a plurality of additional ground electrodes arranged on the applicator tip in a manner at least partially surrounding the cluster of RF application elements.

**6**. The skin treatment device of claim **5**, wherein a total of at least four ground electrodes are arranged about the cluster of RF application elements.

**7**. The skin treatment device of claim **1**, wherein the plurality of RF application elements are electrically connected to a first RF port.

**8**. The skin treatment device of claim **1**, wherein the plurality of RF application elements are arranged relative to the ground electrode in a manner to reduce competition between the RF electrodes.

**9**. The skin treatment device of claim **1**, wherein the plurality of RF application elements include at least 64 RF application elements.

**10**. The skin treatment device of claim **1**, wherein the ground electrode and the plurality of RF application elements are arranged on a common substrate.

**11**. The skin treatment device of claim **1**, wherein the circuit in which the RF application elements and the ground electrode are configured to be arranged includes an isolating transformer configured to reduce ground currents.

**12**. The skin treatment device of claim **11**, wherein the circuit in which the RF application elements and the ground electrode are configured to be arranged further includes a capacitor serially connected between the isolating transformer and the plurality of RF application elements.

**13**. The skin treatment device of claim **1**, wherein the circuit in which the RF application elements and the ground electrode are configured to be arranged further includes an RF energy absorbing element configured to limit an amount of current flowing into skin.

**14**. The skin treatment device of claim **1**, further including a connector for enabling removable attachment of the applicator tip to a source of the RF energy.

15. The skin treatment device of claim 1, wherein each of the plurality of RF application elements includes a rounded distal end configured for contacting the epidermis of skin.

16. The skin treatment device of claim 1, wherein the plurality of RF application elements are arranged in a cluster of a plurality of rows and a plurality of columns, and the ground electrode is elongated and extends along at least a portion of a peripheral edge of the cluster, with a gap between the elongated ground electrode and the peripheral edge of the cluster.

17. The skin treatment device of claim 16, wherein the plurality of RF application elements and the ground electrode are arranged in a generally rectangular shape.

18. The skin treatment device of claim 1, wherein a diameter of each of the plurality of RF application elements is on an order of 250 μm and configured to cause both coagulation and ablation of the skin.

19. A skin treatment device, comprising:

an applicator tip;

a plurality of ground electrodes arranged on the applicator tip, the ground electrodes being configured for contacting epidermis of skin of a patient and being further configured for connection to a circuit for delivering RF energy to the skin; and

a plurality of RF application elements arranged in a cluster on the applicator tip between the plurality of ground electrodes, wherein the plurality of RF application elements are configured for connection to the circuit for delivering RF energy to the skin,

wherein the plurality of RF application elements in the cluster are free of any ground electrode therebetween.

20. The skin treatment device of claim 19, wherein the plurality of ground electrodes have a ground electrode surface area, and wherein the RF application elements have an application surface area substantially smaller than the ground electrode surface area.

21. The skin treatment device of claim 19, wherein the ground electrode is elongated and extends along at least a portion of a peripheral edge of the cluster of RF application elements, with a gap between the elongated ground electrode and the peripheral edge of the cluster.

22. The skin treatment device of claim 19, wherein the plurality of ground electrodes include four ground electrodes



arranged on the applicator tip in a manner at least partially surrounding the cluster of RF application elements.

23. The skin treatment device of claim 19, wherein the plurality of ground electrodes and the RF application elements are arranged on the tip in a generally rectangular shape.

24. A skin treatment device, comprising:

a housing; and

at least one processor within the housing and configured to control RF energy supplied to an RF applicator tip having at least one ground electrode and a plurality of RF application elements arranged thereon, the plurality of RF application elements being arranged in a cluster and being free of any ground electrode therebetween, wherein the at least one ground electrode and the plurality of RF application elements are configured for contacting epidermis of skin and wherein a total surface area of the at least one ground electrode is greater than a combined surface area of the RF application elements.

25. The skin treatment device of claim 24, wherein the at least one ground electrode includes a plurality of elongated ground electrodes arranged on the applicator tip in a manner at least partially surrounding the RF application elements.

26. The skin treatment device of claim 25, wherein a total of at least four ground electrodes are arranged about the plurality of the RF application elements.

27. The skin treatment device of claim 24, wherein the plurality of RF application elements include at least 64 RF application elements.

28. The skin treatment device of claim 24, further comprising a circuit through which RF energy is delivered to the RF application elements, and wherein the circuit includes an isolating transformer configured to reduce ground currents.

29. The skin treatment device of claim 28, wherein the circuit includes a capacitor serially connected between the isolating transformer and the plurality of RF application elements.

30. The skin treatment device of claim 24, further comprising a circuit through which RF energy is delivered to the plurality of RF application elements, and wherein the circuit includes an RF energy absorbing element configured to limit an amount of current flowing into skin.

* * * * *

US009108036B2

(12) **United States Patent**
**Adanny et al.**

(10) **Patent No.: US 9,108,036 B2**
(45) **Date of Patent: *Aug. 18, 2015**

(54) **METHOD AND APPARATUS FOR FRACTIONAL SKIN TREATMENT**

(71) Applicant: **SYNERON MEDICAL LTD.**, Yoqneam Illit (IL)

(72) Inventors: **Yossef Ori Adanny**, Mitzpe (IL); **Genady Nahshon**, Binyamina (IL); **Baruch Levine**, Afula (IL); **Avner Rosenberg**, Beit-Shearim (IL)

(73) Assignee: **SYNERON MEDICAL LTD.**, Yoqneam Illit (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/305,080**

(22) Filed: **Jun. 16, 2014**

(65) **Prior Publication Data**

US 2014/0296852 A1 Oct. 2, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/400,434, filed on Feb. 20, 2012, which is a continuation of application No. 12/505,576, filed on Jul. 20, 2009, now Pat. No. 8,357,150.

(51) **Int. Cl.**

| | |
|---|---|
| ***A61B 18/14*** | (2006.01) |
| ***A61N 5/00*** | (2006.01) |
| ***A61B 18/12*** | (2006.01) |
| ***A61B 18/18*** | (2006.01) |
| *A61B 18/00* | (2006.01) |

(52) **U.S. Cl.**

CPC .............. ***A61N 5/00*** (2013.01); ***A61B 18/1233*** (2013.01); ***A61B 18/14*** (2013.01); ***A61B 18/18*** (2013.01); *A61B 2018/0047* (2013.01); *A61B 2018/00452* (2013.01); *A61B 2018/00577* (2013.01); *A61B 2018/00589* (2013.01); *A61B 2018/00642* (2013.01); *A61B 2018/00702* (2013.01); *A61B 2018/00827* (2013.01); *A61B 2018/00875* (2013.01); *A61B 2018/1467* (2013.01)

(58) **Field of Classification Search**

USPC .......................................... 606/32–35, 41–50

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,200,104 A * | 4/1980 | Harris | ............................ | 606/35 |
| 4,844,063 A | 7/1989 | Clark | | |
| 5,319,363 A | 6/1994 | Welch et al. | | |
| 5,383,874 A | 1/1995 | Jackson et al. | | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0569670 A2 | 11/1993 |
| EP | 1852060 A1 | 11/2007 |

OTHER PUBLICATIONS

Guidelines for Limiting Exposure to Time-Varying Electric, Magnetic, and Electromagnetic Fields (Up to 300 GHz), International Commission on Non-Ionizing Radiation Protection, ICNIRP Guidelines, Apr. 1998, vol. 74, No. 4, pp. 496-522.

*Primary Examiner* — Michael Peffley

(74) *Attorney, Agent, or Firm* — Finnegan, Henderson, Farabow, Garrett & Dunner LLP

(57) **ABSTRACT**

An apparatus for cosmetic RF skin treatment where the RF energy supply is isolated from the patient treated, such that in course of treatment no undesired current flows through the subject body.

**28 Claims, 7 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 5,681,282 | A | 10/1997 | Eggers et al. | |
| 5,755,753 | A | 5/1998 | Knowlton | |
| 5,873,855 | A | 2/1999 | Eggers et al. | |
| 6,024,733 | A * | 2/2000 | Eggers et al. | 604/500 |
| 6,148,232 | A | 11/2000 | Avrahami | |
| 6,413,255 | B1 | 7/2002 | Stern | |
| 6,440,121 | B1 | 8/2002 | Weber et al. | |
| 6,597,946 | B2 | 7/2003 | Avrahami et al. | |
| 6,611,706 | B2 | 8/2003 | Avrahami et al. | |
| 6,702,808 | B1 | 3/2004 | Kreindel | |
| 6,708,060 | B1 | 3/2004 | Avrahami et al. | |
| 7,022,121 | B2 | 4/2006 | Stern et al. | |
| 7,164,942 | B2 | 1/2007 | Avrahami et al. | |
| 7,435,247 | B2 | 10/2008 | Woloszko et al. | |
| 7,494,488 | B2 | 2/2009 | Weber | |
| 8,216,215 | B2 | 7/2012 | Flyash et al. | |
| 2004/0210214 | A1 * | 10/2004 | Knowlton | 606/41 |
| 2007/0191827 | A1 * | 8/2007 | Lischinsky et al. | 606/34 |
| 2008/0188846 | A1 * | 8/2008 | Palanker et al. | 606/32 |
| 2008/0214988 | A1 | 9/2008 | Altshuler et al. | |
| 2009/0054743 | A1 | 2/2009 | Stewart | |
| 2009/0105706 | A1 | 4/2009 | Livneh | |
| 2010/0198216 | A1 * | 8/2010 | Palanker | 606/41 |

* cited by examiner




Fig. 1A




Fig. 1B




Fig. 2




Fig. 3A




Fig. 3B




Fig. 3C



200
408
212
320, 324
224
420
424
404
216
412
432
204


Fig. 4



200
408
212
502
320, 324
224
216
420
424
404
504
412
432
204


Fig. 5


Subject resistance
2400
2100
1800
1500
1200
900
600
300
602
610
606
614
Time

Fig. 6




Fig. 7




Fig. 8

# METHOD AND APPARATUS FOR FRACTIONAL SKIN TREATMENT

## CROSS-REFERENCE TO RELATED REFERENCES

This application is a continuation of U.S. application Ser. No. 13/400,434, filed on Feb. 20, 2012, which is a continuation of U.S. application Ser. No. 12/505,576, filed on Jul. 20, 2009, now issued as U.S. Pat. No. 8,357,150. The contents of these priority applications are incorporated herein by reference. This application is related to U.S. application Ser. No. 12/324,932, filed Nov. 28, 2008, now issued as U.S. Pat. No. 8,216,215, which is incorporated herein by reference.

## TECHNOLOGY FIELD

The method and apparatus generally relate to skin treatment procedures and in particular to cosmetic skin resurfacing and rejuvenation procedures.

## BACKGROUND

Fractional skin resurfacing or rejuvenation is a recently developed skin ablative technology. There are two types of devices used to ablate the skin: laser based devices and RF based devices. Both types of these devices ablate a pattern of extremely small diameter shallow holes or zones. The holes are microscopically small treatment zones surrounded by untreated skin areas. The treatment results in a very rapid healing or recovery and skin resurfacing of the treated. In the healing process of the treated zones, a layer of new skin appears, restoring a fresh, youthful complexion.

The pattern of small holes is typically produced by an X-Y scanning laser beam or by application of RF energy or voltage. The laser is focused on the skin and usually operates in pulse mode ablating micron size holes in the skin.

RF based fractional skin treatment produces a scanning pattern of micron size holes in the skin a similar to laser. Typically, the energy is delivered to the skin by an applicator equipped by a tip having a plurality of voltage to skin applying/delivering elements or contact elements arranged in a matrix or in an array. The voltage to skin applying elements are placed in contact with the segment of the skin to be treated and driven by a source of suitable power and frequency RF energy. Application of a high voltage RF pulse to the electrodes ablates the skin under the respective electrode forming a small hole.

In some instances application of laser or RF voltage pulses causes discomfort and even pain to the treated subject, although the experience based on the individual and as such, the pain sensation may be different from subject to subject. In other instances there may be a difference in the size of micro holes formed by the applicator at the same treatment session. Healing of larger size holes may take a longer period of time than the healing process for smaller size holes and in some instances, the larger holes may tend to result in causing damage to the skin rather than producing the desired skin effect.

In order to soften the discomfort and lessen the pain and other side effects associated with the fractional treatment, practitioners have started using topically applied lidocaine cream or even oral sedation.

Fractional skin treatment is applicable in the correction of almost all cosmetic skin defects such as signs of aging, wrinkles, discolorations, acne scars, tatoo removal, and other skin defects. The cost of the RF based products is lower than that of the products operating with laser radiation and they



will most probably become widely used if the discomfort and occasional pain associated with their use could be eliminated.

US Patent Application Publication No. 2006/0047281 and U.S. patent application Ser. No. 12/324,932 to the same assignee disclose RF based products such as eMatrix™ suitable for fractional skin treatment.

## GLOSSARY

In the context of the present disclosure "RF voltage" and "RF energy" are used interchangeably and have the same meaning. The mathematical relationship between these two parameters is well known and knowledge of one of them allows easy determination of the other.

In the context of the present disclosure "skin resistance" and "skin impedance" are used interchangeably and have the same meaning. The mathematical relation between these two parameters is well known and knowledge of one of them allows easy determination of the other.

The term "desired skin effect" as used in the present disclosure means a result of RF energy application, which may be wrinkle removal, hair removal, collagen shrinking or destruction, skin rejuvenation, and other cosmetic and skin treatments.

The term "plateau" of a function is a part of its domain where the function has constant value.

## BRIEF SUMMARY

An apparatus for cosmetic RF skin treatment where the RF energy supply is isolated from the subject treated, such that in course of treatment no undesired current flows through the subject body. The apparatus includes an applicator with a tip that is populated by a plurality of voltage applying dome shaped elements protruding from the tip surface and organized in one common cluster and a cluster of electrodes bounding the dome shaped elements and having an area larger than the dome shaped elements have. The apparatus applies voltage to the elements with a magnitude sufficient to cause a desired skin effect. A current limiter limits the RF induced current thereby preventing skin damage. The apparatus continuously senses the treated skin segment impedance and varies the RF energy at a low skin impedance and/or stops the pulse in cases of too low or too high skin impedance.

## BRIEF DESCRIPTION OF THE FIGURES

FIGS. **1**A and **1**B, collectively referred to as FIG. **1**, are schematic illustrations of a prior art RF applicator tip for fractional skin treatment.

FIG. **2** is a schematic illustration of a prior art RF voltage supplying circuit for driving the RF applicator tip for fractional skin treatment.

FIGS. **3**A through **3**C are schematic illustrations of an equivalent electric circuit of the tip for fractional skin treatment.

FIG. **4** is a schematic illustration of an exemplary embodiment of the present tip for fractional skin treatment driving circuit.

FIG. **5** is a schematic illustration of another exemplary embodiment of the present tip for fractional skin treatment driving circuit.

FIG. **6** is a schematic illustration of skin resistance variation under the application of an RF energy pulse.

FIG. **7** is a schematic illustration of an exemplary embodiment of the present tip for fractional skin treatment control circuit.

FIG. **8** is a schematic illustration of an exemplary embodiment of the present RF applicator tip for fractional skin treatment.

## DETAILED DESCRIPTION OF EXEMPLARY EMBODIMENTS

The principles and execution of the method and the apparatus may be better understood with reference to the drawings and the accompanying description of the non-limiting, exemplary embodiments, shown in the Figures.

Reference is made to FIG. **1**, which is a schematic illustration of a prior art RF applicator tip for fractional skin treatment disclosed in the U.S. patent application Ser. No. 12/324,932 to the same assignee. A carrier **100** on which voltage to skin delivering elements or contact elements are formed may be a flexible or rigid article made of a polyimide film or similar material, with an exemplary thickness range of 0.5 mil to 6 mil (12.5 micron to 150 micron). The term "carrier" in the context of the present disclosure means a substrate having an array of voltage to skin application elements, a two dimensional array or matrix of voltage to skin application elements. Substrate **104** has on one of its surfaces **112** an array or matrix of miniature (microscopic), discrete, voltage to skin application elements **116** protruding from surface **112** and terminated by dome type shapes **120**. A pattern of conductors **124** and **128** shown in broken lines arranged on the back or second side of substrate **104** enables addressing of all elements **116**, a cluster of elements **116**, or each of elements **116** individually. Carrier **100**, having formed on it, the voltage to skin delivering elements is configured to allow quick attachment to an applicator and will be termed in the present document as a "tip" or an "applicator tip." An arrangement of RF contacts enabling connection to a source of radio frequency voltage is provided by forming on the back side of the carrier **104** contact points or strips **108** communicating with respective contact arrangements made in substrate **104**. Voltage to skin delivering elements **116** are arranged in a symmetric pattern with all even rows **124** connected to one of the RF supply contact strips or ports **124** and all uneven rows **128** connected to another or second contact strip or RF supply port **128**.

FIG. **2** is a schematic illustration of a prior art RF voltage supplying circuit for driving the RF applicator tip for fractional skin treatment. A source of RF voltage **200** may be located in stand alone housing **204**. Alternatively, the source of the RF voltage may be located in the applicator case **208** shown in broken lines. The source provides RF voltage to applicator tip **212**, and in particular to voltage to skin delivering elements **216** through a shielded harness **220**. Shield **224** is schematically shown in broken and doted lines. The length of the harness **220** is selected to enable convenient caregiver operation and may be one to two meters long, for example. There exists a certain parasitic capacitance **232** and **236** between the shield **224** and each of the RF current conducting lines **240** and **244**. The treated subject has also certain capacitance **248**. For skin treatment, tip **212** is placed in contact with a segment of the skin **228** to be treated. As a result of uneven contact of the voltage to skin delivering elements **216** organized into even **124** and uneven **128** rows or clusters with segment of the skin **228** to be treated, an undesired RF current path **252** may be formed. This current passes through the subject **228** and may cause a painful sensation and even an electric shock to the subject.

FIG. **3** is a schematic illustration of an equivalent electric circuit of the tip for fractional skin treatment **212** being in contact with the treated segment of the skin. FIG. **3**A schematically shows the tip **212** with all contact elements **330** located in uneven rows **1**, **3**, **5**, and **7** of the tip **212** collectively marked as **302** and shown as connected to a first RF port of RF voltage source **306** and all contact elements located in even rows **2**, **4**, **6**, and **8** collectively marked as **310** and shown as connected to a second RF port of RF voltage source **306**. All of the contact elements are in contact with the upper skin layer **320** for example, stratum corneum which has a relatively low conductivity, where numeral **324** marks dermis layer and even deeper skin layers that have a relatively high, as compared to stratum corneum, conductivity.

Referring to FIG. **3**B, the electrical channel from each contact element through the low conductance skin layer is represented as a resistor (for the simplicity of the explanation channel capacitance is neglected). The high conductivity dermis is represented as a common resistor Rs. Further equivalent electric scheme simplification is shown in FIG. **3**C, where all uneven resistors have been replaced by an equivalent resistor Ru and even rows resistors by Re. Typically, each of the individual contact element resistors is 50K-100K Ohms, therefore Ru and Re are about 2K Ohms each, whereas Rs is an order of magnitude smaller, about 200 Ohms and it can be neglected for the purpose of the discussion.

Because not all of the voltage to skin delivering elements or contact elements **330** (FIG. **3**A) may be properly attached to the skin and some of them may bear some dirt and other residuals from the previous treatment, and different skin segments may have different resistance, there is a difference in the resistance to current passing through each of the contact elements and accordingly through the clusters (even or uneven clusters) they form. If the RF voltage or energy flows into any of the Ru or Re resistors, it increases its resistance it generates a positive feedback under which the larger resistor gets more energy than the smaller one, its resistance increases more rapidly, therefore it gets even more energy, and so on. The end result is that the one of Ru or Re clusters, which had initially greater value finally takes most of the energy and leaves a different imprint on the skin (for example, only contact elements located in even or uneven rows may leave an imprint). This reduces the efficacy of the treatment and generates undesired skin effects, excessive pain, and even electric shock.

In order to resolve this problem, as disclosed in the U.S. patent application Ser. No. 12/324,932 assigned to the same assignee, it is possible to address individually each contact element or pin and connect it to the source of voltage through a large impedance, which can be a resistor, a small capacitor, a large inductor, or a combinations of all of them. This would stabilize the RF induced current to each individual channel reducing the "competition" between the contact elements and clusters of contact elements. For sterilization and hygiene purposes use of disposable tips is preferred to the use of reusable tips. Addressing of each individual contact element however, complicates and increases manufacturing cost of such tips.

Another way to equalize the resistance or impedance of each contact element and reduce the pain sensation and potential electric shocks to the treated subject is to bring the skin by some initial treatment to an optimal and more uniform resistance value, which for example may be about 3000 Ohms. There will always be however, segments of skin where the resistance is low and any slight sweating may drive the skin to lower impedances.

FIG. **4** is a schematic illustration of an exemplary embodiment of the present tip driving circuit. The embodiment of FIG. **4** eliminates or at least, greatly reduces the pain sensation and electric shock that could affect the treated subject. A low capacitance for example, 4 pF to 10 pF isolating trans-

former **404** is located in close proximity to the tip **212** with the voltage to skin delivering elements **216**. In the course of operation, transformer **404** reduces or completely eliminates currents flowing through the subject body due to parasitic capacitances **408** and **412** formed by the subject skin **320**, **324** and the ground and between the shield **224** and each of the RF conducting lines **420** and **424**. A controller **432** governing operation of all of the apparatus devices may be located in housing **204**. Controller **432** may have a processor, a memory, and other devices necessary for controlling the treatment process.

FIG. **5** is a schematic illustration of an additional exemplary embodiment of the present tip **212** driving circuit that eliminates, or greatly reduces, pain sensation and electric shock that could affect the treated subject. In addition to the low capacitance transformer **404** one or more capacitors **502** and **504** located in the current path and connected in series to the electrodes **216** form a high pass filter. In the course of apparatus operation, the high pass filter filters out the low frequency currents, to which the sensitivity of the treated subject is high, generated by plasma formed at the voltage to skin delivering elements **216** being in contact with the skin **320**, **324** and flowing through the subject body in course of the apparatus/applicator operation. (reference can be made to Guidelines for Limiting Exposure to Time-Varying Electric, Magnetic, and Electromagnetic Fields up to 300 GHz; International Commission on Non-Ionizing Radiation Protection, Page 10.

Electrical resistance of skin differs from subject to subject and complicates proper RF energy value selection and application of the RF energy for cosmetic skin treatment. Further to this, resistance of the subject may vary under application of RF energy. FIG. **6** is a schematic illustration of skin resistance variation under the application of RF energy in a pulse mode. Lines **602** and **606** mark different skin behavior under an RF energy pulse and lines **610** and **614** mark the upper and lower skin resistance or impedance values that result in a desired skin effect, although because of the large variability of the treated subjects skin properties, there may be a need to set experimentally other values matching a particular subject properties. The length of the pulse, as will be explained later, may vary from few milliseconds to hundreds of milliseconds or even seconds.

In order to establish proper treatment parameters prior to the treatment, a system operator or user can calibrate the apparatus and operational treatment parameters derived as a result of the calibration are loaded into a look-up-table (LUT) that may be stored in the memory of the controller **432**. For the purpose of calibration, a known variable resistance modeling the subject and the tip behavior is connected instead of a subject to the RF voltage supply. In one of the calibrations, a current flowing in the circuit at different RF voltages and different resistance value is recorded and in another calibration the RF energy applied to the variable resistance, modeling different skin impedance is recorded.

When skin is wet its resistance is low and with the application of the RF energy it continues to fall (line **606**). Without being bound by a specific theory it is believed that most of the RF energy applied to the skin is initially wasted to dry the skin and when the skin under the influence of RF energy becomes dry, the skin resistance begins growing to higher values. Resistance increase is believed to be connected with vaporization, accompanied or followed by tissue ablation. It is considered a good treatment (desired skin effect) when ablation is created in the tissue below the electrodes.

It has been experimentally established that treatment resulting in a desired skin effect takes place when the resistance of the subject's skin is between Rlow and Rhigh, where the specific values depend on the number of electrodes in the tip and their arrangement and on the skin properties. For a typical tip shown in FIG. **1**, with **64** electrodes and a diameter of 250 μm each, Rlow is about 1500 Ohms and Rhigh is about 4000 Ohms. For the asymmetrical tip of FIG. **8**, Rlow is about 600 Ohms and Rhigh is about 1600 Ohms. When the skin resistance (or impedance) falls below the lower limit, most of the RF energy applied to the skin is wasted on drying the skin and not on causing the desired skin effect. Generally, the upper skin resistance limit is in the vicinity of the stratum corneum resistance with the lower limit corresponding to wet skin. When the skin resistance is within the indicated resistance limits, as shown by broken lines **610** and **614**, application of RF to the skin through the voltage to skin delivering elements results in a desired skin effect. Continuous or pseudo continuous monitoring of the skin impedance during the RF pulse enables control of the energy delivered to skin. For example, when the resistance falls below the pre-set threshold of e.g. 600 Ohms, the time of the RF pulse may be increased by the control, until the control unit identifies or detects the beginning of an increase in the resistance. From the time that the beginning of the resistance increase is detected, the amount of energy delivered is either fixed or it takes into consideration the energy delivered up to that point, thereby allowing or ensuring the proper skin effect. It is also possible to cut off the RF pulses when the skin impedance is below a pre-set impedance or resistance value and notify operator, to exclude inefficient pulses. Another possibility is to notifying the operator on the low value of skin resistance and the need to dry out the skin. It is also possible to set the apparatus to deliver a pre-set amount of energy to the skin.

It is possible to generalize the skin behavior under an RF pulse into at least two typical cases, although a mixture of these cases and other skin behavior may be present: a) skin resistance remains high through all of the RF pulse application time and b) skin resistance drops down below the lower resistance limit and after it reaches (the function reaches) a plateau it begins to rise. Accordingly, by monitoring the current flowing in the voltage to skin delivering elements circuit, it is possible to set proper treatment parameters resulting in a desired skin effect and not causing adverse side effects such as pain, burnings and other. It was found that resistances above Rhigh correspond to dirty tip and/or are caused by improper attachment of the tip to the skin. In both cases, the pulses may cause undesired pain. In order to reduce the pain, current limiter **704** (FIG. **7**) or a control system immediately cuts the pulse when the resistance is above a certain pre-set threshold. The control will notify the operator to check proper attachment of the tip to skin and/or clean the tip.

FIG. **7** is a schematic illustration of another exemplary embodiment of the present tip for fractional skin treatment driving circuit that eliminates pain sensation and electric shock that could affect the treated subject. A sensing element **700** senses the current flowing in the immediate to the tip for fractional skin treatment circuit. The sensing and sampling may be continuous or performed at very short time intervals, for example every few tens of a microsecond. A fast response RF induced current limiter **704** in course of operation sets a maximum to the current which flows into the skin. Immediately, with the current increase above a pre-set value, it operates a fast switch **708** that closes the circuit directing the current to an energy absorbing element **712**, which dissipates the excessive energy as heat. The RF energy absorbing element **712** may be packaged or even be a part of current limiter **704**. The switch may be a bi-polar transistor, a MOSFET switch, an IGBT switch or any other fast switch. If the switch

is operated in the analogue regime, it can stabilize the current to the pre-set maximum value or below that value. The energy absorbing element **712** may be a bank of resistors, bridge of diodes or similar devices. This protects the subject from electric shock, skin burn, and other potential treatment side effects.

FIG. **1** illustrates a prior art tip, which is basically a symmetrical tip including even and uneven arrays of electrodes. FIG. **8** is a schematic illustration of an exemplary embodiment of the present RF applicator tip for fractional skin treatment that eliminates or significantly reduces the "competition" between the tip electrodes. Although the tip **800** is for a bi-polar treatment, it is an asymmetrical tip. Tip **800** has one or more (a cluster) large "ground" electrodes **804** located in the peripheral area of substrate **808** and connected to one RF output port. All of the miniature discrete, voltage to skin application elements **812** protruding from the substrate surface and terminated by dome type shapes are connected together to the other port of the RF output transformer. The particular tip has 64 elements, although other designs with different number of elements are possible. The further advantage of this solution is that the resistance variations may be more obvious since there is no competition between the electrodes located in the even and uneven contact strips, thus preventing the undesired partial imprint on the skin and the accompanied pain. The area of the voltage to skin application elements **804** is substantially larger than the area of the terminated by dome type shapes elements **812**. Tip **800** possesses a mechanism **820** enabling quick removal and attachment of the tip to the applicator and RF voltage connection elements (not shown).

The electric scheme and the tip structure disclosed above eliminate electrical shock feeling, reduce or eliminate the pain associated with the treatment and increase the treatment efficacy. The isolating transformer is located very close to the application tip to reduce ground currents through parasitic capacitance. Series capacitors located in the path to the electrodes filter out low frequency currents which are produced by plasma formed at the electrodes and fast current limiter sets a maximum to the current which flows into the skin.

Typical operating parameters of the apparatus are:

Voltage on high impedance load: 850 Vp-p

Current: 50-400 mA

Pulse length: 10-150 msec

Energy per pulse (Actual energy delivered to the skin): 0.5-4 J, more typical 1-2 J.

Frequency of the RF: 1 MHz, although 100 kHz up to 10 MHz may be considered.

Typical control parameters for the asymmetrical tip, 64 pins, 250 microns each:

High resistance limit for cutting of pulses for pain reduction: >1600 Ohms (for 64 pins asymmetrical tip)

Low resistance limit for cutting low efficiency pulses: <200 Ohms (for 64 pins asymmetrical tip)

Range of resistance where control adds energy to dry the skin: 200-600 Ohms (for 64 pins asymmetrical tip)

We claim:

**1**. A skin treatment device, comprising:

an applicator tip;

a plurality of electrodes configured for contacting a stratum corneum layer of skin external to a patient's body, the plurality of electrodes including:

a plurality of voltage to skin elements of a first size, arranged in a cluster, and being further configured for connection to a circuit for delivering RF energy to cause fractional skin treatment; and



a plurality of electrodes sized substantially larger than the first size and arranged at a periphery of the cluster and spaced from the cluster, and wherein the cluster of voltage to skin elements are free of any portion of the larger sized electrode therebetween.

**2**. The skin treatment device of claim **1**, wherein the plurality of voltage to skin elements are arranged in an array.

**3**. The skin treatment device of claim **1**, wherein the plurality of voltage to skin elements are arranged in a matrix.

**4**. The skin treatment device of claim **1** wherein the plurality of voltage to skin elements are microscopic.

**5**. The skin treatment device of claim **1**, wherein the plurality of voltage to skin elements protrude from the applicator tip.

**6**. The skin treatment device of claim **1**, wherein the cluster of voltage to skin elements is arranged between at least two of the larger sized electrodes.

**7**. The skin treatment device of claim **1**, wherein the plurality of larger electrodes are arranged on the applicator tip in a manner at least partially surrounding the cluster of voltage to skin elements.

**8**. The skin treatment device of claim **7**, wherein a total of at least four larger electrodes are arranged about the cluster of voltage to skin elements.

**9**. The skin treatment device of claim **1**, wherein the plurality of voltage to skin elements each have a domed shape.

**10**. The skin treatment device of claim **1**, wherein the plurality of voltage to skin elements of a first size are further configured for connection to a circuit for delivering RF energy and configured to generate RF pulses of a voltage sufficient to fractionally ablate skin under the voltage to skin elements.

**11**. The skin treatment device of claim **10**, wherein the plurality of voltage to skin elements of a first size are further configured for connection to a circuit configured to deliver RF pulses sufficient to form a small hole in the skin beneath each of the voltage to skin elements.

**12**. The skin treatment device of claim **1**, wherein the cluster includes at least 64 voltage to skin elements.

**13**. The skin treatment device of claim **1**, wherein the cluster of voltage to skin elements and the at least one larger electrode are arranged on a common substrate.

**14**. The skin treatment device of claim **1**, wherein the plurality of voltage to skin elements of a first size are further configured for connection to a circuit that includes an isolating transformer configured to reduce ground currents.

**15**. The skin treatment device of claim **14**, wherein the plurality of voltage to skin elements of a first size are further configured for connection to a circuit that further includes a capacitor serially connected between the isolating transformer and at least some of the voltage to skin elements.

**16**. The skin treatment device of claim **1**, wherein the tip is configured for cosmetic skin treatment and for removable attachment to a source of the RF energy.

**17**. The skin treatment device of claim **1**, wherein the plurality of voltage to skin elements of a first size are further configured for connection to a circuit that further includes an RF energy absorbing element configured to limit an amount of current flowing into skin.

**18**. The skin treatment device of claim **1**, wherein the plurality of voltage to skin elements are arranged in a generally rectangular shape.

**19**. The skin treatment device of claim **1**, wherein a diameter of each of the plurality of voltage to skin elements is on an order of 250 microns and configured to cause both coagulation and ablation of the skin.

**20**. The skin treatment device of claim **1**, wherein the at least one larger electrode is elongated and extends along at least a portion of a peripheral edge of the cluster of voltage to skin elements, with a gap between the elongated larger electrode and the peripheral edge of the cluster.

**21**. A skin treatment device, comprising:

a housing; and

at least one processor within the housing and configured to control RF energy supplied to a removable applicator tip having a plurality of electrodes configured for contacting a stratum corneum layer of skin external to a patient's body, the plurality of electrodes including:

a plurality of voltage to skin elements of a first size, arranged in a cluster, and being further configured for connection to a circuit for delivering RF energy to cause fractional skin treatment; and

a plurality of electrodes sized substantially larger than the first size and arranged at a periphery of the cluster and spaced from the cluster, and wherein the cluster of voltage to skin elements are free of any portion of the larger sized electrode therebetween;

wherein the at least one processor is configured to control RF energy in a manner such that energy is applied to the stratum corneum layer through the plurality of voltage to skin elements of the first size, and such that energy is collected from the stratum corneum on the at least one electrode sized substantially larger than the first size and arranged at a periphery of the cluster and spaced from the cluster.

**22**. The skin treatment device of claim **21**, wherein the cluster of voltage to skin elements is arranged between at least two of the larger sized electrodes.

**23**. The skin treatment device of claim **21**, wherein at least four larger electrodes are arranged about the periphery of the cluster.

**24**. The skin treatment device of claim **21**, wherein the plurality of voltage to skin elements include at least 64 voltage to skin elements.

**25**. The skin treatment device of claim **21**, wherein the circuit for delivering RF energy is configured to generate RE pulses of a voltage sufficient to fractionally ablate skin under the voltage to skin elements.

**26**. The skin treatment device of claim **21**, wherein the circuit is configured to deliver RF pulses sufficient to form a small hole in the skin beneath each of the voltage to skin elements.

**27**. The skin treatment device of claim **21**, wherein the removable applicator tip is configured for cosmetic skin treatment and for removable attachment to a source of the RF energy.

**28**. The skin treatment device of claim **21**, wherein the plurality of voltage to skin elements are arranged in a generally rectangular shape.

* * * * *

## CERTIFICATE OF SERVICE

I, **John J. Edmonds**, being duly sworn according to law and being over the age of 18, pursuant to Federal Rule of Appellate Procedure 25(d) and Federal Circuit Rule 25(e), upon my oath depose and say that:

On January 28, 2019, pursuant to Federal Rules of Appellate Procedure 25 and 31 and Federal Circuit Rules 25 and 31, a copy of the foregoing Corrected Opening Brief of Plaintiff-Appellant was filed electronically with the Clerk of the Court using the CM/ECF System, which will serve via electronic mail notice of such filing to all counsel registered as CM/ECF users.

Upon acceptance by the Court of the electronically filed document and issuance of a notice requesting paper copies, and pursuant to Federal Circuit Rules 25(c)(1)(A) and 31(b), six paper copies will be filed with the Court via courier within five (5) business days, or as otherwise provided by this Court's Rules and Orders.

Dated: January 28, 2019

/s/ *John J. Edmonds*
John J. Edmonds

COLLINS, EDMONDS &
SCHLATHER, PLLC

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME, TYPEFACE, AND TYPE STYLE REQUIREMENTS/LIMITATIONS

1. Pursuant to Federal Rule of Appellate Procedure 32(g), Syneron, by and through its undersigned counsel, hereby respectfully certifies this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) and Federal Circuit Rule 32(a), because it contains 13,887 words based on the word count of the word-processing system used to prepare the document, Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the spacing and margin requirements of Federal Rule of Appellate Procedure 32(a)(4), the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14 Point Times New Roman in double-spaced spacing with one (1) inch margins on all four sides.

Dated: January 28, 2019

/s/ *John J. Edmonds*
John J. Edmonds

COLLINS, EDMONDS &
SCHLATHER, PLLC